1
2
3
4
5
6
7
8            IN THE UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DAVID ALLEN RUNDLE,

11          Petitioner,              No. 2:08-cv-01879 TLN KJN

12      vs.                          DEATH PENALTY CASE

13   WARDEN,
      San Quentin State Prison,
14
            Respondent.             FINDINGS & RECOMMENDATIONS
15
     _____/
16

17          Petitioner is a state prisoner under sentence of death.  He seeks relief pursuant to

18   28 U.S.C. § 2254.  The parties have briefed the application of 28 U.S.C. § 2254(d) to each claim

19   in the petition.  In addition, petitioner moves for an evidentiary hearing on Claims A, B, C, and

20   D.  After careful consideration of the parties' briefs and of the state court record, this court

21   concludes that petitioner has failed to satisfy the requirements of section 2254(d) and

22   recommends the petition be denied.

23   ////

24   ////

25   ////

26   ////

1

BACKGROUND FACTS[1]

I. Introduction

In November of 1986, the bodies of two young women, Caroline Garcia, 18 years of age, and Lanciann Sorensen, 15 years of age, were found in rural areas of Placer County. The bodies were unclothed and the arms of both victims were bound tightly behind their backs. Both bodies were badly decomposed, such that the causes of death could not be authoritatively established, nor was there definitive remaining evidence that the victims had been sexually assaulted. Despite his earlier denials of any involvement in the murders, defendant, who was 21 years of age at the time, confessed to the authorities that he had sexual relations with the victims and killed them by strangulation. At trial, defendant testified he had killed the women in fits of rage induced by the victims' behavior, but did not decide to engage in sexual activities with them until after they were dead. The evidence presented by the defense suggested that defendant's rage was the result of psychological problems arising from the incestuous sexual abuse inflicted upon him as a child by his mother, his mother's extensive history of engaging in other inappropriate sexual behavior (such as exhibitionism and having numerous extramarital affairs) which was common knowledge in the small towns where defendant and his family resided, and the general difficulties defendant had with his family.

The jury deliberated for less than a full court day before returning guilty verdicts and true findings on all charges and allegations.

At the penalty phase, the prosecution presented evidence of an earlier similar murder of a third woman in Sacramento, whose body was found unclothed in a wooded area near the Sacramento River with her arms tied behind her back, and who had been raped and strangled to death. Defendant confessed to this murder during the investigation of the Garcia and Sorensen killings. The evidence also established that defendant committed three sexual assaults against other children when he was 14 years of age, for which he was subjected to juvenile delinquency proceedings. Defendant's ex-wife testified that he physically and sexually abused her during their marriage. The defense presented further evidence of defendant's mental state, his family and employment background, and his good behavior while incarcerated following his arrest for the charged offenses.

////

---

[1] This is the recitation of the facts set out by the California Supreme Court. People v. Rundle, 43 Cal. 4th 76, 91-108 (2008).

1    The jury deliberated further for less than a full court day
2    before returning a verdict of death.

3    II. Guilt Phase

4        A. Prosecution Evidence

5        At approximately 3:00 p.m. on Sunday, September 7, 1986,
     Caroline Garcia left her home in Roseville. She planned to go to
6    the bus station to take a bus to Colfax, where she planned to visit
     her husband Trinidad Garcia, from whom she was separated. She
7    was wearing a black skirt and a red jacket. Trinidad saw Caroline
     at a park in Colfax sometime near 9:00 p.m. She told him she was
8    going to the house of Chris Paoli, a friend who lived in Colfax. She
     also called Kim Manzano, who lived with Garcia in Roseville, and
9    told Manzano she was going to Paoli's house and was planning to
     take a bus back to Roseville that night and would be home at
10   approximately 1:00 a.m.

11       After arriving at Paoli's house, Garcia told Paoli a drunk
     man had bothered her earlier that evening, but another person had
12   intervened on her behalf. She said she expected that person to
     come to Paoli's house to drive her back to the bus station. At
13   approximately 10:45 p.m., defendant arrived in his car and Garcia
     left with him.

14
         No one, other than defendant, reported seeing Garcia alive
15   again.

16       On Monday, September 8, 1986, the day after Garcia
     disappeared, a motorist reported finding discarded clothing near a
17   turnout on Interstate Highway 80 between Weimar Cross Road and
     Colfax. A California Highway Patrol officer responded to the scene
18   and found a dark-colored denim skirt, a pair of black and purple
     women's panties, and a blue and white striped blanket that
19   appeared to have a spot of blood and mucus on it. The area later
     was searched, but no other item of significance was found.
20
         On September 16, 1986, another motorist reported finding a
21   red blazer, a purse, and a wallet containing Garcia's identification
     near a railroad crossing on Carpenter Road, a secluded area
22   approximately two miles from Chris Paoli's house in Colfax and
     six miles by road from where the skirt, underwear, and blanket had
23   been found. Inside the purse was a bus ticket issued on September
     7, 1986, for travel from Colfax to Roseville, a pipe commonly used
24   to smoke marijuana, and an unopened package containing a
     condom. An extensive search of the area the next day failed to
25   disclose any other evidence.

26   ////

3

At trial, Kim Manzano testified that on September 7, 1986, Garcia was wearing the skirt, blouse, and jacket that were found. Manzano also identified the purse as the one Garcia took with her that day, and the panties as a pair Garcia had purchased the day before when she and Manzano were shopping. Defendant's mother testified she had given defendant the blanket in May 1986 and that it did not have any red stains on it when she gave it to him.

Criminalist James Streeter examined the clothes and the blanket. He testified the clothing did not appear to be ripped or torn in any way, and was not stained with blood or any other bodily fluid. The blanket showed several bloodstained areas, in which there was a mixture of blood and a mucous material, most likely saliva, but no semen or seminal fluid. Based upon a comparison of the blood on the blanket and blood samples from Garcia's parents, it was determined that the blood on the blanket was consistent with Garcia's blood type.

In September 1986, defendant was employed as a general laborer by George Willson, a carpenter. The work involved physical labor, and defendant was strong for his size. Defendant did not show up for work on September 8 or 9, the days following Garcia's disappearance.

On September 8, 1986, defendant told his ex-girlfriend Heather Smith that the authorities had been speaking with him about Garcia, and that they appeared to believe he had killed her. On the following day, defendant told his friend James Sciacca that he (defendant) was the number one suspect in Garcia's disappearance because he was the last person seen with her. Defendant also had a chance meeting with Trinidad Garcia in Colfax on that day. Defendant mentioned he had given her a ride to the bus station the night she had disappeared. Trinidad insisted defendant go to the police to make a report, which defendant did. Defendant told the officers he had given Caroline Garcia a ride to the bus station, and had dropped her off after she declined his offer to wait with her. Defendant also said that on the way to the station they had seen the drunk man who had harassed Garcia earlier that day, but Garcia said she would go to the nearby gas station if there was any trouble.

Several days after Garcia's disappearance, defendant and Sciacca went to a carwash, where defendant cleaned and vacuumed the interior of defendant's car.

Defendant had two more interviews with the authorities, on September 11 and October 21, 1986, during which he provided essentially the same statement of events as above, except for adding that on the way to the bus station, they had stopped and smoked a small amount of marijuana Garcia had with her, and that defendant had asked Garcia to have coffee with him but she

4

declined. Defendant denied he had anything to do with Garcia's disappearance or had given her his blanket, and maintained he returned to the trailer where he was staying after dropping Garcia off that night. Defendant said a person named Bob who was staying at the trailer could verify that defendant had returned there that night, but defendant could not find Bob. He also told the officers "things had heated up" for him in Colfax because people thought he was involved in Garcia's disappearance, and therefore he was avoiding the Colfax area.

On September 15 or 16, 1986, George Willson mentioned to defendant he had seen a search party looking for the "missing girl." Defendant told Willson the authorities would not find anything, because they were "stupid," adding they no longer were interested in him as a suspect in Garcia's disappearance because someone else had been seen with her at the bus station and officers had found blood at her husband's apartment. Defendant also said Garcia was a "slut" and a "sleep around," as were most of the girls in Colfax.

On the evening of Thursday, October 10, 1986, Lanciann Sorensen and her friend Laura Yowell were at a friend's house in Roseville, where they each consumed a beer. Later, they went to Yowell's sister's house, also in Roseville. Sorensen left alone sometime between 9:00 and 10:00 p.m., stating she was planning to hitchhike back to her mother's house in Auburn. At approximately 10:00 p.m., Sorensen called her boyfriend, Matthew Sklansky, and said she was in a telephone booth near the freeway in Loomis. Sorensen sounded intoxicated, and told Sklansky she had been drinking alcohol and smoking marijuana. She said she was with a person she met that day named Dave, who lived in Colfax and with whom she had been hitchhiking. Sklansky had told Sorensen he wanted to see her that night, and Sorensen agreed to come to his house when she arrived back in Auburn, but also told him they could not have sexual intercourse because she was menstruating. Sorensen and Sklansky twice before had engaged in sexual intercourse together. Their conversation ended when Sorensen said she should go because Dave was bored. Sorensen also called her mother at approximately 10:15 p.m. and said she was making her way home.

No one reported talking to or seeing Sorensen alive after this telephone call. Her mother reported her missing on Monday, October 13, 1986.

In mid-October Willson observed that defendant was not his usual energetic and well-groomed self. Eventually, on October 17, 1986, Willson noticed defendant was distracted and unable to complete a simple project. Defendant told Willson that "violence is golden." Willson sent defendant home for the day, and defendant did not work for Willson again, despite a well-paying assignment

that was to start soon thereafter.

At the October 21, 1986 interview, defendant also was asked about Sorensen's disappearance. He denied ever having met her, stating he had worked in Roseville on October 10, the day Sorensen disappeared, and had spent the evening in Colfax with James Sciacca, a friend. Sciacca testified, however, that he had breakfast with defendant on October 11, 1986, and defendant told him that the previous day he had traveled to Sacramento where he had sexual relations with a prostitute, and then hitchhiked back, receiving a ride from a newspaper delivery man.

After the interview on October 21, 1986, Sciacca drove defendant to Reno, Nevada. Defendant told Sciacca he had spoken to the officers earlier that day about Garcia's disappearance, and asked Sciacca whether he knew how defendant could secure identification in order to assume a new identity.

On November 7, 1986, a motorist traveling on Interstate Highway 80 stopped at the Loomis exit to let his dog out and saw what appeared to be a human body in a culvert off the road. Because he was afraid, the motorist waited several days to report the sighting. Thereafter, on November 14, 1986, officers went to that location and found Sorensen's body mostly covered with dirt and weeds in a culvert approximately six feet below the level of the road. Her body was completely nude, and her hands were tied behind her back with a pair of pants. The officers also found a blouse and a purse in the area. Sorensen's mother identified the pants, blouse, and purse as belonging to Sorensen.

The pathologist who conducted the autopsy testified Sorensen was slightly over five feet tall and weighed approximately 110 pounds. Because of the advanced decomposition of her body, the pathologist was unable to determine conclusively the cause of death, although a likely cause, in his opinion, was asphyxiation, secondary to strangulation, based upon hemorrhages and damage to muscle and cartilage in the neck area. The decomposition also prevented the pathologist from rendering an opinion whether Sorensen had been raped or whether sperm or other foreign bodily fluids might have been present at the time of her death.

The authorities obtained a warrant for defendant's arrest for the murder of Garcia. On November 20, 1986, after defendant was arrested in Carson City, Nevada, two officers traveled there and interviewed him at the jail. After being advised of and waiving his <u>Miranda</u> rights,FN3 defendant admitted killing Garcia and having sexual relations with her at the location where he strangled her. He drew a map marking where her body had been left. He denied any involvement in the Sorensen killing, however. Defendant said he was "loaded" on "acid" FN4 during the last 30 days he was in

6

Colfax, including the night Garcia was killed.

FN3. Miranda v. Arizona (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (Miranda). The term "Miranda rights" refers to the now ubiquitous advisement of the defendant's right to remain silent, that anything he or she does say may be admitted at trial, and of the right to have an attorney present and to have an attorney appointed if the defendant is indigent. (Id. at p. 479, 86 S.Ct. 1602.)

FN4. Defendant's reference presumably was to lysergic acid diethylamide (LSD).

The area depicted on defendant's map was searched on November 21, 1986. Garcia's unclothed body was found draped around a tree approximately 30 to 40 feet from the road down a very steep incline, partially covered with dirt, rocks and debris, and badly decomposed and largely skeletonized. There was a red cloth tied around her mouth, and her arms were tied behind her back with a piece of wire looped around both wrists and tied with five knots. No other evidence was found in the area. As with Sorensen's body, the advanced state of decomposition prevented the pathologist who performed the autopsy from determining the cause of Garcia's death, or whether trauma from a sexual assault had occurred. The pathologist did conclude, however, that the evidence supported the opinion that Garcia's death had been violent and had been caused by another person.

As defendant returned with the officers to the Placer County Jail in Auburn that day, he provided them with more details concerning the murder of Garcia. Defendant related the following. He ingested LSD before picking up Garcia, and then smoked some marijuana with her. He and Garcia were kissing in the backseat of his car, which was covered with the blue and white striped blanket, but when defendant placed his hand on Garcia's leg, she said "No," which led to an argument between them about having sexual relations. When defendant asked Garcia whether she wanted to have sex, she declined because she thought he was "all fucked up." Defendant "flipped out," "partly" because of this rejection, and pushed Garcia down and had sex with her. Garcia "partly" resisted by squirming. Defendant said he thought he ejaculated, but was not sure. He did not remember having tied her hands. Afterward, defendant became fearful that Garcia would tell others about what had happened, so he decided to kill her. Garcia started fighting, and defendant again pushed her down, grabbed a piece of wire, wrapped it around her neck, and held it there until she stopped moving. Defendant stated he remembered rolling Garcia's body down a hill, but did not recall anything else.

Despite his earlier denials, defendant also admitted during the drive to Auburn that he killed Sorensen, providing the

7

following details. He had met Sorensen at a mall earlier that day. Defendant had ingested LSD and was "really stoned." Defendant killed Sorensen by strangling her "by a road." He said, "It was all so fuzzy." When asked whether he had sexual relations with Sorensen, defendant said, "I think so." He stated he did not remember tying her hands, or exactly how he had returned to Colfax that night, although he remembered delivering newspapers along the way.

After arriving at the jail in Auburn and having dinner, defendant was interviewed by the authorities again, providing more details concerning the murder of Sorensen. Defendant said he and Sorensen were hitchhiking and were dropped off at the Loomis exit. Sorensen walked into town, returned about an hour later, and they then smoked marijuana together. Defendant began thinking about his difficulties with his family and became enraged. Sorensen thought defendant was "freaking out," which made defendant more angry. He placed his hands on her shoulders and Sorensen swung at him, at which point defendant "blew up." Defendant said he did not remember much after that point, but knew he engaged in sexual relations with Sorensen at some point, and ultimately strangled her because he was frightened. He also remembered covering the body with weeds and throwing away Sorensen's purse before leaving the scene.

Teresa Jackson testified she introduced defendant to Garcia in July of 1986. According to the testimony of James Sciacca and Janet Spafford, defendant on several occasions prior to September 7, 1986, had asked Garcia out for a date, but Garcia had declined, once commenting that she thought defendant was "strange" or "weird."

Teresa Jackson, Janet Spafford, and Heather Smith, all former girlfriends of defendant, testified they had seen defendant smoke marijuana, but never had seen him ingest LSD. George Willson testified that in July or August of 1986, when he and defendant were conversing about drug use, defendant said he did not consume LSD. James Sciacca testified, however, that defendant once ingested LSD in his presence.

Heather Smith visited defendant on several occasions in the Placer County jail after his arrest. During her last visit, Smith asked defendant why he killed Garcia and Sorensen. He said it was partly because he did not like "sleazy women." He then said, "I had a good thing going while it lasted. Too bad I got caught." Smith asked defendant why he had not killed her, and defendant replied he had no reason to kill her. Spafford testified that Smith told her defendant had said the reason he had not killed Smith or Spafford was because they had "said yes."

////

B. <u>Defense Evidence</u>

Defendant testified as follows: He met Garcia in June or July 1986, and they became friends. They twice went to Rollins Lake and smoked marijuana together, and once defendant invited Garcia to spend the night at the house where he was staying because she had no place to sleep. Defendant and Garcia never had sexual intercourse on these occasions, although they engaged in "deep kissing" during their visits to the lake. Garcia at that time did not want to be sexually involved with defendant or other men, because she was still in the process of divorcing Trinidad Garcia.

Contrary to what defendant confessed to the authorities, he testified very clearly remembering what happened on the nights he killed Garcia and Sorensen. After defendant picked up Garcia from Chris Paoli's house on the night of September 7, 1986, Garcia inquired whether he had any marijuana. To avoid being detected, they went to the remote location of Carpenter's Flat, parked, smoked marijuana, and talked. Garcia mentioned that her bus left at midnight. As Garcia began to speak about her difficulties with her husband Trinidad, defendant became annoyed because he felt Garcia was nagging and overdramatizing her problems. Defendant began talking about his problems with his own family, but Garcia did not adequately recognize the seriousness of defendant's troubles, which led to a heated discussion. After things calmed down, the two kissed for about 10 minutes. At some point, Garcia pulled away from defendant and again started talking about her problems with Trinidad. She said, "I can't do this because of Trino." They began to argue again about the relative seriousness of their personal difficulties, and Garcia again belittled defendant's problems by stating they "don't mean nothing," telling him he "should just sit there and listen to her and keep [his] mouth shut." This made defendant very angry and he, in rapid succession, punched Garcia in the face with his fist, lowered the back of the front seat in which she was sitting, and pushed her into the backseat of his car. At some point during these actions, Garcia said what had happened was all defendant's fault. As Garcia was face down in the backseat, defendant climbed on top of her, found a piece of wire on the floor of the car, wrapped the wire around Garcia's neck, and strangled her. Defendant intended to kill Garcia when he put the wire around her neck, but at that point had no intention of having sexual relations with her.

After a minute or two had passed and Garcia stopped struggling, defendant released the wire and sat back on the seat. Approximately five to 10 minutes later, he became sexually aroused and began undressing Garcia's body. Defendant testified on direct examination that, while he was doing so, he heard a gurgling sound and saw a bloody substance coming from Garcia's mouth. He tied the red cloth around her head over her mouth to stop the blood, and then continued undressing her. He was still

fully clothed, but 15 to 20 minutes later, he undressed and engaged in sexual activities with Garcia's body. On cross-examination, defendant testified he already had fully undressed Garcia's body and himself and was engaged in sodomizing the body when he heard the gurgling sound, saw the blood, and placed the red cloth over her mouth.

When the blood came out of Garcia's mouth, defendant stopped sodomizing the body, but continued again several minutes later after the bleeding ended. He eventually had an orgasm. About five to 10 minutes later, after again becoming aroused, he turned the body over and had vaginal intercourse until he had another orgasm. While defendant was having sexual relations with Garcia's body, he tied her arms behind her back.

When he finished, defendant dressed, got out of the car briefly, then returned to the car, threw Garcia's purse and jacket out the window, and drove away. Defendant drove around Colfax for approximately an hour and a half, during which time he went to his parents' house, parked in the driveway and honked the horn, and also repeatedly drove past the Colfax police station—all while Garcia's body was lying uncovered in the backseat of the vehicle. Defendant eventually disposed of Garcia's body by throwing it down an embankment adjacent to a remote road, and rolled up Garcia's clothes in the blanket and threw them from his car while en route to the nearby town of Weimar. Defendant did not know why he discarded the various items at different locations.

The next day, defendant returned to the location where he had discarded the body, but could not find it. Defendant proceeded there again on the following day, found the body, and pulled it up to the tree. He sat next to the body, thinking and talking to himself and to the body about his remorse at what had happened, how he hated his mother, and how Garcia's actions had reminded him of his mother. Defendant returned to the body several times. After his last visit, defendant covered it with a piece of wood, rocks, and leaves.

On October 10, 1986, defendant hitchhiked to Sacramento. He ingested LSD during the trip, and smoked marijuana and consumed alcohol while there. He engaged in sexual activities with two prostitutes and then began hitchhiking back to Colfax at approximately 7:30 p.m. He met Sorensen at a restaurant near the highway on Douglas Boulevard, when she approached and asked him to light her cigarette. They decided to hitchhike together. After about 30 minutes, they got a ride, which took them to the Horseshoe Bar Road exit in Loomis. They arrived there about 10:00 p.m., and walked into town because Sorensen needed to make some telephone calls. After she did so, they returned to the freeway exit and smoked marijuana. Sorensen then left to walk back to town to make another phone call. When she returned, they

moved off to the side of the road because the weather was cold, smoked more marijuana, and conversed. Sorensen said she thought defendant was cute, and later started "getting real friendly" toward him by inviting him to spend the night in the trailer behind her mother's house in Auburn and sitting very close to him or on his lap. He, however, was not interested in engaging in sexual relations, because he already had been with the two prostitutes earlier that day and was, in fact, feeling guilty about those earlier activities.

At some point, while defendant was lying on his side on the ground and Sorensen was next to him, she reached over and unbuttoned his pants, reached inside his underwear, grabbed his penis, and moved her head toward him in an attempt to orally copulate him. Defendant became infuriated because he did not want to be touched, and jumped up, grabbing Sorensen by the neck in the process. He held her off the ground, spun her around while shaking her violently, and then threw her down. When she did not move, defendant knew she was dead. He was not thinking clearly when he killed Sorensen; he was very angry because of her unexpected and unwelcome sexual advance.

After realizing Sorensen was dead, defendant stomped around the area for several minutes and punched a nearby fence. He then returned to the body and sat down next to it for approximately 10 minutes. Defendant thought about the Garcia incident and became sexually aroused. He undressed himself as well as Sorensen's body, and sodomized and had vaginal intercourse with the body. During a second act of sodomy, defendant tied Sorensen's arms behind her back with her pants. After having an orgasm, he moved the body 15 to 20 feet away, covered it with grass and weeds, and left.

The sexual activities defendant engaged in with Garcia's and Sorensen's bodies were more exciting than any prior sexual encounters he had ever had, because he had complete control of the victims. The act of tying the victims' hands behind their back, even though they already were dead, was thrilling to him and was brought on by (and heightened) his feeling of total control over the two women.

Defendant testified that when he was eight or nine years of age and residing with his family in Charleston, South Carolina, his mother began sexually molesting him. The molestation continued while the family resided in Idaho Falls, Idaho, and St. Mary's, Georgia, when defendant was a teenager. The sexual abuse was frequent, especially in Idaho, and involved various types of sexual acts, including oral copulation and sexual intercourse.

Defendant also saw his mother having sexual intercourse with a 17–year–old neighbor in South Carolina, Ron K., and

11

learned she had exposed her naked body to, and had sexual relations with, other men who visited the family home or were crew members on trains that passed behind the family's house in Georgia. This behavior occurred in each of the towns in which the family resided, and continued in Colfax until close to the time of the Garcia and Sorensen killings.

Defendant's mother also was present one night when Ron K. tied a rope to a rafter, placed the rope around defendant's neck, and kicked away the chair upon which defendant was standing. Defendant hanged by his neck for 10 to 12 seconds before Ron K. removed the rope. Defendant's mother laughed while defendant was hanging.

After one final incident of molestation in Georgia when defendant was 15 years of age, he refused to participate further and began to stay away from home. Defendant's absences caused problems with defendant's father, who believed defendant merely was being rebellious. Defendant, however, felt he could not tell his father why he was avoiding home. When defendant was 16 years of age, he left home permanently after a severe argument with his father about defendant's behavior.

Defendant moved often during the next year, eventually coming to Colfax. Thereafter, defendant's family, which included defendant's two younger brothers and a younger sister, also moved to Colfax, causing more problems because defendant's parents did not want him residing near them. Defendant was not welcome in their home, and his parents spread rumors about him to make his life in Colfax difficult. They twice paid him to move away, which he did, although he returned in May 1986 and decided to remain there despite his difficulties.

Defendant testified his mother's molestation of him caused him to feel angry and defenseless. He also later became confused when he reached sexual maturity and sometimes felt pleasure during the sexual activities he engaged in with his mother. His mother's exhibitionism and her affairs with Ron K. and other men, which were widely known by other persons in the several communities in which they resided, angered and embarrassed defendant, especially when his friends or others mentioned the subject to him.

Defendant denied having said anything to Heather Smith about the killings or about having "had a good thing going while it lasted." He admitted he had lied to numerous persons, including the authorities, when he first denied having anything to do with the deaths of Garcia and Sorensen. He explained his later confessions had some elements of truth, but that he lied when he stated that Garcia was alive and resisting when he had sex with her and lied when he stated he killed her and Sorensen because he was

12

frightened. He did not tell the authorities he had had sex with the bodies only after the women were dead, because this was embarrassing and he believed it would appear worse if he admitted what happened rather than relating that he had raped the victims while they were alive. He also did not want to discuss the incestuous relationship he had with his mother. Defendant asserted that he believed he simply could admit having killed the women, and that would end the questioning. When the officers continued to press him for details, he gave false answers because he wanted the questioning to stop—but he also acknowledged voluntarily speaking with the officers and being advised he could stop the interviews at any point, and that they in fact had honored defendant's request to stop on one occasion when he complained of a headache. Defendant testified that he decided to tell the truth at trial because he had learned from a defense investigator that defendant's younger brother had legal problems relating to a sexual incident, and defendant did not want his brother to be in defendant's position at some point in the future. Defendant, however, also admitted learning before giving his testimony at trial that it might benefit his defense if he were to testify he had not intended to have sex with the victims until after he had killed them.

Philip Bodily, who resided near defendant from 1975 to 1977 in South Carolina, testified that he, too, observed defendant's mother having sex with Ron K. He never saw defendant's mother engage in sexual behavior with defendant, but testified she did act in a sexually provocative manner toward Bodily on two occasions and Ron K. teased defendant about his mother's sexual activities.

The parties stipulated that James and Sara Jo Ennis were defendant's neighbors when his family resided in Georgia, and would testify that defendant's mother often stood nude at the rear door of the house and sometimes would open and close her blouse while trains were passing on the tracks behind the house, but they did not see her board any of the trains.

Jeffrey Miner and Ronald Ballard testified that, on approximately five or 10 occasions over a two-month period in 1985, a woman standing at a window in defendant's grandfather's house in Colfax exposed her breasts by lifting up her shirt as Miner and Ballard drove by on the road in front of the house. Once, the woman exposed herself to Miner as he drove by, and then about 15 to 20 minutes later Miner and Ballard drove on a dirt road approximately 50 yards behind the house in order to avoid seeing the woman, but she came out on the road and again exposed herself. Scott Greger also saw a woman at that house exposing herself on numerous occasions during the four months he resided on the same street. Greger later learned the woman was defendant's mother and he told defendant of this activity, but defendant appeared unconcerned.

13

Dr. Richard Yarvis, a psychiatrist employed by the defense, had treated victims of incest and molestation. He met with defendant for a total of approximately 20 hours. According to Dr. Yarvis, boys who are victims of incest committed by their mothers are more likely to become psychotic than girls who have incestuous relationships with their fathers. Both types of victimization, however, have "disastrous" impacts upon the victims. Victims of parental incest often have significant feelings of guilt, despondency, anxiety, and anger created by their powerlessness at being compelled by a parent to engage in behavior that the victim knows is wrong. Dr. Yarvis considered it very unlikely that a victim of parental incest would be "normal" in the psychological sense. Rather, the three likely outcomes were severe psychosis, in which the victim would be unable to distinguish reality from fantasy; less severe mental illnesses, such as chronic depression and drug and alcohol abuse; and antisocial behavior, such as criminal activity and sexual promiscuity.

During their meetings, defendant described to Dr. Yarvis an unpleasant childhood in which his father, who was in the Navy, was mostly absent and was often physically abusive to defendant when he was home. Defendant told Dr. Yarvis that his mother was sexually provocative, promiscuous, and an exhibitionist, and carried on an incestuous relationship with defendant for several years. Although Dr. Yarvis did not believe defendant was psychotic, defendant exhibited low self-esteem and nervousness at close physical proximity to others, and had a serious temper with a "short fuse." Defendant unreasonably interpreted a remark made by Dr. Yarvis during one interview, and on another occasion defendant fell out of his chair and became so angry, distressed, and embarrassed that Dr. Yarvis became mildly frightened that defendant might become violent.

Dr. Yarvis testified it is rare for a woman to be an exhibitionist, and that exhibitionists rarely commit more active sexual crimes. He also stated that necrophilia, or sexual activity with dead bodies, is quite abnormal and rare, and he had no clinical or research experience in that area.

Defendant re-called his mother as a witness for the defense. She denied, however, that she had an incestuous relationship with defendant, that she had sexual relations with Ron K. or any train crew members, or that defendant had been subjected to a hanging in her presence. She denied ever having intentionally exposed her body to anyone at any of the places in which she had resided. She said defendant had been a liar since he was a young child, and had left the family home because he would not follow the rules, rather than because of any incestuous relationship with her.

////

14

C. Prosecution Rebuttal Evidence

The prosecution re-called the lead investigating officer, who testified that photographs of defendant's vehicle showed that the lever that would lower the back of the driver's seat was on the outside of the seat, near the door. The officer did not photograph or examine the lever for the front passenger seat, and did not know whether the front seats would fully recline.

II. Penalty Phase

A. Prosecution Evidence

1. Murder of Elizabeth Lactawen

After defendant was arrested, officers from the Sacramento County Sheriff's Department interviewed him concerning a series of other homicides in the Sacramento area. During the first interview, defendant waived his Miranda rights and denied involvement in any other murders. During a second interview, defendant continued to deny any role in the murders the officers were investigating, but confessed to another murder that had occurred in the City of Sacramento. Investigators from the Sacramento Police Department were summoned and they interviewed defendant for a third time regarding the murder of Elizabeth Lactawen.

On May 10, 1986, a homeless man reported finding a dead body near the Sacramento River in an area overgrown with vegetation and known as a homeless encampment. Responding police officers found a woman's body, mostly covered by plastic and cardboard. The unclothed body of Elizabeth Lactawen was not yet cold to the touch. Lactawen was 24 years of age, was four feet five inches tall, and weighed 76 pounds. A cloth gag was tied around her mouth, and her arms were tied behind her back with an electrical cord. There were bruises around her neck and left breast, and blood and other fluids coming out of her nose. The pathologist who performed the autopsy believed Lactawen had been strangled with a thin rope or wire.

There also was evidence of sexual assault, including blood clots in the vagina and on the cervix and bruising on Lactawen's inner thighs, injuries which in the pathologist's opinion could have been caused by someone forcibly spreading open her legs and raping her. The bruises were inflicted before she died. Clothes matching Lactawen's small stature were scattered around the area. There also was fecal matter in the pubic area, which possibly was caused by a person sodomizing Lactawen before having vaginal intercourse with her. There was no tearing of the vagina or anus or evidence of sperm. Lactawen had no alcohol or drugs in her blood.

15

During the interview with the Sacramento police officers, defendant said he was sitting near the Sacramento River when Lactawen walked by. They began talking, and then walked to a more secluded spot nearby, where they had consensual sex. They spoke some more, and defendant became angry and strangled her. He did not remember how he strangled her or whether he tied her up or used a gag.FN5

> FN5. During the prior interview with the sheriff's officers when he admitted killing Lactawen, defendant said he became angry while he and she were speaking, but later calmed down, at which point they had sex. Defendant said he did "not really" force Lactawen to have sex. After having sex, they began to argue, and defendant "flipped out" and strangled her. He did not remember exactly how he strangled her or how or why he tied her hands.

## 2. Childhood Sexual Assaults

In 1979, when defendant was 14 years of age and residing in Idaho Falls, Idaho, he sexually assaulted a six-year-old girl, Rebecca Y., and two boys, 12–year–old Brian M. and 11–year–old Cori H., in two separate incidents. On March 17, 1979, Rebecca Y. was walking home from her friend's house when a teenage boy told her he knew her mother and that Rebecca should do what he said or she would be in trouble. The boy promised he would give her money if she did what he said. Rebecca positively identified defendant in court as the boy.

Defendant led Rebecca to an area under a bridge and told her to do what he said or he would kill her with a rock. He removed his penis from his pants and told Rebecca to put her mouth on it while forcing her head down. When Rebecca's babysitter called for her, defendant ran away.

Rebecca's father received a telephone call about what had happened and drove to the bridge, where he saw a young man jump out of the canal and get on a bicycle. Rebecca's father chased after the boy, eventually tackling him. The zipper of the boy's pants was down, and the boy said he "did not hurt her." The father could not recognize defendant in court, but did identify a picture of him from that time period as looking like the boy.

When a police officer arrived, the boy identified himself as David Allen Rundle. Defendant initially denied having assaulted Rebecca, but later that day at the police station admitted taking her under the bridge, threatening to kill her with a rock, and trying to "have sex" with her.

On April 24, 1979, Brian M. and Cori H. were riding their bikes when they came across a person jogging who said he knew of

16

good trails for bike riding. During his testimony Brian identified defendant as this person. The boys agreed to follow defendant, who led them to the bottom of a 15– to 20–foot–deep pit in a very remote area. Once there, defendant said he had a gun in his pocket and threatened he would either shoot the boys or crush them with a rock if they did not do what he said. Defendant ordered the boys to disrobe and then told Cori to lie on the ground and Brian to "fuck him." When Brian said he did not understand, defendant told him to lie on top of Cori, which he did. Defendant then told them to get up, took out his penis, and had the boys orally copulate him until he ejaculated. He then left with the boys' clothes and told them not to leave the pit for 15 minutes or he would shoot them, and not to tell anyone about what had happened or he would find them and kill them. After the boys left the pit, they found their clothes nearby, returned home, and reported what had happened. Later, Brian was taken to a house, where he identified defendant as the perpetrator.

### 3. Marital Abuse

Defendant's ex-wife testified she married defendant in March of 1984 and separated from him in July of 1985. Defendant was physically violent toward her during the marriage. He often struck her, once pushed her from a moving car, and on one occasion during an argument threw her down and pounded her head on the floor approximately 20 times. On many occasions defendant also physically forced her to engage in oral copulation and sodomy. Defendant continued with these acts even though on various occasions she told him to stop, vomited while his penis was in her mouth, and tried to keep away from him.

### 4. Psychiatric Testimony

Dr. Irwin Lyons, a psychiatrist, interviewed defendant on behalf of the district attorney's office soon after defendant's arrest, in order to evaluate defendant's mental status. Defendant described the incidents with Rebecca Y., Brian M., and Cori H., as well as the Garcia and Sorensen murders. Defendant did not mention that Sorensen had attempted to orally copulate him, or that his mother sexually molested him as a child. Defendant said his family rejected him, and his problems with his family caused him to have attacks of extreme rage during which he could not control himself. Dr. Lyons did not believe defendant suffered from any psychosis, but concluded he did have a personality disorder arising partly from deficient child-rearing practices by his parents. Defendant was egocentric, immature, lacking in capacity for empathy, and amoral. He was subject to impulsive behavior during his rage attacks.

////

B. Defense Evidence

Dr. Richard Thomas, a psychologist, treated defendant in Idaho after his sexual assault on Rebecca Y. In his opinion, defendant at that time had an "explosive personality disorder," which commonly involves overreacting to a situation, blaming others, and making excuses for one's difficulties and inappropriate actions. Defendant was not psychotic or schizophrenic.

At counseling sessions, defendant refused to speak about the assault, a circumstance that concerned Dr. Thomas because defendant also said he enjoyed inflicting pain upon others and, in the doctor's opinion, had a "real high potential . . . to act out." Defendant's mother encouraged his refusal to speak about the incident, thus negatively affecting defendant's ability to accept responsibility and obtain any benefit from treatment. Dr. Thomas felt defendant's family had problems in communicating and that defendant's mother was overwhelmed by having to care for the four children during the father's frequent, and at times lengthy, absences. Dr. Thomas, having provided marriage counseling to defendant's parents after defendant was sent to a state juvenile facility, believed they had made progress in addressing their problems.

Defendant's aunt and uncle, George and Bonnie Mae Russell, testified that defendant was a "bright, alert" child and was "full of promise and potential." According to them, defendant's mother singled defendant out for discipline and often verbally abused him, never acting in a motherly way toward him. George testified he saw defendant's mother attempt to stab his father during a fight that occurred in defendant's presence. When defendant was no more than a year and a half old, George also observed what he thought was evidence of sexual abuse upon seeing defendant's penis. In George's opinion, defendant's mother's denial of abuse was insincere, and she often lied. George viewed defendant as a victim of his mother's abusive parenting and of dealers who supplied defendant with drugs.

Several of defendant's past employers testified he was a hard-working, conscientious, and trustworthy employee. Deborah Peters, with whom defendant resided in Nevada after the murders, testified he was nice and helpful and that she would not have expected him to be charged with murder. Sherry Couzens, an instructor in a high school equivalency program who met with defendant in jail once a week for approximately two months, testified defendant completed the program while incarcerated and was a quiet, focused, and thorough student. A sergeant at the jail testified defendant provided deputies with information concerning another inmate's plan to escape from the jail and helped them locate two prisoner-made weapons.

18

1         A defense investigator testified defendant's ex-wife said
defendant's relationship with his family was very strained and she
2    never saw them act affectionately toward him. She also said
defendant told her his mother was not faithful to his father, and his
3    mother had strange sexual "quirks." Defendant's ex-wife told
another investigator she wanted to "pull the switch" on defendant
4    and have a party to celebrate.

5    C. Prosecution Rebuttal Evidence

6         The prosecution's investigator testified that George Russell,
defendant's uncle who testified on defendant's behalf, stated he felt
7    very strongly that the death penalty should not be imposed in this
case because defendant was not fully responsible for the crimes.
8    Additionally, Russell earlier told the investigator he was unaware
of any sexual conduct between defendant and his mother; Russell
9    had not mentioned observing any evidence of sexual abuse when
defendant was an infant or of defendant's being physically
10   disciplined by his parents.

11        Donald Rundle, defendant's brother, testified that
defendant was not treated differently from any of his siblings, was
12   not subjected to violent discipline or verbal abuse, and refused to
follow the family's rules. Donald saw marijuana in defendant's
13   possession, but never observed other drugs. Donald told a defense
investigator that after defendant was arrested for the murders, their
14   father was so upset that "if [defendant] was to get hit by a car in
front of Dad, Dad would turn around and walk away sooner than
15   help him."

16   D. Defense Surrebuttal Evidence

17        The defense investigator testified that Donald had said
defendant's father would rather run over defendant with a car than
18   stop for him, and that this statement referred to the father's attitude
before defendant was arrested for the murders.

19

20   PROCEDURAL BACKGROUND

21        Petitioner's trial in Placer County Superior Court began in January 1989.  The jury

22   returned its guilty verdict on May 18, 1989.  (Reporter's Transcript ("RT") 8318.[2])  In addition,

23   the jury found the following special circumstances true: (1) that petitioner committed the murder

24

25      [2]  "RT" refers to the reporter's transcript of the trial proceedings.  "CT" refers to the state
court clerk's transcript.  The state court record, including the RT and CT, was lodged herein on
26   April 12, 2010.  (See Dkt. No. 27.)

1   of Ms. Garcia while engaged in the attempted commission of the crime of rape, (2) that petitioner

2   committed the murder of Ms. Sorensen while engaged in the attempted commission of the crime

3   of rape, and (3) that petitioner committed multiple murders.  (RT 8321-22.)  The jury returned a

4   death sentence on June 15, 1989.  (RT 9623.)  In 2008, the California Supreme Court affirmed

5   petitioner's conviction and sentence on appeal.  People v. Rundle, 43 Cal. 4th 76, cert. denied,

6   555 U.S. 1014 (2008).[3]  Petitioner filed a petition for a writ of habeas corpus in the California

7   Supreme Court in 2005.  In re Rundle, No. S130722.  On June 25, 2008, the California Supreme

8   Court denied all claims in the Petition for Writ of Habeas Corpus on the merits except for Claim

9   VIIL, which the Court denied as premature without prejudice to renewal after an execution date

10  is set.  (Cal. Sup. Ct. Order, lodged herein on Apr. 12, 2010, see Dkt. No. 27.[4])

11          Petitioner initiated this federal proceeding on August 13, 2008, by filing a request

12  for appointment of counsel.  On November 24, 2008, the court appointed Lynne S. Coffin and

13  Marcia A. Morrissey to represent petitioner.  (Dkt. No. 5.)  On November 10, 2009, petitioner

14  filed his federal petition for writ of habeas corpus.  (Dkt. No. 7.)  Respondent filed an answer in

15  September 2010.  (Dkt. No. 53.)  Petitioner filed a traverse in February 2011.  (Dkt. No. 65.)

16          The court then ordered briefing on the application of 28 U.S.C. § 2254(d) to each

17  claim in the petition.  (Dkt. No. 85.)  Petitioner was instructed to include in such briefing any

18  request for an evidentiary hearing.  On March 2, 2012, petitioner filed his opening brief and

19  motion.  (Dkt. No. 92.)  Respondent filed an opposition in June and petitioner filed a reply in

20

21          [3]   In 2009, the California Supreme Court disapproved one aspect of its decision in
     Rundle.  In People v. Doolin, 45 Cal. 4th 390, 421 & n.22, the Court disapproved its earlier
22   cases, including its decision in Rundle, which analyzed an attorney conflict of interest claim
     under the California constitution using a different standard than that articulated by the United
23   States Supreme Court.  Because this court reviews only the California Supreme Court's decision
     on petitioner's federal law claims, the decision in Doolin is not relevant to the federal habeas
24   analysis in the present case.

25          [4]   In his reply brief, petitioner states that the California Supreme Court issued an order to
     show cause, "initially finding that Petitioner pled a prima facie case."  (Dkt. No. 107 at 6:8-10.)
26   The record provided to this court does not contain any indication that the state court issued such
     an order or upon what grounds it did so.

1   September.[5]  (Dkt. Nos. 95, 107.)

2                              APPLICATION OF 28 U.S.C. § 2254(d)

3   I.  Legal Standards

4              Title 28 U.S.C. § 2254 confers upon a federal district court the jurisdiction to

5   consider a petition for writ of habeas corpus challenging a state court conviction.  A writ of

6   habeas corpus is available under section 2254 only on the basis of some transgression of federal

7   law binding on the state courts.  See Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1994);

8   Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985).  A federal writ is not available for

9   alleged error in the interpretation or application of state law.  See Estelle v. McGuire, 502 U.S.

10  62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d

11  at 1085.

12             Where a state court resolves a federal constitutional claim on the merits, the

13  petitioner in federal court may not succeed on that claim absent a showing that the state court's

14  resolution of the claim was contrary to law or unreasonable.  28 U.S.C. § 2254(d).  Congress

15  adopted this standard when it revised the habeas statutes in 1996 as part of the Anti-terrorism and

16  Effective Death Penalty Act (the "AEDPA").  To meet this standard, a petitioner must establish

17  that the state court's adjudication of the claim

18                          (1) resulted in a decision that was contrary to, or involved an
                            unreasonable application of, clearly established Federal law, as
19                          determined by the Supreme Court of the United States; or

20                          (2) resulted in a decision that was based on an unreasonable
                            determination of the facts in light of the evidence presented in the

21

22             [5]  Both parties' briefs suffer from serious flaws.  The most frustrating problem with
    respondent's brief was his counsel's refusal to follow the organizational format set out in
23  petitioner's opening brief.  As a result, respondent's brief was, at times extremely difficult, if not
    impossible, to follow.  The court was unable to locate any opposition from respondent on some
24  claims.  The most significant problem with petitioner's brief was counsel's frequent refusal to
    recognize, much less consider, the state court's decision on an issue.  The purpose of this briefing
25  was to review the California Supreme Court's rejection of petitioner's claims under the standards
    set out in 28 U.S.C. § 2254(d).  Petitioner's counsel's simple citation to the section 2254(d)
26  standards without any analysis of them did not accomplish this goal.

                                              21

1        State court proceeding.

2  28 U.S.C. § 2254(d).  Section 2254(d) is a gateway.  If a petitioner satisfies either subsection (1)

3  or (2) for a claim, then the federal court considers that claim de novo.  See Panetti v. Quarterman,

4  551 U.S. 930, 953 (2007) (When section 2254(d) is satisfied, "[a] federal court must then resolve

5  the claim without the deference AEDPA otherwise requires."); Frantz v. Hazey, 533 F.3d 724,

6  737 (9th Cir. 2008).

7        In 2011, the Supreme Court clarified the section 2254(d) standards.  First, the

8  Court made clear that, when making the determination that a state court decision was contrary to

9  law or unreasonable, a federal court may not consider evidence which was not available to the

10  state court.  Cullen v. Pinholster, 131 S. Ct. 1388, 1398-1401 (2011).  Second, the Court stressed

11  the deferential nature of the section 2254(d) standards.

12         As a condition for obtaining habeas corpus from a federal court, a
       state prisoner must show that the state court's ruling on the claim

13         being presented in federal court was so lacking in justification that
       there was an error well understood and comprehended in existing

14         law beyond any possibility for fairminded disagreement.

15  Harrington v. Richter, 131 S. Ct. 770, 786-87 (2011).  Thus, federal habeas relief is precluded if

16  "'fairminded jurists could disagree' on the correctness of the state court's decision."  Id. at 786

17  (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  This objective standard of

18  reasonableness applies to review under both subsections of 28 U.S.C. § 2254(d).  See Hibbler v.

19  Benedetti, 693 F.3d 1140, 1146-47 (9th Cir. 2012), cert. denied, 133 S. Ct. 1262 (2013).  The

20  federal court must engage in this deferential review even where the state court has not provided a

21  reasoned decision.  Richter, 131 S. Ct. at 784-85.

22        In the present case, some of petitioner's claims were raised, and rejected, in the California

23  Supreme Court's reasoned decision on appeal.  However, most were raised in his state habeas

24  petition, which was summarily denied.  A summary denial is presumed to be a denial on the

25  merits of the petitioner's claims.  Stancle v. Clay, 692 F.3d 948, 957 & n.3 (9th Cir. 2012) (The

26  presumption that the denial is based on the merits, rather than on procedural grounds, may be

1   overcome if it is not "plausible."), cert. denied, 133 S. Ct. 1465 (2013).  While the federal court

2   cannot analyze just what the state court did when it issued a summary denial, the federal court

3   must review the state court record to determine whether there was any "reasonable basis for the

4   state court to deny relief."  Richter, 131 S. Ct. at 784.  The federal court "must determine what

5   arguments or theories . . . could have supported[] the state court's decision; and then it must ask

6   whether it is possible fairminded jurists could disagree that those arguments or theories are

7   inconsistent with the holding in a prior decision of [the Supreme] Court."  Id. at 786.  The

8   petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court

9   to deny relief.'"  Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 131 S.

10  Ct. at 784), cert. denied, 2013 WL 3912909 (Nov. 4, 2013).

11          When reviewing the California Supreme Court's summary denial of a petition,

12  this court must consider that

13          the California Supreme Court's summary denial of a habeas
            petition on the merits reflects that court's determination that 'the
14          claims made in th[e] petition do not state a prima facie case
            entitling the petitioner to relief.' It appears that the court generally
15          assumes the allegations in the petition to be true, but does not
            accept wholly conclusory allegations, and will also "review the
16          record of the trial . . . to assess the merits of the petitioner's
            claims."

17

18  Pinholster, 131 S. Ct. at 402 n.12 (quoting In re Clark, 5 Cal. 4th 750, 770 (1993), and citing

19  People v. Duvall, 9 Cal. 4th 464, 474 (1995)).[6]  Accordingly, if this court finds petitioner has

20  unarguably presented a prima facie case for relief on a claim, the state court's summary rejection

21

22          [6]  Respondent adds that in determining whether the petitioner has made out a prima facie
    case, the California Supreme Court also limits its consideration of evidentiary proffers to those
23  that would be admissible at a hearing.  (Dkt. No. 95 at 8-10.)  However, none of the cases
    respondent cites appear to have this strict requirement.  Respondent has not supported his
24  conclusion that "when there is no proffer of admissible evidence that could prove the asserted
    fact true even were a hearing granted, then the assertion is wholly conclusory."  (Dkt. No. 95 at
25  12.)  Rather, the California courts appear to hold that a petitioner must state his claims with
    particularity and support them with all "reasonably available documentary evidence."  See In re
26  Martinez, 46 Cal. 4th 945, 955-56 (2009) (cited in Dkt. No. 95 at 9.)

1  of that claim would be unreasonable.  Taylor v. Maddox, 366 F.3d 992, 1000 (9th Cir. 2004);

2  Nunes v. Mueller, 350 F.3d 1045, 1054-55 (9th Cir. 2003).

3          Under subsection (d)(1), a state court decision is "contrary to . . . clearly

4  established Federal law" if it applies a rule contradicting a holding of the Supreme Court or

5  reaches a result different from Supreme Court precedent on "materially indistinguishable" facts.

6  Price v. Vincent, 538 U.S. 634, 640 (2003).  A state court decision is an "unreasonable

7  application" of clearly established federal law if "the state court correctly identifies the governing

8  legal principle . . . but unreasonably applies it to the facts of the particular case."  Bell v. Cone,

9  535 U.S. 685, 694 (2002) (citing Williams v. Taylor, 529 U.S. 362, 407-08 (2000)).  "Clearly

10  established Federal law" is found in the United States Supreme Court's "applicable holdings."

11  Carey v. Musladin, 549 U.S. 70, 74 (2006).  It refers to "'holdings, as opposed to the dicta, of

12  [the Supreme Court's] decisions' at the time the state court decides the matter."  Cannedy v.

13  Adams, 706 F.3d 1148, 1157 (9th Cir. 2013) (quoting Stanley v. Schriro, 598 F.3d 612, 617 (9th

14  Cir. 2010)), amended by 2013 WL 3744048 (9th Cir. Jul. 16, 2013).  "[C]ircuit court precedent

15  may be persuasive in determining what law is clearly established and whether a state court

16  applied that law unreasonably."  Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (quoting

17  Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).[7]  However, circuit precedent may not be

18  "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific

19  legal rule that th[e] [Supreme] Court has not announced."  Marshall v. Rodgers, 133 S. Ct. 1446,

20  1450 (2013) (citing Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012)).  Nor may it be used to

21  "determine whether a particular rule of law is so widely accepted among the Federal Circuits that

22

23          [7] Respondent argues that it is error "even to 'consult[]' lower court decisions."  (Dkt. No.
24  95 at 28 (quoting Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012)).  Respondent misapplies the
    Court's holding in Parker.  The Court criticized the Sixth Circuit Court of Appeals' reliance on
    solely its own pre-AEDPA standards for analyzing a prosecutorial misconduct claim.  Parker,
25  132 S. Ct. at 5-6.  The Court did not hold that lower court decisions are irrelevant in determining
    clearly established federal law, only that exclusive reliance on lower court law that conflicted
26  with Supreme Court law was inappropriate.

1  it would, if presented to th[e] [Supreme] Court, be accepted as correct." Id.  Further, where

2  courts of appeals have diverged in their treatment of an issue, it cannot be said that there is

3  "clearly established Federal law" governing that issue.  Carey, 549 U.S. at 77.

4            There are two ways a petitioner may satisfy subsection (d)(2).  Hibbler, 693 F.3d

5  at 1146.  He may show the state court's findings of fact "were not supported by substantial

6  evidence in the state court record" or he may "challenge the fact-finding process itself on the

7  ground it was deficient in some material way." Id. (citing Taylor, 366 F.3d at 999-1001); see

8  also Hurles v. Ryan, 706 F.3d 1021, 1038-39 (9th Cir. 2013) (If a state court makes factual

9  findings without an opportunity for the petitioner to present evidence, the fact-finding process is

10 deficient and the state court opinion is not entitled to deference.), petition for cert. filed, 82

11 USLW 3009 (Jun. 17, 2013).[8]  The standard for determining whether the state court's factfinding

12 process is insufficient requires the federal court to "be satisfied that any appellate court to whom

13 the defect [in the state court's fact-finding process] is pointed out would be unreasonable in

14 holding that the state court's fact-finding process was adequate." Hibbler, 693 F.3d at 1146-47

15 (quoting Lambert v. Blodgett, 393 F.3d 943, 972 (9th Cir. 2004)).  The state court's failure to

16 hold an evidentiary hearing does not automatically render its fact finding process unreasonable.

17 Id. at 1147.  However, the Ninth Circuit explained in Hibbler that federal standards for

18 determining when an evidentiary hearing is mandatory are a useful guide to determining the

19 ////

20

21        [8]  Unfortunately, respondent was not helpful in determining the standards of review under
   section 2254(d)(2).  Respondent's counsel appears to have personally held views of the scope of
22 section 2254(d) and asks the court to reject Taylor v. Maddox, 366 F.3d 992 (9th Cir. 2004), and
   its progeny.  (Dkt. No. 95 at 4-7.)  According to Westlaw, over 1,000 cases cite Taylor positively,
23 many on the grounds relevant here.  Further, the Ninth Circuit Court of Appeals, as well as
   federal district courts, including this one, have cited Taylor with approval after the Supreme
24 Court rendered its opinions in Pinholster and Richter.  See, e.g., Hibbler, 693 F.3d at 1146;
   Ocampo v. Vail, 649 F.3d 1098, 1106 (9th Cir. 2011); Vermillion v. Hartley, No. 1:12-cv-00623-
25 AWI-SKO-HC, 2012 WL 4673822 at *4 (E.D. Cal. Oct. 3, 2012); Williams v. Woodford, 859 F.
   Supp. 2d 1154, 1156 (E.D. Cal. 2012).  It is beyond question that this court cannot reject this
26 controlling and overwhelming authority.

reasonableness of the state court's refusal to hold a hearing:

> A state court's decision not to hold an evidentiary hearing does not render its fact-finding process unreasonable so long as the state court could have reasonably concluded that the evidence already adduced was sufficient to resolve the factual question. See Earp, 431 F.3d at 1170 (noting that a state court is not required to hold an evidentiary hearing when it is possible to resolve the factual question "based on 'documentary testimony and evidence in the record'" (citation omitted)); Perez v. Rosario, 459 F.3d 943, 950 (9th Cir. 2006) (holding that it is reasonable for a state court to resolve a disputed factual question without an evidentiary hearing when the petitioner's allegations are "incredible in light of the record, or . . . when the record already before the court is said to establish a fact conclusively"). The ultimate issue is whether the state's factfinding procedures were reasonable; this is a fact-bound and case-specific inquiry.

> Because AEDPA does not provide any specific guidance on what sort of procedural deficiencies will render a state court's fact-finding unreasonable, we have sometimes turned for guidance to cases considering a similar issue in a different context: when a federal district court considering a habeas petition must or should conduct an evidentiary hearing. See Earp, 431 F.3d at 1166-67, 1169-70 (looking to Townsend v. Sain, 372 U.S. 293, 313 (1963), which governs when a federal district court reviewing a habeas petition de novo must grant an evidentiary hearing, in determining whether the state court decision was based on an unreasonable determination of the facts). In this context, the Supreme Court has recently clarified that, "[i]n deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Landrigan, 550 U.S. at 474.  More specifically, "[i]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Id. "'[A]n evidentiary hearing is not required on issues that can be resolved by reference to the state court record.'" Id. (quoting Totten v. Merkle, 137 F.3d 1172, 1176 (9th Cir. 1998)).

> While this framework for determining when a district court errs in failing to conduct an evidentiary hearing provides useful guidance, it is useful only by analogy and does not answer conclusively whether the state court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2). . . .  Unlike our review of a district court's determination that an evidentiary hearing is unnecessary, which is for abuse of discretion, see Landrigan, 550 U.S. at 474-75, we may not "second-guess a state court's fact-finding process"

1    unless we determine "that the state court was not merely wrong,
     but actually unreasonable." Taylor, 366 F.3d at 999. Nevertheless,
2    the rules governing when a district court must grant an evidentiary
     hearing are informative: if a district court would be within its
3    discretion in denying an evidentiary hearing, a state court's similar
     decision is probably not objectively unreasonable.
4
          Accordingly, in considering a petitioner's argument that the
5    state court's failure to hold an evidentiary hearing rendered its
     factual findings unreasonable, we may first consider whether a
6    similarly situated district court would have been required to hold
     an evidentiary hearing. See Earp, 431 F.3d at 1167. We begin with
7    the rule that no such hearing is required "[i]f the record refutes the
     applicant's factual allegations or otherwise precludes habeas
8    relief." Landrigan, 550 U.S. at 474; see also Perez, 459 F.3d at
     950; see also Lambert, 393 F.3d at 965-66 (holding that an
9    evidentiary hearing is not a prerequisite to an adjudication on the
     merits triggering AEDPA deference). The ultimate question,
10   however, is whether an appellate court would be unreasonable in
     holding that an evidentiary hearing was not necessary in light of
11   the state court record. Taylor, 366 F.3d at 1000.

12   693 F.3d at 1147-48.

13          If a petitioner overcomes one of the hurdles posed by section 2254(d), this court

14   may review the merits of the claim de novo.  See Frantz, 533 F.3d at 737.  For the claims upon

15   which petitioner seeks to present evidence, petitioner must meet the standards of 28 U.S.C. §

16   2254(e)(2) by showing that he has not "failed to develop the factual basis of [the] claim in State

17   court proceedings" and by meeting the federal case law standards for the presentation of evidence

18   in a federal habeas proceeding.  See Pinholster, 131 S. Ct. at 1401.

19          Addressed below is the application of section 2254(d) to each claim in the

20   petition.  This court finds that only one of petitioner's claims survives section 2254(d) review.

21   However, that one claim should be denied on its merits.  Because petitioner has not met any of

22   the section 2254(d) standards for Claims A, B, C, and D, petitioner's motion for an evidentiary

23   hearing on those claims should be denied.  In addition, the failure to satisfy any of the section

24   2254(d) requirements means all remaining claims should be denied.

25   ////

26   ////

27

II.  Petitioner's Claims

    Claim A.  Ineffective Assistance of Counsel at the Guilt Phase

        Petitioner asserts numerous claims that his counsel was constitutionally inadequate at the guilt phase.  He argues: (1) counsel failed to investigate, develop and present a coherent guilt phase defense; (2) counsel failed to request, and object to, jury instructions; (3) counsel failed to present evidence to challenge petitioner's Miranda waiver; (4) counsel failed to ensure petitioner's presence at all trial proceedings; and (5) counsel failed to object to prosecutorial misconduct.  For the reasons set out below, this court finds petitioner has failed to satisfy 28 U.S.C. § 2254(d) for any of his assertions of ineffective assistance of counsel at the guilt phase.  This court recommends denial of Claim A.

    1.  Legal Standards

        The Sixth Amendment standard for analyzing an ineffective assistance of counsel claim is well established.  First, a petitioner must show that counsel's conduct failed to meet an objective standard of reasonableness.  Strickland v. Washington, 466 U.S. 668, 687 (1984).  There is "a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance."  Harrington v. Richter, 131 S. Ct. 770, 787 (2011) (quoting Strickland, 466 U.S. at 689.)  When determining whether the state court's application of the Strickland standard was reasonable, the federal court must be "doubly" deferential.  Id. at 788.  The "standard for judging counsel's representation is a most deferential one" and the reasonableness standards of section 2254(d) are also "highly deferential."  Id.  Further, because the Strickland rule is a "general" one, courts have "more leeway . . . in reaching outcomes in case-by-case determinations" and the "range of reasonable applications is substantial."  Id. at 786; Premo v. Moore, 131 S. Ct. 733, 740 (2011).  As the Court described in Richter, "[w]hen §2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard."  131 S. Ct. at 788.

1    The second part of the <u>Strickland</u> test requires a petitioner to show that counsel's

2  conduct prejudiced him.  <u>Id.</u> at 691-92.  Prejudice is found where "there is a reasonable

3  probability that, but for counsel's unprofessional errors, the result of the proceeding would have

4  been different."  <u>Id.</u> at 694.  A reasonable probability is "a probability sufficient to undermine

5  confidence in the outcome."  <u>Id.</u>  "The likelihood of a different result must be substantial, not just

6  conceivable."  <u>Richter</u>, 131 S. Ct. at 792 (citing <u>Strickland</u>, 466 U.S. at 693).

7    2.  <u>Failure to Investigate, Develop, and Present a Coherent Guilt Phase Defense</u>

8    The first two subclaims in Claim A allege that petitioner's trial counsel failed to

9  create a cohesive defense using evidence of petitioner's social and family history; evidence of the

10  physical, emotional, and sexual abuse petitioner experienced from his parents, especially his

11  mother; expert testimony about petitioner's psychological development and mental state at the

12  time of the crimes; and evidence of petitioner's extensive drug and alcohol abuse and their effect

13  on his mental state.  Because these subclaims overlap substantially, the court discusses them

14  together in this section.[9]  Related claims regarding trial counsel's failure to request and object to

15  jury instructions are discussed in the next section.  As set out below, even had petitioner's guilt

16  phase defense included all that he contends counsel should have presented, petitioner has not

17  shown the California Supreme Court would have been unreasonable in finding he had not made a

18  prima facie showing of prejudice at the guilt phase.

19    The guilt phase defense attempted to establish that petitioner did not commit first

20  degree murder by showing the killings were not premeditated and petitioner did not attempt to

21  rape the victims.  The defense was based almost exclusively on petitioner's testimony that he

22  killed the victims in sudden outbursts of violence brought on by their behavior and that he then

23  copulated with their dead bodies.  Petitioner argues that defense counsel should have presented a

24  full social history of petitioner to show: (a) petitioner had been sexually abused by his mother,

25

26    [9] As identified in petitioner's opening brief, these are Claims A.1 and A.2.a through
A.2.g.  (Dkt. No. 92 at 14-126.)

who had also suffered incestuous sexual abuse as a child, (b) the sexual abuse along with other

childhood abuse and difficulties resulted in mental problems for petitioner, and (c) at an early age

petitioner became addicted to drugs and alcohol.  Petitioner argues the jury should have heard the

testimony of mental health professionals to explain how petitioner could have reacted so

extremely to the behavior of the victims.

Petitioner proffers evidence showing that six months before the beginning of trial,

defense investigator Joseph Barthel submitted an investigation plan to defense attorneys.

Petitioner argues defense counsel failed to conduct the investigations suggested.  What petitioner

does not point out in his discussion of Claim A is that Mr. Barthel created the investigation plan

specifically for the penalty phase.  (Barthel Inv. Plan, Ex. 124 (Dkt. No. 11-41).[10])  The first

sentence of the plan describes its purpose: "This is a Preliminary Investigation Plan for the

anticipated Penalty Phase trial of David Rundle."  (Id. at 929.[11])  The first paragraph ends with a

recognition that "there appears to be little doubt that David committed the crimes charged."  (Id.)

Thus, "the overwhelming issue in this case will be the appropriate penalty."  (Id.)  Further, in

their declarations, both petitioner's trial attorneys stated that Mr. Barthel was hired to conduct the

penalty phase investigation.  (Smith Decl., Ex. 26 (Dkt. No. 8-6), ¶ 6; Humphreys Decl., Ex. 162

(Dkt. No. 12-38), ¶ 11.)  Investigator Kenneth Short was responsible for the guilt phase

investigation.  (Id.)  In his briefing on this guilt phase claim, petitioner does not mention this

limitation on Mr. Barthel's investigations.  Mr. Barthel's plan could be considered evidence of a

strategic decision by petitioner's trial attorneys to focus their efforts on the penalty phase.

Nevertheless, the California Supreme Court rejected this claim in its summary denial of the state

---

[10]  All exhibits cited by petitioner in his briefs were exhibits to his state habeas petition, In re Rundle, No. S130722 and were lodged with this court on April 12, 2010, see Dkt. No. 27.  In addition, petitioner has submitted those exhibits with his petition.  They are referred to herein by their exhibit number as well as their location in this court's docket.

[11]  The exhibits to petitioner's state court petition were Bates stamped to be consecutively paginated.  Page number references herein refer to the Bates stamped page number, not to any page number used within the exhibit itself.

1  habeas petition.  Thus, that court determined that, even accepting the allegations of the petition to

2  be true, petitioner had failed to make a prima facie showing of success on this claim.

3  Considering, then, petitioner's allegations in the most favorable light, this court will presume

4  petitioner is arguing that a reasonable attorney presented with the investigation plan provided by

5  Mr. Barthel would have recognized that many aspects of petitioner's social history could have

6  been used at the guilt phase as well.

7        As discussed in more detail below, it is not surprising that trial counsel focused on

8  the penalty phase.  Petitioner confessed to raping both women and then killing them.  His trial

9  testimony was that sexual abuse by his mother caused him to react violently to the victims'

10  behavior, and that he then, for reasons that are not clear, became sexually attracted to the victim's

11  corpses.  Besides testimony that petitioner's mother was an exhibitionist, there was no testimony

12  supporting petitioner's allegations of sexual abuse and nothing showing a causal connection

13  between any abuse and petitioner's version of the circumstances of each crime.

14                    a. Evidence Presented at the Guilt Phase

15                        i. Prosecution Case

16        As described above, the prosecution had a strong guilt phase case.  Both victim's

17  were found nude and bound.  Petitioner confessed to raping and killing Ms. Garcia and to having

18  sex with Ms. Sorensen and killing her because he was "scared."

19        After hearing testimony that petitioner had drawn police officers a map of the

20  location of Ms. Garcia's body, the jury heard the following testimony from Officer Phillips

21  regarding petitioner's confession to raping and killing Ms. Garcia:

22            A    Smith asked Rundle if he had strangled her [Ms. Garcia].

23            Q    What did Mr. Rundle say or do?

24            A    He paused for a moment then he nodded his head yes.
                 . . .

25

26            A    I asked Rundle if he had tied Carrie up.
                 . . .

1    Q       What did he say to that when you asked him that?

2    A       I'll give his answer in quotes from my report.  "Go there.  It
             will answer all your questions."

3            . . .

4    A       Smith asked if Carrie had rejected David and if that's why
             this happened.

5

6    Q       What did Mr. Rundle say?

     A       He said, "Partly."

7            . . .

8    A       I asked him if he had made a pass at Carrie and she had
             declined.

9

     Q       What did he say?

10

     A       Yes.

11           . . .

12   A       I asked Rundle if he had sexual intercourse with Carrie on
             the hill by the tracks.

13

     Q       What did he say or do?

14

     A       He nodded yes.

15

     Q       What then did you ask him?

16

     A       I asked him if the intercourse was against her will.

17           . . .

18   Q       What did he say?

19   A       He didn't answer.

20   Q       Then what?

21   A       Smith asked Rundle if he strangled Carrie there.

22   Q       What did Mr. Rundle say?

23   A       He nodded yes.

24   (RT 6683:13 - 6685:27.)  Officer Jensen testified that during the car trip from Carson City, where

25   petitioner was apprehended, to Auburn, the following conversation took place:

26   ////

| | | |
|---|---|---|
| 1 | Q | Did Mr. Rundle at this point go into detail about what happened in the car as he was with Ms. Garcia that night? |
| 2 | | |
| | A | Yes, he did. |
| 3 | | |
| | Q | Would you describe that? |
| 4 | | |
| | A | He said that he and Carrie were sitting in the back seat of the car and he leaned over and kissed her on the cheek. |
| 5 | | |
| 6 | Q | What happened next, did he say? |
| 7 | A | Then she kissed him on the mouth. |
| 8 | Q | What happened after that? |
| 9 | A | He said they started kissing, and that he reached his hand down, put it on her leg. |
| 10 | | |
| | Q | And this was going on in his vehicle? |
| 11 | | |
| | A | Yes. |
| 12 | . . . | |
| 13 | Q | What happened then? |
| 14 | A | She said, "No." |
| 15 | Q | Was that when he put his hand on her leg? |
| 16 | A | Yes. |
| 17 | Q | What did he say that she or he did at that point? |
| 18 | A | He said that he and Carrie had started arguing about having sex, and then I asked if she wanted to. He said she did not want to. |
| 19 | | |
| 20 | Q | You asked him if she wanted to have sex – |
| 21 | A | Yes. |
| 22 | Q | – with him? |
| 23 | A | Yes. |
| 24 | Q | And what did he say she said? |
| 25 | A | That he – that she did not want to. |
| 26 | Q | What did Mr. Rundle say occurred after that? |

1     A     Well, he described everything – he said everything was going wiry.

2           And Smith asked why she didn't want to have sex, and he said, "She thought I was all fucked up."

3

4     Q     Those are his words?

5     A     Yes.

6     Q     All right.  Now, did Mr. Rundle describe specifically what he did when Ms. Garcia declined to have sexual relations with him?

7

8     A     He said that – he said, "I flipped, went – I went crazy."

9     Q     All right.  What did he say happened then?

10     A     Well, Smith asked him if this was because he was rejected by Carrie. He said, "Partly."

. . .

11

12     Q     All right. What did he say happened at that time after he went crazy because of the rejection?

13     A     I asked him if he had any weapon with him, and he said, "No."

14           He said that he pushed Carrie down in the back seat of the car and had sex with her.

15

16     Q     What was he asked at that point when he described pushing her down in the car and having sex?

17     A     Smith asked her [sic] if she resisted, and he said, "Partly."

. . .

18

19     Q     And was he asked to described how Ms. Garcia resisted his pushing her down in the seat of the car.

20     A     Yes.   Yes.  Smith asked him how she resisted, and he said, "By squirming."

21

. . .

22     Q     What happened next; what did you ask him?

23     A     Well, Smith asked him what happened after the sex, and he said he got scared.  Things got strange.  Things were inside out.

24

25     Q     And are those his exact words?

26     A     Yes.

| 1 | Q | And after he described that, was Mr. Rundle asked to explain what he meant, "Things got strange, things were inside out?" |
| 2 | | |
| 3 | A | Yes. |
| 4 | Q | What did he say to that? |
| 5 | A | He didn't, he didn't offer any explanation at all. |
| 6 | Q | What did Inspector Smith ask him next at that point? |
| 7 | A | Smith asked him if he killed Carrie because he was afraid that she would say something to someone about him having sex with her. |
| 8 | | He said, "Yes." |
| 9 | . . . | |
| 10 | Q | What was he asked next? |
| 11 | A | Well, he was asked what happened, how did this happen? And he said they began scuffling.  He pushed her down on the seat and began fighting with her. |
| 12 | | |
| 13 | Q | What did he say he did once he pushed her down on the seat and began fighting with her? |
| 14 | | |
| 15 | A | He said, "I grabbed that piece of wire from the bottom of my car." |
| 15 | . . . | |
| 16 | | |
| 17 | Q | All right.  Did he describe for you as he is saying to you these things that he had forced sexual intercourse with Carrie before he got the wire and strangled her? |
| 18 | | |
| | A | As we understood it, yes. |
| 19 | | |
| | Q | What did he say next? |
| 20 | | |
| | A | I asked what he did with the wire after this incident.  He said – |
| 21 | | |
| 22 | Q | And what did he say? |
| 23 | A | He said that he didn't remember what he did with the wire, but he knew that the wire was involved. |
| 24 | | |
| | Q | Did Inspector Smith ask him when he thought or knew that Ms. Garcia was dead? |
| 25 | | |
| 26 | A | Yes. |

35

| | | |
|---|---|---|
| 1 | Q | What did he say to that? |
| 2 | A | "When she didn't move." |
| 3 | Q | What was asked of him next? |
| 4 | A | Smith asked him to think about what he did with the wire, and Rundle – |
| 5 | | |
| 6 | Q | And what did he say? |
| | A | Rundle said, "I remember grabbing the wire and wrapping it around her neck." |
| 7 | | |
| 8 | Q | What did he say after that? |
| 9 | A | He – we asked him or Smith asked him what happened then? |
| 10 | | And he said that he couldn't remember anything else until he woke up the next morning in Weimar. |
| 11 | | |
| | Q | Did one of you ask Mr. Rundle at that point or remind him that he knew where the body had been placed by him? |
| 12 | | |
| 13 | A | Yes. |
| 14 | Q | Will you describe what was said about that? |
| 15 | A | Well, I asked him that if he had forgotten what happened after that, how was he able to draw a map to where he had placed the body? |
| 16 | | |
| 17 | Q | What did he say? |
| 18 | A | He said that he remembered rolling the body down the hill while he was driving towards the freeway, I-80. |
| 19 | . . . | |
| 20 | A | I again asked Rundle how he was able to tell us where the body was if he doesn't remember what happened after the – after he strangled her? |
| 21 | | |
| 22 | | And he said he dreamed where the body was. |
| | . . . | |
| 23 | Q | Did you ask him any details about tying Ms. Garcia up? |
| 24 | A | Yes. |
| 25 | Q | Why don't you describe that; what did you ask him? |
| 26 | A | Well, I asked him if he remembered tying her hands? |

36

1          And he said, "No."

2   (RT 6819:6 - 6826:18.)

3          The jury heard the following testimony regarding petitioner's confession to killing

4   Lanciann Sorensen.  First, Officer Jensen testified regarding the following conversations with

5   petitioner during the drive from Carson City to Auburn:

6          A          Smith asked him if he killed the girl.

7          Q          Did he say the name or just "the girl"?

8          A          I think he said "the girl in Loomis."

9          Q          All right.
                      What did Mr. Rundle say to that?
10
             A          He said, "I guess I should tell you the truth, yes."
11           . . .

12          A          He asked David how he killed the girl.

13          Q          What did he say?

14          A          "The same way, I believe."

15          Q          What did Mr. Rundle say next after describing "The same
                      way, I believe" killing Ms. Sorensen?
16
             A          He said that the girl had gone into town and that he stayed
17                     by the road.  When she came back, "It was all so fuzzy."

18          Q          Did Inspector Smith at that point specifically ask the
                      defendant how he killed the girl?
19
             A          Yes.
20
             Q          What was Mr. Rundle's response?
21
             A          Strangulation.
22
             Q          Was that his exact description?
23
             A          Yes.
24
             Q          What happened next?
25
             A          Smith asked what he used, and he said he didn't remember.
26

| | | |
|---|---|---|
| 1 | Q | What happened after that?  What was said or done? |
| 2 | A | Smith asked if he took the girl's clothes off. |
| 3 | Q | What did Mr. Rundle say? |
| 4 | A | "Yes." |
| 5 | Q | What happened next? |
| 6 | A | I asked Rundle if he had sex with the girl. |
| 7 | Q | What did he say? |
| 8 | A | "I think so." |
| 9 | Q | What did you ask him after that? |
| 10 | A | I asked him if he tied her hands. |
| 11 | Q | What did he say to that? |
| 12 | A | He said, "I don't remember." |

(RT 6833:17 - 6836:3.)   Officer Jensen also testified that petitioner identified a photo of

Lanciann Sorensen as the "girl in Loomis."  (RT 6836:4-23.)

Officer Jensen then testified to another conversation with petitioner at the Placer

County Jail later that day:

| | | |
|---|---|---|
| 17 | A | I began asking him questions from the beginning. |
| 18 | Q | About which case? |
| 19 | A | About Lanciann Sorensen. |
| 20 | Q | What did Mr. Rundle tell you at the interview at the Placer County Jail that afternoon? |
| 21/22 | A | He said that he had met her somewhere on Douglas Boulevard around some buildings. |
| | . . . | |
| 23/24 | A | He said the girl came up to him and started talking to him. |

(RT 6839:18 - 6840:19.)   Officer Jensen then testified that petitioner told him he and Ms.

Sorensen hitched a ride to Loomis and ended up smoking marijuana while they sat by the

1    roadway and talked.  (RT 6841:14 - 6844:14.)   Petitioner then told Officer Jensen:

2        A    Well, he said that he went into deep thought about stuff that
              had been happening to him.
3
4        Q    What did he say?

5        A    He said that his two wives and children that he's not
              allowed to see, his mother and his father.

6        Q    And he brought this up himself?

7        A    Yes.
         . . .
8
9        Q    What did he say, he, Mr. Rundle, did after he was thinking
              about these people?

10       A    Well, he said he got enraged because of his thoughts.

11       Q    What did he do at that point?

12       A    He said, he said that he remembered swinging and kicking
              the sign.
13
         Q    Did he describe in his own words how he was acting?
14
         A    Oh, he said he thought he was freaking out.
15       . . .

16       A    I asked him where the girl was, and he said she was a few
              feet away.  And that nothing seemed to be in focus.  She
17            thought he was all freaking out.

18       Q    That was his words, that Lanciann thought he was, quote,
              all freaking out, close quote?
19
20       A    Right.

         Q    What did he say happened at that point?
21
         A    He said the more he thought that she – or the more, the
22            more she thought that he was freaking out the madder he
              got.
23
         Q    All right.  What did he say he did at that time?
24
         A    He said, "I put my hands on her shoulders.  She swung at
25            me a couple of times.  I just blew up."

26       Q    And was that his exact description?

1     A     Yes.

2     Q     Okay.  And what did he say he did after he put his hands on
Miss Sorensen's shoulders, she swung at him and he blew
3     up?

4     A     He said, "I didn't remember much after this."

5     Q     What did you ask him then?

6     A     Why he killed her.

7     Q     And what did he say?

8     A     He said he didn't know.

9     Q     What did you ask him at that point?

10     A     I asked him if he had sex with her.

11     Q     What did he say?

12     A     He said, "I know I did that."
. . .
13     Q     What next?

14     A     I asked him where, and he said, "It had to be there.  I
15     remember it happening."

16     Q     What did Inspector Smith say or ask at that point?

17     A     Smith asked him what happened after he had sex with the
girl.
18     And Rundle said he didn't remember.
. . .
19
    A     Smith asked him if he could remember what he did after he
20     had sex with the girl, but before he left for home.

21     Q     What did he say?

22     A     He said after he had sex he remembers being terrified.  "I
remember hearing things behind me, around me."
23
    Q     All right. Those were his words?
24
    A     Yes.
25     . . .

26     A     He said he remembered having sex with the girl by a tree

1    and the fence.

2    . . .

3    Q    What did he say happened after he had sex by the fence and
          the tree?

4    A    Smith asked him how he had killed the girl, and he said, "I
          strangled her because I was scared."

5

6    Q    And those were his exact words?

     A    Yes.
7
     Q    What next was asked of him?
8
     A    Smith asked him what he did before he left.
9
     Q    What did he say?
10
     A    He thought for a few minutes and he said, "The weeds."
11   . . .

12   Q    What did the Defendant say?

13   A    "I covered her up with weeds."
     . . .
14
     Q    And what did he say he did next after he covered Ms.
15        Sorensen's body with the weeds?

16   A    He said, "I ran."

17   (RT 6844:23 - 6850:5.)

18          Petitioner's former girlfriend Heather Smith testified that she visited petitioner

19   three times at the Placer County Jail.  (RT 6955:5-12.)  During one visit, she asked petitioner

20   why he killed the girls.  At first he did not respond.  When she told him she had heard he "didn't

21   like women that walked the streets or sleazy women," he responded, "'That's part of it.'" (Id. at

22   22-25.)  He then told Ms. Smith, "'I had a good thing going while it lasted.  Too bad I got

23   caught.'" (Id. at 27-28.)  When Ms. Smith asked petitioner why he hadn't killed her, he told her

24   he "didn't have any reason to."  (RT 6956:15-18.)  Ms. Smith denied telling her friend, and

25   petitioner's former girlfriend, Janet Spafford (formerly Paoli), that petitioner told her he did not

26   kill them because they had said yes.  (RT 6957:12-15.)

1    Janet Spafford testified that Ms. Smith told her about the visit to see petitioner in

2  jail.  (RT 6968:28 - 6969:5; 6975:10-15.)  According to Ms. Spafford, Ms. Smith told her that

3  she asked petitioner why he hadn't killed Ms. Smith or Ms. Spafford and petitioner responded,

4  "because we had said yes."  (RT 6975:16-20.)

5                              ii.  <u>Defense Case</u>

6    The defense was based almost exclusively on petitioner's testimony.  He testified

7  that he had taken LSD, smoked marijuana, and drunk beer the night of Ms. Garcia's death.  He

8  and she spent time talking, which turned to arguing.  Petitioner became enraged during their

9  argument and he strangled Ms. Garcia.  When she was dead, petitioner had sexual intercourse

10  with her body.  He tied a cloth around her head to stop bleeding coming from her mouth.

11    Petitioner testified he met Ms. Sorensen while both were hitchhiking.  They

12  decided to get out of the wind, and headed into a gully.  While there, Ms. Sorensen began kissing

13  him and attempted to orally copulate him.  He became enraged, grabbed her, and probably killed

14  her at this point.  After she was no longer moving, he had sexual intercourse with her body.

15    The first defense witness was Jeffrey Miner.  (RT 7058, et. seq.)  Mr. Miner

16  occasionally employed petitioner in his manufacturing business for about a 30-day period in

17  1985.  (RT 7059:10-16; 7078:1-15.)  He sometimes picked up petitioner at a home he understood

18  to be petitioner's grandfather's home, where petitioner's mother also lived.  (RT 7060:8-10;

19  7062:23-25.)  It was on Drynan Lane in Colfax.  (RT 7062:23.)  He drove by that home often

20  and, during a period of a couple months, sometimes saw a woman standing in the window who

21  would pull up her shirt and "flash her breasts."  (RT 7069:1 - 7072:4.)  He drove by the home to

22  pick up Ron Ballard, his employee, who lived at the end of the same street.  (RT 7067:22-27;

23  7070:8-13.)  One time, while driving with Mr. Ballard, he took a dirt road that ran behind the

24  houses and the woman came out to that road and exposed herself.  (RT 7074:14-23.)  Mr. Miner

25  understood from other people that the woman was petitioner's mother.  (RT 7082:19-22.)

26  ////

1          Ronald Ballard testified next.  (RT 7099 et. seq.)  In 1985, he lived on Drynan

2    Lane in Colfax.  (RT 7100:15-23.)  He knew petitioner because petitioner lived on the same

3    street with his grandfather, a woman he understood to be petitioner's mother, a teenage girl, and

4    a teenage boy.  (RT 7103:22 - 7104:4.)   On four or five occasions, the woman exposed her

5    breasts to Mr. Ballard as he drove by the house.  (RT 7104:18 - 7105:6.)  He also confirmed that

6    he and Mr. Miner drove around the back of the house to avoid being "flashed" and the same

7    woman "come out of the bushes at us as we were driving by" and "bared her breasts at us."  (RT

8    7106A:15-24.)

9          The third defense witness was psychiatrist Dr. Richard Yarvis.  (RT 7228, et seq.)

10   Dr. Yarvis examined petitioner in a series of visits, for a total of over twenty hours.  (RT

11   7231:19-25.)  Petitioner told Dr. Yarvis about his "chaotic unfriendly childhood," in which his

12   father was often absent, and was physically abusive when he was home, and his mother was

13   "promiscuous" and "carried on with him in an incestuous relationship."  (RT 7235:1-13.)  That

14   incestuous relationship began when petitioner was seven or eight and ended when he left home in

15   his mid-teens.  (RT 7235:14-27.)  Dr. Yarvis testified that a parent who suffered sexual abuse as

16   a child would be more likely to inflict similar abuse upon her own child.  (RT 7236:7-12.)  A son

17   who is sexually abused by his mother is more likely to end up with "[s]evere psychiatric illness"

18   or "psychotic."  (RT 7241:9-21.)  However, he testified that he did not believe petitioner was

19   psychotic.  (RT 7244:5-6.)  Dr. Yarvis also testified that victims of incest often end up feeling

20   tremendously angry, have chronic depression, or exhibit antisocial behavior.  (RT 7239:18-20;

21   7253:17-24.)  Drug abuse and alcoholism are quite common.  (RT 7253:28 - 7254:5.)

22          On cross-examination, Dr. Yarvis testified that he knew little about necrophilia.

23   (RT 7291:25 - 7292:10; 7293:10-19.)  Dr. Yarvis also testified that it was difficult to find

24   petitioner credible with respect to his description of the crimes because he had given different

25   versions of them at different times, including inconsistent versions throughout Dr. Yarvis's

26   interviews with petitioner.  (RT 7305:10-22; 7338:14-21.)  He testified that exhibitionists "tend

43

1    to be relatively harmless in the sense that they relatively infrequently go on to commit more

2    active sexual crimes." (RT 7308:19-21.)  Also on cross-examination, Dr. Yarvis testified that he

3    felt petitioner was quick to anger and that two or three times during the interviews Yarvis felt

4    frightened, felt that petitioner could assault him.  (RT 7322:9 - 7323:8.)  Finally, Dr. Yarvis

5    stated that the only information he had that petitioner had been sexually abused by his mother

6    was from petitioner himself.  (RT 7325:1-16.)

7            The fourth defense witness was Philip Bodily.  (RT 7343 et seq.)  Mr. Bodily

8    lived next-door to petitioner from 1975 through 1977 in South Carolina.  (RT 7345:18-21;

9    7346:6-8.)  He is two years older than petitioner and they were friends during that time.  (RT

10   2350:1-3.)  In the fall of 1975, Bodily was entering the 7th grade.  (RT 2350:11-13.)  He was

11   thirteen years old.  (RT 2361:25-26.)  On several occasions, petitioner's mother acted in a

12   sexually provocative way toward Bodily.  She rubbed up against him.  (RT 7356:1-12; 7365:15-

13   17.)  Another time, Mrs. Rundle rubbed his leg, moving her hand up his thigh.  (RT 7360:7-17.)

14   Mr. Bodily also testified that petitioner told him he knew his mother was "screwing around,"

15   having sex with other men.  (RT 7368:18 - 7369:7.)  Mr. Bodily further testified that he saw

16   petitioner's mother and a seventeen-year-old neighbor named Ron Kinney having sexual

17   intercourse.  (RT 7376:8-13; 7381:5 - 7383:8.)  Bodily also heard Kinney tease petitioner about

18   his mother's behavior, calling her a "tramp."  (RT 7387:19 - 7388:5.)  Bodily never saw petitioner

19   and his mother in any sexually inappropriate situations.  (RT 7392:18-26.)

20           Scott Greger testified that in 1985, he lived for several months on Drynan Lane in

21   Colfax.  (RT 7397:2-6.)  As he drove by petitioner's grandfather's house each day for work, he

22   frequently saw a woman standing in the doorway and nude from the waist up.  (RT 7399:1-19.)

23   Later, when he met petitioner's mother, he realized she was the woman he had seen in the

24   doorway.  (RT 7404:1-25.)

25           Petitioner was the sixth defense witness at the guilt phase.  (RT 7412, et seq.)

26   Petitioner testified he walked in on his mother and Ron Kinney having sex more than once.  (RT

7416:9-18.)  Petitioner testified that Mr. Bodily told him about his mother "coming on to him"
and that Mr. Kinney teased him about "the stuff he was doing with my mom."  (RT 7418:7-15.)
Kinney referred to his mother as a "whore" and a "tramp."  (RT 7949:22-23.)  When he was
almost nine years old and living in South Carolina, his mother took him to the bedroom and
directed him to lay on top of her and fondle her.[12]  (RT 7419:1 - 7421:5.)  There were eight or ten
similar events during that time, some of which involved oral sex.  (RT 7421:12 - 7422:13.)
Petitioner also testified that Mr. Kinney once hung a rope from the rafter in the carport, put it
around petitioner's neck, and kicked the chair out from under him.  (RT 7424:13 - 28.)  His
mother and Philip Bodily were also present.  (RT 7424:13-23.)  Petitioner felt like his eyes "were
about ready to pop out of my head" and his "tongue swelled up."  (RT 7425:26 - 7426:2.)  He
testified that his mother laughed about it.  (RT 7425:18-19.)

Petitioner testified that in 1977 his family moved to Idaho Falls.  (RT 7426:26-
28.)  He was sexually mature then and frequently had sexual intercourse with his mother.  (RT
7427:5-25.)  He felt confused and angry.  (RT 7428:3-8.)  When they were in Idaho, his mother
would stand in front of the living room window and expose her breasts to cars that went by.  (RT
7428:24 - 7429:2.)  When petitioner was fifteen, his family moved to Georgia.  (RT 7431:4-22.)
He had one more sexual encounter with his mother there, "blew up" about it, and then "started
staying away from the house as much as possible."  (RT 7431:14-18; 7431:27 - 7432:18.)  While
in Georgia, his mother would flash bypassing trains.  (RT 7433:2-4.)  Sometimes trains would
stop and he saw his mother board them at night, returning in the morning.  (RT 7435:20 -
7436:5.)  He heard from others that his mother was having sex with train crews.  (RT 7436:8-13.)
His sister, who was ten or eleven years old at the time, would sometimes go with her mother to
the trains.  (RT 7444:9-12.)  The "whole town knew" about his mother flashing the trains.  (RT
7436:25 - 7437:2.)  Later, he saw his sister and mother on the front porch of his grandfather's

[12]  On cross-examination it was established that petitioner was likely at least ten years old
at that time.  (RT 7705:11 - 7706:17.)

45

1   house in Colfax.  Both were nude.  (RT 7445:5-25.)

2           Petitioner testified that when he was sixteen and a half, he left home.  (RT

3   7441:21-27.)   When he was almost seventeen, he and his girlfriend Darby moved to Colfax into

4   a cabin across the street from his grandfather's house on Drynan Lane.  (RT 7446:17 - 7447:2.)

5   About four months later, his mother and siblings moved in with his grandfather across the street.

6   (RT 7447:18-21.)  His parents were angry to find him there because they had planned to live in

7   the cabin.  (RT 7448:9-18.)  His mother gave him money and told him to move.  (RT 7448:19-

8   21.)  He and Darby moved back to Georgia.  (RT 7448:23-27.)  After a couple months, he and

9   Darby broke up and eventually he made his way back toward California.  (RT 7449:3-27.)

10  Shortly before his eighteenth birthday, he ended up back in Colfax.  (RT 7450:15 - 7451:5.)  He

11  met and married a woman named Randi.  (RT 7451:4-12.)  They lived in various places in the

12  Auburn and Colfax area.  (RT 7451:15-23.)  After his relationship with Randi failed, petitioner's

13  parents harassed him about leaving the Colfax area.  (RT 7453:13-17.)  He ended up

14  "wandering" again, taking jobs here and there.  (RT 7453:19-22.)

15          In 1986, petitioner landed in Colfax again.  (RT 7455:16-22.)  He was twenty

16  years old.  (Id.)  He lived in his car, camped, or slept at friends' houses.  (RT 7456:12 - 7457:16.)

17  A lot of people in the area knew his mother was flashing people.  (RT 7459:16-18.)  Petitioner

18  also testified that he knew his family was spreading rumors about him.  (RT 7459:1-3.)  He felt

19  angry and embarrassed.  (RT 7463:1-6.)

20          Petitioner met victim Carrie Garcia in the summer of 1986.  (RT 7464:6-24.)

21  They were friends, who "went by the lake and stuff and smoked weed, stuff like that" two or

22  three times.  (RT 7465:11-17.)  Once he saw Carrie in town very early in the morning and,

23  because she had no where to go, took her to his friends' house so she could sleep.  (RT 7466:27 -

24  7469:28.)  Petitioner testified that on the night of the crime, he was driving in Colfax and saw

25  Carrie outside a liquor store being "hassled" by a "drunk guy."  (RT 7472:6-28.)  After petitioner

26  intervened, Carrie left to walk to Chris Paoli's house and asked petitioner to come by later to take

her to the bus station. (RT 7473:9-27.) Approximately an hour later, petitioner picked up Carrie at Paoli's house. (RT 7474:10-20.) Because they had some time before Carrie's bus left, she and petitioner smoked some marijuana. (RT 7475:17 - 7479:20.) Earlier in the evening, petitioner had taken "a couple hits of acid." (RT 7476:9-12.) Carrie discussed her problems with petitioner. (RT 7485:1-4.) He felt "annoyed" because "she wasn't the only one that had problems." (RT 7485:5-20.) They kissed for a while, and then began arguing because Carrie felt she shouldn't be kissing him because she was still married. (RT 7487:9-19.) Eventually, things became heated when Carrie told him his "problems don't mean nothing." (RT 7488:3-11.) He hit her "real hard," pushed her into the back seat, and strangled her with a wire. (RT 7490:1 - 7491:26.) After he felt she was dead, he began removing her clothes. (RT 7494:2.) While he was doing so, he heard a gurgling noise and saw blood coming from her mouth. (RT 7493:5 - 7494:10.) He put a red cloth "up there" to stop the blood. (RT 7495:1-19.) About fifteen or twenty minutes later he undressed and "had sex with her." (RT 7495:23-27.) He felt that the sex was "exciting" because she "[c]ouldn't hurt me" and "[c]ouldn't control me." (RT 7496:1-11.) At some point after she was dead, he tied her wrists because it gave him a feeling of control. (RT 7496:24 - 7497:4; 7512:12-22.) He then drove north of Colfax and threw Ms. Garcia's body down an embankment. (RT 7498:22 - 7499:12.) The following day, he found the body and moved it near a tree. (RT 7499:13 - 7500:15.) He talked to himself and thought about his hatred for his mother. (RT 7502:21-23.) Ms. Garcia reminded him of his mother because of the "nagging." (RT 7502:24-26.)

Petitioner testified that he told the police he had sex with Ms. Garcia before killing her because he was too embarrassed to tell them he had sex with a dead body. (RT 7514:1-27.) Petitioner said he decided to talk about his mother's abuse after learning that his younger brother had been charged with a sex-related crime. (RT 7517:28 - 7518:13; 7520:17 - 7521:12.) Petitioner was concerned that his brother would end up "sitting in a place like I'm sitting one day." (RT 7521:23-26.)

On the day he met victim Lanciann Sorensen, petitioner spent the night in Colfax and then hitchhiked to Sacramento. (RT 7522:13 - 7524:6.) He "got high" and had sex with two prostitutes. (RT 7524:9, 19-20; 7796:10 - 7810:3.) While hitchhiking back to Colfax that evening, he met Ms. Sorensen. (RT 7526:17 - 7527:3.) They got a ride to Loomis. (RT 7528:19-22.) Petitioner testified that he had been "high most of the day" on acid, marijuana, and alcohol. (RT 7530:7-16.) At one point, they stopped and sat down near the road to get out of the wind. (RT 7824:21 - 7825:21.) He did not consider having sex with Ms. Sorensen. (RT 7535:16-27.) He felt guilty and very depressed about having had sex with prostitutes. (RT 7536:1-5.) Ms. Sorensen than unbuttoned his pants and started to orally copulate him. (RT 7537:1-19.) He jumped up and grabbed Ms. Sorensen around the neck. (RT 7539:10-25.) He felt mad and "[a]fter a few minutes shaking her around and everything, I threw her down." (RT 7540:1-17.) He stated that he wasn't thinking about killing her because he was "in the middle of a rage." (RT 7853:25-26.) When he realized she was dead, he "[b]eat the fence a couple times" because he was still "really mad." (RT 7542:12-18.) Afterwards, he undressed her body and had sex with it. (RT 7545:10-20.) He felt a "revenge feeling" for what he had had to go through with his family. (RT 7546:22-23.) He also tied her hands up with her pants because it gave him an "awesome feeling of accomplishing total control." (RT 7547:17-18.)

During cross examination, petitioner admitted that he was not so "high" that he did not remember, in detail, what had happened when he killed both women. (RT 7550:23-26; 7551:5-21.) Petitioner also admitted that he gave Dr. Yarvis "at least ten different and inconsistent versions of how" he killed the victims. (RT 7556:22-25.) He did not contest statements he gave to the police about how he raped and murdered the victims. (RT 7588:15-26.) He just stated that he was lying to them. Petitioner also testified that he did not tell prison psychiatrist Dr. Lyons the truth about the crimes. (RT 7636:1-18.) Petitioner admitted that he knew before he testified that his situation would be better if he testified that he had sexual intercourse with the victims after they were dead, rather than before. (RT 7638:9-17.) On cross-

48

examination, petitioner also testified that after wrapping the wire around Ms. Garcia's neck, he was thinking of killing her and intended to kill her as he pulled the wire tight.  (RT 7667:15-24.) Petitioner contradicted some of his direct testimony.  He stated that he heard the "gurgling" sound and saw blood coming from Ms. Garcia's mouth as he was sodomizing her, not, as he testified on direct, as he was removing her clothes.  (RT 7682:26 - 7683:5.)

Kenneth Short, a defense investigator, testified that petitioner told him he had been sexually abused by his mother.  (RT 7956:21-25.)  Petitioner did not reveal this fact to Mr. Short until petitioner learned that his brother had been involved in a child molestation.  (RT 7962:3-6, 24 - 7963:7.)

Petitioner's mother originally testified for the prosecution that the blanket found near Ms. Garcia's body was one she had lent to petitioner, and about the family's moves.  (RT 5951 - 5988.)  She also testified for the defense.  (RT 7992, et seq.)  Mrs. Rundle denied having sex with Ron Kinney, or any other men besides her husband, and denied exposing herself to passers by.  (RT 8011:16-18; 8016:22 - 8023:24.)  She also denied boarding any of the trains that ran behind their house in Georgia or having sexual relations with any members of the train crews. (RT 8026:11-22.)  Finally, she denied having any sort of sexual relations with petitioner when he was growing up.  (RT 8026:23 - 8029:5.)

The court read the jury stipulated testimony that neighbors of petitioner's family when they lived in Georgia would testify that they saw petitioner's mother expose herself to passing trains.  (RT 8044:16 - 8045:2.)

b. Evidence Petitioner Argues Should Have Been Presented at the Guilt Phase

Petitioner sets out the evidence he argues a reasonable attorney would have found and presented in support of petitioner's guilt phase defense that he neither premeditated the murders nor attempted to commit rape.[13]  Petitioner sets out an extensive social and family

---

[13]  While this court uses the term "evidence" to refer to petitioner's factual support for his claims, the undersigned recognizes that the factual support is not evidence at this point.  Rather,

1   history of himself and his immediate family.  Much of petitioner's proffer of this evidence is

2   described in detail below in the discussion of petitioner's Claim D, that counsel was ineffective

3   at the penalty phase.  Because much of the evidence has limited relevance to the resolution of

4   petitioner's Claim A, it is summarized only briefly here.

5              Petitioner alleges that the evidence would establish the following information.

6   Petitioner's mother was sexually abused by her father for many years.  As is common with incest

7   victims, she exhibited inappropriate sexual behavior from a fairly young age.  Petitioner's parents

8   were married when both were seventeen years old and petitioner was born only a year later.

9   Petitioner's childhood was marked by physical and emotional abuse by both parents, frequent

10  moves, and poverty.  Petitioner extensively describes the sexual abuse he suffered from his

11  mother.[14]  While the factual basis for petitioner's claim of incestuous sexual abuse is primarily

12  his own statements, it is also supported by the declaration of psychologist David Lisak who

13  found it "highly credible" and by the declaration of one of petitioner's friends from the 1980s

14  that petitioner told him at that time that his mother had "sexually molested him for many years."

15  Petitioner also provides support for his claims that his father beat him.

16             Petitioner began abusing drugs and alcohol when he was in junior high.  At that

17  time, he also started exhibiting inappropriate sexual behavior.  He attempted to sexually assault a

18  six-year-old girl and later sexually assaulted two young boys.  During this time, petitioner was

19  still being sexually abused by his mother.  In addition, she frequently exposed herself to

20  passersby.  Petitioner's drug use became regular and heavy in high school.

21             In 1983, petitioner and his girlfriend left Georgia and moved into a cabin across

22  the street from his grandfather in Colfax.  Petitioner's parents arrived shortly thereafter and told

23  petitioner they did not want him in town.  Petitioner frequently felt unwanted by his family.  In

24  _____

25  it is petitioner's proffer in support of his claims.

26      [14]  As set forth above, much of what petitioner was seeking to establish was, in fact,
    presented through other testimony at trial.

1   1984, after a very short relationship with a new woman, petitioner married her.  He continued to

2   take large amounts of drugs and was physically and sexually violent to his wife.  During this

3   time, petitioner's mother continued to expose herself to passing drivers.

4          Petitioner also proffers the following expert testimony: (1) the declaration of

5   psychiatrist Dr. Jay Jackman, who describes petitioner's psychological development and

6   concludes petitioner has emotional and mental impairments as a result; (2) the declaration of

7   psychologist Dr. David Lisak, who opines that petitioner's reports of maternal sexual abuse were

8   "highly credible;" (3) the declaration of psychologist Dr. Nicholas Groth, an expert on male

9   sexual abuse, who states he could have testified about the effects of mother-son incest on a

10  child's psychological development.[15]  These opinions were buttressed by the report of Jim

11  Denman, a defense investigator and practicing Marriage, Family, and Child Counselor.  Mr.

12  Denman interviewed petitioner extensively and reported that petitioner learned to associate sex

13  with physical abuse, and with rage.  All of these experts opined that petitioner's story of reacting

14  violently to the victims' provocation was believable in light of his history of suffering incestuous

15  sexual abuse and of extensive alcohol and drug abuse.  Dr. Jackman also stated that petitioner's

16  described feelings of power or control over the victims' bodies was consistent with having been

17  sexually abused.  The mental health experts opined that petitioner's mental state at the time was

18  such that he could not have formed specific intent to rape or murder.

19          Finally, petitioner presents corroboration for his account of the crimes.  He argues

20  his trial counsel should have located and had testify a man familiar with Ms. Sorensen's

21  aggressive sexual behavior, which would have corroborated petitioner's account of Ms.

22  Sorensen's actions in attempting to fellate him.  (Irwin Decl., Ex. 16 (Dkt. No. 7-17), ¶ 3.)  He

23  also presents the opinions of Drs. Jackman and Lisak that stress caused petitioner's demeanor to

24

25          [15]  Dr. Groth's declaration does not describe what those effects are or how they are
    relevant to petitioner's case.  In fact, he appears to be an expert on the psychology of male
26  rapists.  This would not have been particularly helpful to petitioner at the guilt phase because he
    claimed he did not rape the victims.

1  appear very unemotional and, along with his fuzzy memory, caused him to tell conflicting stories

2  when he was interviewed by police and at the time of trial.

3                      c.  Discussion

4               The problem with petitioner's recitation of his social history and proffer of expert

5  testimony is that it establishes little connection between the sexual abuse he suffered and the

6  story he told at trial.  Even assuming petitioner's trial attorneys should have investigated and

7  presented evidence substantiating petitioner's testimony of abuse by his mother, that abuse was

8  only relevant to one aspect of petitioner's story - that each woman did something that petitioner

9  associated with his mother and triggered a rage reaction, causing him to kill them.  The evidence

10  of abuse did not, however, explain why it was more likely petitioner sexually assaulted the

11  victims' dead bodies rather than raped them.  The only, very slight bit of corroboration for that

12  story would have been Dr. Jackman's statement that petitioner's descriptions of feeling powerful

13  over the dead women would have been consistent with an incest victim.  However, there is no

14  reason to think that feeling of power wouldn't have been equally true had petitioner bound and

15  raped the women while they were alive.

16               The jury did not believe petitioner's story of necrophilia; it found him guilty of

17  attempting to rape both women.  Therefore, even if petitioner could have shown successfully that

18  he did not premeditate and deliberate the murders, all this evidence petitioner claims should have

19  been introduced does not explain the substantial other evidence of rape: the women were bound

20  in ways so that they could not struggle and Ms. Garcia could not call out for help, the women

21  were both nude, petitioner confessed that Ms. Garcia resisted sexual intercourse by "squirming,"

22  petitioner told police that he killed Ms. Sorensen because he was "scared" after having sex with

23  her, and petitioner indicated to Ms. Smith that he killed the women because they did not say

24  "yes."

25               Even with this new evidence, petitioner provides no reason to believe his story at

26  trial is any more believable than the story told by the prosecution, supported by the circumstantial

1    evidence, and to which petitioner largely confessed, that he raped or attempted to rape both

2    women and then killed them to avoid being caught.  Dr. Jackman's opinions regarding

3    petitioner's state of mind at the time of the crimes are based solely on the assumption that

4    petitioner's description of them is true.  (Jackman Decl., Ex. 163 (Dkt. No. 12-39), ¶¶ 137-45.)

5    The jury's verdict makes clear they did not believe petitioner's story.  While expert opinions

6    would have supported the possibility that petitioner might react as he described before killing the

7    women, they are still based on petitioner's description of the crimes.  It is certainly reasonable to

8    assume that had the experts been presented with the facts that petitioner raped and then murdered

9    both women, they would have considered petitioner's history of abuse to be a factor leading to

10    that result as well.

11          Petitioner's attempt to present additional evidence of his intoxication and mental

12    issues also fails to support his story at trial.  Petitioner testified that he was not so intoxicated or

13    high at the time of the crimes that he did not remember what had happened.  (RT 7550:23-26;

14    7551:5-21.)  Trying to show petitioner was so intoxicated that he could not have formed intent to

15    rape or murder flies in the face of this trial testimony.  It also flies in the face of the facts that

16    petitioner tightly bound both women's hands behind their backs, gagged Ms. Garcia, and,

17    apparently, removed both women's clothes.  Certainly, all these facts favor a conclusion that

18    petitioner was not so intoxicated at the time of the crimes that he could not carry out several steps

19    toward raping the women.

20          Whether or not petitioner's trial attorneys acted reasonably in failing to present the

21    sort of social history and expert evidence presented here, petitioner has failed to establish a

22    reasonable probability the result of the guilt phase would have been different had the jury heard

23    the evidence he presents here.  Petitioner has not made a prima facie showing of prejudice under

24    Strickland.  Accordingly, the California Supreme Court's denial of petitioner's Claims A.1 and

25    A.2.a through A.2.g was not unreasonable under 28 U.S.C. § 2254(d).

26    ////

3. Ineffective Assistance of Counsel for Failures re Jury Instructions

Petitioner raised these claims of ineffective assistance of counsel in state court in his habeas petition. They were denied summarily by the California Supreme Court. He raised many of the related claims of trial court error on appeal. For the reasons set out in this section, petitioner has failed to meet any of the hurdles of section 2254(d). Accordingly, this court recommends denial of these claims of ineffective assistance of counsel for failure to request and object to jury instructions.

a. Failure to Request Instruction re Voluntary Intoxication and Intent

Petitioner argues his trial counsel should have requested an instruction that voluntary intoxication can negate the mental states of premeditation, deliberation, and the specific intent to commit rape. However, petitioner makes no attempt to argue that the California Supreme Court unreasonably denied his state habeas claim that counsel was ineffective for failing to request the voluntary intoxication instruction. This court finds that the California Supreme Court could reasonably have found that petitioner did not make out a prima facie case that counsel acted unreasonably in failing to request the instruction. The defense did not focus on petitioner's intoxication, and for good reason. Petitioner testified that he was not so "high" that he did not remember, in detail, what had happened when he killed both women. (RT 7550:23-26; 7551:5-21.) The entire defense case rested on the jury believing petitioner's recounting of the crimes. Because he has failed to satisfy section 2254(d), petitioner's claim of ineffective assistance of counsel for failing to request an intoxication instruction should be denied.

b. Failure to Request Complete Reading of CALJIC 3.32

CALJIC 3.32 was read to the jury as follows:

> Evidence has been received from which you may find that the defendant was affected by a mental condition at the time of the crimes charged.

////

54

1
2
> You may consider such evidence solely for the purpose of determining whether or not the defendant actually formed any intent or mental state which is an element of the crimes charged.

3  (RT 8272:20-26.)   Petitioner argues his counsel should have requested that the jury be instructed

4  that "mental state" includes malice, premeditation and deliberation for the murder counts, as well

5  as the specific intent requirements of the attempted rape charges.

6         The California Supreme Court addressed petitioner's claim that the trial court

7  erred in failing to give an appropriate instruction:

8
9
10
11
12
13
14
15
> At the conclusion of the guilt phase of the trial, the court instructed the jury pursuant to a modified version of CALJIC No. 3.32, as follows: "Evidence has been received from which you may find that the defendant was affected by a mental condition at the time of the crimes charged. You may consider such evidence solely for the purpose of determining whether or not the defendant actually formed any intent or mental state which is an element of the crimes charged." Defendant contends the trial court erred by failing to specifically name for the jury the intent or mental state to which defendant's "mental condition" evidence was relevant. He argues that without such an instruction, it is likely the jury did not understand that premeditation and deliberation and the specific intent to commit rape were the intent and mental states to which this instruction referred.FN35

16
17
18
19
> FN35. It appears from defense counsel's closing argument that the "mental condition" at issue was the psychological impact of the supposed incestuous relationship between defendant and his mother. In other words, counsel asserted that defendant had unique sensitivities that could cause uncontrollable rage, precluding premeditation and deliberation and explaining why he had no intent to rape the victims before killing them.

20
21
22
23
24
> As an initial matter, defendant failed to preserve an objection to the adequacy of the instruction given at the guilt phase, and therefore has forfeited that challenge. (People v. Hudson (2006) 38 Cal.4th 1002, 1011–1012, 44 Cal.Rptr.3d 632, 136 P.3d 168 (Hudson) ["'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language'"].)

25
26
> To the extent we may review defendant's claim despite his failure to preserve the issue, it is without merit. (See § 1259 ["The appellate court may . . . review any instruction given, . . . even though no objection was made thereto in the lower court, if the

55

substantial rights of the defendant were affected thereby."].) When we review challenges to a jury instruction as being incorrect or incomplete, we evaluate the instructions given as a whole, not in isolation. (People v. Mayfield (1997) 14 Cal.4th 668, 777, 60 Cal.Rptr.2d 1, 928 P.2d 485.) "For ambiguous instructions, the test is whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction." (Ibid.) We previously have rejected challenges similar to defendant's regarding the failure explicitly to define the term "mental states" in instructions concerning the effect of a mental defect upon the defendant's ability to form mental states required for the commission of various offenses. Thus, we have found no error in cases in which a mental defect instruction merely mentioned the term "mental state" in a generic sense, but the trial court elsewhere either specifically explained that premeditation and deliberation were mental states necessary for a conviction of first degree murder (People v. Musselwhite (1998) 17 Cal.4th 1216, 1247–1249, 74 Cal.Rptr.2d 212, 954 P.2d 475 (Musselwhite); People v. Jones (1991) 53 Cal.3d 1115, 1145, 282 Cal.Rptr. 465, 811 P.2d 757), or generally instructed that " '[t]he mental state required is included in the definition of the crime charged.' " (People v. Smithey (1999) 20 Cal.4th 936, 988, 86 Cal.Rptr.2d 243, 978 P.2d 1171 (Smithey).)

Defendant observes that in the present case, the trial court did not specifically define premeditation and deliberation or the intent to rape as "mental states," rendering Musselwhite and People v. Jones inapplicable. He further argues the trial court did not clearly instruct the jury that the mental states were defined in the instructions concerning the charged offenses. The trial court did give a modified version of CALJIC No. 3.31 regarding the concurrence of act and mental state, with language similar to the instruction on which we based our decision in Smithey, but there was a slight variance in the oral reading of the instructions. The written version stated in relevant part: "These specific intent and mental states are set out in the instructions pertaining to the specific crimes." The oral version was: "These specific intents and mental states required in each of these crimes are set out in the instructions pertaining to a specific crime which I'll be giving you." Defendant argues the jury likely was confused by the oral version because it referred to a specific crime's instructions, in the singular, which was not possible because there were two specific crimes charged. He claims this potential for confusion makes Smithey inapplicable as well.

Even assuming the transcription is completely accurate and the instructions did not clearly inform the jury that the mental states referred to in the mental condition instruction were defined in the instructions on the crimes (plural), we still conclude there is no possibility the jury failed to realize this connection. Recently, we found no error even when "the jury neither was informed that

56

premeditation and deliberation were mental states, nor told that the mental state required for each crime was included in the definition of that crime," because no reasonable juror, when properly instructed on the elements of first degree murder, could fail to realize that premeditation and deliberation are mental states at issue in such a charge and to make the connection between the elements of the crime and the limited purpose of the admission of mental defect evidence. (Rogers, supra, 39 Cal.4th at p. 881, 48 Cal.Rptr.3d 1, 141 P.3d 135, citing People v. Castillo (1997) 16 Cal.4th 1009, 1017, 68 Cal.Rptr.2d 648, 945 P.2d 1197.) Although in People v. Jones, Musselwhite, and Smithey other instructions were given lessening the chance of confusion, the absence of such instructions in the present case, as in Rogers, does not suggest the jury was unable to make the connection between the mental states referred to in the mental condition instruction and those described in the instructions on the charged offenses.

In the present case, the trial court properly instructed the jury concerning the concepts of premeditation and deliberation required for an express-malice first degree murder finding, the specific intent to commit rape required for an attempted-rape finding and an associated felony-murder finding, and the elements of the attempted-rape special-circumstance allegations. The primary issue at trial, moreover, was defendant's mental state at the time he killed Garcia and Sorensen—whether he intended to rape them then and/or whether he premeditated and deliberated before killing them—and the arguments of counsel further clarified the connection between defendant's asserted mental condition and the relevant mental states. (See Rogers, supra, 39 Cal.4th at p. 882, 48 Cal.Rptr.3d 1, 141 P.3d 135.) We therefore conclude no reasonable jury would have failed to realize these were the mental states to which the mental condition instruction referred. Accordingly, the absence of specific reference to them in the instructions was not error.

43 Cal. 4th at 148-50.  Petitioner makes no attempt to argue that the California Supreme Court's determination that the instruction was not, on its face, ambiguous is unreasonable.  There is no reason to think the jury would not have understood the instruction's reference to "mental state" to include premeditation, deliberation, and the specific intent necessary for attempted rape.  If the instruction was not ambiguous, trial counsel cannot be said to have been unreasonable in failing to seek to clarify it and there is no reasonable probability the lack of clarification prejudiced petitioner.  The California Supreme Court could reasonably have found that petitioner had not

////

57

1    made a prima facie showing that counsel was ineffective for failing to request clarification of that

2    instruction.

3                        c.   Failure to Request Instruction on Lesser Included Offense of Assault

4                        Petitioner next argues trial counsel unreasonably failed to request an instruction

5    that, due to intoxication, petitioner was not guilty of attempted rape, but of the lesser included

6    offense of assault.  The jury was given two choices with respect to petitioner's admitted assault

7    of the women – guilty or not guilty of attempted rape.  (RT 8275:11-17.)  Petitioner argues that

8    the jury could have entertained a reasonable doubt that petitioner had the ability to form the

9    specific intent to rape.  Because the evidence of intoxication supported that doubt, petitioner

10   argues, counsel acted unreasonably in failing to request the instruction.

11                        On appeal, the California Supreme Court rejected the related claim of trial court

12   error in failing to sua sponte give the instruction:

13                    Defendant contends the evidence presented at trial was
            sufficient for the jury to find that, because of his intoxicated state,
14          he was unable to form the specific intent to commit rape,
            precluding conviction on the attempted rape charges. But because
15          his intoxication cannot negate the general intent required for
            simple assault, defendant argues, the jury should have been
16          instructed on the offense of assault as an "intoxication based"
            lesser included offense of attempted rape. Although defendant did
17          not request the trial court to instruct the jury on the crime of assault
            as a lesser included offense, he claims on appeal the court violated
18          its alleged duty to so instruct on its own motion, and this failure
            violated his state and federal constitutional rights. (See Breverman,
19          supra, 19 Cal.4th 142, 77 Cal.Rptr.2d 870, 960 P.2d 1094; Beck v.
            Alabama (1980) 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392
20          (Beck ).) We disagree.

21                    It is clear, as a matter of state constitutional law, that trial
            courts are required to give instructions on all lesser offenses
22          necessarily included within the filed charges, when there is
            substantial evidence supporting a conviction for a lesser offense,
23          regardless of whether the parties request such instructions or even
            oppose them. (Breverman, supra, 19 Cal.4th at pp. 154–155, 77
24          Cal.Rptr.2d 870, 960 P.2d 1094.) As we explained in Breverman,
            however, the related federal constitutional right is more
25          circumscribed, prohibiting only in capital cases those situations in
            which the state has created an "artificial barrier" preventing the
26          jury from considering a noncapital verdict other than a complete

acquittal and thereby calling into question the reliability of the outcome. (Id. at pp. 166–168, 77 Cal.Rptr.2d 870, 960 P.2d 1094, citing Beck, supra, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392, Schad v. Arizona (1991) 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555, and Hopkins v. Reeves (1998) 524 U.S. 88, 118 S.Ct. 1895, 141 L.Ed.2d 76 (Reeves).)

Defendant contends the trial court's failure to give an assault instruction violated the rule of Beck, because the jury was forced into an "all-or-nothing" situation in which the choice on the attempted rape charges essentially was between the death penalty and acquittal, due to the felony-murder rule and the attempted-rape special-circumstance allegations. (See Beck, supra, 447 U.S. at p. 637, 100 S.Ct. 2382.) For several reasons, defendant's assertion is incorrect.

First, the jury was not forced to choose between convicting defendant of crimes he did not commit (assertedly, the attempted rapes and associated first degree felony murder and attempted-rape special-circumstance findings) and a complete acquittal. The jury had the option of finding that defendant did not form the intent to have sexual relations with the victims until after they were dead (and therefore of acquitting him of the attempted rape charges), but nonetheless of finding—if this was supported by sufficient evidence—that defendant murdered the victims with premeditation and deliberation, as well as the associated multiple-murder special circumstance, rendering him still eligible for the death penalty. In addition, the jury had the option of finding him guilty of some lesser degree of noncapital homicide for one or both of the murders, instead of issuing a complete acquittal.

Second, as discussed in Reeves in the context of Nebraska law, there is a structural difference in California's death penalty statute distinguishing this case from Beck. Under the Alabama law applicable to Beck's trial, if the jury convicted the defendant of capital murder, it was required to impose the death penalty, a circumstance that "threatened to make the issue at trial whether the defendant should be executed or not, rather than 'whether the State ha[d] proved each and every element of the capital crime beyond a reasonable doubt.' " (Reeves, supra, 524 U.S. at p. 98, 118 S.Ct. 1895.) In California, as under Nebraska law, a guilty verdict of first degree murder with true special circumstance findings does not require the jury automatically to set defendant's punishment at death. Defendant's jury was instructed that if its verdict at the conclusion of the guilt phase of the trial made defendant eligible for the death penalty, it then would consider whether a sentence of death or life imprisonment without the possibility of parole should be imposed. The jury, therefore, when considering defendant's guilt or innocence, was not placed in the position of determining whether or not he should be executed instead of whether his guilt had been adequately proven.

59

Thus, for both these reasons, there is no likelihood the lack of an instruction on assault as a lesser included offense of attempted rape affected the reliability of the jury's verdict, in violation of defendant's federal constitutional rights. (See Reeves, supra, 524 U.S. at p. 95, 118 S.Ct. 1895.)

Additionally, there is a third reason why defendant's federal constitutional claim must fail, also disposing of his state constitutional claim: assault is not a lesser included offense of attempted rape in the present case. (Reeves, supra, 524 U.S. at p. 96, 118 S.Ct. 1895; Breverman, supra, 19 Cal.4th at p. 154, 77 Cal.Rptr.2d 870, 960 P.2d 1094.) We apply the statutory elements and accusatory pleading tests to determine whether one offense is a lesser included offense of another. (People v. Reed (2006) 38 Cal.4th 1224, 1227–1228, 45 Cal.Rptr.3d 353, 137 P.3d 184 (Reed).) First, under the elements test, we look to the two statutes to determine whether in the defendant's commission of the greater offense, his or her actions necessarily would satisfy all of the elements of the lesser offense. (Ibid.) One who has committed the crime of attempted rape has not necessarily committed an assault, because an essential element of assault—the present ability to inflict harm—is not necessarily present in an attempted rape.

In order to commit an attempted rape, a person must form the intent to rape and perform a direct but ineffectual act, beyond mere preparation, leading toward commission of a rape. (§ 21a; Carpenter, supra, 15 Cal.4th at p. 387, 63 Cal.Rptr.2d 1, 935 P.2d 708.) An assault is "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) Although there is no doubt that a rape is a violent injury to another, an attempted rape is not necessarily also an assault, because the attempt to commit a rape does not require that the perpetrator ever progress to the point of having the present ability to commit a rape. As we previously have noted, although in a criminal attempt the underlying conduct completing the attempt may be remote from the completion of the intended crime, in an assault that underlying conduct must immediately precede the commission of the violent injury; that is, "'"[t]he next movement would, at least to all appearance, complete the battery."'" (People v. Williams (2001) 26 Cal.4th 779, 786, 111 Cal.Rptr.2d 114, 29 P.3d 197; see ibid. ["Indeed, our criminal code has long recognized this fundamental distinction between criminal attempt and assault, by treating these offenses as separate and independent crimes"]; cf. People v. Licas (2007) 41 Cal.4th 362, 368–369, 60 Cal.Rptr.3d 31, 159 P.3d 507 [assault with a firearm (§ 245, subd. (a)(2)) is not a lesser included offense of shooting at another person from a vehicle (§ 12034, subd. (c)), because the latter offense does not include the element that the shooter have the present ability to inflict a violent injury on the target]; People v. Marshall (1997) 15 Cal.4th 1, 38–39, 61 Cal.Rptr.2d 84, 931 P.2d 262 [the crime of battery (§ 242)—an unlawful touching of the victim—is not a

60

1   lesser included offense of attempted rape, because the victim of
    attempted rape might never be touched].) FN31 Because a person
2   who has committed an attempted rape has not necessarily
    committed an assault, assault is not a lesser included offense of
3   attempted rape under the elements test.

4           FN31. Indeed, assault with intent to commit a particular
            crime is considered a more aggravated crime than mere
5           attempt to commit that crime, because in the former there
            exists the present ability to commit the crime. (People v.
6           Ghent (1987) 43 Cal.3d 739, 757, 239 Cal.Rptr. 82, 739
            P.2d 1250.)
7
            Second, in the present circumstances, assault also is not a
8   lesser included offense under the accusatory pleading test. Nothing
    in the information's charges of attempted forcible rape alleged
9   defendant possessed the present ability to inflict injury upon the
    victims. (Cf. Reed, supra, 38 Cal.4th at p. 1228, 45 Cal.Rptr.3d
10  353, 137 P.3d 184 [charge of being a felon in possession of a
    firearm was a lesser included offense of the charges of carrying a
11  concealed firearm and carrying a loaded firearm in a public place
    under the accusatory pleading test (but not the elements test) when
12  the information alleged in all counts that defendant was a convicted
    felon].)
13
            Because under the elements and accusatory pleading tests
14  assault is not a lesser included offense of the charges that
    defendant attempted to forcibly rape Garcia and Sorensen, the trial
15  court had no duty on its own motion to instruct on the crime of
    assault.
16
17  Rundle, 43 Cal. 4th at 141-44.

18          Without citation to authority, petitioner argues that assault is a lesser included

19  offense of attempted rape.  Petitioner makes no attempt to challenge the California Supreme

20  Court's ruling to the contrary.  Petitioner simply cites federal cases requiring instruction on a

21  lesser included offense in a capital case.  (Dkt. No. 92 at 130.)  As shown by the California

22  Supreme Court, assault was not a lesser included offense in this case.  Therefore, petitioner's trial

23  counsel cannot be charged with failing to request the instruction and petitioner has not shown

24  prejudice because the trial court would not have given the instruction in any event.  Accordingly,

25  the California Supreme Court's rejection of this claim was not unreasonable under 28 U.S.C. §

26  2254(d).

1          d.  Failure to Request Definition of "Sexual Intercourse"

2          The definition of rape given at trial stated that one of the elements was "an act of

3   sexual intercourse."  (RT 8281:1-2.)  Petitioner argues that under California law at that time,

4   "sexual intercourse" was limited to vaginal intercourse.  While not entirely clear, petitioner

5   appears to argue that counsel should have requested this clarification in case the jury had a

6   reasonable doubt as to whether petitioner intended sodomy, rather than rape.

7          In addressing the related claim of trial court error, the California Supreme Court

8   rejected the claim because counsel failed to seek the instruction at trial.  43 Cal. 4th at 150.  The

9   court also addressed the merits:

10              Of course, despite defendant's failure to preserve this issue
           for appeal, we may review his claim of instructional error to the
11         extent his substantial rights were affected. (§ 1259.) We previously
           have rejected the contention that the term "sexual intercourse"
12         must be defined for the jury. (Stitely, supra, 35 Cal.4th at p. 554,
           26 Cal.Rptr.3d 1, 108 P.3d 182, citing Holt, supra, 15 Cal.4th at p.
13         676, 63 Cal.Rptr.2d 782, 937 P.2d 213.) Defendant presents no
           compelling reason for us to revisit that holding. Further, the
14         charges and special circumstance allegations in the present case
           involved attempted rape. We see no possibility that because
15         defendant testified he sodomized the victims in addition to having
           vaginal intercourse—assuming the jury believed that portion of his
16         testimony, despite its obvious rejection of his testimony regarding
           the timing of these acts—any juror found that defendant attempted
17         to rape the victims based solely upon a mistaken finding that he
           intended only to sodomize them. Thus, there was no need to define
18         "sexual intercourse," and no error or constitutional violation
           occurred.
19

20   43 Cal. 4th at 150-52.

21         Petitioner does not show why the California Supreme Court was unreasonable in

22   finding that there was no possibility that a jury would have found petitioner attempted to rape the

23   victims based solely upon a mistaken finding that he only intended to sodomize them.  Petitioner

24   has shown no reason to think that, had the instruction been given, the result of the guilt phase

25   would have been any different.  Therefore, the California Supreme Court's determination that

26   petitioner had not made out a prima facie case for this claim was not unreasonable.

e. Failure to Object to Instruction that Diluted Reasonable Doubt Standard

Petitioner makes only a very brief argument that counsel should have objected to

the dilution of the reasonable doubt standard in the instructions on circumstantial evidence.  The

California Supreme Court rejected petitioner's claim of trial court error on appeal:

> Defendant raises a familiar claim that several of the then standard instructions given in this case individually and cumulatively "diluted" the jury's understanding of the reasonable doubt standard it was constitutionally required to apply to the determination of his guilt, and that this error violated his rights to due process of law, to a jury trial, and to be free from cruel and unusual punishment under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. (See In re Winship (1970) 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368; see also Sullivan v. Louisiana (1993) 508 U.S. 275, 278–282, 113 S.Ct. 2078, 124 L.Ed.2d 182.) FN39 Defendant did not raise these challenges below and therefore has forfeited them.

> FN39. Defendant cites the following instructions as the cause of this asserted error: a modified instruction combining CALJIC Nos. 2.01 and 8.83 (sufficiency of circumstantial evidence to prove guilt of offenses and truth of special circumstances); a modified instruction combining CALJIC Nos. 2.20 and 8.83.1 (sufficiency of circumstantial evidence to prove intent and mental state underlying offenses and truth of special circumstances); CALJIC No. 2.21.1 (discrepancies in testimony); CALJIC No. 2.21.2 (willfully false witnesses); CALJIC No. 2.22 (weighing of conflicting testimony); CALJIC No. 2.27 (sufficiency of evidence of one witness); and CALJIC No. 2.51 (motive).

> To the extent that under section 1259 we may review defendant's claims despite his failure to preserve them, we recently rejected the same challenges in Rogers, supra, 39 Cal.4th 826, 48 Cal.Rptr.3d 1, 141 P.3d 135. Defendant's claims are without merit for the same reasons we stated in that case: "We previously have rejected claims that the challenged instructions, alone or in combination, somehow dilute or undermine the reasonable doubt standard and thus deprive defendants of due process. . . .  We decline to revisit these holdings. Because defendant's Sixth and Eighth Amendment claims are intertwined with his due process claim, we reject those claims for the same reasons. . . .  (Rogers, supra, 39 Cal.4th at pp. 888–889, 48 Cal.Rptr.3d 1, 141 P.3d 135.)

> Finally, defendant asserts the instructions cumulatively diluted the prosecution's burden of proof. As noted above, however, several of our prior opinions involved challenges to multiple instructions and rejected such claims. We adhere to those

63

decisions. "Here the jury was instructed on the presumption of innocence and reasonable doubt under the then standard California instruction, CALJIC No. 2.90. The United States Supreme Court has held that this instruction satisfies due process requirements. (Victor v. Nebraska [ (1994) ] 511 U.S. [1,] 7–17, 114 S.Ct. 1239, 127 L.Ed.2d 583; People v. Millwee (1998) 18 Cal.4th 96, 161, 74 Cal.Rptr.2d 418, 954 P.2d 990.) No federal constitutional violation occurred." (Rogers, supra, 39 Cal.4th at p. 889, 48 Cal.Rptr.3d 1, 141 P.3d 135.)

43 Cal. 4th at 154-55 (some internal citations omitted).  Petitioner cites no contrary federal law and does nothing to argue that the California Supreme Court's decision on appeal holding that the instructions were constitutionally adequate was incorrect, or that the court was unreasonable in denying this ineffective assistance of counsel claim.  Petitioner gives this court no reason to find the California Supreme Court's decision was unreasonable.

### 4.  Ineffective Assistance of Counsel re Miranda Waiver

Petitioner argues his trial counsel rendered ineffective assistance by failing to demonstrate that his Miranda waivers were invalid and his subsequent statements were involuntary and unreliable.  Petitioner challenges both his confessions to police officers and his statements to prosecution psychiatrist Dr. Irwin Lyons.

Specifically, petitioner claims his trial attorneys acted unreasonably by failing to obtain and present at the suppression hearings evidence of his mental health around the time he was arrested.  Petitioner presents jail records and the opinion of an expert who reviewed them that he lacked the cognitive ability to waive his Miranda rights at that time.  Petitioner's argument that counsel acted unreasonably is supported by a hand-written note dated May 4, 1988, well before the first suppression hearing in December 1988, in attorney Humphreys' trial file which recognized the need for the information.  It states, "Need to get copies of [defendant's] Jail Infirmary records."  (Ex. 151 at 1169.)  However, as discussed below, whether or not trial counsel acted reasonably petitioner has failed to make a prima facie showing that he was prejudiced by that failure.  Accordingly, this court recommends denial of petitioner's claim of ineffective assistance of counsel regarding his Miranda waiver.

1                    a.  Background

2          Petitioner raised this ineffective assistance of counsel claim in his state habeas

3   petition.  Therefore, there is no reasoned state court opinion on it.  On appeal, petitioner made a

4   related claim of trial court error in denying his motions to suppress.  Those appellate issues,

5   including the California Supreme Court's resolution of them, are addressed below in the

6   discussion of Claim F.  The evidence adduced at each suppression hearing is also set out in some

7   detail below in the discussion of Claim F.  It is summarized briefly here.

8          Shortly after his arrest, petitioner was interrogated eight times over the course of

9   three days.  Placer County Sheriff's Department Detectives first questioned petitioner on

10  November 20, 1986, at the Carson City Jail.  Prior to interrogating him, the detectives advised

11  petitioner of his Miranda rights, petitioner signed a waiver of those rights, and he agreed to talk

12  with the officers.  During this interrogation, petitioner admitted raping and killing Ms. Garcia.

13  The following day, during the car ride from Carson City to Auburn, the detectives questioned

14  petitioner again.  Petitioner provided more details about the Garcia murder and confessed to

15  having sexual intercourse with and killing Ms. Sorensen.  After petitioner had dinner at the

16  Placer County Jail, the detectives questioned him a third time.  Petitioner brought up his mental

17  health problems and told the detectives he would cut his throat if he could.  Petitioner provided

18  further details about the Sorensen murder.

19         The next two interviews were conducted by Sacramento County officers who

20  were investigating a series of murders of young girls along Interstate 5.  At the beginning of the

21  first interview, petitioner told officers he was suicidal.  They then read him his Miranda rights

22  and he again waived those rights.  Petitioner told the Sacramento County officers a number of

23  times that he wanted help for his mental health problems.  During the second interview, he

24  repeated that he had not committed the I-5 murders but told the officers he had committed

25  another one.  After discussion of petitioner's mental health problems, petitioner provided details

26  of the murder of Elizabeth Lactawen.  Evidence regarding that murder was introduced by the

1    prosecution at the penalty phase.

2              Because the Lactawen murder occurred in the City of Sacramento, Sacramento

3    police detectives questioned petitioner next.  They read petitioner his <u>Miranda</u> rights and he

4    agreed to talk with them.  Petitioner provided these officers more details regarding the Lactawen

5    murder.

6              Sacramento County detectives re-appeared on November 22 for a seventh

7    interview.  Again, they questioned petitioner regarding the I-5 murders.  They did not re-advise

8    petitioner of his <u>Miranda</u> rights.  Petitioner told these officers repeatedly that he was very

9    concerned about getting psychiatric help.

10             The final interview was conducted by Dr. Lyons, a psychiatrist sent by the district

11   attorney to evaluate petitioner.  After Dr. Lyons read petitioner his <u>Miranda</u> rights, petitioner

12   again signed a waiver and agreed to talk with Dr. Lyons.  Dr. Lyons informed petitioner several

13   times throughout the interview that he was there at the behest of the district attorney and that Dr.

14   Lyons could end up testifying to things petitioner told him.  Petitioner described the Garcia and

15   Sorensen killings to Dr. Lyons, discussed two incidents when he sexually assaulted children as a

16   teenager, and reiterated his concern that he get help for his mental problems.

17             The trial court held two suppression hearings; one in December 1988 and the

18   second in March 1989.  The first hearing examined the validity of petitioner's <u>Miranda</u> waivers

19   given to officers and the voluntariness of petitioner's confessions to officers.  The second hearing

20   involved the admissibility of petitioner's statements to Dr. Lyons and Dr. Lyons' opinions.  In

21   addition, based on petitioner's testimony during the second proceeding that he had requested and

22   been denied access to an attorney, the trial court re-opened consideration of the voluntariness of

23   petitioner's confessions.  The trial judge denied both motions to suppress.

24                          b.  <u>Legal Standards</u>

25             As described above, the questions under <u>Strickland v. Washington</u> are whether

26   trial counsel acted reasonably and, if they did not, whether there is a reasonable probability that,

1   but for those unprofessional errors, the result of the proceedings would have been different.

2   Strickland, 466 U.S. at 687, 694.  Here, petitioner must establish that a reasonable trial attorney

3   would have introduced at the suppression hearings the evidence set forth below to show that

4   petitioner was suffering serious mental problems at the time he confessed.  In addition, petitioner

5   must show that, had counsel done so, the confessions to the rapes and murders of Ms. Garcia and

6   Ms. Sorensen would have been excluded, resulting in a reasonable probability that the guilt phase

7   verdict would have been different.  In addition, petitioner must show that counsel's actions

8   would have likely also resulted in exclusion of evidence regarding the rape and murder of Ms.

9   Lactawen and of Dr. Lyons' testimony at the penalty phase, resulting in a reasonable probability

10  the jury would have found life without parole the appropriate punishment.

11              These questions implicate the legal standards under Miranda and the admissibility

12  of confessions.  Those standards are set out below in the discussion of Claim F.

13                         c.  Evidence Petitioner Argues Should Have Been Presented

14              Petitioner presents his medical records from the Placer County Jail showing that

15  he was considered suicidal from the time he was arrested until over a month later.  An "Arrest

16  Information" form listed petitioner as suicidal, noting "says he will cut his throat first chance."

17  (Ex. 86 (Dkt. No. 10-11) at 490.)  In the "Receiving Screening Form," petitioner responded "yes"

18  to questions asking if he had ever thought about ending his life and if he felt that way now.  (Ex.

19  85 (Dkt. No. 10-10) at 489.)  The records show that on November 22, apparently before

20  petitioner was interviewed by Dr. Lyons, petitioner was seen by someone in "sick call."  (Ex. 94

21  (Dkt. No. 10-19) at 533.)  The following was noted regarding petitioner's mental health: "When

22  questioned about mental status, states 'is suicidal due to nature of crime.'  Would like to talk to

23  mental health.  Will notify mental health and post suicide watch. . . . Lt. Nichols requested not to

24  call mental health, they have psych. Dr. coming into eval.  Keep him posted on any care inmate

25  might require."  (Id.)  After Dr. Lyons interviewed petitioner, he wrote two notes in petitioner's

26  jail "Mental Health Record."  (Ex. 94 (Dkt. No. 10-19) at 531.)  These notes show the

1   prescription for Navane and a referral to the jail psychiatrist.  (Id.)  Another note on that date

2   states that Dr. Lyons recommended medication and a suicide watch.  (Id.)  A memorandum from

3   nursing staff to "all shifts" dated November 22 informed them that petitioner was on suicide

4   watch.  (Ex. 87 (Dkt. No. 10-12) at 491.)  A memo from Inspector Smith to Placer County

5   Sheriff's Department Captain Jacinto dated November 26, 1986, states that Inspector Smith had

6   learned from Dr. Lyons that petitioner "should be considered suicidal.  Furthermore, it is possible

7   that when realty [sic] sets in as to what he is facing and what he has done, Rundle may become

8   even more suicidal." (Ex. 88 (Dkt. No. 10-13) at 492.)  Jail records show that petitioner was on

9   suicide watch for over a month, through December 27, 1986.  (Ex. 93 (Dkt. No. 10-18) at 521.)

10   A jail record dated December 27, 1986, stated that the day shift should call "P.C.M.H.," Placer

11   County Mental Health, to "try to get a Dr. to see RUNDLE." (Ex. 92 (Dkt. No. 10-17) at 497.)

12          Petitioner also presents evidence to show that he was considered seriously

13   mentally ill during this time.  He makes much of the fact that Dr. Lyons prescribed Navane,

14   which is considered an anti-psychotic drug.  (Dkt. No. 92 at 142:23 - 143:14.)  Dr. Lyons

15   testified that he prescribed Navane because he felt it would help petitioner's anxiety.  (RT

16   3534:15-22.) Petitioner presents the testimony of other doctors in an apparent attempt to show

17   that Dr. Lyons must have felt petitioner was suffering more than anxiety.  Dr. Ted Moore, the

18   treating psychiatrist at the Placer County Jail, stated that he "definitely would not have prescribed

19   Navane merely to relieve anxiety or to calm someone down." (Moore Decl., Ex. 22 (Dkt. No. 8-

20   2) at 67, ¶ 4.)  In his declaration, Dr. Jackman, petitioner's expert, agreed that Navane was not

21   appropriate to treat only anxiety.  (Ex. 163 (Dkt. No. 12-39), ¶ 156.)  Dr. Moore considered

22   petitioner to have symptoms "consistent with three different psychiatric diagnoses:

23   schizophrenia, drug-induced psychosis, and bi-polar disorder." (Ex. 22 (Dkt. No. 8-2) at 66, ¶ 3.)

24   Dr. Moore described petitioner's symptoms as "psychotic." (Id. ¶ 4.)  They included "auditory

25   hallucinations of a persecutory nature, paranoid ideas of reference, thought insertion and blunted

26   affect." (Id. ¶ 3.)  Dr. Moore prescribed increasing doses of Navane for petitioner over a six-

week period.  (Id. at 67, ¶ 6.)  Petitioner described auditory hallucinations continually throughout

this time period.  (Id. at 70-74.)  However, by April 1987, petitioner told Dr. Moore he was

hearing voices only occasionally and that they were no longer bothering him.  (Id. at 74.)

Petitioner continued on Navane through April 1987.  (Id. at 68, ¶ 6.)  In addition to these records,

petitioner adds that trial counsel should have investigated and presented petitioner's high school

records showing he has an I.Q. of 88.  (Ex. 48 (Dkt. No. 8-28) at 140.)

        Based on this information from the Placer County Jail, Dr. Jackman opined that a

diagnosis of "drug psychosis at the time of [petitioner's] arrest is supported by the actions of . . .

Dr. Lyons" and Dr. Moore.  (Ex. 163 (Dkt. No. 12-39), ¶ 146.)  Dr. Jackman went on, "drug

psychosis, as well as [petitioner's] psychological impairments . . . impacted [petitioner's] mental

state at the time he gave statements to the police and during trial and had implications for

[petitioner's] ability to understand and waive his Miranda rights, recall details of the offenses and

testify effectively on his behalf."  (Id. ¶ 147.)  Dr. Jackman concluded that he did not feel

petitioner was capable at that time of knowingly and voluntarily waiving his Miranda rights:

> If at the time of his arrest David Rundle was a suicidal
> individual experiencing auditory hallucinations and medicated with
> a powerful anti-psychotic drug, as the medical and psychiatric
> evidence from that time documents, then it is my opinion that he
> was incapable of knowingly and voluntarily waiving his right to
> remain silent and was unduly susceptible to psychologically
> coercive interrogation tactics. The nature of the interrogation in
> this case, during which David was assured psychiatric help in
> exchange for confessing, was particularly exploitive of David's
> impairments and it is my opinion that it further undermined the
> reliability of his purported waiver and admissions.

(Id. ¶ 148.)

                    d.  Discussion

        Petitioner does nothing to show that the California Supreme Court's denial of his

claim was an unreasonable construction of federal law.  In fact, he cites only three cases and

those cases merely state the general rules regarding the Miranda requirements and the

voluntariness of confessions.  (Dkt. No. 92 at 133:7-12.)  He does not show why his long

recitation of facts regarding petitioner's mental state at the time of the interrogations is legally

relevant to any constitutional analysis.  He does not show how the information he alleges his trial

attorney should have introduced at the suppression hearings would have changed the trial judge's

decision regarding the admissibility of his confessions.  Similarly, petitioner does not attempt to

show that the California Supreme Court's rejection of his claim involved an unreasonable

construction of the facts.

        The California Supreme Court could reasonably have rejected this claim based on

the facts that neither of the doctors who saw petitioner around the time he confessed opined that

he lacked the cognitive ability to waive his <u>Miranda</u> rights.  A fair-minded jurist could also have

determined that the additional information provided would not have affected the trial judge's

decision that petitioner knowingly and voluntarily confessed.  Dr. Jackman's opinion to the

contrary is lacking in numerous respects.  First, Dr. Jackman relies upon Dr. Lyons' prescription

of Navane as part of his determination that petitioner was psychotic. This opinion flies in the face

of Dr. Lyons' testimony that he prescribed it for anxiety.  Second, to conclude that petitioner

"was incapable of knowingly and voluntarily waiving his right to remain silent and was unduly

susceptible to psychologically coercive interrogation tactics," Dr. Jackman relies upon three

"facts:" that petitioner was suicidal, that he was "experiencing auditory hallucinations," and that

he was "medicated with a powerful anti-psychotic drug."  Two of these "facts" are not supported

by the record.[16]  Dr. Lyons did not testify that petitioner was, at the time of his arrest,

experiencing auditory hallucinations.  Rather, he testified that he detected no "active psychosis"

_____

[16]  Respondent also argues that petitioner's assertions that he was suicidal should not be taken seriously.  Respondent claims the prosecution could have countered petitioner's assertions with what respondent refers to as petitioner's statement "that he enjoyed joking that he was suicidal."  (Dkt. No. 95 at 117.)  Respondent cites to petitioner's health records from the Placer County Jail.  However, these records do not reflect respondent's broad interpretation of petitioner's statements.  With respect to one statement that he was suicidal, petitioner later told health care workers that he was "only joking."  (Ex. 94 (Dkt. No. 10-19) at 527.)  Respondent's characterization of this one statement as "levity" reflecting the lack of seriousness of *any* of petitioner's statements that he was suicidal is not well taken.

1    when he interviewed petitioner.  In addition, there is no evidence petitioner was taking a

2    "powerful anti-psychotic drug" at the time of his arrest.  Because Dr. Lyons was the last one to

3    interview petitioner, he could not have been given Navane until after the final confession.   Two

4    out of the three bases for Dr. Jackman's opinion are in error.  Therefore, it would have been

5    reasonable for the California Supreme Court to give Dr. Jackman's opinion on this issue little

6    credence.

7            Petitioner provides this court no reason to conclude that his trial attorneys acted

8    unreasonably when they did not present additional testimony regarding petitioner's mental health

9    at the time he confessed.  Similarly, petitioner has not provided any basis for concluding he was

10   prejudiced by the lack of any such evidence.  Accordingly, petitioner has failed to show the

11   California Supreme Court's rejection of this claim was unreasonable under section 2254(d).

12           5.  Ineffective Assistance re Petitioner's Presence at Trial

13           Petitioner argues trial counsel rendered ineffective assistance by failing to ensure

14   petitioner's presence at all critical stages of trial and by failing to request that the jury be

15   admonished not to consider petitioner's absence against him.  Petitioner argues he was absent

16   from two critical proceedings in violation of his right to be present.  First, petitioner was

17   excluded from closed proceedings at which the court discussed whether his counsel had a

18   prejudicial conflict of interest and how to investigate alleged juror misconduct in a way that

19   would shield counsel's interests.  Second, petitioner waived his right to be present during his

20   mother's testimony.[17]

21           Petitioner's arguments are identical to arguments he makes in Claim E, in which

22   petitioner argues his absence during certain trial proceedings violated his constitutional rights.

23   _____

24       [17] Petitioner also states in a footnote that he was excluded from closed proceedings in
     which the court and defense counsel discussed whether petitioner would be present during the
25   penalty phase, whether petitioner was competent to proceed, and whether petitioner should be
     medicated to ensure his presence and competence.  (Dkt. No. 92 at 147 n.55.)  Because petitioner
26   merely mentions this issue and does nothing to argue counsel acted unreasonably in discussing
     these issues outside petitioner's presence, this court will not consider it.

1  The court has examined these ineffective assistance of counsel arguments below in the section on

2  Claim E and concludes they should fail.

3                6.  Ineffective Assistance of Counsel re Prosecutor's Misconduct

4                    a.  Failure to Object during Cross-examination of Dr. Yarvis

5            This court discusses below petitioner's Claim N.2.b., alleging that the prosecutor

6  committed misconduct during his questioning of Dr. Yarvis.  This court concludes that any

7  misconduct did not prejudice petitioner.  For the same reasons, whether or not defense counsel's

8  failure to object to any misconduct was unreasonable, petitioner has failed to show a reasonable

9  probability that, but for counsel's failure to object, the result of the proceedings would have been

10  different.  Therefore, the California Supreme Court's rejection of this claim was not

11  unreasonable.

12                    b.  Failure to Object to Misconduct During Summation

13            Petitioner argues that his trial attorneys failed to object to the following instances

14  of misconduct by the prosecutor during his closing argument: (i) playing upon the jurors' general

15  fear of crime; and (ii) "exploiting" the exclusion of evidence regarding Ms. Sorensen's address

16  book.  Petitioner's claims of prosecutorial misconduct on these bases are Claims N.2.e and N.2.f,

17  discussed below.  With respect to the allegation that the prosecutor committed misconduct by

18  playing on jurors' fear of crime, this court determines below that there was no likelihood the

19  argument had any influence on the jury's verdict.  Thus, petitioner has failed to show prejudice

20  for purposes of his ineffective assistance of counsel claim.

21            With respect to the claim that the prosecutor made arguments which petitioner

22  could not refute because he was unable to introduce evidence of Ms. Sorensen's address book,

23  this court finds below that the related claim of prosecutorial misconduct is baseless.  Petitioner

24  failed to show the excluded evidence would, in fact, have refuted the prosecutor's statements.

25  Again, this lack of prejudice defeats petitioner's ineffective assistance of counsel claim.

26  ////

1    Claim B.   Ineffective Assistance of Counsel Due to Conflicts of Interest

2          Petitioner makes three claims that his attorneys labored under conflicts of interest

3    that rendered their representation unconstitutional.  First, petitioner argues that attorney Smith had

4    a personal conflict with respect to a jury misconduct issue and this court should presume prejudice

5    from that conflict.  Second, petitioner argues that attorney Humphreys actively represented

6    conflicting interests when he represented petitioner's brother in a separate criminal action during

7    the time he was representing petitioner.  Third, petitioner argues attorney Humphreys'

8    representation suffered from a conflict because Humphreys was being prosecuted by the District

9    Attorney's Office for driving under the influence during the time he represented petitioner.  For

10   the reasons described below, this court finds that petitioner has failed to satisfy any of the

11   requirements of 28 U.S.C. § 2254(d) for any of these conflict of interest claims and recommends

12   their denial.

13         1.  Conflict re Jury Misconduct Issue

14           a.  Background

15   The California Supreme Court set out the background for this claim as follows:

16           The guilt phase of the trial was completed and the jury
     began deliberating on Wednesday, May 17, 1989. After an evening
17   recess, the jury reached its guilt phase verdicts the following day.
     On Friday, May 19, the court conducted an ex parte in camera
18   proceeding with defense counsel, David Humphreys, who was lead
     counsel, and Lawrence Smith, who had been appointed as cocounsel
19   pursuant to Keenan v. Superior Court (1982) 31 Cal.3d 424, 180
     Cal.Rptr. 489, 640 P.2d 108.FN41 Defendant was not present.[18]
20   Smith told the court he had learned from a "fairly unimpeachable"
     source that the jury foreman, Juror T.W., who was a medical doctor,
21   had been overheard in a public area of the courthouse, making a
     statement to the effect that "if he were to accept [the defense] theory
22

23       [18]  The transcript of this in camera proceeding was sealed by the trial court.  The
24   California Supreme Court unsealed that transcript, and the other transcripts of proceedings
     involving the potential juror misconduct/conflict of counsel issues, in a November 19, 2003
25   Order.  (Lodged herein with state court record as item # 10.g.)  These transcripts are appended to
     the November 2003 order in the record lodged herein.  They are identified in these Findings and
26   Recommendations as the sealed reporter's transcript, "SRT."  The May 19, 1989 in camera
     hearing can be found at SRT 8330-38.

of the case, . . . he would be violating his Hippocratic Oath." FN42
Smith explained that the person who told him of the statement did
not hear the juror utter it, but rather was told of it by the person who
did hear the statement. Smith provided no information concerning
when the juror made the comment or when Smith learned of it.
Further, Smith explained, he did not wish to reveal the source of the
information at that time, because to do so " would cause [him]
grave personal problems to the extent that it might even give [him]
a conflict of interest."

> FN41. Although Humphreys was designated lead counsel, it
> appears that he and Smith in a general sense equally shared
> responsibilities.

> FN42. The term "Hippocratic Oath" denotes an oath of
> professional ethics that in modern times often is
> administered to medical school graduates during
> commencement proceedings. The oath is named after the
> Greek medical practitioner and philosopher Hippocrates,
> although it is not clear that he actually was involved in its
> creation. There are numerous modern adaptations of the
> oath, which include additions and deletions from the ancient
> version, reflecting modern views on various aspects of the
> practice of medicine. Interestingly, the most well-known
> proviso of the modern oath, "First, do no harm," is not found
> in the original. (Markel, Becoming a Physician: "I Swear by
> Apollo"—On Taking the Hippocratic Oath (May 13, 2004)
> 350 New Eng. J. Med.2026.)

The trial court and counsel recognized that if true, the
circumstance that such a statement had been made might indicate
serious misconduct by Juror T.W. in both discussing the merits of
the case outside of jury deliberations and in relying upon improper
external influences in his decisionmaking. The trial court, however,
suggested that investigation of the issue might be delayed until after
the penalty phase of the trial in order to avoid "causing a problem
for the jurors should we find out after litigation that it is [a]
not-as-it-seems kind of thing." The court later reiterated its concern
that immediate investigation of the report needlessly might "sour"
the jury before it completed the case if the report ultimately proved
to be incorrect. Both defense counsel agreed that prejudicing the
jury was a concern. No decision concerning a course of action was
reached, and the issue was put over to the next court day.

On Tuesday morning, May 23, 1989, the trial court again
met with defense counsel in chambers to discuss the possible juror
misconduct, without defendant or the prosecutor present.[19] Both

---

[19]  The transcript of the proceedings on the morning of May 23, 1989 can be found
attached to lodged item 10.g. at SRT 8345-58.

Smith and Humphreys stated they agreed with the court's concern
that questioning the jurors about the supposed statement might
"alienate" them. The court stated it could see no detriment in
postponing the investigation of the possible misconduct to avoid
prejudicing the jury "should it be determined that the events as
reported did not happen, or that if they happened, they happened in
some fashion that did not constitute misconduct."[20] Again, no final
decision was reached, and it was resolved that the issue would be
further discussed with input from the prosecutor.

The court thereafter reconvened in a closed session with
defense counsel, defendant, the prosecutor, and court staff present.
The trial court generally recounted the information Smith had
disclosed, and asserted that the juror's supposed statement "doesn't
make a lot of sense in the form we received it, but there may be
more out there." The court once again expressed its view that
delaying investigation into the making of the statement would not
create prejudice. The court explained that in its view, if the alleged
misconduct occurred, both the guilt phase and penalty phase
verdicts might be set aside. The court apparently reasoned that in
light of this situation, for the time being it was preferable to defer
exploring the issue of Juror T.W.'s possible misconduct. The court
expressed concern that "inquiring and finding that there was nothing
could leave an impact on the jury that would prejudice one side or
another or both." The trial court rejected the prosecutor's suggestion
that an investigator interview the witnesses, because the court was
"concerned it will get to the jury in some fashion." The court also
noted Smith might be required to become a witness in the matter,
and unless and until it proved necessary to do so, the court did not
want to initiate steps that might force Smith to withdraw from the
case. Smith stated that in his view, if the firsthand source of the
information were directly questioned concerning the statement, it
was "very likely that that person would claim certain privileges
which would start a legal controversy and quickly become very
public and blow the whole thing up." The court adjourned
discussion of the matter until the afternoon in order to allow the
prosecutor to consider what to recommend.

That afternoon, another closed court session was held with
defense counsel, defendant, the prosecutor, and court staff present.[21]
The prosecutor initially and strongly suggested that the witnesses be
identified and questioned about the statement as soon as possible.
He did concede, however, that "it would be dangerous to start
questioning the jury now." It appears the prosecutor contemplated

---

[20]  Specifically, the trial judge stated that after giving it "some further thought," "I cannot
come up with any reason to conclude that deferring this issue until the jury has completed its task
will in any fashion be prejudicial to the Defendant."  (SRT 8346:5-8.)

[21]  The transcript of this proceeding on the afternoon of May 23, 1989 is at SRT 8445-61.

first questioning the witnesses, and then possibly the jurors, depending on what information was gained from the witnesses. Smith stated that if he "were to disclose the source of the alleged comment at this time, it would just create an impossible situation to me that I think would be a conflict of interest. . .." Smith then agreed to discuss the identities of the witnesses, first without the prosecutor present. Smith disclosed that the source of the information was his wife, who worked at the local newspaper, and the witness to the juror's supposed statement was a reporter for the newspaper, Angus Thomson, who was covering the trial. Smith explained that Thomson told Smith's wife about the statement in the course of a personal conversation between the two of them. Smith's difficulties arose because a condition of his wife's employment with the newspaper specified that she was not to disclose to Smith information she learned at the newspaper, and thus if Thomson were directly questioned about the supposed statement, he probably would deduce that Smith's wife had informed Smith, which in turn would jeopardize her employment and, it seemed, the Smiths' marriage.[22]

The court again stated its belief there would be no problem in proceeding with the trial of the penalty phase and deferring investigation into the statement until after that portion of the trial was completed. When Smith agreed and said this course of action was his "preference," the court clarified: "[M]y motivation is in the control of the integrity of these proceedings, and I don't see any damage to this Court's obligations which, quite frankly, are not to your personal situation, [but to] Mr. Rundle, the People and the law, and I don't see there is a problem with that." The court then summoned the prosecutor, summarized the new information, and again suggested that all questioning of the witnesses related to this issue be postponed until after the jury began its deliberations. Final resolution of the matter was postponed until the following morning so the prosecutor could develop any final recommendations, but the court stated its tentative plan to order that Thomson not be contacted concerning the statement, but instead to question

---

[22]  Smith's testimony and statements were somewhat dramatic. In response to the prosecutor's suggestion that the court hold a hearing immediately, Smith responded "If that request were granted, I would have to move to withdraw as counsel in this case at this time as well as withdraw my residency in the State of California in all probability. [¶] I indicated to the Court that the reason that I brought this matter up in camera in the way that I did is because I felt placed in an extremely delicate situation raising basic personal conflicts for me with my obligations to a client in this case and other obligations that I have in other parts of my life. [¶] . . . if I were to disclose the source of the alleged comment at this time, it would just create an impossible situation to me that I think would be a conflict of interest."  (SRT 8447:28 - 8448:13.) In speaking with the court, Smith stated that once his wife told him the information, he was put "in this impossible situation of potentially having to choose between continuing in this marriage, because I am sure that if she were identified as the source of the information she'd lose her job and it would create a terrible mess for me personally, as well as for her."  (SRT 8452:6-11.)

Thomson after the jury had begun the penalty phase deliberations, and possibly to question the jurors after they reached a verdict.

There is no record of any meeting the next day, May 24, 1989—or for the next three weeks—concerning this matter. Consistently with the trial court's concluding remarks, however, the subject was raised again on June 15, 1989, after the jury had retired to deliberate on the penalty.[23] The court's bailiff was called as a witness and testified he had a conversation with the reporter, Thomson, outside the courtroom after the jury had reached a guilt phase verdict, but before the verdict was announced in court. FN43 The bailiff recalled mentioning to Thomson that he was surprised Juror T.W. had been chosen for this jury. The bailiff did not remember hearing a reference to the Hippocratic Oath in this conversation or at any other point during the trial, or hearing Juror T.W. or any other juror speak about the case in public. It was the bailiff's impression, in fact, that Juror T.W. was "very quiet and usually hangs by himself during the whole trial." Another bailiff was called as a witness, but testified he did not recall the substance of any conversation with Thomson because he was concentrating upon monitoring the jury.

> FN43. Before defense counsel questioned the bailiff, Smith stated that due to his wife's involvement, he would be "recusing" himself from these particular proceedings. Humphreys thereafter conducted the questioning of the witnesses.

Next, Thomson was called to testify. He did not remember the bailiff's comments regarding being surprised that Juror T.W. remained on the jury. He also did not remember hearing anyone speak of that juror, or hearing Juror T.W. speak of the case or the Hippocratic Oath. Thomson's answers regarding whether he heard mention of the term "Hippocratic Oath" were somewhat awkwardly stated, but although there was some unresolved ambiguity, a logical reading in the context of the questioning is that he had not heard anyone related to this trial employ the term.FN44 Thomson was not asked whether he had spoken with Smith's wife about overhearing such a statement. Smith's wife was not called as a witness. After the questioning of Thomson concluded, the trial court stated it would question the jurors on the subject after they reached a verdict. Humphreys and the prosecutor agreed this should be done.

> FN44. Humphreys asked Thomson whether he "ever heard that term [the Hippocratic Oath] mentioned during the course of this proceeding—your course of covering these proceedings, I should say, other than outside the courtroom?" The trial court interjected and Humphreys

---

[23]  The transcript of these proceedings on June 15, 1989 is at SRT 9586-9620.

rephrased the question to state, "[o]ther than inside the courtroom?" Thomson answered, "[o]ther than inside the courtroom and in the court building, no." Humphreys then stated, "Okay," and Thomson added, "Or outside the court building by members of the jury or by other people within the earshot of members of the jury, no." Humphreys then asked, "You never heard it?" Thomson answered, "No." Thomson was then excused.

After the jury's verdict was rendered later that day, the trial court conducted another closed session during which the jurors and alternates were individually questioned concerning whether they had heard any juror talking about the case outside of the jury's deliberations.[24] All of the jurors and alternates answered in the negative. Juror T.W. also was asked specifically whether he could "recall any conversation that you may have been involved in during this trial, whether or not it involved the case, where you may have been discussing with anybody the subject of your oath as a doctor, the Hippocratic Oath." He answered, "No. No, other than—" at which point the court interrupted and said, "Not during jury deliberation. I am talking about a conversation outside the normal court proceedings." Juror T.W. then answered, "Not that I can recall." Neither defense attorney accepted the trial court's invitation to approach the bench with any other questions to be posed. The issue of the supposed statement by Juror T.W. never was discussed again in the course of the trial court proceedings.

43 Cal. 4th at 164-68.

b. Legal Standards

It is well established that the Sixth Amendment right to effective assistance of counsel carries with it "a correlative right to representation that is free from conflicts of interest." Wood v. Georgia, 450 U.S. 261, 271 (1981). Conflicts of interest broadly embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or by his own interests. (See generally ABA, Model Rules Prof. Conduct, Rule 1.7 and commentary (1983)). Conflicts may occur in various factual settings. For example, conflicts may arise in circumstances in which one attorney represents more than one defendant in the same proceeding. See, e.g., Holloway v. Arkansas, 435

---

[24] The transcript of this closed proceeding is at SRT 9630-42.

U.S. 475, 481-91 (1978).  Conflicts may also arise in situations in which an attorney has

represented a person who is a witness, has a financial interest in the outcome of the case, or has a

personal relationship with the prosecutor.  See, e.g., Houston v. Schomig, 533 F.3d 1076, 1081

(9th Cir. 2008); United States v. Hearst, 638 F.2d 1190, 1193 (9th Cir. 1980).  The rule

prohibiting counsel from representing conflicting interests serves to protect confidential

information obtained during the course of an earlier representation, ensure undivided attorney

loyalty, and/or guard against infringement of the right to cross-examination.  See Sanders v.

Ratelle, 21 F.3d 1446, 1452-53 (9th Cir. 1994);  Fitzpatrick v. McCormick, 869 F.2d 1247, 1251

(9th Cir. 1989); United States v. Allen, 831 F.2d 1487, 1497 (9th Cir. 1987); Trone v. Smith, 621

F.2d 994, 999 (9th Cir. 1980).  Courts "generally presume that the lawyer is fully conscious of the

overarching duty of complete loyalty to his or her client."  Burger v. Kemp, 483 U.S. 776, 784

(1987).

   Generally, the Strickland v. Washington standard is applied to ineffective

assistance of counsel claims.  A petitioner must prove both that his attorney acted unreasonably

and that those actions or inactions prejudiced him.  466 U.S. at 687, 694.  However, the Supreme

Court has carved out an exception to the requirement that a petitioner prove prejudice for certain

claims of attorney conflict of interest.  Where a petitioner's attorney "actively represented

conflicting interests," the petitioner must show that "an actual conflict of interest" existed and that

it "adversely affected his lawyer's performance" to satisfy the Sixth Amendment standard.  Cuyler

v. Sullivan, 446 U.S. 335, 348 (1980).  In Sullivan, the Court examined multiple concurrent

representations.  The Court stressed the "high probability of prejudice arising" from this conflict

situation and the difficulty of proving prejudice.  Mickens v. Taylor, 535 U.S. 162, 175 (2002)

(citing Sullivan, 446 U.S. at 348-49).  A petitioner who shows an "adverse affect" as a result of

this conflict need not also show he was prejudiced under Strickland.  Sullivan, 446 U.S. at 349-

50.

////

1          Many courts of appeals have applied the <u>Sullivan</u> prejudice standard to a variety of

2   conflicts of interest.  <u>See</u> <u>Mickens</u>, 535 U.S. at 174-75 (collecting cases).  In <u>Mickens</u>, the

3   Supreme Court noted that this "expansive application" of the <u>Sullivan</u> prejudice standard was not

4   supported by the language of <u>Sullivan</u>.  <u>Id.</u> at 175.  The Court in <u>Mickens</u> explained that whether

5   or not the <u>Sullivan</u> prejudice standard should apply to conflict situations besides those involving

6   multiple concurrent representation was an "open question."  <u>Id.</u> at 176;[25] <u>see also</u> <u>Schomig</u>, 533

7

---

8          [25] Petitioner argues that this court should not rely upon the "open question" statement in
    <u>Mickens</u> because it is dicta and because it is not clear a majority of the justices supported it.
9   First, as discussed in the text, the Court of Appeals for the Ninth Circuit has relied upon this
    language and upon the Court's statement that <u>Sullivan</u> does not "clearly establish" application of
10  its prejudice rule to any situation besides concurrent multiple representation.  In <u>Earp v. Ornoski</u>,
    the court stated: "The <u>Mickens</u> Court specifically and explicitly concluded that <u>Sullivan</u> was
11  limited to joint representation, and that any extension of <u>Sullivan</u> outside of the joint
    representation context remained, 'as far as the jurisprudence of [the Supreme Court was]
12  concerned, an open question.'" 431 F.3d 1158, 1184 (9th Cir. 2005) (quoting <u>Mickens</u>, 533 U.S.
    at 176).  Whether or not it is technically dicta, this court must follow the lead of the Court of
13  Appeals in adhering to the Supreme Court's statements.  Second, petitioner recognizes that the
    five-justice majority opinion in <u>Mickens</u> states that "the need for the <u>Sullivan</u> prophylaxis in
14  situations other than concurrent multiple representation is an 'open question.'" (Dkt. No. 92 at
    173:9-10, quoting <u>Mickens</u>, 533 U.S. at 176.)  However, petitioner points to language in Justice
15  Kennedy's concurring opinion, which was joined by Justice O'Connor, that he indicates is
    contrary to the "open question" dictum.  The language he relies upon "framed the 'constitutional
16  question' as 'whether trial counsel had a conflict of interest that hampered the representation.'"
    (Dkt. No. 92 at 173:13-14, quoting <u>Mickens</u>, 533 U.S. at 179.)   Petitioner's selective citation
17  misrepresents the point of Justice Kennedy's concurrence.

18         The limited issue in <u>Mickens</u> was determining what effect a trial judge's failure to inquire
    about counsel's conflict has on the <u>Sullivan</u> presumed prejudice standard.  <u>Mickens</u>, 535 U.S. at
19  164, 174.  The Court specifically noted that the issue before it presupposed the applicability of
    <u>Sullivan</u>.  <u>Id.</u> at 174.  The Court then went on to state that whether or not <u>Sullivan</u> applies in any
20  situation besides multiple joint representation is an open one.  <u>Id.</u> at 174-76.  In his concurrence,
    Justice Kennedy discusses only the question at issue - does a "trial judge's failure to inquire into
21  a suspected conflict" require a presumption of prejudice.  <u>Id.</u> at 176.  He then considers just that
    question and concludes that the Sixth Amendment guarantees involve the deficiency of the
22  lawyer, not of the trial judge.  <u>Id.</u> at 179.  Petitioner cites only the first half of Justice Kennedy's
    conclusion, and takes it out of context.  Justice Kennedy concluded that the "constitutional
23  question" under the Sixth Amendment "must turn on whether trial counsel had a conflict of
    interest that hampered the representation, not on whether the trial judge should have been more
24  assiduous in taking prophylactic measures."  <u>Id.</u>  Justice Kennedy did not address the majority
    opinion's statements criticizing the "expansive application" of the <u>Sullivan</u> presumption of
25  prejudice to situations besides concurrent multiple representation.  Petitioner's attempt to argue
    otherwise is not well taken.

26

1    F.3d at 1081 ("Supreme Court . . . has left open the question whether conflicts in successive

2    representation that affect an attorney's performance require a showing of prejudice for reversal.");

3    Alberni v. McDaniel, 458 F.3d 860, 873 (9th Cir. 2006) (same); Earp v. Ornoski, 431 F.3d 1158,

4    1184 (9th Cir. 2005) (same); but see Lewis v. Mayle, 391 F.3d 989 (9th Cir. 2004) (court applies

5    Sullivan prejudice standard to conflict based on successive representation; no discussion of, or

6    citation to, Mickens).  The Court stated that Sullivan does not "clearly establish, or indeed even

7    support" application of the Sullivan prejudice standard to these other situations.  Mickens, 535

8    U.S. at 176.  If Sullivan does not apply, a petitioner must meet the Strickland prejudice standard

9    by establishing a reasonable probability that, but for the conflict, the result of the proceedings

10   would have been different.  See id.; Strickland, 466 U.S. at 694.

11          In Earp, the Court of Appeals examined a claim that counsel's romantic

12   relationship with petitioner, her client, amounted to an unconstitutional conflict of interest.  The

13   state court summarily denied Earp's Sixth Amendment habeas claim.  Earp, 431 F.3d at 1164.  To

14   determine whether petitioner satisfied 28 U.S.C. § 2254(d), the court examined whether the state

15   court decision was contrary to or an unreasonable application of clearly established law.  Relying

16   primarily on circuit case law, Earp argued that he should be entitled to the presumption of

17   prejudice established in Sullivan by showing that the relationship amounted to an actual conflict

18   and that it affected his representation.  The court explained that the "Supreme Court has never

19   held that the Sullivan exception applies to conflicts stemming from intimate relations with

20   clients."  Id. at 1184-85.  Because there was no clearly established Supreme Court law on the

21   subject, the Court of Appeals held that it could not find the state court's rejection of the claim to

22   be contrary to or an unreasonable application of federal law under 28 U.S.C. § 2254(d).  Id. at

23   1185 ("[T]he advent of AEDPA forecloses the option of reversing a state court determination

24   simply because it conflicts with established circuit law."); see also Hand v. Secretary, Dept. of

25   Corrections, 305 Fed. Appx. 547, 550 (11th Cir. 2008) ("Because the alleged conflict in this case

26   does not involve the representation of multiple defendants, the state court's decision was not

1  contrary to or an unreasonable application of the Sullivan rule.").

2          A defendant may "waive his right to the assistance of an attorney unhindered by a

3  conflict of interests." Holloway, 435 U.S. at 483 n.5.  "A valid waiver of conflict of interest must

4  be voluntary, knowing, and intelligent, such that the defendant is sufficiently informed of the

5  consequences of his choice." Lewis, 391 F.3d at 996.  See also Garcia v. Bunnell, 33 F.3d 1193,

6  1195 (9th Cir. 1994) ("Even if counsel is subject to an actual conflict of interest, however, the

7  trial court may generally allow the attorney to proceed if the defendant makes a voluntary,

8  knowing, and intelligent waiver."); Allen, 831 F.2d at 1494 ("Of course, a defendant may waive

9  his right to the assistance of an attorney who is unhindered by conflicts . . . provided the waiver is

10  given knowingly and intelligently.")  Whether there is a proper waiver is to be determined by the

11  trial court and any such waiver should appear on the record.  Johnson v. Zerbst, 304 U.S. 458,

12  464-65 (1938).  Resolution of the issue of waiver depends "upon the particular facts and

13  circumstances surrounding that case, including the background, experience, and conduct of the

14  accused." Id.; see also Edwards v. Arizona, 451 U.S. 477, 482 (1981).  Moreover, a court must

15  "indulge every reasonable presumption against the waiver of fundamental rights." Lewis, 391

16  F.3d at 997 (citations omitted.)

17                            c.  State Court Decision

18          Petitioner raised this claim in his appeal and again in his state habeas petition.

19  The California Supreme Court issued a reasoned denial of petitioner's federal constitutional claim

20  in his appeal.  That denial is set out below.  The court did not explain its denial of petitioner's

21  habeas corpus claim.  The habeas claim appears to be substantially similar to the appellate claim.

22  However, petitioner did present the state court with one piece of extra-record evidence in support

23  of that habeas claim.  He presented the declaration of attorney Smith to show that Smith was

24  motivated by concern for his wife to raise the jury misconduct topic ex parte.  (State Pet., lodged

25  with this court on April 12, 2010 (see Dkt. No. 27) at p. 223-34; ex. 26.)

26  ////

1    Petitioner simply argues that the California Supreme Court's appellate decision is

2  incorrect.  Petitioner does not consider that the standard of review for the California Supreme

3  Court's silent denial of the habeas claim may be different and that, under Harrington v. Richter, it

4  may require this court to determine "what arguments or theories . . . could have supported the

5  state court's decision; and then it must ask whether it is possible fairminded jurists could disagree

6  that those arguments or theories are inconsistent with the holding in a prior decision of [the

7  Supreme] Court."  131 S. Ct. at 786.  While recognizing the issue, respondent argues that it is

8  appropriate to analyze the California Supreme Court's appellate decision.  (See Dkt. No. 95 at 162

9  n.47.)  Respondent states that because the state habeas claim "provided nothing to alter the

10  evidentiary picture presented by the record on direct appeal . . ., the ruling on direct appeal . . .

11  was left undisturbed."  (Id.)  This assertion is correct.  The declaration of attorney Smith

12  submitted with the state habeas petition adds little, if anything, of substance to petitioner's claim.

13  Assuming the claims made on appeal and in the state habeas are thus essentially the same, then

14  the California Supreme Court's decision on appeal is the "last reasoned state court decision" and

15  therefore the decision subject to analysis under section 2254(d).  See Ylst v. Nunnemaker, 501

16  U.S. 797, 803 (1991) ("Where there has been one reasoned state judgment rejecting a federal

17  claim, later unexplained orders upholding that judgment or rejecting the same claim [are

18  presumed to] rest upon the same ground.").

19    In any event, whether this court reviews the appellate decision or the habeas

20  decision, the result is the same.  Petitioner has not shown the state court decisions were contrary

21  to or an unreasonable application of federal law, as determined by the Supreme Court.  Similarly,

22  petitioner has not shown the California Supreme Court made an unreasonable determination of the

23  facts.  The California Supreme Court opinion on appeal is set out below:

24    The Sixth Amendment to the federal Constitution, made
    applicable to the states through the due process clause of the
25    Fourteenth Amendment, provides that "[i]n all criminal
    prosecutions, the accused shall enjoy the right . . . to have the
26    assistance of counsel for his defense."  Similarly, article I, section 15

83

of our state Constitution provides that "[t]he defendant in a criminal case has the right . . . to have the assistance of counsel for the defendant's defense. . .." It has long been held that under both Constitutions, a defendant is deprived of his or her constitutional right to the assistance of counsel in certain circumstances when, despite the physical presence of a defense attorney at trial, that attorney labored under a conflict of interest that compromised his or her loyalty to the defendant. (See Glasser v. United States (1942) 315 U.S. 60, 70, 62 S.Ct. 457, 86 L.Ed. 680 (Glasser); People v. Lanigan (1943) 22 Cal.2d 569, 575–576, 140 P.2d 24 [discussing former art. I, § 13 of Cal. Const., which guaranteed the defendant's right "to appear and defend, in person and with counsel"]; People v. Chacon (1968) 69 Cal.2d 765, 776–777, fn. 3, 73 Cal.Rptr. 10, 447 P.2d 106 (Chacon); People v. Mroczko (1983) 35 Cal.3d 86, 104, 197 Cal.Rptr. 52, 672 P.2d 835 (Mroczko).) Defendant contends a conflict of interest existed in the present case and denied him his federal and state constitutional rights to counsel.

a. Federal Constitutional Claim

A recent decision of the United States Supreme Court, Mickens v. Taylor (2002) 535 U.S. 162, 122 S.Ct. 1237, 152 L.Ed.2d 291 (Mickens), clarified several aspects of the applicable law concerning the determination whether a conflict of interest acted to deny a defendant the Sixth Amendment right to counsel. In its central holding, the high court decided that in cases in which the trial court should have inquired into the possibility of a conflict of interest on the part of defense counsel but failed to do so, before reversal is warranted the defendant nonetheless must demonstrate that an actual conflict of interest affected counsel's performance. (Mickens, supra, 535 U.S. at pp. 173–174, 122 S.Ct. 1237.) As relevant to the present case, the high court also confirmed that conflict-of-interest claims are a category of ineffective-assistance-of-counsel claims, which, pursuant to the court's decision in Strickland v. Washington (1984) 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (Strickland), generally require the defendant to demonstrate (1) deficient performance by counsel, and (2) " 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " (Mickens, supra, 535 U.S. at p. 166, 122 S.Ct. 1237, quoting Strickland, supra, 466 U.S. at p. 694, 104 S.Ct. 2052.) In the context of a claim of conflict of interest, however, the deficient-performance prong of the Strickland test is satisfied by a showing that defense counsel labored under an actual conflict of interest, that is, "a conflict that affected counsel's performance—as opposed to a mere theoretical division of loyalties." (Mickens, supra, 535 U.S. at p. 171, 122 S.Ct. 1237.) As to the second prong—that a defendant demonstrate prejudice in the outcome—the court recognized an exception to this requirement, applicable when there exist " 'circumstances of [the] magnitude' " of the denial of counsel entirely or during a critical stage of the proceeding. (Id., at p. 166, 122 S.Ct. 1237.) The court acknowledged that several of its cases held that circumstances of

84

that magnitude existed when the defendant's attorney had "actively represented conflicting interests," and thus no showing of prejudice was required in such circumstances. (Ibid.; see also United States v. Cronic (1984) 466 U.S. 648, 659, fn. 26, 104 S.Ct. 2039, 80 L.Ed.2d 657.) Those earlier cases established what has become known as a "presumption of prejudice" that would relieve the defendant of the otherwise applicable burden of demonstrating a reasonable probability that the conflict affected the outcome of the trial. (See Glasser, supra, 315 U.S. 60, 76, 62 S.Ct. 457, 86 L.Ed. 680; Cuyler v. Sullivan (1980) 446 U.S. 335, 349–350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (Sullivan).)

In determining whether a defendant has demonstrated the existence of an actual conflict of interest satisfying the first prong of the analysis, we consider whether "the record shows that counsel 'pulled his punches,' i.e., failed to represent defendant as vigorously as he might have had there been no conflict." (People v. Easley (1988) 46 Cal.3d 712, 725, 250 Cal.Rptr. 855, 759 P.2d 490 (Easley).) And yet we must bear in mind, as we observed in People v. Roldan (2005) 35 Cal.4th 646, 674, 27 Cal.Rptr.3d 360, 110 P.3d 289 (Roldan), that when " 'a conflict of interest causes an attorney not to do something, the record may not reflect such an omission. We must therefore examine the record to determine (i) whether arguments or actions omitted would likely have been made by counsel who did not have a conflict of interest, and (ii) whether there may have been a tactical reason (other than the asserted conflict of interest) that might have caused any such omission.' "

Defendant contends that his attorneys labored under an actual conflict of interest that adversely affected their performance in two general respects: first, their decision to agree to delay investigation into the alleged statement until the end of the trial, and second, their handling of the inquiry when the witnesses and jurors ultimately were questioned. We find it unnecessary to determine whether the decision to delay the inquiry was a reasonable tactical choice by counsel or a result of divided loyalties, because we agree with defendant that counsel "pulled their punches" during the questioning of the witnesses.

Although Smith's report was multiple-level hearsay, some pieces of known information—that Juror T.W., the jury foreman, was a medical doctor and possibly undertook the Hippocratic Oath at some point in his career—fit with the specifics of the statement as recounted by Smith, affording some indication of reliability. Moreover, despite the trial court's view that the statement, taken literally, did not "make a lot of sense," it is reasonably possible to discern a meaning behind the words: for example, that the juror felt an obligation to society to protect it from a confessed killer such as defendant, quite apart from the juror's view of the evidence presented at the trial.FN46 Indeed, the trial court repeatedly mentioned the possibility that confirmation of the report might lead

85

it to declare a mistrial as to both the guilt and penalty phases.

> FN46. Of course, under the rules of evidence, even had a more thorough and probing investigation been undertaken, evidence of Juror T.W.'s mental process in arriving at his verdict would not be admissible to impeach the verdict in a direct manner; that is, it would be improper to rely upon this evidence to establish that he actually rejected the defense theory of the case because he felt bound to follow the Hippocratic Oath. (Evid. Code, § 1150, subd. (a).) Nonetheless, if further inquiry produced credible information demonstrating that, despite his denial, Juror T.W. did make the alleged statement, the statement itself might constitute competent evidence of "overt acts" of misconduct that if established might have given rise to a presumption of bias (see In re Hamilton (1999) 20 Cal.4th 273, 294–295, 84 Cal.Rptr.2d 403, 975 P.2d 600): namely, that Juror T.W. (1) had discussed the case outside of jury deliberations, and (2) might have been untruthful during voir dire concerning his ability to judge the case on the evidence, and not to be affected by his professional training and responsibilities.

In light of the foregoing, there appears to be no reasonable explanation for defense counsel's ultimate failure to ask news reporter Thomson specifically whether he told Smith's wife about the alleged statement by Juror T.W., other than the desire to protect Smith's personal interest in not publicly exposing his wife as the source of the report. It seems unlikely that if Smith had learned of the alleged statement from an acquaintance who had a casual conversation with Thomson on the street—instead of from Smith's own wife, who allegedly had a confidential conversation with Thomson in connection with her employment—Thomson would not have been pointedly questioned about the conversation, even in light of the denials offered at the hearing by the other percipient witnesses. We doubt that unconflicted counsel would have ended the investigation of this potentially serious allegation of juror misconduct without asking more direct and probing questions of the witness who supposedly had heard the alleged statement.

The Attorney General observes that defendant at all times was represented by two attorneys, and contends the record on appeal does not establish that defendant's other counsel, Humphreys, labored under a conflict of interest. We disagree. Even assuming we could consider separately the actions of Humphreys from those of Smith such that Smith's conflict would not automatically "taint" the entire defense team's handling of the juror misconduct issue, we believe Humphreys's sense of loyalty to his cocounsel was sufficient to create an actual division of loyalties on his part when viewed in light of the unreasonable failure of either counsel adequately to explore with Thomson the statement attributed to

Juror T.W. Attorneys Humphreys and Smith at that time had worked together on defendant's case for more than one and a half years. Smith spoke repeatedly of the serious personal difficulties he perceived he would face if the source of his information were publicly exposed, and he and the trial court mentioned that he even might be required to withdraw from the case, depending upon how the matter was handled. (See Roldan, supra, 35 Cal.4th at pp. 726–727, 27 Cal.Rptr.3d 360, 110 P.3d 289.) Under these circumstances, we believe the record demonstrates that Humphreys also labored under an actual conflict of interest.

In sum, we conclude defense counsel's questioning of Thomson was inadequate compared to what reasonable and unconflicted counsel would have done, was a result of Smith's predicament and both attorneys' desire not to exacerbate it, and could not have been based upon a strategic choice regarding how best to protect defendant's rights. Defendant therefore has demonstrated that an actual conflict of interest affected counsels' performance.

Turning to the second prong of the analysis—the question of prejudice arising from this actual conflict of interest—we conclude no presumption of prejudice should be applied in this case, and, further, the appellate record does not demonstrate a reasonable probability that, absent the conflict of interest, the result of the trial would have been different.

As the Attorney General observes, dictum in Mickens expressed some uncertainty concerning the circumstances in which a presumption of prejudice should be applied. The court observed that its previous conflict of interest cases (Glasser, supra, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680; Holloway v. Arkansas (1978) 435 U.S. 475, 489–490, 98 S.Ct. 1173, 55 L.Ed.2d 426; Sullivan, supra, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333), in which a showing of prejudice to the outcome was not required, all involved situations in which a single defense attorney represented jointly charged defendants. The court further observed that despite this common factual underpinning, lower courts had applied the presumption of prejudice " 'unblinkingly' to 'all kinds of alleged attorney ethical conflicts,' " even though "the language of Sullivan itself does not clearly establish, or indeed even support, such expansive application." (Mickens, supra, 535 U.S. at pp. 174, 175, 122 S.Ct. 1237.) The court stated that whether the presumption properly would be applied to other conflicts "remains, as far as the jurisprudence of this Court is concerned, an open question." (Id. at p. 175, 122 S.Ct. 1237.)

In evaluating claims of Sixth Amendment violation based upon conflicts of interest, we in the past have stated that the presumption of prejudice would be applicable in a variety of factual circumstances, including matters in which, as in the present case, it

87

was alleged that the personal interests of the attorney conflicted with those of the defendant. (See, e.g., People v. Dunkle (2005) 36 Cal.4th 861, 914, 32 Cal.Rptr.3d 23, 116 P.3d 494 ("Dunkle") [conflict based upon possibility that the attorney might be a defense witness]; Roldan, supra, 35 Cal.4th at p. 674, 27 Cal.Rptr.3d 360, 110 P.3d 289 [conflict based upon defense attorney's having been threatened by the defendant]; Frye, supra, 18 Cal.4th at p. 998, 77 Cal.Rptr.2d 25, 959 P.2d 183 [conflict based upon defense attorney's upcoming suspension from the practice of law]; Mayfield, supra, 5 Cal.4th at p. 206, 19 Cal.Rptr.2d 836, 852 P.2d 331 [conflict based upon defense attorney's financial and reputational interests].) The only cases in which we have had occasion to actually apply the presumption, however, have involved, like the high court's cases, concurrent representation of adverse clients by a single attorney. (See Easley, supra, 46 Cal.3d 712, 250 Cal.Rptr. 855, 759 P.2d 490; Mroczko, supra, 35 Cal.3d 86, 197 Cal.Rptr. 52, 672 P.2d 835; see also Chacon, supra, 69 Cal.2d at 767, 73 Cal.Rptr. 10, 447 P.2d 106.) In all other cases in which we mentioned the presumption of prejudice in the recitation of the applicable law, we concluded that the defendant failed to establish that an actual conflict of interest adversely affected counsel's performance; that is, we determined " 'the constitutional predicate for [the] claim of ineffective assistance' " was lacking. (Mickens, supra, 535 U.S. at p. 175, 122 S.Ct. 1237, quoting Sullivan, supra, 446 U.S. at p. 350, 100 S.Ct. 1708.) Our past decisions, therefore, do not constitute controlling authority concerning the question whether the presumption of prejudice applies to all or only some conflict of interest situations, and we are especially reluctant to interpret those holdings broadly here, in light of the skepticism expressed by the high court in Mickens concerning an expansive application of the presumption.

As the high court pointed out in Mickens, the presumption of prejudice is a prophylactic measure established to address "situations where Strickland itself is evidently inadequate to assure vindication of the defendant's Sixth Amendment right to counsel." (Mickens, supra, 535 U.S. at p. 176, 122 S.Ct. 1237.) Only when the court concludes that the possibility of prejudice and the corresponding difficulty in demonstrating such prejudice are sufficiently great compared to other more customary assessments of the detrimental effects of deficient performance by defense counsel, must the presumption be applied in order to safeguard the defendant's fundamental right to the effective assistance of counsel under the Sixth Amendment. (Mickens, at p. 175, 122 S.Ct. 1237.) We conclude that the Strickland standard is not "inadequate" in this case, and, accordingly, no presumption of prejudice is called for.

Defendant does not contend that the conflict affected his counsel's performance related to their conduct of the trial itself, apart from counsel's reaction to the juror-misconduct issue in question. As a result, the complained-of shortcomings of counsel in

this case are fundamentally different from those found in typical conflict-of-interest situations. In most conflict cases, in which a conflict of interest affected the presentation of the defense case to the jury, the problem in assessing prejudice to the outcome of the proceeding has arisen from the reviewing court's difficulty in evaluating how extensively the conflict affected counsel's choices and, ultimately, in predicting how the presence or absence of certain evidence or arguments at trial would have affected the jury's deliberations and verdict.

In the present case, we must examine how counsel's conflict affected the resolution of the allegation of juror misconduct and the possibility of defendant's moving for and receiving a mistrial on that basis.FN47 This determination does not pose the same level of difficulty as attempting to gauge the effect of a conflict upon how counsel conducted the defense case at trial, and further to predict how a jury would have reacted if counsel had put forth a different defense. Rather, it essentially involves a factual determination of whether any misconduct occurred and, if so, a legal determination of whether such misconduct would have provided grounds for moving for and granting a mistrial. Accordingly, we cannot say that any difficulty in assessing the prejudice resulting from the type of conflict of interest at issue in this case is so great that the Strickland standard is inadequate. We therefore conclude we should not apply the prophylactic presumption of prejudice under these circumstances.

> FN47. We shall assume for the sake of argument that the loss of the procedural right to request and be granted a mistrial implicates a fundamental procedural right that, if proved to result from ineffective assistance of counsel due to a conflict of interest, would constitute prejudice to the outcome of the proceeding for Sixth Amendment purposes, even if defendant would have been convicted and sentenced to death following a retrial. (See United States v. Ramsey (D.D.C.2004) 323 F.Supp.2d 27, 39–44; Davidson v. United States (W.D.Pa.1996) 951 F.Supp. 555, 558–559.)

We further conclude, based upon the appellate record, that defendant has not carried his burden of demonstrating a reasonable probability he would have received a more favorable outcome were it not for his counsel's conflict of interest—that is, of demonstrating that more extensive questioning of the witnesses would have uncovered sufficient grounds to support the making and granting of a motion for a mistrial. Smith revealed to the court the reported statement and his concerns surrounding it. Other than Smith's unsworn statements and possibly Juror T.W.'s half-statement that he had spoken of the Hippocratic Oath at some point, the evidence in the appellate record, including a logical reading of Thomson's testimony, strongly contradicts the allegation that Juror T.W. made the statement in question. We also cannot determine at this time

1    whether, even if Juror T.W. did make the statement as reported,
2    such action constituted misconduct, or if it did, that it would
     warrant a mistrial. Similarly, even were we to assume that counsel's
3    decisions to delay investigation of Smith's report and not to call
     Smith's wife as a witness at the hearing also were products of a
4    conflict of interest, there is nothing in the record before us
     establishing that a different course of action would have exposed
5    any more convincing evidence of misconduct. Therefore, based
     upon this record, we conclude there is no reasonable probability
6    that, absent the conflict, defendant would have received a more
     favorable outcome—specifically, a ruling by the trial court granting
7    a mistrial based upon juror misconduct.FN48

8              FN48. To the extent it might prove to be true that counsel's
               conflicted performance retarded the development of the
9              appellate record concerning the alleged misconduct, habeas
               corpus is available to expand upon the existing record in the
10             event defendant uncovers evidence of juror misconduct that
               counsel should have developed at trial. (See People v. Snow
11             (2003) 30 Cal.4th 43, 111, 132 Cal.Rptr.2d 271, 65 P.3d 749
               (Snow) ["normally a claim of ineffective assistance of
12             counsel is appropriately raised in a petition for writ of
               habeas corpus [citation], where relevant facts and
13             circumstances not reflected in the record on appeal . . . can
               be brought to light"].)

14   43 Cal. 4th at 168-74.[26]

15                    d.  Discussion

16        Petitioner does not, of course, challenge the California Supreme Court's

17   determination that both of his attorneys acted under a conflict of interest.  What petitioner does

18   challenge is the state court's legal conclusion that, "no presumption of prejudice should be applied

19   in this case." 43 Cal. 4th at 171.  Petitioner argues that under Mickens, the California Supreme

20   Court was required to presume prejudice.  Petitioner argues that presuming prejudice is

21   particularly appropriate because, as the California Supreme Court pointed out, the appellate record

22

23        [26]  The California Supreme Court later overturned the standards it used in this case to
     analyze the state law aspects of this claim.  See People v. Doolin, 45 Cal. 4th 390, 421 & n.22
24   (2009)(Court disapproves its earlier cases, including its decision in Rundle, which analyzed an
     attorney conflict of interest claim under the California constitution using a different standard than
25   that articulated by the United States Supreme Court.).  Because this court reviews only the
     California Supreme Court's decision on petitioner's federal law claims, the decision in Doolin is
26   not relevant to the federal habeas analysis in the present case.

1  lacks the information necessary to resolve petitioner's claim.  Under <u>Mickens</u>, however, that is not

2  a basis to presume prejudice.  The California Supreme Court followed the controlling federal law,

3  as determined by the United States Supreme Court, by refusing to extend the presumption of

4  prejudice beyond the limits described in <u>Mickens</u>.  That decision was not unreasonable under 28

5  U.S.C. § 2254(d).

6          With respect to the California Supreme Court's decision that petitioner had not

7  shown actual prejudice, petitioner avoids the fact that he could have supplemented this claim, as

8  he was invited by the California Supreme Court to do, in his state habeas petition.  He did not do

9  so.  Petitioner failed to add any evidence of substance to support this claim.  This court recognizes

10  that petitioner could succeed under section 2254(d)(2) if he could show the state court's fact-

11  finding process was "deficient in some material way."  <u>Hibbler v. Benedetti</u>, 693 F.3d 1140, 1146

12  (9th Cir. 2012) (citing <u>Taylor v. Maddox</u>, 366 F.3d 992, 999-1001 (9th Cir. 2004)), <u>cert.</u> <u>denied</u>,

13  133 S. Ct. 1262 (2013)).  But, petitioner has failed to show either the state court should have

14  conducted a hearing or how an evidentiary hearing in this court would enable him to prove this

15  claim.  As explained above, when examining the reasonableness of a state court's denial under

16  section 2254(d)(2), this court may look to the federal standards for determining the necessity of an

17  evidentiary hearing.  <u>See</u> <u>Hibbler</u>, 693 F.3d at 1146-47.  One part of the test for establishing that

18  an evidentiary hearing is required is a determination that petitioner has presented a "colorable"

19  claim for relief by alleging "specific facts which, if true, would entitle [the petitioner] to relief.

20  <u>Earp</u>, 431 F.3d at 1166-27.  Petitioner's claim is not colorable.  It is based solely on the multiple-

21  hearsay statement made by attorney Smith.  That statement is insufficient to establish that

22  petitioner could succeed on this claim if allowed to prove it.  No other testimony or declaration

23  support this claim.  Accordingly, petitioner has failed to show the California Supreme Court's

24  rejection of this claim was unreasonable under 28 U.S.C. § 2254(d)(2) and it should be denied.

25  ////

26  ////

2. <u>Attorney Humphreys' Conflicts of Interest</u>

Petitioner argues Assistant Public Defender Humphreys acted under two conflicts of interest.  First, he claims the representation of petitioner's brother Danny Rundle by the Placer County Public Defender's Office at the same time Mr. Humphreys represented petitioner amounted to a conflict of interest.  Second, he argues that Mr. Humphreys was himself being prosecuted by the Placer County District Attorney at the same time as was petitioner.  The California Supreme Court rejected this claim summarily when it denied petitioner's state habeas petition.

a. <u>Dual Representation of Petitioner and his Brother</u>

i. <u>Background</u>

On September 23, 1987, after petitioner's arrest in this case and before his trial, petitioner's thirteen-year-old brother Danny Rundle was charged by the Placer County Juvenile Court with several counts of indecent exposure and lewd acts with minor girls.  (Ex. 118 (Dkt. No. 11-35) at 916-17.)  In addition, Danny Rundle was charged with battery upon Janet Marie Rundle (nee Thornal).  (<u>Id.</u>)  The police report states that an officer was contacted by Janet Rundle, who asked for help finding a lawyer to initiate divorce proceedings against Donald Rundle.  (<u>Id.</u> at 918.)  During their conversation, Ms. Rundle told the officer that, among other things, Danny Rundle "is lewd and lascivious and has made sexual advances toward her in the recent past." (<u>Id.</u>)  She explained that Danny "had approached her at her residence and exposed his penis to her, while at the same time [g]rabbed and attempted to fondle one of her breasts. Janet said she resisted Danny and told him to get away from her, which he did for several minutes, but then returned and again exposed his penis to her." (<u>Id.</u>)  Danny Rundle was represented by the Placer County Public Defender's Office.  (Ex. 162 (Dkt. No. 12-38), ¶ 19.)

Mr. Humphreys was the head of the Placer County Public Defender's Office at that time.  (<u>Id.</u> ¶ 2.)  Mr. Humphreys had access to Danny Rundle's juvenile file and reviewed it. (Humphreys' notes, Ex. 119 (Dkt. No. 11-36).)  In an October 14, 1988 note to his file,

1   Humphreys wrote that the probation officer's report stated that Janet Rundle had complained of

2   sexually inappropriate conduct by Danny Rundle.  (Id.)  Mr. Humphreys notes also indicate that

3   Danny Rundle's case had been adjudicated and Danny had been sent to the Juvenile Center.  (Id.)

4   The notes state that there was "no reference to sexual misconduct by mom."  (Id.)

5          Janet Rundle was interviewed by Joseph Barthel, the defense investigator, on April

6   2, 1989.  (Reports of Investigator Barthel, exhibit to state habeas petition, submitted herein on

7   Apr. 12, 2010 as record item #37, at 919.70 - 919.79.[27])  Her mother was present during this

8   interview.  (Id. at 919.70.)  Ms. Rundle described meeting Donald Rundle, following him to

9   California to marry him, her impressions of his family, and his eventual drinking and violence

10  towards her.  Mr. Barthel's notes show Ms. Rundle provided substantial information about

11  petitioner's mother's behavior, although nothing indicating possible sexual molestation of

12  petitioner or his siblings.  In addition, during this interview Ms. Rundle did not mention the

13  sexually inappropriate conduct of Danny Rundle.

14                           ii.  New Facts on Habeas

15         Petitioner presents a February 11, 2003 Declaration of Janet Thornal.  (Ex. 30

16  (Dkt. No. 8-10).)  In her declaration, Ms. Thornal describes being in the Rundle home in Georgia

17  and later in California.  In both places, she was aware that her husband Donald Rundle and his

18  brother Danny would sometimes be locked in a bedroom with their mother Jane.  (Id. ¶¶ 3, 6.)

19  _____

20      [27]  When respondent submitted this document, he identified it as part of the state habeas
     proceeding.  However, from the face of the document itself, it is not clear how or when it was
21  submitted.  As discussed below in the section on Claim D, it appears that petitioner's trial
     attorneys attached it to their post-trial motion to dismiss the special circumstances, which was
22  part of their motion for a new trial.  (CT 916-17.)
         The first portion of the document appears to be pages 11-31 and 41-64 of an investigative
23  report prepared on March 28, 1989 by Joe Barthel and Jayson Wechter (their signatures appear
     on page 64.)  This first portion has hand-written pagination of 919.1 to 919.45.  Respondent
24  identifies this portion on the cover sheet to this exhibit as "CT '919.1' - '919.45.'"  The second
     portion of the exhibit is pages 1-24 and 30-39 of a document entitled "Report of Investigation,
25  RE: PEO v. David Rundle," dated April 19, 1989 from Barthel and Wechter Investigations to
     attorneys Smith and Humphreys.  Its hand-written pagination is 919.46 to 919.79.  It does not
26  appear to the court that petitioner filed this document as an exhibit to the federal petition.  (See
     Exhibit Index (Dkt. No. 7-1).)

1  Donald told her they were having "family meetings." (Id.)  These "meetings" "often lasted for

2  hours." (Id.)  Donald later told Ms. Thornal that "abuse" was happening at these "meetings." (Id.

3  ¶ 4.)  However, he would not explain what he meant by "abuse." (Id.)  Ms. Thornal also stated

4  that Danny Rundle once exposed his penis to her and "asked me if I wanted to play with it." (Id. ¶

5  7.)  When she refused, he told her, "'My mama likes to.'" (Id.)   When she told petitioner's

6  mother what Danny had done, Mrs. Rundle told her it was "'none of my business.'" (Id. ¶¶ 8, 9.)

7  Ms. Thornal also described physical and emotional abuse she suffered from Donald and Mrs.

8  Rundle.

9         Ms. Thornal states that she did not reveal some of the information in her current

10  declaration during her 1989 interview with a defense investigator because her mother was there

11  and she "did not feel comfortable talking" about that information. (Id. ¶ 18.)  She also stated that

12  she was never interviewed alone and was never asked to testify. (Id. ¶¶ 18, 19.)

13                          iii.  Discussion

14         Petitioner claims attorney Humphreys had a conflict of interest because his office

15  represented Danny Rundle during the same time period he represented petitioner.  He argues

16  Humphreys failed to interview Ms. Thornal more thoroughly, in particular outside the presence of

17  her mother, and failed to put her on as a witness because he did not want her to reveal the

18  information about Danny.

19         The California Supreme Court's rejection of petitioner's claim was not

20  unreasonable.  Petitioner has not shown Mr. Humphreys concurrently represented both his brother

21  and himself.  In fact, petitioner's argument appears to misstate the facts in the record before this

22  court.  Petitioner claims that "Mr. Humphrey's conflict caused him to forgo presentation of Janet

23  Thornal Rundle's testimony because it would have been against the interest of Danny Rundle in

24  his pending juvenile case." (Dkt. No. 107 at 25:17-19.)  As shown above, according to Mr.

25  Humphreys' notes, Danny Rundle's juvenile case was concluded by October 1988, long before

26  defense investigators interviewed Ms. Thornal Rundle and long before she testified at trial.  While

94

1  the Placer County Public Defender's Office may have represented Danny Rundle during a portion

2  of Mr. Humphrey's representation of petitioner, petitioner has not shown any active, concurrent

3  representation.  The mere fact that Mr. Humphreys had access to Danny Rundle's juvenile court

4  file does not show he "actively represented conflicting interests."  Cuyler v. Sullivan, 446 U.S.

5  335, 348 (1980).  Therefore, there is no basis to presume prejudice.  Moreover, petitioner has

6  failed to establish that Mr. Humphreys had any conflict at all, much less that any such conflict was

7  the reason counsel did not conduct a more thorough investigation of Janet Thornal Rundle.

8  According to Mr. Humphreys' notes, Danny Rundle's case was resolved long before the defense

9  interviewed Janet Thornal.  Petitioner has made no showing that Mr. Humphreys represented

10  Danny Rundle at all.  Therefore, it would not have been unreasonable for the California Supreme

11  Court to have so found.

12                    b.  Conflict Due to Prosecution of Mr. Humphreys

13          Petitioner next argues that Mr. Humphreys also acted under a conflict of interest

14  because, at the time he was representing petitioner, he was also being prosecuted by the District

15  Attorney's Office for driving under the influence.  Again, petitioner fails to show how this

16  constituted a conflict for Mr. Humphreys or, assuming it amounted to a conflict, how it affected

17  Mr. Humphreys' representation of petitioner.  Petitioner admits that he must show prejudice to

18  succeed on this claim.  (Dkt. No. 107 at 30:3-7.)  Because he makes no showing that any conflict,

19  on its own, caused Mr. Humphreys to do something prejudicial, petitioner must establish

20  prejudice in his other allegations of ineffective assistance of counsel, which he would have to do

21  in any event.  Petitioner has done nothing to show the California Supreme Court's summary

22  rejection of this claim was unreasonable.

23          Claim C.  Juror Misconduct and Ineffective Assistance of Counsel on Voir Dire

24          Petitioner alleges that during voir dire Juror V.O. intentionally concealed material

25  facts about her own experience as a sexual abuse victim.  Petitioner further alleges that his

26  counsel was ineffective for failing to conduct an adequate voir dire to discover that Juror V.O. had

1   been a sexual abuse victim and her views regarding the effect of such abuse.  As discussed below,

2   because petitioner's argument lacks a factual underpinning, he has not shown the California

3   Supreme Court unreasonably rejected it and this court recommends denial of Claim C.

4           1.  Background

5           Question 17 in the juror questionnaire in this case asked:

6           Have you or any close friend or relative been involved in a criminal
            case either as a victim or defendant, or witness.  If so, please explain
7           on the attached sheet.

8   (Supp. CT 3232.)   Juror V.O. answered this question by writing "yes," but did not explain her

9   answer as instructed.  (Supp. CT 3247-48.)  On voir dire, no one asked Juror V.O. to explain her

10  "yes" response to the question 17.  Defense counsel did ask two questions about Juror V.O.'s

11  attitude toward child sexual abuse, which disclosed that she did not read or follow stories of child

12  molestation or abuse over the past few years, and that she believed children who are abused

13  "probably" carry the effects of abuse "the rest of their lives, depending on the individual, how they

14  overcome that."  (RT 3723:10-18.)

15          During an interview with state post-conviction counsel, Juror V.O. was asked if

16  she felt that more corroborative evidence of petitioner's allegations of sexual abuse by his mother

17  would have made a difference in her decision at either the guilt or penalty phase of the trial.  Juror

18  V.O. answered that "'it would have to be pretty horrific. Not that sexual abuse isn't horrific. I was

19  a victim of sexual abuse and I didn't turn into a murderer.'" (Decl. of Evan Young, Ex. 165 (Dkt.

20  No. 12-43), ¶¶ 7-8.)  During a second interview, Juror V.O. reiterated that any additional evidence

21  that petitioner had been sexually abused would have had to have been "'pretty horrific' before it

22  would have made a difference to her because she had been the victim of sexual abuse and had not

23  turned into a murder[er]."  (Id. ¶ 10.)   Juror V.O. admitted that at the time of trial, she was

24  "conscious of" the fact that she was a victim of "sexual abuse," and that she thought about her

25  own experience as a sexual abuse victim at the time of the trial.  (Id. ¶¶ 11, 12.)  Mr. Evans also

26  stated that Juror V.O. told him her experience as a sexual abuse victim did not make it more

1   difficult for her to sit as a juror in a case involving sexual abuse.  (Id. ¶ 8.)

2       Petitioner raised this claim in his state habeas petition, which was denied without

3   comment.  Accordingly, this court "must determine what arguments or theories . . . could have

4   supported the state court's decision; and then it must ask whether it is possible fairminded jurists

5   could disagree that those arguments or theories are inconsistent with the holding in a prior

6   decision of [the Supreme] Court."  Richter, 131 U.S. at 786.

7       2.  Legal Standards

8       "The right to a jury free of biased persons is of constitutional magnitude."

9   Johnson v. Armontrout, 961 F.2d 748, 755 (8th Cir. 1992) (citing Smith v. Phillips, 455 U.S. 209

10  (1982)).  "One touchstone of a fair trial is an impartial trier of fact - 'a jury capable and willing to

11  decide the case solely on the evidence before it.'"  McDonnough Power Equip., Inc. v.

12  Greenwood, 464 U.S. 548, 554 (1984) (quoting Smith, 455 U.S. at 217.)  The Court explained

13  that the purpose of voir dire is to protect this right to an impartial trial by "exposing possible

14  biases."  Id.  Even a "hint[] of bias not sufficient to warrant a challenge for cause may assist

15  parties in exercising their peremptory challenges."  Id.

16      In McDonough, the Court set out a standard for determining when an evidentiary

17  inquiry is necessary regarding some claims of juror bias.  The trial in McDonough involved a

18  child's injuries sustained when he was operating a riding lawn mower.  During voir dire, potential

19  jurors were asked whether they, or any members of their families, had sustained any injuries that

20  resulted in any disability or prolonged pain and suffering.  464 U.S. at 550.  Ronald Payton, who

21  eventually became a juror, did not respond to this question.  Id.  The jury verdict found several

22  people, including the plaintiff's mother, partly liable for his injuries.  Id. at 550 n.1.  Thereafter, it

23  was discovered that Juror Payton's son had been injured in the explosion of a truck tire.  Id. at

24  551.  The Court reversed the Court of Appeals' conclusion that this information was alone

25  sufficient to overturn the verdict.  Id. at 555-56.  It rested that holding on the following standard:

26  "to obtain a new trial in such a situation, a party must first demonstrate that a juror failed to

1  answer honestly a material question on <u>voir dire</u>, and then further show that a correct response

2  would have provided a valid basis for a challenge for cause." <u>Id.</u> at 556.

3        The Court of Appeals has held that even if the record does not show actual juror

4  bias, circumstances could require a finding of implied bias. <u>Tinsley v. Borg</u>, 895 F.2d 520, 526-

5  27 (9th Cir. 1990). In <u>Tinsley</u>, a rape case, juror Smith testified during voir dire that she worked

6  as a psychiatric social worker, who was trained to deal with rape victims, but did not recall

7  counseling any rape victims. <u>Id.</u> at 524. At a later trial, Smith testified that she had testified

8  previously in court on behalf of a rape victim and had found the experience "anxiety provoking."

9  <u>Id.</u> The court found no evidence of actual bias on juror Smith's part. The court then examined in

10  some detail the doctrine of implied bias.

11        In <u>Tinsley</u>, the court first noted that the United States Supreme Court "has never

12  explicitly adopted or rejected the doctrine of implied bias." <u>Id.</u> at 527. The court cautioned

13  against presuming bias. <u>Id.</u> at 527-28 (bias should be presumed only in extraordinary

14  circumstances). It listed the limited situations in which courts had presumed bias: (a) where there

15  was a "'potential for substantial emotional involvement, adversely affecting impartiality,' inherent

16  in certain relationships," <u>United States v. Allsup</u>, 566 F.2d 68, 71 (9th Cir. 1977) (in bank robbery

17  trial, prospective jurors who were employees of the bank that had been robbed could not be

18  impartial); (b) where a juror is apprised of such prejudicial information about the defendant that it

19  is highly unlikely the juror can exercise independent judgment; and (c) "where a juror or his close

20  relatives have been personally involved in a situation involving a similar fact pattern," <u>United</u>

21  <u>States v. Eubanks</u>, 591 F.2d 513, 516-17 (9th Cir. 1979). <u>Tinsley</u>, 895 F.2d at 528.

22        3. <u>Discussion</u>

23        Petitioner primarily argues that bias may be found where a juror failed to answer

24  honestly a question on voir dire. The problem is that the test established in <u>McDonough</u> does not

25  necessarily apply to petitioner's argument for a number of reasons. First, petitioner has not shown

26  Juror V.O. concealed anything. She revealed in the juror questionnaire that she or someone she

1    knew had been involved in a criminal case.  Second, even assuming that response related to her

2    having been sexually abused, the fact that she did not follow up that response on the attached page

3    could very well have been carelessness rather than intentional concealment.  Moreover, another

4    very reasonable possibility is that she felt she had followed up in her response to a later voir dire

5    question.  Question 43 asked, "How has crime touched your life?"  (Supp. CT 3239.)[28]  Juror V.O.

6    responded, "I was hit by a drunk driver approx. 4-5 years ago."  (Id.)  It is reasonable to think this

7    constituted an explanation to question 17 about involvement in a "criminal case" and any further

8    response was unnecessary.

9            Lastly, petitioner has not established that the sexual abuse Juror V.O.

10   acknowledged ended up as a "criminal case."  Petitioner has provided no reason to think Juror

11   V.O. was required to respond to question 17 with the sexual abuse information.  It is possible

12   Juror V.O.'s response to the question referred to involvement in a criminal proceeding that had

13   nothing to do with the sexual abuse she suffered.  That "criminal case" could have been the drunk

14   driving accident she mentioned in response to question 43, or it could have been something

15   involving a "close friend or relative."

16           Petitioner has not shown Juror V.O. failed to respond appropriately to a jury

17   question or otherwise concealed information.  This is not a situation like the ones in Eubanks,

18   where the juror failed to answer a question that would have revealed a basis for a finding of bias

19   and, had it been known, the juror would have "undoubtedly" been excused for cause.  519 F.2d at

20   517.  In fact, had Juror V.O. revealed that she had been sexually abused, there is no assurance her

21   one statement cited by the defense investigator, that the abuse would have to be extreme to cause

22   someone to commit murder, would have been revealed.  Defense counsel may, in fact, have felt

23

24   [28]  Petitioner never mentions voir dire question 43, though he probably would have a
     better argument that it may have called for a response regarding sexual abuse.  However, it is also
25   not clear that every juror would have considered past sexual abuse, particularly if it was by a
     family member, to constitute a "crime."  Therefore, it is not clear Juror V.O. necessarily should
26   have included sexual abuse in her response to question 43.  In any event, because petitioner does
     not raise the issue, this court need not address it.

1  that having a sexual abuse victim on the jury would mean she may be more, rather than less,

2  sympathetic to petitioner's story.

3        Petitioner has also failed to show ineffective assistance of counsel.  It would have

4  been reasonable for counsel to think that Juror V.O.'s response to question 43 provided the

5  explanation for her "yes" response to question 17.

6        Accordingly, petitioner has not shown the California Supreme Court's denial of

7  Claim C was contrary to or an unreasonable application of federal law, as determined by the

8  Supreme Court, or involved an unreasonable determination of the facts.  Claim C should be

9  denied.

10      Claim D.  <u>Ineffective Assistance of Counsel at the Penalty Phase</u>

11        Petitioner alleges numerous instances of ineffective assistance of counsel at the

12  penalty phase of this trial.  He claims trial counsel:  (i) failed to investigate and present mitigating

13  evidence; (ii) failed to adequately challenge the admissibility of Dr. Lyons' testimony; (iii) failed

14  to prepare for the testimony of Dr. Thomas; (iv) failed to request a competency hearing; and (v)

15  failed to object to several instances of prosecutorial misconduct.  This court finds below that

16  petitioner has failed to satisfy 28 U.S.C. § 2254(d) for each aspect of Claim D and recommends its

17  denial.

18      1.  <u>Background</u>

19        The evidence presented at the penalty phase is set out above.  In summary, the

20  prosecution presented evidence of the unadjudicated sexual assault and murder of Elizabeth

21  Lactawen; evidence of petitioner's juvenile commitments for sexually assaulting a six-year-old

22  girl and, later, two twelve-year-old boys; petitioner's ex-wife's testimony that petitioner

23  physically and sexually abused her during their marriage; and Dr. Lyons' testimony that petitioner

24  told him about the murders of Ms. Garcia and Ms. Sorensen and about the sexual assaults of the

25  three children.  Dr. Lyons also testified that he did not find petitioner to be psychotic, but felt he

26  had a personality disorder, and found him to be "egocentric, immature, lacking in capacity for

1    empathy, and amoral." According to Dr. Lyons, petitioner was "subject to impulsive behavior

2    during his rage attacks."

3            Because petitioner alleges the evidence presented by the defense at the penalty

4    phase was inadequate, it is necessary to review that evidence in some detail. The first defense

5    witness was Dr. Richard Thomas.[29] (RT 8782.) Dr. Thomas, a psychologist, saw petitioner and

6    his parents three of four times when petitioner was on house arrest pending a formal hearing on

7    the Idaho assault of the young girl. (RT 8783:14-27; 8784:3-14.) Initially, the meetings were set

8    up so that petitioner could receive some counseling. (RT 8785:4-5.) However, Dr. Thomas

9    determined that there was a "family communication problem" and he "thought that through a

10   family counseling process we could improve the quality of their interactions." (RT 8785:5-9, 23-

11   24.) After petitioner became a ward of the Youth Services Center, Dr. Thomas continued to work

12   with petitioner's family for several months, until they decided to move out of Idaho Falls. (RT

13   8785:27 - 8786:6.) Dr. Thomas felt that he had helped petitioner's parents' relationship by giving

14   the women in the family more power to do some things for themselves and by giving petitioner's

15   father permission to do nothing when he was home. (RT 8797:2-14.)

16           Dr. Thomas's impression of petitioner's mother was that she was "totally

17   overwhelmed" because she was raising three children "basically by herself." (RT 8790:11-23.)

18   Petitioner's mother told Dr. Thomas she had been sexually molested as a child. (RT 8791:25-26.)

19   He felt she was concerned that petitioner may have "inherited" an inclination to be a sexual

20   molester. (RT 8792:10-28.) Dr. Thomas testified that ninety percent of perpetrators of sexual

21   abuse were themselves abused as children. (RT 8793:26-28.) Dr. Thomas was not aware that

22   petitioner's mother was having sexual relations with petitioner. (RT 8817:1-4.) He testified that,

23

24           [29] Dr. Thomas was scheduled to testify for the prosecution that petitioner threatened to
     kill him. However, after an in camera hearing, the trial judge excluded that testimony. (RT
     8778:23-24.) It appears that the defense did not plan to call Dr. Thomas until after his testimony

25   about the threat was excluded. (Humphreys Decl., Ex. 162 (Dkt. No. 12-38), ¶ 37.) Counsel's
     conduct regarding Dr. Thomas's testimony is a separate aspect of Claim D and is discussed

26   below.

1 "I don't think that was a fact at that time." (RT 8817:6.)   In fact, Dr. Thomas's testimony was

2 that petitioner's parents were supportive of him.  When YSC staff set up a meeting with Dr.

3 Thomas, petitioner's parents, and petitioner, petitioner's parents "were willing to attempt to do

4 anything, it looked like, at that time." (RT 8806:21-22.)  When petitioner did not show up for the

5 meeting, petitioner's parents stayed.  Dr. Thomas felt that they wanted to help him.  (RT 8807:19-

6 20.)

7          Dr. Thomas's testimony made clear he felt petitioner was dangerous.  He was

8 concerned about petitioner returning to live with his parents.  (RT 8798:11.)  He felt that because

9 petitioner was unwilling to talk about the incident involving the young girl, "it is a matter of time

10 before somebody gets violated again." (RT 8798:4-7.)  On cross-examination, Dr. Thomas

11 testified that he was aware that petitioner had committed the sexual assault of the two boys during

12 the time that he was seeing him.  (RT 8801:2-6.)

13          Dr. Thomas described petitioner as "an individual who enjoyed doing pain, pain

14 when he was trying to pin somebody while wrestling at the junior high school. [¶] David was

15 someone who liked to talk about killing deer and yet had little or no consideration for the animals.

16 I think that David had a long history of violent behavior. . . ." (RT 8804:24 - 8805:1.)  When he

17 talked about wrestling, petitioner "very specifically described hurting people." (RT 8805:24-25.)

18 Petitioner told Dr. Thomas that "he really enjoyed hurting people and causing pain." (RT 8806:5.)

19          Dr. Thomas testified that he "didn't ever see any indications that would indicate

20 [petitioner] was mentally ill or mentally defective." (RT 8810:5-6.)  Petitioner was "not

21 psychotic" and "not schizophrenic." (RT 8810:9-10.)  At that time, Dr. Thomas diagnosed

22 petitioner with "explosive personality disorder." (RT 8810:21-22.)  At the time of trial, that

23 disorder would have been labeled "antisocial personality" disorder.  (RT 8815:22-23.)  Dr.

24 Thomas testified that it was not a "mental illness or defect." (RT 8815:18-19.)  Dr. Thomas

25 described a person with the disorder as "one who will look at a situation and exaggerate what's

26 taking place,"

1          Quite often when they retaliate it is with a heavy
           underlayment of justification that they can do anything in order to
2          prove their point.

3          If pushing and shoving are allowed in the lunch line, the
           explosive personality disorder will be hitting people over the head
4          with their lunch trays.

5          They are very difficult to work with. No matter what you
           bring up and try to confront them with, they generally have a
6          defense, and they use any positive behavior they might adapt as a
           way to avoid not only dealing with issues, but also as a way to avoid
7          dealing with the consequences.

8    (RT 8815:26 - 8816:12.)  According to Dr. Thomas, two of the key features of the personality

9    disorder are blaming others and justifying the use of force.  (RT 8816:22-26.)

10         Dr. Thomas felt that petitioner had "rage inside him" "for a considerable period of

11   time."  (RT 8822:13-17.)

12         The rage that I picked up was mostly due to the
           circumstances of the family having to move with the Navy every
13         two to three years.  David wanted to go hunting with his dad and
           having the Jeep partially loaded and the orders would come in that
14         dad had to go out to the base to go to work, and then he would walk
           around for two or three days and be extremely upset.
15
           Time and again, the Navy coming between David and his
16         dad.  Those were the kinds of rage activities that I heard the most of.

17         There were some other rage activities, how the other kids
           treated him in school.  The majority of the kids didn't deal with
18         David very well, so he ended up with older friends.

19   (RT 8822:24 - 8823:9.)

20         Most of the remaining defense witnesses testified that petitioner was a hard and

21   conscientious worker.  Norval Griffin, a machinist whose shop was near a trailer petitioner rented

22   with his wife Randi, testified that petitioner worked hard as a machine operator for about six

23   months in 1985.  (RT 9084-86.)  Mr. Griffin's wife, Mayday, testified that petitioner was "a hard-

24   working young man."  (RT 9094; 9096:7.)  Petitioner worked for Tim Kile for about a year and a

25   half in 1984 and 1985.  (RT 9221; 9223:1-12.)  Petitioner inserted advertising in the local

26   newspaper.  (RT 9222:1-6.)  Both Mr. Kile and his wife testified that petitioner was a good,

1  dependable employee.  (RT 9223:27; 9223:27 - 9224:2; 9231:13.)  David Luce testified that he

2  owned a restaurant in Colfax.  (RT 9236:13-16.)  For a couple years, petitioner worked on and off

3  doing maintenance at the restaurant and also helped Mr. Luce at his home.  (RT 9237:1-14.)  Mr.

4  Luce testified that petitioner "always did a great job" and Mr. Luce trusted him enough to have

5  him work at his home.  (RT 9238:19-21.)  Deborah Peters testified that in about 1986 petitioner

6  worked in her husband's carpet-laying business and lived with them for about a month.  (RT

7  9274:9-28.)  Petitioner was "really nice, helpful." (RT 9275:4.)

8           Two witnesses testified to petitioner's good behavior while he was in jail awaiting

9  trial.  Bill Roloff, a sergeant with the Placer County Sheriff's Department, testified that petitioner

10 helped officers locate weapons and block an escape attempt.  (RT 9257:25-27; 9258:13 -

11 9262:12.)  Petitioner did not ask for any special consideration from the officers for having

12 provided the information.  (RT 9262:13-15.)  Sherry Couzens, a teacher, testified that petitioner

13 contacted her about getting his GED.  (RT 9212:10-26.)  She met with him about once a week for

14 ten weeks to help him prepare to take the test.  (RT 9214:12-13.)  Petitioner was a "good student,"

15 "[v]ery focused," and "rather quiet."  (RT 9214:16-19.)

16          The defense presented limited testimony about petitioner's childhood.  George

17 Russell, petitioner's maternal uncle, testified that petitioner's mother screamed at him, even when

18 he was quite young, and was physically violent with petitioner in a way she was not with her other

19 children.  (RT 9108:19 - 9109:5; 9110:1-12; 9111:15-18.)  Mr. Russell also witnessed a fight

20 between petitioner's parents in which petitioner's mother attempted to stab his father.  (RT 9114:5

21 - 9116:12.)  Petitioner also witnessed this fight.  (RT 9116:21-26.)  Mr. Russell testified that when

22 petitioner was about a year and a half old, he had "quite a bit of chafing" on his penis and scrotum

23 that Mr. Russell's mother felt was due to petitioner's parents "playing with him and touching his

24 private parts in a way that wasn't right."  (RT 9138:8-10; 9139:7-17.)  Mr. Russell felt petitioner's

25 mother had sexually abused petitioner.  (RT 9147:5-8.)

26 ////

1    Mr. Russell's positive testimony was tempered somewhat by the surprising

2  revelation that his son had dated Lanciann Sorensen and was extremely depressed by her death.

3  (RT 9121:21 - 9122:17.)  Discovering that petitioner had been arrested for her murder, "did

4  nothing for my son's depression."  (RT 9122:15-17.)  However, Mr. Russell testified that he felt

5  petitioner "is every bit a victim as the girls were."  (RT 9127:14-16.)  He blamed petitioner's

6  mother and "dope pushers" for "warp[ing] his mind."  (RT 9127:17-19.)

7    Bonnie Russell, George Russell's wife, also testified.  (RT 9176:8-10.)  Ms.

8  Russell saw petitioner's mother verbally abuse him frequently.  (RT 9181:1-8.)  However, she

9  never saw petitioner's mother physically discipline petitioner.  (RT 9186:4-6.)  Ms. Russell

10  testified that petitioner was "never anything but polite and considerate and hard-working and

11  honest towards all three of us in our family."  (RT 9197:3-5.)  She felt that petitioner had ended

12  up on trial because "he was the victim of parental abuse" and "of the drug problem."  (RT

13  9197:15-19.)  She also testified that in the two years before his arrest, she had little contact with

14  petitioner.  (RT 9198:17-20.)

15    Defense investigator Ken Short testified next.  (RT 9281:2.)  He testified that he

16  interviewed petitioner's ex-wife Randi Rundle, who told him she thought it was strange that

17  petitioner's family members were never affectionate toward him.  (RT 9281:3; 9282:13-21.)  She

18  also told him that petitioner told her about his mother's infidelity and "that she had some weird

19  quirks relating to her sexual misbehavior."  (RT 9284:2-5.)  Thereafter, investigator Joseph

20  Barthel testified that petitioner's brother Donald told him that their father "would rather run David

21  over with a car than stop for him."  (RT 9325:26 - 9326:4.)  Finally, the defense attempted to

22  show Randi Rundle was biased against petitioner.  Investigator Barthel testified that, when asked

23  about her feelings that petitioner was facing the death penalty, Ms. Rundle told him that "she

24  wanted to pull the switch and that she would have a party."  (RT 9289:4-6.)

25    In his closing argument, attorney Humphreys argued that the only two aggravating

26  factors the jury could apply were factor (a), the present crimes, and factor (b), prior criminal

1   activity.  With respect to the present crimes, he argued that they were not, when compared to other

2   first degree murders, so terrible that death was the only appropriate punishment.  (RT 9493:10 -

3   9506:9.)  Essentially, he argued that these were not well-thought-out, sophisticated killings like

4   those committed by the Hillside Strangler or Ted Bundy.  With respect to prior criminal activity,

5   Humphreys acknowledged to the jury petitioner's guilt for the Lactawen murder, the sexual

6   assault of the three children in Idaho, and, perhaps, some crimes against Randi Rundle.  (RT

7   9516:6-14.)  Humphreys argued that the Lactawen murder did not involve the sort of brutality

8   involved in the Hillside Strangler and Bundy cases.  (RT 9506:13-17.)  With respect to the sexual

9   assaults on children in Idaho, Humphreys stated that "no physical harm was actually perpetrated

10  by Mr. Rundle against" the victims.  (RT 9506:21-27.)  Finally, with respect to Randi Rundle's

11  testimony, Humphreys argued the jury should question her credibility and also determine whether

12  petitioner's behavior constituted a crime.  (RT 9507:7-10.)

13          Attorney Humphreys then argued the mitigating factors.  His argument focused on

14  petitioner's human qualities.  He started by arguing that "we should reserve the death penalty only

15  for those persons whose crimes and background show beyond a shadow of any doubt that they

16  can't be redeemed or rehabilitated and have no human qualities whatsoever."  (RT 9518:18-21.)

17  First, Humphreys described petitioner's confessions to the Garcia, Sorensen, and Lactawen

18  killings.  (RT 9519-9522.)  He focused on the lack of evidence connecting petitioner to the

19  Lactawen killing and argued that petitioner nonetheless confessed because he appeared to want to

20  relieve his conscience.  (RT 9522:7-17.)  Humphreys next asked the jury to consider whether the

21  abuse petitioner suffered as a child contributed to his conduct.  (RT 9525:19-22.)  He reviewed the

22  testimony of the mental health professionals who had testified.  (RT 9526:5-19.)  Humphreys

23  noted Dr. Yarvis's testimony that a boy who has been the victim of mother-son incest is likely to

24  feel "overpowering rage," and Dr. Lyons' testimony that petitioner's personality disorder "arises

25  out of faulty child-rearing practices."  (Id.)  Humphreys described petitioner's uncle's testimony

26  about seeing petitioner with chafing marks and petitioner's acknowledgment to officers during his

1  confessions that he often felt uncontrollable rage.  (RT 9527-30.)  He then described the guilt

2  phase testimony about Mrs. Rundle's strange behaviors, including flashing passers-by and having

3  a sexual relationship with a neighborhood teen.  (RT 9531-32.)  Humphreys noted petitioner's

4  drug abuse, but dismissed its importance.  (RT 9533:2-10.)  Humphreys discussed petitioner's

5  "gainful employment."  (RT 9533-34.)  He discussed petitioner's relative youth at the time of the

6  crimes, petitioner's successful adaptation to prison life, and petitioner's skills that could be used

7  to work in prison.  (RT 9541-44.)  Humphreys stressed that petitioner's rages had to be caused by

8  something and attempted to summarize petitioner's life as one marked by abuse and rejection,

9  despite which petitioner "has many admirable human qualities."  (RT 9544-52.)

10         Mr. Humphreys concluded by describing the difficulties and deprivations inherent

11  in a sentence of life without the possibility of parole.  (RT 9552-56.)

12         2.  Legal Standards

13         To prevail on a claim of ineffective assistance of counsel, a petitioner must show

14  that his trial counsel's performance "fell below an objective standard of reasonableness" and that

15  "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

16  proceeding would have been different."  Strickland v. Washington, 466 U.S. 668, 687-88, 694

17  (1984).

18         a.  Deficient Performance

19         As explained above, judicial scrutiny of counsel's performance is highly

20  deferential.  Strickland, 466 U.S. at 689.  When reviewing a state court decision finding counsel's

21  conduct reasonable, the federal court's review under 28 U.S.C. § 2254(d) is "doubly" deferential.

22  Harrington v. Richter, 131 S. Ct. 770, 788 (2011) (citing Knowles v. Mirzayance, 556 U.S. 111,

23  123 (2009)).  Further, "[t]he Strickland standard is a general one, so the range of reasonable

24  applications is substantial."  Id.  Under section 2254(d), "the question is not whether counsel's

25  actions were reasonable.  The question is whether there is any reasonable argument that counsel

26  satisfied Strickland's deferential standard."  Id.

107

1    Under Strickland, "strategic choices made after thorough investigation of [the

2  relevant] law and facts relevant to plausible options are virtually unchallengeable." Strickland,

3  466 U.S. at 690.  However, strategic choices made after less than complete investigation are

4  reasonable precisely to the extent that reasonable professional judgments support the limitations

5  on investigation.  "In other words, counsel has a duty to make reasonable investigations or to

6  make a reasonable decision that makes particular investigations unnecessary.  In any

7  ineffectiveness case, a particular decision not to investigate must be directly assessed for

8  reasonableness in all the circumstances." Id. at 690-91; see also Wiggins v. Smith, 539 U.S. 510,

9  521 (2003).  Similarly, a decision not to present a particular defense or not to offer particular

10  mitigating evidence is unreasonable unless counsel has explored the issue sufficiently to discover

11  the facts that might be relevant to making an informed decision. Wiggins, 539 U.S. at 522-23;

12  Stankewitz v. Woodford, 365 F.3d 706, 719 (9th Cir. 2004).

13    Although the Supreme Court has "declined to articulate specific guidelines for

14  appropriate attorney conduct and instead ha[s] emphasized that 'the proper measure of attorney

15  performance remains simply reasonableness under prevailing professional norms,'" Wiggins, 539

16  U.S. at 521 (quoting Strickland, 466 U.S. at 688), "general principles have emerged regarding the

17  duties of criminal defense attorneys that inform [a court's] view as to the 'objective standard of

18  reasonableness' by which [a court must] assess attorney performance, particularly with respect to

19  the duty to investigate," Summerlin v. Schriro, 427 F.3d 623, 629 (9th Cir. 2005).  Specifically,

20  the Ninth Circuit has held that "'[t]o perform effectively . . . counsel must conduct sufficient

21  investigation and engage in sufficient preparation to be able to 'present[ ] and explain[ ]' the

22  significance of all the available [mitigating] evidence.'" Allen v. Woodford, 395 F.3d 979, 1000

23  (9th Cir. 2005) (citing Mayfield v. Woodford, 270 F.3d 915, 927 (9th Cir. 2001) (en banc)); see

24  also Summerlin, 427 F.3d at 630.  Indeed, "'it is imperative that all relevant mitigating

25  information be unearthed for consideration at the capital sentencing phase.'" Wallace v. Stewart,

26  184 F.3d 1112, 1117 (9th Cir. 1999) (quoting Caro v. Calderon, 165 F.3d 1223, 1227 (9th Cir.

1  1999)).

2          Accordingly, attorneys representing defendants in capital sentencing proceedings

3  have "an 'obligation to conduct a thorough investigation of [the defendant's] background.'"

4  Mayfield, 270 F.3d at 927.  They also have a "'duty to investigate and present mitigating evidence

5  of mental impairment' . . . [,] [which] includes examination of mental health records."

6  Summerlin, 427 F.3d at 630 (quoting Bean v. Calderon, 163 F.3d 1073, 1080 (9th Cir. 1998)).

7  Furthermore, "counsel has an affirmative duty to provide mental health experts with information

8  needed to develop an accurate profile of the defendant's mental health."  Caro v. Woodford, 280

9  F.3d 1247, 1254 (9th Cir. 2002).  "The defendant's history of drug and alcohol abuse should also

10 be investigated."  Summerlin, 427 F.3d at 630 (citing Jennings v. Woodford, 290 F.3d 1006,

11 1016-17 (9th Cir. 2002)).

12         Moreover, where indications in the record suggest that certain mitigating evidence

13 may be available, those leads must be pursued.  Lambright v. Schriro, 490 F.3d 1103, 1117 (9th

14 Cir. 2007); see also Stankewitz, 365 F.3d at 706 (finding ineffective assistance where counsel

15 failed to thoroughly investigate the defendant's childhood, history of drug abuse, and mental

16 health problems notwithstanding the fact that he was on notice that such an investigation might

17 yield mitigating evidence); Summerlin, 427 F.3d at 632 (finding ineffective assistance in a case in

18 which counsel failed to obtain readily available evidence concerning possible mental state

19 mitigation where his client's prior attorney told him there were indications that the defendant was

20 mentally ill); Mayfield, 270 F.3d at 928 (finding ineffective assistance where counsel did not

21 consult the appropriate medical experts or collect relevant records after "his investigator's limited

22 efforts revealed evidence of diabetes and substance abuse," and failed to explain to the jury the

23 relevance of the evidence that was presented).

24              b.  Prejudice

25         To establish prejudice, a petitioner must demonstrate that there is "a reasonable

26 probability that, but for counsel's unprofessional errors, the result of the proceeding would have

1    been different." Strickland, 466 U.S. at 694.  A reasonable probability is one "'sufficient to

2    undermine confidence in the outcome,'" but is "less than the preponderance more-likely-than-not

3    standard." Summerlin, 427 F.3d at 640, 643 (quoting and citing Strickland, 466 U.S. at 693-94).

4    "The likelihood of a different result must be substantial, not just conceivable. Richter, 131 S. Ct.

5    at 792 (citing Strickland, 466 U.S. at 693.)  Accordingly, "[i]n establishing prejudice under

6    Strickland, it is not necessary for the habeas petitioner to demonstrate that the newly presented

7    mitigation evidence would necessarily overcome the aggravating circumstances." Correll v.

8    Ryan, 539 F.3d 938, 951-52 (9th Cir. 2008) (citing Williams v. Taylor, 529 U.S. 362, 398

9    (2000)); see also Rompilla v. Beard, 545 U.S. 374, 393 (2005) ("[A]lthough we suppose it is

10   possible that [the sentencer] could have heard it all and still have decided on the death penalty,

11   that is not the test.").  Instead, in evaluating prejudice, the court must "compare the evidence that

12   actually was presented to the jury with the evidence that might have been presented had counsel

13   acted differently," Bonin v. Calderon, 59 F.3d 815, 834 (9th Cir. 1995), and evaluate whether the

14   difference between what was presented and what could have been presented is sufficient to

15   "undermine confidence in the outcome" of the proceeding, Strickland, 466 U.S. at 694.  Prejudice

16   is established if "there is a reasonable probability that at least one juror would have struck a

17   different balance" between life and death. Wiggins, 539 U.S. at 537.

18                    3.  State Court Decision

19           Petitioner raised these claims in his state habeas petition, which was denied

20   summarily.  Accordingly, the standard for this court's review under 28 U.S.C. § 2254(d)(1) is

21   whether any "arguments or theories . . . could have supported the state court's decision; and then

22   it must ask whether it is possible fairminded jurists could disagree that those arguments or

23   theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Richter,

24   131 U.S. at 786.  Under subsection (d)(2), this court must determine either that the state court's

25   findings of fact "were not supported by substantial evidence in the state court record" or that "the

26   fact-finding process . . . was deficient in some material way." Hibbler v. Benedetti, 693 F.3d

1  1140, 1146 (9th Cir. 2012) (citing <u>Taylor v. Maddox</u>, 366 F.3d 992, 999-1001 (9th Cir. 2004)),

2  <u>cert.</u> denied, 133 S. Ct. 1262 (2013).[30]  The standard for determining whether the state court's

3  factfinding process is insufficient is that "'we must be satisfied that any appellate court to whom

4  the defect [in the state court's fact-finding process] is pointed out would be unreasonable in

5  holding that the state court's fact-finding process was adequate." <u>Id.</u> at 1146-47 (quoting <u>Lambert</u>

6  <u>v. Blodgett</u>, 393 F.3d 943, 972 (9th Cir. 2004)).  This court may look to federal standards for

7  determining the necessity of an evidentiary hearing to determine whether or not the state's refusal

8  to hold an evidentiary hearing ran afoul of section 2254(d)(2).  <u>Id.</u> at 1147-48.

9       4. <u>Claims</u>

10       a. <u>Failure to Investigate and Present Mitigating Evidence</u>

11       Petitioner claims his trial attorneys failed to investigate and present the following

12  mitigating evidence: (i) the failure of the justice system and schools to identify petitioner's mental

13  health issues and help him with them; (ii) petitioner's mental health problems; (iii) responses to

14  the aggravating evidence; (iv) petitioner's history of drug abuse; and (v) petitioner's history of

15  sexual, emotional, and physical abuse.

16       Petitioner argues the following evidence should have been presented at the guilt

17  and penalty phases.  As discussed above in the section on Claim A, the court finds that even had

18  this evidence been presented at the guilt phase, there is no reasonable probability it would have

19  made a difference in the verdict.  Petitioner has a more substantial argument regarding the absence

20  of this sort of evidence at the penalty phase.  The Ninth Circuit Court of Appeals has recognized

21  the qualitative difference between the guilt and penalty phase determinations:

22       The determination of whether to impose a death sentence is not an
23       ordinary legal determination which turns on the establishment of
     hard facts.  The statutory factors give the jury broad latitude to
24       consider amorphous human factors, in effect, to weigh the worth of
     one's life against his culpability.  Presumably the imposition of a

25

26     [30] As discussed above in note 8.

1          death sentence is entrusted to a jury because it is a uniquely moral
           decision in which bright line rules have a limited place.
2

3  Hendricks v. Calderon, 70 F.3d 1032, 1044 (9th Cir. 1995).  The court in Hendricks noted that the

4  law is "sensitive" to failures in the penalty phase of a capital case.  Id.  Thus, because a penalty

5  phase verdict involves a more subjective weighing of factors, it is difficult to determine the effect

6  a substantial class of mitigating evidence would have had.  On the other hand, the general nature

7  of the Strickland standard also means its "range of reasonable applications" by the state court is

8  "substantial."  Richter, 131 S. Ct. at 788; Walker v. Martel, 709 F.3d 925, 942 (9th Cir. 2013),

9  cert. denied, 2013 WL 3912909 (Nov. 4, 2013).  With these two, somewhat conflicting, standards

10 in mind, this court has carefully reviewed petitioner's claim and determined that he has failed to

11 establish unreasonableness under either subsection (d)(1) or (d)(2) for his arguments that counsel

12 failed to investigate and present mitigating evidence.  Accordingly, this court recommends denial

13 of these ineffective assistance of counsel claims.

14                         i.  Evidence Petitioner Argues Should Have Been Presented

15                             (a)  Institutional Failures

16         Petitioner attended the Head Start program in Colfax when he was about five years

17 old.  (Davis Decl., Ex. 8 (Dkt. No. 7-9), ¶ 1.)  Petitioner presents the declaration of a Head Start

18 Teacher, Marc Davis, who describes petitioner's hyperactive behavior, his mother's lack of

19 concern about her children, and his father's apparent physical abuse of both petitioner and his

20 mother.  (Id. ¶¶ 2-11.)  Davis recalled seeing petitioner at least once with a bruised face.  (Id. ¶

21 11.)  Petitioner also presents the declaration of a parent volunteer who heard petitioner's mother

22 rage at her children using profanity, suspected petitioner's mother of physically abusing the

23 children, and understood that petitioner's mother and a Head Start teacher were having an affair.

24 (Godwin, Z. Decl., Ex. 14 (Dkt. No. 7-15).)

25         Kenneth Wrenn, a counselor at petitioner's middle school in Idaho Falls, was also

26 aware that petitioner had behavioral issues.  (Wrenn Decl., Ex. 31 (Dkt. No. 8-11).)  He describes

1   inappropriate and often sexual conduct by petitioner at school.  (Id. ¶ 3.)  When he was fourteen

2   years old, petitioner was committed to the Youth Services Center ("YSC") in St. Anthony's,

3   Idaho, for a year after being charged with sexually abusing a six-year-old girl, indecent exposure,

4   and lewd acts toward other minor girls.  (Juvenile Court Records:  Ex. 118 (Dkt. No. 11-35) at

5   916-17; Ex. 70 (Dkt. No. 9-23) at 270; Ex. 70 (Dkt. No. 9-24) at 281.)  Counselor Wrenn wrote

6   the YSC, the institution where petitioner was housed, regarding petitioner's need for

7   psychological counseling.  (Dkt. No. 8-11, ¶ 4.)  Wrenn felt petitioner's behavior at school, and

8   with the children he assaulted, indicated petitioner may have been the victim of sexual assault.

9   (Id. ¶ 5.)  Wrenn states that he was contacted by a defense investigator, but was never asked to

10  testify.  (Id. ¶ 8.)

11          Petitioner also presents evidence of a civil rights class action suit filed in Idaho

12  federal court in 1984, four years after his release, against the YSC.  (Danny O., et al., v. Bowman,

13  No. Civ. 84-1272, Ex. 72 (Dkt. No. 9-26).)  The judge found a number of the YSC's disciplinary

14  practices unconstitutional because they were "cruel, excessive and not necessary for the proper

15  management, control or discipline of the plaintiffs at the institution."  (Id. at 324-25.)  The

16  director of the YSC during petitioner's tenure there states that it was run on a "punitive model"

17  and practices found unconstitutional, such as solitary confinement, were practiced at the time of

18  petitioner's tenure.  (Kendell Decl., Ex. 18 (Dkt. No. 7-19), ¶¶ 2, 3, 10.)  Director Kendell states

19  that counselors at the YSC provided "little in the way of therapy" and had no programs for dealing

20  with sexual abuse or sexual disorders, even for those who had committed sexual offenses.  (Id. ¶

21  12.)

22          For this aspect of mitigating evidence, as well as most others, petitioner relies

23  heavily upon the declaration of psychologist Dr. David Lisak.  (Ex. 164 (Dkt. Nos. 12-40, 12-41,

24  12-42).)  Dr. Lisak prepared an extensive social history of petitioner.  (Id.)  In addition, he was

25  asked a number of questions regarding petitioner's report of sexual abuse by his mother and about

26  the research available on the issue in 1989, the time of trial.  (Id. (Dkt. No. 12-40), ¶ 3.)  With

1  respect to petitioner's argument that counsel should have investigated and presented evidence of

2  institutional failure, Dr. Lisak opined that petitioner's year of incarceration at the YSC "was a

3  tragically missed opportunity for substance abuse treatment and incest victim recovery." (Id. ¶

4  106.)  He reviewed in detail the records from the YSC, which showed staff had some clues that

5  petitioner's relationship with his parents, and particularly his mother, were tense.  (Id. ¶¶ 107-11;

6  (Dkt. No. 12-41), ¶¶ 112-15.)  Those records also showed that petitioner appeared to get no

7  psychological help regarding that relationship or his sexually-oriented problems.  (Id.)   In

8  addition, records show petitioner took drugs while at the YSC, tried to escape more than once, and

9  appeared to purposely commit an infraction so that he would not be sent home.  (Id.)

10                          (b) Evidence of Mental Health Problems

11          Petitioner claims the evidence of his mental health problems that should have been

12  introduced at the guilt phase should have also been introduced at the penalty phase.  Petitioner

13  presents the declarations of several mental health professionals regarding his psychiatric

14  development and how it related to his behavior during the crimes.

15          Petitioner's primary expert is Dr. Lisak.  In addition to preparing the social history,

16  Dr. Lisak describes the devastating effects of mother-son incest and the connection in this case

17  between incest and petitioner's mental health problems and violence against women.

18          Mother-son incest is widely regarded as one of the most
        damaging forms of sexual abuse imaginable.  For most children,
19      their mother is their primary attachment figure - the person who
        literally and figuratively nurtures them, who protects them, who
20      comforts them, who mediates between them and the world.  There is
        no closer bond than that between a mother and her child; there is no
21      one in a child's life who can have as much impact on its
        development.
22
           Therefore, there is no form of abuse that can be as damaging
23      as that inflicted by a mother on her own child. There is nothing that
        is as psychologically devastating to a child as experiencing abuse at
24      the hands of the person who is simultaneously their primary source
        of nurturance, comfort and protection. Abuse by a mother
25      is internalized by a child. Since the child learns who it is, and whether
        it is worthy of love in its relationship to its mother, when that
26      mother is abusive and cruel the child inevitably ends up feeling that

114

it is unlovable and worse, that it is intrinsically bad and the cause of the abusive and cruel treatment.  Simultaneously, the child experiences anger at the cruel and abusive mother – anger that is both a normal and inevitable response to cruelty. But that anger creates an intolerable condition for the child. It cannot afford to feel that kind of anger directed at its primary source of love and nurturance; and so the child represses the anger out of consciousness for as long as possible; in doing so, the child protects its mother, and protects its own illusion that its mother is a source of love and protection.

It is not surprising that maternal incest, like other forms of severe childhood abuse, leads to an array of severe and long term problems. It is associated with depression, with severe and early onset substance abuse, as well as with an increased risk for the perpetration of violence. Mr. Rundle's history is highly consistent with this pattern that has been demonstrated by decades of research.

. . . .

Incest is utterly toxic to the development of a child's sense of self. That incest – particularly maternal incest – would damage self-development can be most easily appreciated when considered against the backdrop of normal development. One of the fundamental goals of psychological development is the creation of a "new" human being capable of independent thought and action; one who will ultimately be capable of performing the tasks required to participate in community and raise and provide – either directly or indirectly – for a new generation of children. Incest strikes at the heart of this developmental process. It does so by severely disrupting the delicate balance required to foster independence in a child (or adolescent) who is by nature still deeply attached to, and needy of, his parents. A sexual relationship between a mother and a son magnifies an already powerful bond, thereby severely hampering the son's ability to psychologically separate sufficiently to embark on the complex process of developing an independent sense of self.

The concept of an "independent sense of self," while necessarily abstract, has extremely concrete and practical manifestations. Without such a sense of self, a person is incapable of making the kinds of firm choices and commitments that are required to move successfully from the stage of adolescent "trial-and-error" to the stage of responsible adulthood. Adulthood requires the inner stability to make good on commitments; to persist in the face of inevitable adversities. Thus, without such a sense of self, intimate relationships tend to be unstable and short-lived and occupational stability is severely hampered. David Jr.'s life revealed precisely these weaknesses. However, in David Jr.'s case, the effects were immensely magnified by the abandonment by his

////

115

family, and his reliance on a variety of mind-altering substances to
dull his emotional pain and stress.

(Ex. 164 (Dkt. No. 12-40), ¶¶ 11-13, 68-69.)

Petitioner's second mental health expert, Dr. Jay Jackman, a forensic psychiatrist

specializing in substance abuse, "unequivocally" agreed with Dr. Lisak's assessment of the effects

of mother-son incest.  (Ex. 163 (Dkt. No. 12-39), ¶ 35.)  Dr. Jackman further found:

> The traumas David endured, experienced at such a young
> age and persisting so long, and the associated symptoms of drug
> abuse, depression and anxiety, markedly affected his psychological
> development and his ability to function. At a time when David's
> focus should have been on the acquisition of adult life skills and
> competence necessary for success in everyday life and relationships,
> he was forced to find adaptive skills to numb the pain of his trauma
> and its long-term effects. David, like all children, was far more
> likely to have developed normally, with healthy mental functioning
> and appropriate social responsibility, if he had grown up in a safe,
> stable and nurturing environment. Instead, at a time when David
> needed nurturing, discipline and guidance, he was exploited, abused
> and exposed to perversity by the very ones who should have cared
> for him.
>
> . . . .
>
> David Rundle's years of sexual, physical and emotional
> abuse resulted in psychiatric deficits and mental impairment. It is
> my professional opinion, which I hold to a reasonable degree of
> medical certainty, that David Rundle suffered from the effects of
> severe trauma and the associated symptoms of drug and alcohol
> abuse, depression, anxiety and dissociation, all of which further
> impaired his psychiatric state.
>
> Years of mother-son incest created great conflict and tension
> within David. He was eroticized by the incest and eventually
> became filled with anger at his mother's sexual conduct and
> behavior. Because she was his mother, however, David could not
> express, or even acknowledge, this intense anger. This conflict was
> so emotionally charged that it placed David in a constant state of
> psychic tension and disequilibrium. David's commission of the
> offenses was the sudden release of this emotionally charged psychic
> conflict and tension upon women who were for him unconscious
> symbolic representations of key figures in his past traumatic
> experiences.

(Id. ¶¶ 134, 115-16.)

1            Both doctors also opined that not only the sexual abuse petitioner suffered, but the

2    physical and emotional abuse, neglect, and rejection petitioner's parents inflicted, combined to

3    derail petitioner's development.  By the summer of 1986, petitioner's mental state had so

4    deteriorated, helped along by his increasing substance abuse, that Dr. Lisak opined that petitioner

5    was "an incipiently dangerous individual whose anger and sexually violent outbursts were about

6    to create untold tragedy."  (Ex. 164 (Dkt. No. 12-41), ¶ 181.)  Dr. Jackman characterized

7    petitioner's judgment as impaired and felt he had "an inability to control his actions."  (Ex. 163

8    (Dkt. No. 12-39), ¶ 135.)

9            Petitioner also refers to the declaration of Mr. Denman, the counselor hired to

10   assist in the defense investigation, who could have added his professional opinion regarding

11   petitioner:

12            David was severely and repeatedly abused, sexually and physically,
             throughout much of his childhood and teenage years. This abuse
13           was so devastating that David never had the opportunity to develop
             normally – emotionally, psychologically, or socially. David began
14           self-medicating with drugs at an early age in an attempt to cope with
             an inner world that he could not control or understand. David's
15           substance abuse continued to intensify throughout his life and
             culminated in an extreme degree of chemical-induced impairment
16           by the time of his crimes. David's crimes were not consciously
             motivated. Instead, he unconsciously acted out upon his victims a
17           violence and rage that was a direct result of the abuse he suffered.
             After his arrest, after finally comprehending the disastrous
18           consequences of his own history, David began to reveal his own
             story.

19

20   (Ex. 9 (Dkt. No. 7-10), ¶ 28.)

21                          (c) Evidence to Counter Aggravating Evidence

22           Petitioner contends trial counsel unreasonably failed to counter the penalty phase

23   testimony of his ex-wife Randi Rundle.  The mental health professionals could have testified that

24   the abuse petitioner suffered, particularly the sexual abuse, caused him to feel "chronically torn

25   between his need for the closeness and comfort he could only find in relationships with women,

26   ////

                                          117

1   and the fear and anger that such closeness would inevitably produce." (Lisak Decl., Ex. 164 (Dkt.

2   No. 12-41), ¶ 171.)

3                          (d) Evidence of Drug Abuse

4                 Petitioner claims the following evidence of his history of extensive drug abuse

5   should have been presented at the penalty phase.  In 1979, a junior high friend began noticing that

6   petitioner was hanging out with a "bad crowd" who "[e]veryone knew" "drank alcohol and used

7   drugs."  (Diestelhorst Decl., Ex. 10 (Dkt. No. 7-11), ¶¶ 5-6.)  While he was at the YSC, petitioner

8   had access to alcohol and drugs, and he claims he frequently abused them.  (Ex. 105 at 793.[31])  A

9   high school friend, Rahn Carter, stated that he and petitioner drank and took drugs together

10  frequently.  (Ex. 6 (Dkt. No. 7-7), ¶¶ 2-5.)  He "witnessed David use a lot of marijuana, alcohol,

11  hallucinogenic mushrooms, and acid."  (Id.; see also Irving Decl., Ex. 15 (Dkt. No. 7-16), ¶ 9.)

12  Another friend saw petitioner smoke a lot of marijuana.  (Kwiatek Decl., Ex. 20 (Dkt. No. 7-21),

13  ¶ 2.)  Shortly before petitioner's arrest in this case, friends saw him use a lot of drugs.  (Blanchard

14  Decl., Ex. 2 (Dkt. No. 7-3), ¶¶ 2-7; Souza, B. Decl, Ex. 27 (Dkt. No. 8-7), ¶¶ 2-3; Souza, D. Decl.,

15  Ex. 28 (Dkt. No. 8-8), ¶¶ 2,4; Brennan Decl., Ex. 5 (Dkt. No. 7-6), ¶¶ 1-2; Sciacca Decl., Ex. 25

16  (Dkt. No. 8-5), ¶¶ 2-3.)  A number of people could also have testified to the effects drugs had on

17  petitioner's personality. Sometimes he appeared more outgoing and other times he was "almost

18  catatonic."  (Ex. 6 (Dkt. No. 7-7), ¶ 4; Ex. 27 (Dkt. No. 8-7), ¶ 3; Ex. 2 (Dkt. No. 7-3), ¶ 9; Ex. 20

19  (Dkt. No. 7-21), ¶ 2.)

20  ////

21  ////

22  ////

23

24         [31]  The scanned copy of this exhibit, at Dkt. Nos. 11-5 to 11-18, that was filed with the
       petition is mostly unreadable.  Exhibit 105 was also lodged here with the state petition on April
25     12, 2010.  (See Dkt. No. 27.)  Some portions of the lodged copy are legible, many are not.  While
       petitioner cites to several pages of this exhibit, which appears to be his records from the Youth
26     Services Center, the court was able to decipher only p. 793 as support for his claim that he
       abused substances while there.

1          Petitioner and his girlfriend Darby, who was then pregnant, moved from Georgia to

2   Colfax in early 1983.[32]  They fixed up a small cabin owned by petitioner's grandfather to live in.

3   However, petitioner's parents and siblings showed up in Colfax shortly afterwards and petitioner

4   was forced to move out of the cabin.  That feeling of rejection drove petitioner to abuse drugs and

5   alcohol in greater amounts.  (Lisak Decl., Ex. 164 (Dkt. No. 12-41), ¶¶ 162-64.)  Petitioner and

6   Darby returned to Georgia and separated.  (Id. ¶ 166.)  Petitioner then went through a period of

7   drifting, part of the time with his wife Randi, eventually ending up back in Colfax.  (Id. ¶ 167.)

8   During his time on the road and when he returned to Colfax, he regularly used large amounts of

9   LSD, marijuana, amphetamines, and alcohol.  (Id. ¶ 179.)

10          Petitioner's mental health experts describe the effects of petitioner's drug and

11   alcohol abuse.  Dr. Lisak opined that petitioner started using alcohol and drugs at a young age to

12   "dull emotional pain and unhappiness."  (Ex. 164 (Dkt. No. 12-41), ¶ 150.)  Because those

13   substances are addicting and because they worked to medicate his distress, petitioner rapidly

14   became a substance abuser.  (Id. ¶¶ 150-151.)  Self-medicating in this way led petitioner to fail to

15   develop less harmful coping mechanisms for his stress and undermined his "capacity to weather

16   the normal crises of development."  (Id. ¶ 151.)  Mr. Denman agreed that petitioner's extreme and

17   frequent intoxication "ruined his capacity to make conscious choices and to manage his feelings"

18   and "severely damaged his memory."  (Ex. 9 (Dkt. No. 7-10), ¶¶ 14, 15.)  Psychiatrist Dr.

19   Jackman states that petitioner's long and substantial substance abuse "had a severely damaging

20   effect on his mental functions."  (Ex. 163 (Dkt. No. 12-39), ¶ 133.)  The drugs "weakened his

21   already fragile mental state and ultimately led to a complete deterioration of logical thought and

22   self-control in the months surrounding the crimes in question."  (Id.)

23   _____

24          [32]  Much of the information in this paragraph comes from Dr. Lisak's declaration.  It
       appears he learned it from petitioner.  While the court finds the information would have been
25       helpful to paint a more thorough picture of petitioner at the penalty phase, the court also
       recognizes that a jury may have considered petitioner's testimony as self-interested.  It is also
26       quite possible a reasonable attorney would not have presented it because he would not want to
       subject petitioner to cross-examination during the penalty phase.

1                              (e) Evidence of Sexual, Physical, and Emotional Abuse

2           Petitioner sets out his family background and development.  (Dkt. No. 92 at 20-

3   31.)  Without repeating petitioner's entire evidentiary proffer and excluding evidence that was

4   presented during the guilt or penalty phases, the court finds the following facts particularly

5   relevant to the penalty phase.

6           When petitioner's mother, then Charlotte Jane Russell, was twelve to fourteen

7   years old, her father, Billy Joe Russell, began raping her.  (People v. Billy Joe Russell, Nev. Co.

8   Sup. Ct. No. 13117, Ex. 99 (Dkt. No. 10-29) at 676 (psychiatric report re: Billy Joe Russell) and

9   Ex. 99 (Dkt. No. 10-30) at 683 (probation officer's report).)  Billy Joe Russell also physically

10  abused and threatened his wife.  (Russell v. Russell, Nev. Co. Sup. Ct. No. 12764, Ex. 65 (Dkt.

11  No. 9-17) at 201-02 (Complaint for Divorce).)

12          When Jane was fifteen years old, her mother discovered that she had had sexual

13  intercourse with several teenagers and reported it to the Nevada County District Attorney.  (Nev.

14  Co. Juv. Ct. Records of Charlotte Jane Russell, Ex. 68 at 210.[33])  Jane Russell was declared a

15  minor "in danger of leading an immoral life" and made a ward of the court.  (Id. at 207, 217.)  She

16  was sent to the Napa State Hospital Children's Clinic for 90 days.  (Id. at 225.)  Afterwards, Jane

17  was sent home to live with her mother "as long as said minor's father does not reside in the

18  home."  (Id. at 237, 245.)

19          It was during the course of Jane's juvenile court proceedings that she revealed that

20  she had been sexually abused by her father for several years.  (Ex. 99 (Dkt. No. 10-28) at 669.)

21  Her father was charged with incest, plead guilty, was declared a "sexual psychopath," and was

22  sentenced to six months in jail and five years probation.  (Id. at 666, 668; Ex. 99 (Dkt. No. 10-29)

23  at 676-77; Ex. 99 (Dkt. No. 10-30) at 679, 686.)

24  _____

25  [33]  The scanned version of this exhibit that was filed with the petition is incomplete.  (See
    Ex. 68 (Dkt. Nos. 9-19, 9-20).)  It is missing pages 206-25.  A complete version of Ex. 68 was
26  lodged herein with the state petition on April 12, 2010.  (See Dkt. No. 27.)

1    Later, petitioner's parents, who were both teenagers at the time, were forced to get

2  married because Jane became pregnant.  (Lisak Decl., Ex. 164 (Dkt. No. 12-40), ¶ 16.)

3  Petitioner's father, David Sr., was aware that Jane had been sexually abused by her father and had

4  been sexually active as a teenager.  (Id. ¶ 18.)

5    When petitioner was young, his family moved frequently and his father was away

6  from home for extended periods of time.  (Id. ¶ 42.)  Petitioner's mother never learned to drive a

7  car and had no friends.  (Id.)  Petitioner's father was a stern disciplinarian.  In addition to yelling,

8  he often beat or pushed petitioner's mother and the children.  (Id. ¶ 43; Davis Decl., Ex. 8 (Dkt.

9  No. 7-9), ¶¶ 10-11; McAdams Decl., Ex. 21 (Dkt. No. 8-1), ¶ 4; Cooke Decl., Ex. 7 (Dkt. No. 7-

10  8), ¶¶ 2-4.)  According to Dr. Lisak, petitioner's father admitted that he screamed at and

11  physically beat petitioner on "numerous occasions."  (Ex. 164 (Dkt. No. 12-41), ¶ 184(I).)

12  Several of petitioner's friends over the years saw evidence that petitioner was being beaten at

13  home.  (Carter Decl., Ex. 6 (Dkt. No. 7-7), ¶ 5; Irving Decl., Ex. 15 (Dkt. No. 7-16), ¶¶ 1, 3-4.)

14  Petitioner's mother also yelled and hit the children.  (Ex. 164 (Dkt. No. 12-40), ¶¶ 46-48; Godwin,

15  Z. Decl., Ex. 14 (Dkt. No. 7-15), ¶¶ 2-4.)

16    In addition to physical abuse, petitioner was abused emotionally.  Phillip Bodily

17  witnessed the incident, about which petitioner testified at the guilt phase, in which Jane Rundle's

18  teenage lover, Ron Kinney, hung petitioner by a noose in the carport while his mother and Bodily

19  were present.  (Bodily Decl., Ex. 3 (Dkt. No. 7-4), ¶¶ 5-6.)  Mr. Bodily also states that he heard

20  "the insulting and belittling" way petitioner's mother spoke to him in front of his friends.  (Id. ¶

21  30.)  Apparently Mr. Bodily did not testify to this information at trial because he was reluctant to

22  speak to the defense investigator in the presence of his parents.  (Id. ¶ 3.)  Bodily indicates he

23  would have been able to "talk to him about a lot more of the things I knew about the Rundles" had

24  his parents not been present.  (Id.)  Dr. Jackman could also have testified that the humiliation

25  petitioner experienced from the communities' awareness of his mother's aberrant sexual behavior

26  took an emotional toll on petitioner.  (Ex. 163 (Dkt. No. 12-39), ¶ 87.)

1    Petitioner's experts could have testified to the effects emotional abuse and

2 rejection can have on children.  Dr. Jackman states that emotional abuse "can be the cruelest and

3 most destructive of all types of abuse.  Because emotional abuse attacks the child's psyche and

4 self concept, the victim comes to see him or herself as unworthy of love and affection."  (Ex. 163

5 (Dkt. No. 12-39), ¶ 85.)

6    Petitioner presents the following evidence to support his testimony that he was

7 sexually abused by his mother.  First, well before trial, petitioner told several people about the

8 incestuous relationship with his mother.  Jim Denman, a licensed Marriage, Family, and Child

9 Counselor, who worked with the defense investigators, states that petitioner told him about the

10 abuse during his interviews with petitioner in March and April of 1988.  (Denman Decl., Ex. 9

11 (Dkt. No. 7-10), ¶ 4.)  According to Mr. Humphreys, petitioner only disclosed the abuse to guilt

12 phase investigator Kenneth Short after being told that his younger brother Danny had been

13 charged with sexual offenses.  (Ex. 162 (Dkt. No. 12-38), ¶ 19.)  Danny Rundle was charged in

14 the fall of 1987.  (Ex. 118 (Dkt. No. 11-35) at 916-17.)  According to Mr. Humphreys, petitioner

15 expressed concern to Mr. Short that Danny was also being abused by their mother.  (Id.[34])

16 According to Mr. Humphreys' notes from a conversation with Dr. Yarvis, Yarvis believed

17 petitioner's story of being sexually abused.  (Ex. 115 (Dkt. No. 11-32) at 897.[35])  Second, a

18 counselor at the junior high petitioner attended in Idaho described petitioner's strange behavior at

19 school.  (Wrenn Decl., Ex. 31 (Dkt. No. 8-11), ¶¶ 1-3.)  Petitioner was seen by students with his

20 hand on or around his genitals, fondling himself in class, and "trying to have sex with utilities

21 poles."  (Id. ¶ 3.)  The counselor felt petitioner was "preoccupied by sex."  (Id.)  The counselor

22 wondered at that time whether petitioner might be the victim of sexual abuse.  (Id. ¶ 5.)  Dr. Lisak

23

24    [34] Petitioner does not provide a declaration from Kenneth Short regarding this
conversation.  It would have been reasonable for the California Supreme Court to discount Mr.
25 Humphreys' testimony, a conversation it does not appear he was involved in.

26    [35] Again, petitioner provides no direct evidence regarding this opinion of Dr. Yarvis.

1  stated that petitioner's inappropriate sexual behavior is "often tied to a history of sexual abuse."

2  (Ex. 164 (Dkt. No. 12-41), ¶ 184(C).)

3          Mike Godwin, a friend of petitioner's from Colfax, who saw petitioner during the

4  times petitioner returned to Colfax in the early 1980s, states that during that time, petitioner

5  "confided in me that his mother had sexually molested him for many years, beginning when he

6  was a young child and continuing until he was about 14." (Godwin, M. Decl., Ex. 13 (Dkt. No. 7-

7  14), ¶ 3.) According to Godwin, petitioner was concerned that his mother was also molesting his

8  younger brother, Donald, and wanted to get Donald out of his parents' house. (Id.)

9          Petitioner's high school friend Albert Irving stated that he thought petitioner was

10  being sexually abused by his mother at that time. (Ex. 15 (Dkt. No. 7-16), ¶ 6.) Petitioner's

11  mother propositioned him once. (Id. ¶ 5.) He heard she had done the same to many of

12  petitioner's friends. (Id.)

13          As described above in the discussion of attorney Humphrey's alleged conflict of

14  interest, Janet Thornal, Donald Rundle's ex-wife, states that Donald and his brother Danny would

15  sometimes be locked in a bedroom with their mother. (Ex. 30 (Dkt. No. 8-10), ¶¶ 3,6.) Donald

16  told her they were having "family meetings." (Id.) These meetings "often lasted for hours." (Id.)

17  Donald later told Ms. Thornal that "abuse" was happening at these "meetings." (Id. ¶ 4.) Ms.

18  Thornal also stated that Danny Rundle once exposed his penis to her and "asked me if I wanted to

19  play with it." (Id. ¶ 7.) When she refused, he told her, "'My mama likes to.'" (Id.)

20          Petitioner presents declarations of additional neighbors from St. Mary's, Georgia

21  regarding petitioner's mother's "flashing" of passersby and men on trains. (Ennis, J. Decl., Ex. 12

22  (Dkt. No. 7-13); Jones Decl., Ex. 17 (Dkt. No. 7-18); Stephens Decl., Ex. 29 (Dkt. No. 8-9).)  In

23  addition, besides the witnesses who testified at trial about Jane Rundle's flashing in Colfax,

24  petitioner presents the testimony of one of his friends who also saw petitioner's mother and sister

25  nude or topless while in the front yard of their Colfax home. (Kwiatek Decl., Ex. 20 (Dkt. No. 7-

26  21), ¶ 1.) Dr. Lisak states that petitioner's mother admitted to him that she was a "compulsive

1    exhibitionist," was "compulsively sexually active with numerous partners throughout her

2    marriage," and "sexually abused numerous adolescent males."  (Ex. 164 (Dkt. No. 12-41), ¶

3    184(D).)

4                                           ii.  Discussion

5            Petitioner argues that counsel either knew, or should have known, they needed to

6    investigate and present the areas of evidence discussed above.  There is no question that counsel

7    had, and could have obtained, more information about petitioner than was presented during the

8    penalty phase.  The penalty phase evidence presented by the defense was somewhat limited.  Most

9    witnesses testified simply that petitioner was a good employee.  Despite counsel's closing penalty

10   phase argument in which he stressed a connection between the abuse petitioner suffered and his

11   criminal conduct, counsel presented little evidence to show that abuse.  Further, the mental health

12   expert presented by the defense at the penalty phase probably did as much harm as good.  Thus,

13   without a better mental health expert who could explain to the jury how all of the problems

14   petitioner encountered in his young life would lead to significant mental issues, it is difficult to

15   conceive that counsel's conduct could be considered objectively reasonable.  Nonetheless, this

16   court must also consider whether petitioner was prejudiced by these failures.  For the reasons set

17   forth below, this court does not find that the California Supreme Court would have been

18   unreasonable in concluding that petitioner had not made a prima facie showing that he was

19   prejudiced by counsel's conduct.

20                           (a)  Reasonableness of Counsel's Conduct

21           Despite respondent's protestations to the contrary, the court finds trial counsel's

22   conduct likely amounted to unreasonable representation under Strickland.  Counsel was aware of

23   the importance of expert testimony regarding petitioner's mental health.  Both attorneys have

24   stated that they knew that Dr. Yarvis's guilt phase testimony was "harmful in some respects" and

25   both felt that, had they known how he would testify, they would not have called him as a witness.

26   (Smith Decl., Ex. 26 (Dkt. No. 8-6), ¶¶ 13,14; Humphreys Decl., Ex. 162 (Dkt. No. 12-38), ¶ 21.)

1   Mental health evidence, including expert testimony to help the jury make sense of that evidence,

2   has been considered by courts to be an important mitigating factor at the penalty phase.  See, e.g.,

3   Earp v. Ornoski, 431 F.3d 1158, 1179 (9th Cir. 2005) ("If proven to be true . . ., this alleged

4   history of substance abuse, emotional problems, and organic brain damage is the very sort of

5   mitigating evidence that 'might well have influenced the jury's appraisal of [Earp's] moral

6   culpability.'" (quoting Williams v. Taylor, 529 U.S. 362, 398 (2000)); Smith v. Mullin, 379 F.3d

7   919, 942 (10th Cir. 2004) ("[T]he mitigating evidence [of mental illness] omitted in Mr. Smith's

8   trial is exactly the sort of evidence that garners the most sympathy from jurors.").  It is difficult to

9   perceive why counsel did not find a new expert to testify to the connection between the abuse

10  petitioner suffered and his mental condition.

11          Counsel was also aware of the importance of the failures of the institutions

12  petitioner attended, in particular the YSC, to help petitioner address his problems at an early age.

13  In a post-trial motion to strike the special circumstances, petitioner's trial attorneys argued that the

14  "great tragedy of the present case" is that petitioner did not get treatment for his underlying

15  problems during his year at the YSC.  (CT 917.)  The attorneys attached portions of their defense

16  investigators' reports, which included interviews with a number of people associated with the

17  YSC, several of whom worked with petitioner.[36]  Those interviewed reported that the YSC was

18  "punishment oriented" at that time.  It had no programs for identifying or dealing with sexual

19  abuse or sexual disorders.  The interviewees also revealed that petitioner told a counselor he

20  preferred to stay at the YSC, rather than go home.

21          It is not as clear that petitioner's counsel should have pursued evidence of drug

22  abuse.  As respondent points out, it was important to the believability of petitioner's guilt phase

23  testimony that he demonstrate the ability to remember what happened during the killings.  On the

24  other hand, petitioner's historical substance abuse probably would have been relevant to

25  _____

26          [36]  See n.27, supra, regarding the location of the investigators' notes in the state court
    record lodged herein.

1  consideration of his mental health.

2        Finally, counsel was aware of many more potential witnesses to petitioner's past

3  than were presented at the penalty phase and could have probably located others.  On June 10,

4  1988, defense investigators Barthel and Wechter submitted a penalty phase investigation plan to

5  trial counsel.  (Ex. 124 (Dkt. No. 11-41).)  The plan "outlines the areas of inquiry we feel are

6  necessary to document David's life."  (Id. at 929.)  The ultimate goal of the investigation was to

7  present a "detailed and insightful social history of David Rundle" to "help the jurors understand

8  him, recognize his humanity, and realize that he too has been a victim."  (Id.)

9        We want them to view David Rundle twenty years in the past, to see
         and appreciate the defenseless little boy who was sexually and

10       physically abused, the rejected teenager who made failed efforts at
         leading a normal life.  We also want them to see David twenty years

11       into the future, as a life inmate who will suffer tremendously for his
         heinous crimes, but who will pose no threats to jailers or other

12       prisoners.

13 (Id.)

14       Investigator Barthel made counsel aware that the investigations might need to be

15 wide-ranging because petitioner "appears to have little support from his immediate family."  (Id.

16 at 931.)  "We will therefore be compiling a profile of David's family, by interviews with

17 neighbors, friends, relatives, and with social and community workers who interacted with them."

18 (Id.)  In addition, Barthel discussed interviewing petitioner's employers, ex-wives, friends who

19 knew of his drug use, and jail personnel regarding his behavior there; and investigating

20 petitioner's living situations during the time he was a homeless drifter.  Barthel proposed focusing

21 on the following areas for developing mitigating evidence:  (1) sexual and physical abuse, (2)

22 petitioner's efforts at normalcy, (3) unstable living situations during the time petitioner "drifted,"

23 (4) impact of psychoactive drugs, (5) good behavior in jail, (6) countering aggravation, (7)

24 petitioner's institutional history, and (8) interviewing victims' families to diffuse hostility.  (Id. at

25 932-36.)

26 ////

1          Barthel listed fifty-three people in or near California and about twenty people out

2   of the state to be contacted.  (Ex. 124 (Dkt. No. 11-41) at 937-941.)  Barthel then provided a

3   detailed, lengthy report based on the 26 hours of interviews his office had conducted with

4   petitioner.  (Id. at 946-1018.)

5          It appears that Barthel and Wechter then interviewed people in both Idaho Falls

6   and St. Mary, Georgia, where petitioner and his family had resided when he was growing up.  The

7   investigators presented counsel with at least two reports reflecting numerous interviews at those

8   locations.  The complete reports were not provided to the California Supreme Court.  Rather, what

9   appear to be incomplete copies of March 1989 and April 1989 reports from Barthel and Wechter

10  to trial counsel are part of the state court record.  See, n.27, supra.  The provided portions of those

11  reports reveal that investigators interviewed at least twenty people and attempted to contact a

12  number of others.  It is somewhat curious that some of that information was not presented at the

13  penalty phase.  For example, investigators spoke to junior high counselor Kenneth Wrenn and to

14  YSC director Dick Kendall, both of whose declarations have been provided now by counsel to

15  show the institutional failures in helping petitioner.  However, it is also worth pointing out that

16  many of those interviewed had bad, and new, things to report about petitioner.  It is

17  understandable that counsel may have wished to limit the amount of new incidents of bad

18  behavior revealed to the jury.

19          Finally, counsel recognized that supporting petitioner's guilt phase testimony about

20  his mother's sexual abuse was important mitigation.  (Smith Decl., Ex. 26 (Dkt. No. 8-6), ¶ 20;

21  Humphreys Decl., Ex. 162 (Dkt. No. 12-38), ¶ 39.)  Both attorneys stated that the only

22  corroborating testimony was that of petitioner's uncle, Gary Russell.  (Ex. 26, ¶ 20; Ex. 162, ¶

23  39.)  Gary Russell's testimony about suspecting some sort of sexual abuse when petitioner was a

24  baby provided little, if any, corroboration of petitioner's story of his mother's sexual abuse during

25  his adolescence.

26  ////

1          Counsel were aware of Billy Joe Russell's conviction for sexually abusing

2    petitioner's mother.  They attempted to introduce that evidence at the guilt phase.  Mr. Humphreys

3    simply states that they did not attempt to re-introduce the evidence at the penalty phase because,

4    based on the guilt phase ruling, he did not believe the judge would permit it.  (Ex. 162 (Dkt. No.

5    12-38), ¶ 40.)  However, the connection between being a sexual abuser and having been abused,

6    which was not made at the guilt phase, was made at the penalty phase.  Dr. Thomas testified that

7    ninety percent of perpetrators of sexual abuse were themselves abused as children.  (RT 8793:26-

8    28.)  It is not clear when the defense decided to have Dr. Thomas testify for them; he had been

9    called as a prosecution witness.  It is also not clear whether the defense attorneys knew how Dr.

10   Thomas would testify.  Regardless of whether counsel failed to prepare Dr. Thomas or failed to

11   find a new expert to testify at the penalty phase, the result is the same – they acted unreasonably.

12   This conclusion is particularly true with respect to showing petitioner was caught up in a family

13   cycle of abuse.  Petitioner's counsel had little else at the penalty phase.  There is no question that

14   emphasis should have been placed on showing this cycle of abuse.  The court finds it difficult to

15   conceive any reason not to have done so.

16          According to Dr. Lisak, it was well known at the time of petitioner's trial that

17   "victims of sexual abuse are at a substantially greater risk of perpetrating abuse themselves."  (Ex.

18   164 (Dkt. No. 12-41), ¶ 184(D).)  The evidence regarding Jane and Billy Joe Russell was

19   particularly important because it documented the sexual abuse she suffered.  As noted by Dr.

20   Lisak, "it is extremely rare for such incest to result in documentary evidence." (Id.)  Petitioner's

21   testimony, which could very well have been seen by the jury as self-serving, would have been

22   enormously bolstered by the evidence that petitioner's mother suffered similar abuse and by the

23   testimony of experts regarding the "cycle of violence" in families fraught by abuse.  (See id.)

24   Expert testimony would have been necessary to explain the relationship between what petitioner's

25   mother suffered, what she perpetrated, what petitioner suffered, and what he, in turn, perpetrated.

26   This is just the sort of mitigating evidence which would have given the jury some window into

1   petitioner's behavior and might have influenced the jury's sense of petitioner's moral culpability.

2          Most of the other evidence of sexual abuse presented to the California Supreme

3   Court could, and should, have been pursued by counsel.[37] Counsel knew Janet Thornal could

4   testify to Danny Rundle's inappropriate sexual behavior.  There is no indication counsel discussed

5   that incident with her.  If they had, the testimony presented in her declaration regarding Danny's

6   statement that his mother liked to fondle him, would likely have been revealed.  Further, expert

7   testimony like that which was presented to the California Supreme Court and here would have

8   corroborated petitioner's story of abuse by showing that petitioner's inappropriate sexual behavior

9   at a young age was a warning sign of abuse.

10          The Supreme Court has "acknowledged the essential importance of developing the

11   background and character of a defendant in order to make an individualized assessment of the

12   appropriateness of the death penalty."  Ainsworth v. Woodford, 268 F.3d 868, 877 (9th Cir. 2001)

13   (citing Penry v. Lynaugh, 492 U.S. 302, 319 (1989)).  At the time of petitioner's trial, a defense

14   attorney's "obligation" to investigate and present at the penalty phase evidence of the background

15   and character of the defendant was "an integral thread in the fabric of constitutionally effective

16   representation."  Id.; Bean v. Calderon, 163 F.3d 1073, 1080 (9th Cir. 1998).

17          Petitioner's attorneys adduced little substantive evidence in mitigation, and their

18   "ill-preparation resulted in the testimony of one defense witness [here, Dr. Thomas] contributing

19   to the evidence in aggravation."  Ainsworth, 268 F.3d at 874-75.

20              If the sentencer is to make an individualized assessment of the
               appropriateness of the death penalty, evidence about the defendant's
21             background and character is relevant because of the belief, long held
               by this society, that defendants who commit criminal acts that are
22             attributable to a disadvantaged background, or to emotional or

23

24      _____

        [37]  Petitioner also relies upon the declaration of his friend Mike Godwin that petitioner
25   told him he had been abused by his mother.  The court finds that trial counsel should not be
     charged with failing to locate Mr. Godwin.  The list of potential witnesses petitioner provided to
26   investigators did not include Mr. Godwin.  (Ex. 124 (Dkt. No. 11-41) at 938-39.)  Counsel
     cannot be expected to turn over every possible stone.

1    mental problems, may be less culpable than defendants who have no
     such excuse.
2

3    Id. at 877 (quoting Penry, 492 U.S. at 319).  Petitioner's abusive childhood, his substance abuse,

4    and his mental health problems were the only thing that could have put all the aggravating

5    evidence in any sort of perspective.  See Hardwick v. Crosby, 320 F.3d 1127, 1164 (11th Cir.

6    2003) ("'Psychiatric mitigating evidence not only can act in mitigation, it also could significantly

7    weaken the aggravating factors.'") (quoting Elledge v. Dugger, 823 F.2d 1439, 1447 (11th Cir.

8    1987)).  Without that evidence, petitioner's jury had little context to understand how petitioner

9    ended up before them.  Petitioner's trial attorneys failure to give the jury that opportunity

10   amounted to unreasonable conduct in violation of the first prong of the Strickland test.

11           That conclusion having been said, this court need not consider whether or not the

12   California Supreme Court may have unreasonably made a determination of the reasonableness of

13   counsel's conduct, because that court could have reasonably determined petitioner had not made a

14   prima facie showing of prejudice.

15                                    (b) Prejudice

16           Despite defense counsel's failures at the penalty phase, and considering the

17   evidence petitioner presented to the California Supreme Court and here in the light most favorable

18   to petitioner, this court finds it possible that at least one fair-minded jurist could conclude that

19   petitioner failed to make a prima facie showing of prejudice.  On one side of the penalty-phase

20   scale, the evidence in aggravation was substantial.  Petitioner had been found guilty of the first

21   degree murders of two young women; he admitted the murder of a third.  All three murders

22   involved attempted or actual sexual assaults of the women, severe restraints imposed on them, and

23   death by strangulation.

24           In addition to the penalty phase testimony regarding the murder of Elizabeth Lactawen, the

25   prosecution showed a number of other violent acts by petitioner.  First, the jury heard about

26   petitioner's juvenile convictions for a sexually motivated attack on a very young girl and the

                                              130

1   sexual assault of two boys.  The girl testified that after petitioner led her under a bridge, he

2   unzipped his pants, took out his penis, and told her to put her mouth on it.  (RT 8670:3-5.)  He

3   tried to force her head down.  (RT 8670:6-9.)  He told the girl he would kill her if she didn't keep

4   quiet.  (RT 8668:7-9; 8670:11-13.)  One of the boys testified that petitioner led him and a friend

5   to a remote location.  (RT 8991:19 - 8993:3.)  Petitioner then threatened to kill the boys if they

6   didn't do as he said.  (RT 8993:10-27.)  Petitioner forced them to remove their clothes and lay on

7   top of each other; he then forced them to fellate him.  (RT 8998:12 - 9003:6.)  Second,

8   petitioner's ex-wife testified that he brutalized her physically and sexually.  This evidence of

9   violent, sexually-driven behavior was extensive and uncontroverted.  Trial counsel's closing

10  argument that petitioner was not deserving of the death penalty because he was not the "worst of

11  the worst" could hardly have carried much weight because he had committed so many violent

12  crimes against so many victims who were smaller and weaker than he was.

13          On the other side of the penalty-phase scale, counsel could, and should, have

14  presented cohesive testimony showing petitioner's family was ensnared in a cycle of sexual abuse.

15  This evidence may have given the jury some sense that petitioner's moral culpability was not

16  necessarily equal to his legal culpability.  Evidence of childhood abuse and mental health

17  problems is "precisely the type of evidence that we [have] found critical for a jury to consider

18  when deciding whether to impose a death sentence."  Douglas v. Woodford, 316 F.3d 1079, 1090

19  (9th Cir. 2003).  This sort of "troubled history" is "relevant to assessing a defendant's moral

20  culpability."  Wiggins v. Smith, 539 U.S. 510, 535 (2003).  In cases which also had significant

21  aggravating evidence, as does this case, the Ninth Circuit Court of Appeals held that the absence

22  of this sort of mitigating evidence was constitutionally significant.  See, e.g., Hendricks v.

23  Calderon, 70 F.3d 1032, 1043 (9th Cir. 1995); Mayfield v. Woodford, 270 F.3d 915, 936 (9th Cir.

24  2001).  This court also recognizes the Supreme Court's stress on the importance of the sort of

25  mitigating evidence presented here.  There is a "belief, long held by this society, that defendants

26  who commit criminal acts that are attributable to a disadvantaged background or to emotional and

1  mental problems, may be less culpable than defendants who have no such excuse." Boyde v.

2  California, 494 U.S. 370, 382 (1990).

3          Hendricks and Mayfield were not, however, considered under the AEDPA and

4  therefore those courts were not required to defer to the state court's denial of the claim.  This

5  court is required to do so.  Even assuming petitioner was permitted to introduce all the evidence

6  presented here, this court cannot conclude that no fair-minded jurist could have determined that

7  the aggravating circumstances necessarily outweighed even the best case mitigation scenario

8  presented by petitioner here.  Moreover, while the case in mitigation could have been far better

9  than what was presented, it was not without problems.  First, the jury had rejected petitioner's

10  guilt phase tale of killing the young women in a rage and then having sex with their bodies.  They

11  also heard that he told various stories to doctors hired to help him.  The expert opinions presented

12  by petitioner are all based on the belief that petitioner was, in fact, sexually abused by his mother.

13  However, petitioner was the only direct source of that information.  Given petitioner's credibility

14  problem with the jury, it is not unreasonable to think they may have had difficulty with expert

15  opinions based on believing petitioner's story.  Second, any penalty phase argument that petitioner

16  was so overcome by rage, mental health issues, and intoxication at the time of the crimes that he

17  should be considered less morally culpable would also have been less convincing after

18  consideration of petitioner's guilt phase testimony in which he remembered many details of each

19  of the killings.

20          In addition to the failures mentioned here, petitioner argues his trial counsel

21  rendered ineffective assistance at the penalty phase for a number of other reasons.  They are

22  discussed below.  Yet none of these alleged failures change this court's opinion that it would not

23  be unreasonable for the California Supreme Court to have found petitioner failed to make a prima

24  facie showing of prejudice.

25  ////

26  ////

b. <u>Ineffective Assistance of Counsel re Dr. Lyon's Testimony</u>

According to petitioner, the purpose of Dr. Lyons' penalty phase testimony was to identify petitioner as the perpetrator of the two juvenile offenses in Idaho because defense counsel refused to stipulate to his identity in those crimes.  (RT 8652:9-10; 8658:7-24.)  However, Dr. Lyons also testified as an expert at the penalty phase. (RT 8826:13-16.)   He testified that petitioner had a "character disorder," was an "angry person," and was "amoral; in other words, he had a defect in his conscience."  (RT 8835-37.)  Not all of Dr. Lyons' testimony was prejudicial to petitioner.  Dr. Lyons testified that petitioner's personality problems arose "out of faulty child rearing practices." (RT 8835:13-16.)  This testimony aligned with the defense attempts to show petitioner's criminal conduct was the result of the abuse he suffered from his parents.

Petitioner argues counsel was ineffective for failing to seek to exclude Dr. Lyon's testimony or impeach it because he had an inadequate basis to render a diagnosis of petitioner. Petitioner presents the declaration of Dr. Jackman who states that Dr. Lyons' brief interview with petitioner was not "a professionally acceptable basis for the opinions he rendered."  (Ex. 163 (Dkt. No. 12-39), ¶ 158.)  Petitioner further argues counsel was ineffective for failing to impeach Dr. Lyons' testimony that petitioner was not psychotic.  This argument is based on the interpretation, discussed above, of Dr. Lyons' prescription of Navane for petitioner.  However, regardless of that prescription, petitioner could have presented the testimony of Dr. Ted Moore, the treating psychiatrist at the Placer County Jail, that he considered petitioner to have symptoms "consistent with three different psychiatric diagnoses: schizophrenia, drug-induced psychosis, and bi-polar disorder." (Moore Decl., Ex. 22 (Dkt. No. 8-2) at 66, ¶ 3.)  Dr. Moore described petitioner's symptoms as "psychotic." (<u>Id.</u> ¶ 4.)  They included "auditory hallucinations of a persecutory nature, paranoid ideas of reference, thought insertion and blunted affect." (<u>Id.</u> ¶ 3.)  Dr. Moore prescribed increasing doses of Navane for petitioner over a six-week period.  (<u>Id.</u> at 67, ¶ 6.) Petitioner described auditory hallucinations continually throughout this time period.  (<u>Id.</u> at 70-74.)

1    It is unclear whether trial counsel obtained petitioner's jail medical records.

2   Counsel recognized the need for them.  (Humphreys Notes, Ex. 151 (Dkt. No. 12-27) at 1169.)  If

3   he had them, however, he presumably would have sought to present Dr. Moore's testimony.

4    There is no question that trial counsel should have sought out a better mental

5   health expert at the penalty phase.  Nonetheless, as explained in the prior section, this court finds

6   the California Supreme Court's rejection of this claim was not unreasonable under 28 U.S.C. §

7   2254(d) because petitioner has failed to make a sufficient showing of prejudice.

8                    c.  Ineffective Assistance of Counsel re Dr. Thomas's Testimony

9    Dr. Thomas, a psychologist who saw petitioner several times after petitioner was

10  apprehended for the attempted sexual assault of the young girl, was identified by the prosecution

11  as a penalty phase witness to testify to an "assault[] with a deadly or dangerous weapon" by

12  petitioner.  (CT 398-99.)  Twice during the his opening statement at the penalty phase, the

13  prosecutor mentioned that Dr. Thomas would so testify.  After opening statements, the defense

14  moved to exclude Dr. Thomas's testimony about the alleged attack because there was insufficient

15  evidence for the jury to find the elements of an assault.  (RT 8354:10-16.)  The court heard Dr.

16  Thomas's proposed testimony in camera and granted the motion to exclude.  (RT 8756-80.)

17  Thereafter, however, the defense asked to put on Dr. Thomas's testimony, which is set out above.

18   Petitioner complains about several aspects of his counsel's conduct with respect to

19  Dr. Thomas.  First, petitioner argues counsel should have moved to exclude Dr. Thomas's

20  testimony prior to the opening statement.  Whether or not counsel acted reasonably in that regard,

21  it is hard to determine what, if any, prejudice petitioner suffered as a result.  Courts have

22  recognized the potential for great prejudice in failing to "produce important evidence that had

23  been promised in an opening."  See Anderson v. Butler, 858 F.2d 16, 17 (1st Cir. 1988); Williams

24  v. Woodford, 859 F. Supp. 2d 1154, 1171-73 (E.D. Cal. 2012).  Therefore, the prosecutor's failure

25  to produce the evidence promised may have actually hurt the prosecution more than the reference

26  to the incident helped.  Moreover, given the breadth of much more serious evidence against

134

1  petitioner at the penalty phase, it is hard to imagine that even if the jury credited the prosecutor's

2  statement as evidence, it made any difference to the outcome.

3          Petitioner's second argument is that counsel had no good reason to put on Dr.

4  Thomas's testimony.  Investigator Barthel had interviewed Dr. Thomas.  His summary of that

5  interview revealed that Dr. Thomas had far more damaging, than positive, opinions of petitioner.

6  Dr. Thomas told Barthel he felt petitioner "was the most volatile person I've seen to date, the

7  most difficult."  (CT 919.26.[38])  Barthel reported that:

8          Thomas "reluctantly" has come to support the death penalty
           and "from what I have heard" feels it appropriate in this case.  He
9          noted the "near impossibility" of change where problems are as
           deeply rooted as these, and said,
10
           It's just clear that he will strike or erupt again.  He'll be
11         under control while the pressure is on and he's being
           watched, but later on when the pressure's off, he'll just
12         explode. . . .  It's too late to change anything, and it's a
           waste of resources to try, knowing that it won't work.
13

14  (CT 919.30.)

15          Attorney Humphreys did not recall how or when they decided to call Dr. Thomas

16  as a witness.  He guessed that it was probably after the motion to exclude the prosecution's

17  evidence of the threat against Thomas.  (Humphreys Decl., Ex. 162 (Dkt. No. 12-38), ¶ 37.)

18  Humphreys "did not recall meeting with Dr. Thomas before we called him to testify."  (Id.)

19          Dr. Thomas's testimony was, in large part, detrimental to petitioner's case.  While

20  Dr. Thomas testified that petitioner's mother told him she had been sexually molested as a child

21  and that most perpetrators of sexual abuse had themselves been abused as children, Dr. Thomas

22  also testified that he did not think petitioner was being abused by his mother at that time.  (RT

23  8721:25-26; 8793:26-28; 8817:1-6.)  Moreover, contrary to the defense theme of parental abuse

24  and neglect, Thomas testified that petitioner's parents were supportive and wanted to help.  (RT

25  _____
26      [38] For the location in the lodged record of this portion of the Clerk's Transcript, see n.27,
    supra.

1   8807:19-20.)  Dr. Thomas also testified repeatedly about petitioner's refusal to discuss his attack

2   on the six-year-old girl.  (RT 8798-8802.)  As petitioner points out, the trial judge specifically

3   noted the prejudicial effect of such testimony and the fact that it should be kept from the jury.

4   (RT 8779:20-23.)

5            Dr. Thomas's further testimony was also damaging.  He felt that petitioner was

6   dangerous and enjoyed hurting people.  (RT 8798-8806.)  He testified that petitioner suffered

7   from a personality disorder, not a mental illness or defect.  (RT 8810-15.)  The prosecutor used

8   this testimony during his closing argument regarding the inapplicability of mitigating factors to

9   show that petitioner was not acting under an "extreme mental or emotional disturbance" when he

10  committed the crimes.  (RT 9428-43.)

11           As discussed above, this court finds trial counsel unreasonably failed to investigate

12  and present testimony from a mental health expert at the penalty phase.  It is difficult to imagine

13  the basis for counsel's decision to put on the testimony of Dr. Thomas.  That said, this court also

14  finds that at least one "fair-minded jurist" might determine Dr. Thomas's testimony was not, in

15  the context of a penalty phase replete with serious aggravating evidence, prejudicial under

16  Strickland.

17           d.   Ineffective Assistance for Failure to Request Competency Hearing

18           The background for this claim is primarily set out below in the discussion of Claim

19  M regarding the trial court's failure to conduct a competency proceeding.  Essentially, the record

20  shows that petitioner became extremely anxious at the beginning of the penalty phase and

21  appeared to wish to absent himself from the remainder of the proceedings.  After giving counsel

22  an opportunity to discuss the matter with petitioner, the court conducted an in camera hearing at

23  which counsel informed the court that petitioner was acting "irrationally."  Counsel stated that

24  they "better declare a doubt," presumably as to petitioner's competence.  They then asked the

25  court for additional time to meet with petitioner, and perhaps have him seen by a mental health

26  professional.

1    In this habeas claim of ineffective assistance of counsel, petitioner references

2  evidence that he claims shows that doctors were aware of petitioner's stress levels.  Dr. Lyons'

3  had prescribed Navane right after petitioner's arrest and Dr. Moore had continued that

4  prescription of Navane based on petitioner's auditory hallucinations.

5    Petitioner also presents Placer County Jail records which he claims show that on

6  the evening of May 24, 1989, petitioner was visited by both attorneys and by a Dr. Allan Roske.

7  (Dkt. No. 92 at 239-40.)  Petitioner alleges the visit lasted five hours because attorney Smith's

8  billing records show a five-hour charge for an "emergency" on May 24, 1989.  (Id.)  The evidence

9  petitioner provides does not support his description of a jail visit.  First, the jail records show that

10 on May 24, 1989, at "1520," which the court presumes to be 3:20 p.m., Mr. Humphreys visited

11 petitioner.  (Ex. 95 (Dkt. No. 10-20) at 573.)  Records show that Mr. Smith also visited petitioner

12 that day, but it was at "8:10."  (Id. at 575.)  The record does not show, however, that Dr. Roske

13 visited petitioner on the 24th.  Rather, the record for Dr. Roske's visit is dated what appears to be

14 May 28, 1989, at "8:13."  (Id. at 574.)  As petitioner describes, Dr. Roske's form lists the purpose

15 of the visit as "psych eval."  (Id.)  Petitioner's claim that the visit lasted five hours also does not

16 appear accurate.  According to the portion of Mr. Smith's declaration cited by petitioner, Mr.

17 Smith's records indicate that he spent five hours on May 23, not May 24, 1989 for an "emergency

18 evening meetg. w/D & Dr Roske."  (Smith Decl., Ex. 26 (Dkt. No. 8-6), ¶ 18.)  It is not clear

19 whether the entire five hours was spent with both petitioner and Dr. Roske.  Dr. Roske's billing

20 records do not indicate how long the visit took; they simply reflect charges for an evaluation and a

21 report.  (Ex. 158 (Dkt. No. 12-35).)  Petitioner argues that the five-hour evaluation shows the

22 seriousness of petitioner's condition.

23    As petitioner points out, neither attorney recalls meeting with Dr. Roske or the

24 apparent fact that Dr. Roske evaluated petitioner and prepared a report.  (Ex. 26 (Dkt. No. 8-6), ¶

25 18; Ex. 162 (Dkt. No. 12-38), ¶ 47.)

26 ////

1    As discussed below regarding Claim M, the trial court did not err in continuing the

2 penalty phase without conducting a competency proceeding.  Nothing petitioner presents in

3 support of this ineffective assistance of counsel claim changes this court's opinion that petitioner

4 has failed to make a prima facie showing that he was in fact incompetent at the penalty phase.

5 Petitioner has also failed to make a prima facie showing that there existed "substantial evidence"

6 of incompetence that would have created a "bona fide doubt" that he was not competent.  Pate v.

7 Robinson, 383 U.S. 375, 385 (1966); Moran v. Godinez, 57 F.3d 690, 695 (9th Cir. 1995).  The

8 fact that petitioner might have been experiencing significant stress is unsurprising and would be

9 natural for someone facing the death penalty.  While his counsel felt that they had to "express a

10 doubt" about petitioner's competence, they did not follow up with that concern and appeared to

11 have resolved it in the time provided by the court to work with petitioner.  Petitioner has not

12 shown counsel acted inappropriately.  Therefore, the California Supreme Court's denial of this

13 claim was not unreasonable.

14    e.  Ineffective Assistance for Failure to Object to Prosecutorial Misconduct

15    In Claim N, petitioner argues the prosecutor committed numerous acts of

16 misconduct during his argument at the penalty phase.  Petitioner argues counsel was ineffective

17 for failing to object to the following alleged misconduct: (i) argument that a death verdict was

18 required, (ii) argument that minimized the jury's sense of responsibility for its penalty decision,

19 (iii) argument that denigrated the mitigating evidence, (iv) argument that the lack of mitigating

20 evidence was aggravating, (v) argument that a personality disorder should not be considered

21 mitigating, and (vi) argument that mislead the jury about the weighing process.

22    Below, in section N.3, this court addresses each of those allegations of

23 prosecutorial misconduct and finds the California Supreme Court's rejection of each to have been

24 reasonable.  Because the California Supreme Court was not unreasonable in finding either no

25 misconduct or no prejudice, or both, it follows that the court was not unreasonable in rejecting the

26 related claims that the defense failed to object to that misconduct.

1      Claim E.  <u>Petitioner's Absence from Critical Trial Proceedings</u>

2          Petitioner argues that he was absent from three critical proceedings in violation of

3 his rights to be present under the Due Process Clause, the Confrontation Clause, and the Eighth

4 Amendment.  First, petitioner was excluded from closed proceedings at which the court discussed

5 whether petitioner's counsel had a prejudicial conflict of interest and how to investigate alleged

6 juror misconduct in a way that would shield counsel's interests.  Second, petitioner waived his

7 right to be present during his mother's testimony.  Third, petitioner was absent from closed

8 proceedings in which the court and defense counsel discussed whether petitioner would be present

9 during the penalty phase, whether petitioner was competent to proceed, and whether petitioner

10 should be medicated to ensure his presence and competence.  Each of these proceedings is

11 described in detail below.

12          In addition to these claims, petitioner argued in his state habeas petition, and

13 argues here, that his counsel was ineffective for failing to ensure petitioner's presence at each of

14 these proceedings, by allowing him to waive his right to be present during his mother's testimony,

15 and by failing to request a jury admonition to disregard petitioner's absence.

16          As set forth below, petitioner fails to meet any of the hurdles of section 2254(d).

17 Accordingly, this court recommends denial of Claim E.

18      1.  <u>Appellate Claims</u>

19         a.  <u>Legal Standards</u>

20          Under the Due Process Clause, a criminal defendant has a right to be present at any

21 stage of the criminal proceeding that is critical to its outcome if his presence would contribute to

22 the fairness or reliability of the procedure.  <u>Kentucky v. Stincer</u>, 482 U.S. 730, 745 (1987); <u>United</u>

23 <u>States v. Gagnon</u>, 470 U.S. 522, 527 (1985) (per curiam).  A defendant must be allowed to be

24 present "to the extent that a fair and just hearing would be thwarted by his absence."  <u>Stincer</u>, 482

25 U.S. at 745 (quoting <u>Snyder v. Massachusetts</u>, 291 U.S. 97, 108 (1934)).  However,"th[e]

26 privilege of presence is not guaranteed 'when presence would be useless, or the benefit but a

1   shadow.'" Stincer, 482 U.S. at 745 (quoting Snyder, 291 U.S. at 106-07). See also Gagnon, 470

2   U.S. at 527 (defendants' absence did not violate the Due Process Clause where their presence was

3   not needed to "ensure fundamental fairness" and they could not have added to or gained from

4   being present at the conference). The right to be present, like many other constitutional rights,

5   may be waived. See Gagnon, 470 U.S. at 529; Taylor v. United States, 414 U.S. 17, 19-20

6   (1973). The defendant must personally waive his right to be present; waiver by counsel is

7   insufficient. Turner v. Marshall, 63 F.3d 807, 815 (9th Cir. 1995), overruled on other grounds in

8   Tolbert v. Page, 182 F.3d 677, 685 (9th Cir. 1999); United States v. Kupau, 781 F.2d 740, 743

9   (9th Cir. 1986); see also Lugo v. Terhune, 277 Fed. Appx. 714 (9th Cir. 2008).[39]

10         Under the Confrontation Clause, the question is "whether there has been any

11  interference with the defendant's opportunity for effective cross-examination." Stincer, 482 U.S.

12  at 744 n.17. Petitioner also argues that his exclusion from the proceedings violated his right to a

13  reliable sentence under the Eighth Amendment. A denial of the right to be present during all

14  critical stages of the proceedings is subject to harmless error analysis. Rushen v. Spain, 464 U.S.

15  114, 117 (1983); Campbell v. Rice, 408 F.3d 1166, 1172 (9th Cir. 2005). However, in certain

16  limited situations, the error may affect the structure of the proceedings and harmless error analysis

17  is inapplicable. Arizona v. Fulminante, 499 U.S. 279 (1991).

18         Petitioner also cites California Penal Code requirements regarding the presence of

19  a capital defendant. (See Dkt. No. 92 at 147:4-13.) However, violations of petitioner's rights

20  under state law do not inform the federal constitutional analysis. See Estelle v. McGuire, 502

21  U.S. 62, 67-68 (1991).

22              b. Absence During Proceeding re Counsel's Conflict/Juror Misconduct

23                      i. Background

24         The California Supreme Court set out the factual backdrop for this claim in its

25  _____

26  [39] Citation of this unpublished disposition by the Ninth Circuit Court of Appeals is
    appropriate pursuant to Fed. R. App. P. 32.1 and U.S. Ct. of App. 9th Cir. Rule 36-3(b).

1 discussion of petitioner's federal Claim B, ineffective assistance of counsel based on a conflict of

2 interest regarding the juror misconduct allegation.  Those facts are discussed above in this court's

3 analysis of Claim B.  To summarize here:  Petitioner was not present at the first two in camera

4 proceedings in which attorney Smith informed the court that he had learned of potential juror

5 misconduct, but that he had a conflict of interest preventing him from disclosing how he had

6 learned such information.  (SRT 8330-38; 8345-48.)  The first proceeding occurred on the

7 morning of May 19, 1989, and involved only defense attorneys Smith and Humphreys and the trial

8 judge.  (SRT 8330.)  The second proceeding occurred on the morning of Tuesday May 23, 1989,

9 and involved the same three people.  (SRT 8345.)  The second proceeding was brief.  Shortly after

10 it commenced, the court and defense counsel returned to the courtroom.  The judge closed the

11 courtroom, except for counsel for both parties and petitioner.  (SRT 8349.)  The judge and counsel

12 then discussed the subject and appeared to discuss everything that had been revealed during the in

13 camera proceedings.  (SRT 8349-58.)  Petitioner does not allege that subjects were discussed

14 during the first two proceedings that were not also discussed during the third proceeding at which

15 he was present.

16                                    ii.  <u>State Court Decision</u>

17              The California Supreme Court made the following ruling on petitioner's

18 appellate claim:

19              Defendant was not present during the first two ex parte in
          camera hearings concerning Smith's report of the alleged
20          misconduct on the part of Juror T.W. He contends on appeal that his
          absence from these proceedings violated his federal and state
21          constitutional rights, as well as state statutory law.

22              "As a constitutional matter, a criminal defendant accused of
          a felony has the right to be present at every critical stage of the trial.
23          (<u>Illinois v. Allen</u> (1970) 397 U.S. 337, 338, 90 S.Ct. 1057, 25
          L.Ed.2d 353.) The right derives from the confrontation clause of the
24          Sixth Amendment to the federal Constitution and the due process
          clauses of the Fifth and Fourteenth Amendments, and article I,
25          section 15 of the California Constitution." (<u>Frye</u>, <u>supra</u>, 18 Cal.4th
          at p. 1010, 77 Cal.Rptr.2d 25, 959 P.2d 183.) A critical stage of the
26          trial is one in which a defendant's " 'absence might frustrate the

                                              141

1    fairness of the proceedings' (<u>Faretta v. California</u> (1975) 422 U.S.
     806, 819, fn. 15, 95 S.Ct. 2525, 45 L.Ed.2d 562) or 'whenever his
2    presence has a relation, reasonably substantial, to the fullness of his
     opportunity to defend against the charge' (<u>Snyder v. Massachusetts</u>
3    (1934) 291 U.S. 97, 105–106, 54 S.Ct. 330, 78 L.Ed. 674)."
     (<u>Rodriguez</u>, <u>supra</u>, 17 Cal.4th at p. 260, 70 Cal.Rptr.2d 334, 949
4    P.2d 31.)

5            The ex parte meetings between the trial court and defense
     counsel concerning Juror T.W.'s alleged statement, at which
6    defendant was not present, were not critical stages of the trial for
     constitutional purposes, because they were merely exploratory
7    discussions concerning the potential problem of juror misconduct
     and possible courses of action that might be taken to resolve that
8    issue. Defendant, in arguing to the contrary, relies primarily upon
     the three-judge-panel decision in <u>Campbell v. Rice</u> (9th Cir.2002)
9    302 F.3d 892. After completion of briefing in the present appeal, the
     <u>Campbell</u> opinion was vacated by the Ninth Circuit Court of
10   Appeals' decision to order an en banc rehearing of the appeal.
     (<u>Campbell v. Rice</u> (9th Cir.2004) 386 F.3d 1258.) The court's
11   subsequent en banc decision declined to determine whether error
     occurred, instead concluding that the California Court of Appeal
12   was not unreasonable in holding that any error resulting from the
     defendant's absence while the trial court and counsel discussed a
13   possible conflict of interest was harmless. (<u>Campbell v. Rice</u> (9th
     Cir.2005) 408 F.3d 1166, 1172–1173 (en banc).) Even to the extent
14   the three-judge opinion might carry some persuasive value,
     however, the <u>Campbell</u> case is factually distinguishable. In the
15   present case, no final decisions were made during the meetings in
     question, and the information possessed by the court and defense
16   counsel and their contemplated course of action subsequently were
     conveyed to defendant (and the prosecutor) in the closed court
17   sessions before any course of action was determined. (<u>Cf.</u> <u>Campbell</u>,
     <u>supra</u>, 302 F.3d at p. 899 ["the in-chambers hearing held to
18   determine whether Campbell's right to conflict-free counsel had
     been violated must have been a critical stage of the criminal
19   proceedings" (italics added) ].)

20           There is no indication in the case before us that defendant's
     presence during the preliminary meetings held between the court
21   and defense counsel was necessary to ensure the fairness of the
     proceedings or that defendant's absence in any way affected his
22   defense. Indeed, the record reflects that defendant was present
     during the several discussions that subsequently took place
23   concerning the subjects of the alleged misconduct and Smith's
     possible conflict of interest, and never sought to add his personal
24   input into the decisionmaking process. Accordingly, defendant's
     constitutional right to be present was not violated by his absence at
25   the earlier meetings.

26   43 Cal. 4th at 177-179.

iii.  <u>Discussion</u>

1          Petitioner fails to address the California Supreme Court's ruling on his appellate

2  claim.  Without citation to any authority on point, petitioner simply concludes that the two initial

3  in camera proceedings were "plainly critical" and his presence "would have contributed" to their

4  fairness.  In <u>Stincer</u>, the Court considered whether under the Confrontation and Due Process

5  Clauses a defendant had a right to be present during a hearing to determine the competency of two

6  child witnesses.  482 U.S. at 730.  The question for purposes of the Confrontation Clause is

7  whether "there has been any interference with the defendant's opportunity for effective cross-

8  examination."  <u>Id.</u> at 744 n.17.  The Court held there was no such interference.  The defendant had

9  the opportunity to assist in the cross-examination of the child witnesses when they testified at

10  trial.  <u>Id.</u> at 740.  In addition, the Court noted that the competency proceeding did not involve the

11  basic issues of the trial.  <u>Id.</u> at 741.

12          The Court next considered whether the competency proceeding was "critical to

13  [the] outcome" of the defendant's trial for purposes of due process.  The Court set the standard as

14  whether "'a fair and just hearing would be thwarted by [the defendant's] absence.'"  <u>Id.</u> at 745

15  (quoting <u>Snyder v. Massachusetts</u>, 291 U.S. 97, 108 (1934)).  Because the competency hearing did

16  not involve the substance of the children's potential trial testimony, the Court found it was not a

17  critical stage for due process purposes.  <u>Id.</u> at 746.  The Court noted that the defendant "has given

18  no indication that his presence at the competency hearing in this case would have been useful in

19  ensuring a more reliable determination as to whether the witnesses were competent to testify."  <u>Id.</u>

20  at 747.

21          Petitioner cannot show the in camera proceedings related to his right to cross-

22  examine, were critical for purposes of his due process rights, or implicated his Eighth Amendment

23  right to a reliable sentence.  As the California Supreme Court pointed out, petitioner had an

24  opportunity to participate, to any extent he wanted to, during the third in camera proceeding

25  regarding the jury misconduct and conflict of counsel issues.  The issues discussed during that

1   third proceeding were the same as those discussed in the prior two sessions, and, in fact, more

2   details were revealed regarding the source of attorney Smith's possible conflict.

3           Further, even if this court assumes that the two first in camera proceedings were

4   "critical stages" of petitioner's trial, petitioner's argument that his exclusion from them amounted

5   to structural error requiring automatic reversal is unsupported.  In Arizona v. Fulminante, 499

6   U.S. 279 (1991), the Court listed the few violations considered structural error: "total deprivation

7   of the right to counsel at trial," a biased judge, exclusion of members of the defendant's race from

8   a grand jury, violation of the right to self-representation at trial, and violation of the right to a

9   public trial.  499 U.S. at 309-10.  It categorized these violations as "basic protections" without

10  which "a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or

11  innocence."  Id. at 310 (quoting Rose v. Clark, 478 U.S. 570, 577-78 (1986)).  Finding an error to

12  be "structural" is "the exception and not the rule."  Rice v. Wood, 77 F.3d 1138, 1141 (9th Cir.

13  1996) (en banc).

14          The Court of Appeals has held that denial of a defendant's right to be present does

15  not necessarily amount to structural error:

16                  The Supreme Court has never held that the exclusion of a
        defendant from a critical stage of his criminal proceedings
17      constitutes a structural error. To the contrary, in Rushen v. Spain,
        464 U.S. 114, 117, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983) (per
18      curiam), the Court determined that the fact that the defendant was
        denied the right to be present during an ex parte communication
19      between the judge and a juror was a trial error that was subject to
        harmless error analysis. The court explained that the right to be
20      present during all critical stages of the proceedings and the right to
        be represented by counsel, "as with most constitutional rights, are
21      subject to harmless error analysis unless the deprivation, by its very
        nature, cannot be harmless." Id. at 117 n.2, 104 S. Ct. 453 (citations
22      omitted).

23  Campbell, 408 F.3d at 1172.  Petitioner cites no cases in which a court held a denial of the right to

24  be present amounted to structural error.  The two Court of Appeals cases he cites both held

25  otherwise, concluding that the petitioners must show the denial of the right to be present was not

26  harmless error.  See Hegler v. Borg, 50 F.3d 1472, 1476 (9th Cir. 1995) (defendant's absence

1   from reading of trial testimony amenable to harmless error analysis); Rice, 77 F.3d at 1141

2   (defendant's absence when jury announced his sentence not structural error; defendant had no

3   active role to play).  Further, the court in Hegler noted that harmless error analysis is appropriate

4   as long as the effects of the error can be "quantified and assessed in an evidentiary hearing."  50

5   F.3d at 1477 (citing Rushen, 464 U.S. at 119).  That same analysis is true here.  The ultimate

6   question at the in camera proceedings was whether Juror T.W. committed misconduct that

7   affected the outcome of petitioner's trial.  On habeas, petitioner has the opportunity to make a

8   showing that misconduct in fact occurred.  Petitioner has not established that any denial of his

9   right to be present at the initial in camera hearings amounted to structural error.

10          If any error was not structural, then the court must consider whether or not it was

11  harmless because there was no "'substantial and injurious effect or influence'" flowing from

12  constitutional trial errors.  See Hegler, 50 F.3d at 1477 (quoting Brecht v. Abrahamson, 507 U.S.

13  619, 637 (1993)).  See also Lugo, 277 Fed. Appx. at 716 (holding that although there was error in

14  failing to obtain the defendant's waiver of his presence at a read-back, "in the absence of any

15  showing of prejudice, the conviction must stand").  Petitioner alleges only that if he had been

16  present during the initial in camera proceedings he "may have adamantly opposed Mr. Smith's

17  continued participation in the case" and "he may have demanded an immediate inquiry into the

18  juror misconduct; and/or he may have asked to consult with unconflicted counsel."  (Dkt. No. 92

19  at 18-20.)  The court can find no reason why petitioner did not have the same opportunity to do

20  these things during the third in camera proceeding.  The California Supreme Court so held.  The

21  reasons set forth by the California Supreme Court for denying this claim are not unreasonable

22  under 28 U.S.C. § 2254(d).  For these same reasons, this court finds petitioner has not made out a

23  claim of ineffective assistance of counsel.  Any failure by counsel to include petitioner in the first

24  two in camera proceedings was ameliorated by petitioner's inclusion in the third proceeding.

25  Accordingly, this aspect of petitioner's Claim E should be denied.

26  ////

c. <u>Absence During Petitioner's Mother's Guilt Phase Testimony</u>

Petitioner argues he should not have been permitted to be absent during his mother's guilt phase testimony. In addition, he argues his attorneys were ineffective for failing to ensure he was present during her testimony and for failing to request that the jury be admonished not to consider petitioner's absence against him.

i. <u>Background</u>

The California Supreme Court set out the following facts:

> After defendant testified, defense counsel announced they would re-call defendant's mother as a witness in order to examine her concerning the claimed incestuous relationship she had with defendant and about her exhibitionism. Outside the presence of the jury, defense counsel notified the court that defendant was "experiencing extreme stress at the prospect of hearing his mother testify concerning these subjects," and instead wished to voluntarily absent himself during her testimony.[40] Counsel stated they had advised defendant of his right to be present and his right to waive that right, and of the possible advantages and disadvantages of his not being present. The court then directly questioned defendant as to whether he had sufficiently discussed the matter with his attorneys and still wished to waive his presence.[41] Defendant said he had, and wanted to absent himself from that testimony.
>
> The trial court, finding defendant knowingly and voluntarily had waived his right to be present, granted his request to be absent. Before defendant's mother testified, the court explained to the jury that due to the nature of the expected testimony, the court had granted defendant's request to exercise "his right" to be absent during the testimony.[42] Defendant returned to the courtroom after his mother completed her testimony.

---

[40] (RT 7988:23-24.) Counsel also informed the court that petitioner had "expressed" "an uncertainty in his own mind whether he would be able to hold it together" during his mother's testimony. (RT 7988:20-22.)

[41] The judge specifically asked petitioner whether he understood he had an "absolute right" to be present and that he would be waiving that right with regard to the testimony of his mother. (RT 7989:28 - 7990:17.) Petitioner responded affirmatively. The judge then asked whether petitioner felt he had sufficiently discussed the matter with his attorneys, including discussing what his absence might mean to the jury. (RT 7990:18 - 7991:3.) Petitioner responded that he had talked with his attorneys. (RT 7990:26; 7991:3.) Petitioner then specifically waived his right to be present. (RT 7991:4-7.)

[42] (RT 7992:9-12.)

146

ii. <u>State Court Decision</u>

Petitioner argued on appeal that his absence violated the federal and state constitutions, as well as state statutory law.  While petitioner argued on appeal that the violation of his state law statutory right to be present amounted to a federal due process violation, he argues here only that he had a constitutional right to be present.  (Dkt. No. 92 at 261:3-22.)  He does not address the effect or constitutionality of his waiver.  The California Supreme Court made the following ruling on petitioner's federal due process claim:

> "As a constitutional matter, a criminal defendant accused of a felony has the right to be present at every critical stage of the trial. (<u>Illinois v. Allen</u> (1970) 397 U.S. 337, 338, 90 S.Ct. 1057, 25 L.Ed.2d 353.) The right derives from the confrontation clause of the Sixth Amendment to the federal Constitution and the due process clauses of the Fifth and Fourteenth Amendments, and article I, section 15 of the California Constitution." (<u>Frye</u>, <u>supra</u>, 18 Cal.4th at p. 1010, 77 Cal.Rptr.2d 25, 959 P.2d 183.) A critical stage of the trial is one in which a defendant's " 'absence might frustrate the fairness of the proceedings' (<u>Faretta v. California</u> (1975) 422 U.S. 806, 819, fn. 15, 95 S.Ct. 2525, 45 L.Ed.2d 562), or 'whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge' (<u>Snyder v. Massachusetts</u> (1934) 291 U.S. 97, 105–106, 54 S.Ct. 330, 78 L.Ed. 674)." (<u>People v. Rodriguez</u> (1998) 17 Cal.4th 253, 260, 70 Cal.Rptr.2d 334, 949 P.2d 31 (<u>Rodriguez</u>).) A defendant may waive his or her constitutional right to be present during a critical stage, provided the waiver is knowing, intelligent, and voluntary. (<u>People v. Moon</u> (2005) 37 Cal.4th 1, 20–21, 32 Cal.Rptr.3d 894, 117 P.3d 591.)
>
> . . .
>
> Defendant first contends that in a capital case the defendant's presence during the taking of testimony is so fundamental to the fairness of the proceeding that he or she should not be permitted to waive the constitutional right to be present, even if done so knowingly, intelligently, and voluntarily. We have rejected this very claim (<u>People v. Price</u> (1991) 1 Cal.4th 324, 405, 3 Cal.Rptr.2d 106, 821 P.2d 610), and defendant's argument, which relies primarily upon three nearly 200–year–old United States Supreme Court cases, the relevant parts of which the high court itself has rejected as "broad dicta" (<u>Illinois v. Allen</u>, <u>supra</u>, 397 U.S. at pp. 342–343, 90 S.Ct. 1057 (<u>Allen</u>)), provides no compelling reason to revisit the issue. (<u>See also People v. Davis</u> (2005) 36 Cal.4th 510, 531, 31 Cal.Rptr.3d 96, 115 P.3d 417; <u>Weaver</u>, <u>supra</u>, 26 Cal.4th at p. 966, 111 Cal.Rptr.2d 2, 29 P.3d 103; <u>People v. Jackson</u> (1996) 13 Cal.4th 1164, 1209–1210, 56 Cal.Rptr.2d 49, 920 P.2d 1254;

147

1    <u>Campbell v. Wood</u> (9th Cir.1994) 18 F.3d 662, 672 (en banc)
     ["There is no principled basis for limiting to noncapital offenses a
2    defendant's ability knowingly, voluntarily, and intelligently to
     waive the right of presence. Nor do we find logic in the proposition
3    that a right that may be waived by disruptive behavior cannot be
     waived by an affirmative petition freely made and based on
4    informed judgment."].)

5    43 Cal. 4th at 134-35.

6                    iii.  <u>Discussion</u>

7            The right to be present, like many other constitutional rights, may be waived.  <u>See</u>

8    <u>United States v. Gagnon</u>, 470 U.S. 522, 529 (1985) (per curiam); <u>Taylor v. United States</u>, 414

9    U.S. 17, 19-20 (1973).  Petitioner states that his right to be present could not be waived, citing

10   three Supreme Court cases.  The Ninth Circuit Court of Appeals has considered these cases, and

11   others, and determined that they do not stand for the proposition that a condemned petitioner may

12   never waive his right to be present.  <u>Campbell v. Blodgett</u>, 978 F.2d 1502, 1509-11 (9th Cir.

13   1992) (citing <u>Hopt v. Utah</u>, 110 U.S. 574 (1884); <u>Diaz v. United States</u>, 223 U.S. 442 (1912); and

14   <u>Illinois v. Allen</u>, 397 U.S. 337 (1970)); <u>see also</u>  <u>Snyder v. Massachusetts</u>, 291 U.S. 97 (1934),

15   <u>overruled</u> <u>on</u> <u>other</u> <u>grounds</u>, <u>Malloy v. Hogan</u>, 378 U.S. 1 (1964).  Petitioner does not show why

16   the Court of Appeals' construction of this precedent is not correct and, thus, this court is bound to

17   follow it.  Accordingly, the California Supreme Court's determination that petitioner suffered no

18   federal constitutional violation as a result of his absence during his mother's testimony was not

19   unreasonable under 28 U.S.C. § 2254(d).

20           Petitioner argues his counsel was ineffective for failing to ensure petitioner's

21   presence during his mother's testimony and for failing to request the jury be admonished not to

22   consider petitioner's absence during trial against him.  Because the California Supreme Court

23   rejected these claims summarily, this court "must determine what arguments or theories . . . could

24   have supported, the state court's decision; and then it must ask whether it is possible fairminded

25   jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

26   decision of [the Supreme] Court."  <u>Richter</u>, 131 S. Ct. at 786.

1    Petitioner has some basis for these arguments.  First, state law "severely restricted"

2  "a capital defendant's right to voluntarily waive his right to be present."  <u>People v. Rundle</u>, 43

3  Cal. 4th 76, 135 (2008).  In fact, the California Supreme Court in petitioner's appeal ruled that

4  petitioner's waiver violated state statute.  <u>Id.</u>  The court found, however, that the error was

5  harmless.  <u>Id.</u>  Petitioner here has similarly failed to show he was prejudiced by any failure of

6  counsel to ensure his presence during his mother's testimony.  Petitioner has not shown his

7  absence affected his rights to confrontation or to due process.

8    Petitioner argues that he was prejudiced because the jury would have drawn an

9  unfavorable inference from his absence.  He bolsters his prejudice argument by showing that the

10  prosecutor mentioned petitioner's absence as an indication that he lied during his testimony.

11  Therefore, petitioner argues, counsel should have requested an admonition that the jury disregard

12  it.  With respect to the guilt phase, petitioner has failed to show prejudice.  As discussed above,

13  the evidence against petitioner at the guilt phase was overwhelming.  Further, the jury may not

14  necessarily have drawn a negative inference from petitioner's absence during his mother's

15  testimony.  Certainly the jury could have also inferred that her testimony might be extremely

16  upsetting to petitioner because he had, in fact, been sexually abused by his mother.

17    With respect to petitioner's claim of prejudice at the penalty phase, when arguing

18  that the jury could tell from petitioner's "performance on the witness stand, that he is a profuse

19  and inveterate liar," the prosecutor continued:

20      And I would assert, also, that during his testimony in the
       guilt phase of this trial the first week in May that he attempted to
21      manipulate you, like he has manipulated so many other persons, and
       that he expressly tried to manipulate you with this ridiculous
22      explanation of how these women died in order to decrease his
       punishment . . . .
23
24      Here is a person who blames, essentially, his mother and
       says the most ridiculous assertions of what his mother did to him as
       he grew up, and I would suggest to you lied extensively about what
25      his mother may have done to him, and then <u>didn't have the guts in</u>
       <u>this courtroom to sit here while his lawyers questioned her about</u>
26      <u>having sexual intercourse with him because he couldn't look her in</u>

1        <u>the eye with those ridiculous lies.</u>

2   (RT 9389:24 - 9390:14; emphasis added.)  Admittedly, petitioner's attorneys did not request

3   either an admonition to the jury in the jury instructions or an instruction to the prosecutor that

4   petitioner's absence could not be mentioned.  While, as discussed below, this comment did not

5   amount to a federal constitutional violation, because the state court held petitioner should not have

6   been permitted to absent himself under state law, a request for an admonition may very well have

7   been granted.  Nonetheless, this court finds that, given the breadth of the aggravating penalty

8   phase evidence, the prosecutor's one, obviously argumentative, remark regarding petitioner's

9   absence did not have such an effect on the verdict that there is a reasonable probability that, had

10  counsel challenged it, the result of the proceeding would have been different.

11      Claim F.  <u>Admission of Petitioner's Statements in Violation of Miranda</u>

12          Petitioner claims the trial court erred in denying his motion to suppress his

13  confessions to the Garcia, Sorensen, and Lactawen crimes.  Specifically, he argues he invoked his

14  right to remain silent at the end of his first interrogation, his confession to the Lactawen homicide

15  was the result of coercion, and his statements to the prosecutor's psychiatrist Dr. Lyon were

16  involuntary.  This latter argument is the subject of Claim G, discussed below.  Because there is

17  some overlap, the following background facts apply to both Claims F and G, as well as to the

18  ineffective assistance of counsel claim, Claim A.3., discussed above.

19          The officers' trial testimony about petitioner's confessions is set out above in the

20  discussion of Claim A.  The testimony showed that petitioner drew a map of the location of Ms.

21  Garcia's body.  He then confessed to strangling Ms. Garcia, having sex with Ms. Garcia which she

22  "partly" resisted, and killing Ms. Garcia because he was afraid she would tell someone about the

23  sex.  He also admitted strangling Ms. Sorensen and having sex with her.  He told officers he

24  remembers being terrified after having sex with Ms. Sorensen.  He also told them he killed Ms.

25  Sorensen because he was scared.

26  ////

1        Dr. Lyons testified at the penalty phase.  (RT 8825 et seq.)  He testified that

2   petitioner told him about attempting to rape a young girl and sexually assaulting two boys when

3   he was a fourteen years old.  (RT 8830:7 - 8831:11; 8832:3-5.)  Petitioner did not tell Dr. Lyons

4   that he had been sexually abused by his mother.  (RT 8832:11-24.)  When discussing the murder

5   of Ms. Sorensen, petitioner did not tell Dr. Lyons that he became enraged because she attempted

6   to fellate him.  (RT 8834:21-28.)  Dr. Lyons did not find petitioner to be psychotic, but felt the

7   petitioner had a "character disorder."  (RT 8835:6-7.)  Dr. Lyons explained that a person with a

8   character disorder had an "intact" sense of "reality."  (RT 8835:19-22.)  Dr. Lyons also testified

9   that petitioner repeatedly asked for help with his mental health problems and asked Dr. Lyons to

10  recommend that he be sent to a psychiatric facility, instead of a regular prison.  (RT 8837:17 -

11  8838:10.)  Finally, Dr. Lyons testified that petitioner felt his family rejected him, and petitioner

12  described frequent beatings by his father.  (RT 8839:5-26.)

13        For the reasons set out below, this court finds petitioner has failed to satisfy section

14  2254(d) for Claim F and recommends it be denied.

15        1.  Background

16        Shortly after his arrest, petitioner was interrogated eight times over the course of

17  three days.  Placer County Sheriff's Officers first questioned petitioner on November 20, 1986, at

18  the Carson City Jail, then on November 21 during the car ride from Carson City to Auburn, and

19  later on November 21 at the Placer County Jail.  Petitioner then gave four statements to

20  Sacramento law enforcement officers later in the evening of November 21 and on the morning of

21  the 22nd.  Later on the 22nd, he gave his eighth statement to Dr. Lyon.  Petitioner was advised of

22  his Miranda rights four times and, either in writing or orally, waived them.  The trial court held

23  two suppression hearings.

24        a.  First Suppression Hearing

25        Before trial, petitioner filed a motion to suppress all statements he gave to the

26  police.  (CT 534-38.)  In December 1988, the trial court held an evidentiary hearing on

1   petitioner's claim that his statements were not knowingly, intelligently, and voluntarily given.

2   (RT 161, et seq.)  The following evidence was presented at that hearing.

3           Placer County Sheriff's Department Sergeant Ken Phillips testified that he, along

4   with a Carson City Sheriff's Department Officer, arrested petitioner in Carson City, Nevada, on

5   November 20, 1986.  (RT 184:5 - 185:2.[43])  Sergeant Phillips rode with petitioner to the Carson

6   City Jail.  (RT 185:3-5.)  He did not question petitioner.  (RT 185-86.)  Sergeant Phillips did not

7   feel petitioner was under the influence of any substance or in any distress when he was arrested.

8   (RT 190:2-16.)

9           Placer County Sheriff's Department Detective Jeffrey Jensen testified that he and

10   Inspector Smith drove to Carson City on November 20, 1986, to interrogate petitioner.  (RT

11   229:19-22.)  They interviewed petitioner at about 6:45 p.m. that day at the Carson City Jail.  (RT

12   229:19 - 230:12.)  Jensen testified that he first told petitioner that they were there because they

13   had connected him to the Garcia and Sorensen murders and wanted to discuss the murders with

14   him.  (RT 232:4-10.)  Petitioner's demeanor was "fairly calm.  He's always been very

15   expressionless with us, and he was the same as I had seen him before."  (RT 232:27 - 233:1.)

16   Detective Jensen gave petitioner a copy of the <u>Miranda</u> waiver form and read it to him.  (RT 233:8

17   - 236:15.)  Jensen asked petitioner if he understood the rights and petitioner responded, "yes."

18   (RT 236:17-20.)  Petitioner then initialed and signed the <u>Miranda</u> waiver form.  (RT 237:1 -

19   238:4.)  Petitioner was "attentive" and "responsive" to questioning.  (RT 239:7-10.)  After about

20   45 minutes, petitioner asked to stop because his "head was hurting."  (RT 240:2-4.)  Officers

21   stopped questioning him at that point.  (RT 243:25-28.)  However, before they left, Inspector

22   Smith asked petitioner if they could return the following day to ask more questions and petitioner

23   responded, "yes."  (RT 240:7-21.)  Detective Jensen testified that petitioner was asked at least

24

25      [43]  Carson City is incorrectly referred to as "Carson County" throughout several officers'

26   testimony.  It is not a county.  Carson City is an independent municipal government.  <u>See</u>
    <u>http://www.carson.org.</u>

1    twice if they could tape record the interview and petitioner said "no." (RT 241:11-23.) During

2    this first interview, petitioner admitted to having sexual intercourse with Ms. Garcia and

3    strangling Ms. Garcia; he drew a map of the location of her body. (RT 240:28 - 241:3; 241:26 -

4    242:2; 6683:13 - 6685:27.) He denied killing Ms. Sorensen. (RT 6688:1-5.)

5            Detective Jensen and Inspector Smith returned to the Carson City Jail the following

6    day to transport petitioner to Auburn. (RT 244:4-18.) During the car trip, Inspector Smith

7    thanked petitioner for drawing a map of the location of Garcia's body and told petitioner they had

8    found it. (RT 244:23 - 245:1.) Inspector Smith then asked petitioner if he would talk to them.

9    (RT 245:6-7.) Petitioner shrugged and nodded his head. (RT 245:12-17.) Petitioner was not re-

10   advised of his <u>Miranda</u> rights. (RT 246:7-9.) He was restrained with handcuffs and a belly chain

11   during the trip. (RT 247:22-27.) During the approximately two-hour car ride to Auburn, the

12   officers and petitioner had on and off conversations. (RT 246:20-25.) Petitioner appeared

13   "attentive" and talked more than he had the prior evening when he responded mostly by nodding

14   his head. (RT 247:6-14.) During this trip, petitioner gave officers more details about Ms.

15   Garcia's murder and confessed to having sexual intercourse with and killing Ms. Sorensen. (RT

16   6815:4 - 6824:25; 6833:17 - 6836:23.) When they arrived at the Placer County Jail at 4:50 p.m.,

17   petitioner was left alone in an interview room to eat dinner. (RT 248:25 - 249:2.) Before leaving

18   him, Inspector Smith asked whether they could continue the interview after dinner. (RT 249:14-

19   17.) Petitioner told them that was "okay." (RT 249:18-22.)

20           At 5:30 p.m., Inspector Smith and Detective Jensen returned to the interview room.

21   (RT 249:26 - 250:1.) They did not tape record the interview and did not attempt to record it. (RT

22   250:21-24.) Petitioner's demeanor was "[p]retty much the same. He was attentive. Again, he

23   was a little bit more talkative than he even had been on the trip home. I don't mean he was open,

24   but when you'd ask him a question he would answer the question with full sentences and describe

25   his feelings or thoughts or memories or actions, whatever." (RT 251:13-19.) He was "very

26   cooperative." (RT 255:20-21.) Detective Jensen testified that petitioner did bring up his mental

1    problems, but did not ask for help with them.  (RT 254:19 - 255:17.)  At one point, after

2    discussing the murder of Ms. Sorensen, petitioner said if he had "a chance to end this all, he

3    would" by "cut[ing] my throat."  (RT 258:6-10.)  During this interrogation, petitioner provided

4    more details about Ms. Sorensen's murder.  (RT 6839:18 - 6850:4.)

5         Sacramento County Sheriff's Department Detective Michael Bell testified that he

6    was investigating the murders of several young girls near Interstate 5.  (RT 194:15-18.)  After

7    being contacted by Placer County authorities, he and Detective Stan Reed interviewed petitioner

8    at approximately 6:30 p.m. on November 21, 1986, at the Placer County Jail.  (RT 195:3-13;

9    196:26; 197:7.)  This interrogation was tape recorded.  (RT198:3-6; 216:24-26.[44])  The transcript

10   shows that at the very beginning of this interview, petitioner told officers "my nerves are shot and

11   I'm contemplating suicide, so . . . ."  (Supp. CT 4714.[45])  An officer responded, "Alright."  (Id.)

12   Petitioner then asked, "What's new."  (Id.)  Officers told petitioner they wanted to ask him

13   questions about "some things in Sacramento" and read him his Miranda rights.  (Supp. CT 4714-

14   15; RT 198:25 - 199:25.)  Petitioner indicated he had "heard them [the Miranda advisements] all

15   before" and, when asked whether he wanted to talk with the detectives, stated "Shoot.  I ain't done

16   nothing anyway."  (CT 4715; RT 199:26 - 200:5.)

17        Petitioner appeared to Bell to be "a little withdrawn" but "was responsive to our

18   questions, was cognizant of what was going on in my opinion."  (RT 200:16-18.)  Regarding the

19   Garcia and Sorensen murders, petitioner stated that he was "too deep into drugs" and that he

20   would start thinking about his family problems and "blow up and black out, sexually."  (Supp. CT

21   4720.)  He told officers he was "higher than a kite" on acid when he committed the murders.

22   (Supp. CT 4721.)  He also told them that he confessed to the killings because, "I want to get my

23

---

24   [44]  A transcript of the recording was introduced into evidence as People's Exhibit 8.  (RT
     269:5-15.)  It can be found in the Supplemental Clerk's Transcript starting at page 4714.

25

26   [45]  The transcript does not identify who is talking.  It appears that questions and responses
     are separated by two blank lines in the text.

1   head straightened out." (Supp. CT 4723.)  He stated that he has "serious mental problems."

2   (Supp. CT 4724.)   He repeated that he wanted to get help as soon as possible.  (Supp. CT 4723-

3   4724.)  As the interview was concluding, petitioner asked "So what are they gonna do, stick me in

4   the cuckoo lounge for the rest of my life?"  (Supp. CT 4727.)  An officer responded, "I have no

5   idea what they are gonna do."  (Id.)

6          Detectives Bell and Reed concluded their interview at 7:04 p.m.  (RT 201:3.)

7   During that interview, Sacramento Police Lieutenant Ray Biondi had arrived at the Placer County

8   Jail. (RT 201:18-23.)  A few minutes later, Lieutenant Biondi and Detectives Bell and Reed re-

9   entered the interview room.  (RT 202:11-23.)  Lieutenant Biondi then began questioning

10  petitioner about the I-5 murders. (RT 202:25 - 203:2.)  The first part of this interrogation was not

11  tape recorded.  (RT 206:8-17.)

12         After being questioned about the I-5 series of murders for almost a half hour,

13  petitioner stated, "I didn't do . . . those, but I did another one." (RT 206:6-7.)  When he made this

14  comment, Officer Bell reactivated the tape recorder.  (RT 206:8-9.[46])  The first part of the

15  transcript of this second half of the interrogation shows that petitioner and the officers discussed

16  petitioner's feeling that he would not get help for his mental health problems in prison.  (Supp. RT

17  4697.)  Officers told petitioner about a serial murderer named Kemper who "ended up working in

18  the psychiatric aide [sic] in Vacaville."  (Id.)  The next portion of the transcript was the subject of

19  a dispute.  Petitioner's counsel claimed it stated what had been transcribed: "My other point is all

20  that time you can get is a deal like Kemper got." (Supp. CT 4698.)  After a challenge by the

21  prosecution, the trial judge listened to the tape and determined that what the officer said was: "I

22  am not telling you you can get a deal like Kemper got."  (RT 5794:12-17.)  Petitioner appeared to

23

24         [46] The transcript of the tape recorded portion of this interrogation is marked as
    Defendant's Exhibit A. (RT 218:6-11.)  It can be found in the Supplemental Clerk's Transcript
25  starting at page 4697.  A redacted version of this tape recording was introduced at trial as Exhibit
    48 and played for the jury during the penalty phase. (RT 8705-07.)  The transcript of the
26  redacted version can be found in the 4th Supplemental Clerk's Transcript at pages 475-95.

1  recognize that point, "No there [sic] not going to give me nothing like that." (Supp. CT 4698.)

2  Petitioner repeated several times that he needed, and wanted, help for his mental

3  health problems. (Id.) Officers asked petitioner, "what have you got to lose by telling us?" (Id.)

4  They also indicated petitioner would be more likely to get help if he confessed: "[T]he only thing

5  you can hope to do by telling us about the third one is more edge on [] possibly getting that help";

6  "The judge is going to consider it [getting help] a great deal more if you're voluntarily coming up

7  with something like this [than] he is if you don't;" "You have certain wants and needs that you're

8  going to want out of this system. . . .   This system in turn before it can consider that has wants and

9  needs from you.  Does that seem fair?" (Id.) An officer then recognized that petitioner had said

10 he was suicidal: "you're on rock bottom now[,] you talked about comitting [sic] suicide and we

11 don't want to see that happen and I guarantee you that if you try to hold a secret like the one

12 you've got bottled up inside its going to drive you probably to it." (Id.) Officers again assured

13 petitioner he would get help, "There are people there that will be out there to help you, believe

14 me.  We deal with them all the time.  Ah, but we need your help to get the ball rolling.  We need

15 you to tell us the truth about this third." (Supp. CT 4699.) Petitioner then began to respond to

16 questions about the Lactawen homicide. (Supp. CT 4699-708.) He stated that he had sex with

17 her and strangled her. (Supp. CT 4700-01.) He indicated the sex was consensual. (Id.)

18 Petitioner stated that he met an "Asian or Filipino girl" in downtown Sacramento

19 near the river and "he had sex with her and killed her." (RT 207:1-4.) He then drew a map of the

20 location. (RT 208:12-15.) Because the location was in the city of Sacramento, the Sacramento

21 Police Department was notified. (RT 208:16-19.) Detective Bell later learned that the homicide

22 involved a woman named Elizabeth Lactawen. (RT 209:10-12.)

23 Sacramento Police Detective Douglas Wagner testified that around 9:30 p.m. on

24 November 21, 1986, he came to the Placer County Jail to speak to petitioner because, when giving

25 a statement to Sacramento County Sheriff's Officers, petitioner had "implicated himself" in the

26 Sacramento homicide of Elizabeth Lactawen. (RT 163:8-23; 164:20-24.) After petitioner entered

1  the interview room around 10:30 p.m., Detective Wagner told him why he was there and then read

2  petitioner his <u>Miranda</u> rights.  (RT 166:4-10.)  After reading each portion of the <u>Miranda</u> warning,

3  Detective Wagner asked petitioner if he understood and petitioner nodded affirmatively.  (RT

4  166:28 - 167:25.)  Detective Wagner then asked petitioner if "he had any problem talking to me."

5  (RT 167:28.)  Petitioner replied, "No."  (RT 168:1.)  Detective Wagner's approximately 20-

6  minute conversation with petitioner was tape recorded.  (RT 169:28 - 170:5.[47])  Detective Wagner

7  testified that petitioner "appeared somewhat tired" but was "very responsive."  (RT 170:23-24.)

8  Wagner assumed petitioner was tired because petitioner was "kind of slouched in the seat" and

9  spoke "very softly."  (RT 173:28 - 174:10.)   During this interrogation, petitioner provided more

10  information about the Lactawen killing.   (Supp. CT 4747-54.)

11         The seventh interrogation occurred at 9:30 the following morning when Detective

12  Bell, Inspector Smith, and Detective Reed returned to ask petitioner more questions about the I-5

13  murders. (RT 210:11-21.)  Petitioner was not re-advised of his <u>Miranda</u> rights.  (RT 210:25 -

14  211:4.)  This interrogation was tape recorded.  (RT 269.[48])  Petitioner was questioned only about

15  the I-5 murders. (RT 211:26-28.)  Petitioner told the officers he was "[s]cared and confused,

16  'cause these people aren't gonna worry about helping any, they're just going to ship me off into a

17  little square room and forget about me."  (Supp. CT 4729.)  He repeated that he wanted "to see

18  people who can help me."  (<u>Id.</u>)  One of the officers then told petitioner, "we're going to let you

19  see people that can help you.  I've got a call in for the deputy district attorney this morning that

20  can make, uh, those arrangements."  (<u>Id.</u>)  When petitioner said a few minutes later that he was

21

22      [47]  The transcript of that tape recording is People's Exhibit 1.  (RT 169:13-19.)  It appears
in the Supplemental Clerk's Transcript starting at page 4747. A redacted version of this tape

23  recording was introduced as People's Exhibit 49 and played for the jury during the penalty phase.
(RT 8718-19.)  The transcript of this redacted version can be found in the 4th Supplemental

24  Clerk's Transcript at pp. 475-76; 496-500.

25      [48]  The transcript of this tape recording was admitted as People's Exhibit 9.  (RT 269.)
The transcript can be found in the Supplemental Clerk's Transcript starting at page 4729.  While

26  the transcript identifies questions and answers, it does not identify which officer is asking the
questions.

1  scared and confused because "no one's gonna help me." (Supp. CT 4730.) An officer repeated,

2  "I've told you that we're going to get someone to help you." (Id.) And again a few minutes later,

3  "I don't know how many times I can tell you that, you know, I've got a call in to, uh, to see about

4  getting you the, uh, the help that, uh, you may need." (Supp. CT 4731.) During the course of the

5  interview, petitioner repeated numerous times his fear that he would be sent to prison and receive

6  no medical help. (Supp. CT 4729-32, 4738-39, 4743-44.) When petitioner denied that he had

7  suppressed memories of other killings, an officer told him, "[s]o that means then that we don't

8  need to worry about the psychiatrist." (Supp. CT 4745.) Petitioner responded, "I know I need

9  help." (Id.) Finally, petitioner told officers, "You just shut up and leave me alone!" (Supp. CT

10  4746.) Officers made a couple more statements and then ended the interrogation. (Id.; RT

11  212:20-25.)

12        After hearing argument, the trial court held that petitioner's Miranda waivers were

13  knowingly, intelligently, and voluntarily made. (RT 304:3-11.) The court further held that

14  petitioner's initial waiver continued through the Placer County officers' questioning the day after

15  his arrest. (RT 304:12-25.) The trial court found the only issue was whether petitioner's

16  confession to the Lactawen homicide was produced by an inducement of lenient treatment. (RT

17  305:4-8.) The court reviewed petitioner's apparent concern regarding his mental health during the

18  different periods of questioning. (RT 304-06.) The court found that when petitioner was being

19  interviewed by the Sacramento County Sheriff's Officers, his mental health appeared to be at the

20  "forefront" of petitioner's mind along with "his concern for getting some help for the conduct

21  which has produced this behavior for which he appears to be sorry." (RT 306:9-13.) The court

22  further found that the officers were attempting to induce petitioner's cooperation by suggesting it

23  would assist him in getting help. (RT 307:16-22.) However, the court also found that petitioner's

24  confession to the Lactawen homicide was not a result of those inducements. (RT 307:23-28.)

25  Petitioner's statements indicated he did not believe he would receive help if he confessed to

26  anything else. (RT 308:1 - 309:21.) Rather, he told officers he was confessing to the Lactawen

1  killing to "get that off my chest."  (RT 309:22-24.)  The court reserved ruling on petitioner's

2  statements to Dr. Lyons.  (RT 311:28 - 312:13.)

3                         b. Second Suppression Hearing

4           On March 3, 1989, the court held an evidentiary hearing regarding the admissibility

5  of petitioner's statements to Dr. Lyons.  (RT 3497.)  Petitioner had ended the final interview with

6  Sacramento Police Officers by saying "'Will you just shut up and leave me alone?'" (RT 3500:3-

7  9.)  That interview ended at 10:24 a.m.  (RT 215:17-19.)  At 2:10 p.m. that day, Dr. Lyons met

8  with petitioner at the Placer County Jail.  (RT 227:2-24; 3500:15-17.)  Dr. Lyons stated that he

9  was called to the Placer County Jail by someone from the District Attorney's Office to perform a

10 mental status examination on petitioner "both for the purpose of determining his present – or for

11 his mental state at the time I examined him, and for possible tendering of future opinions as to

12 1368 [competence] issues and 1026 [sanity] issues if it became material and relevant;" "also on

13 any other issues, like intentionality or premeditation."  (RT 3503:2-8; 3523:25-26.)  Dr. Lyon

14 testified that he first told petitioner that he was a psychiatrist who had been appointed by the

15 District Attorney to do a mental status exam.  (RT 3505:18-27.)  He asked petitioner if he knew

16 what a psychiatrist was and "[h]e gave me an answer which I thought showed understanding."

17 (RT 3505:24-25.)  Dr. Lyon also told petitioner that he "might be testifying against him."  (RT

18 3505:28.)  He then asked petitioner if petitioner would talk to him and petitioner said he would.

19 (RT 3506:3-4.)

20          Before he started interviewing petitioner, Dr. Lyon read petitioner his Miranda

21 rights.  (RT 3507:8 - 3510:22.)  Petitioner told Dr. Lyon he understood them and initialed and

22 signed the waiver form.  (RT 3510:24 - 3513:21.)  Part way into the interview, petitioner began

23 saying, repeatedly, that he wanted help, that "people don't understand him" and that "the police

24 officers in the jail don't understand him."  (RT 3516:20-22.)  Petitioner then told Dr. Lyon that

25 "'They won't let him see a public defender.'"  (RT 3516:23-24.)  Dr. Lyon testified that he then

26 asked petitioner if he wanted to talk to a lawyer.  (RT 3517:4-6.)  Petitioner said he did not and he

1  wanted to continue to talk with Dr. Lyon.  (RT 3517:8-12.)  Dr. Lyon continued to question

2  whether petitioner wanted to stop the interview.  He reminded petitioner that he was there at the

3  behest of the District Attorney and that he could end up testifying against petitioner at trial.  (RT

4  3517:15-25.)  Petitioner reiterated that he wanted to talk to Dr. Lyons.  (RT 3518:5-15.)

5        Dr. Lyons testified that petitioner's demeanor was "downcast" and he spoke in a

6  "barely audible voice, and he was hesitating and halting in his speech."  (RT 3519:9-11.)

7  However, petitioner appeared "eager" to talk with Dr. Lyon and "kept saying he wanted

8  psychiatric help instead of imprisonment."  (RT 3519:23-24.)  At the end of the interview, Dr.

9  Lyon prescribed petitioner an antipsychotic medication called Navane because he felt petitioner

10  "was in bad mental shape and all upset.  I thought that this drug would serve to tranquilize him."

11  (RT 3520:8-18.)  Dr. Lyon had not been asked by the District Attorney to treat petitioner in any

12  way.  (RT 3526:1-6.)  However, Dr. Lyon prescribed medication because he felt sorry for

13  petitioner, thought his anxiety level was high, and knew the jail doctor was not around because it

14  was the weekend.  (RT 3534:15-22.)  Petitioner asked for psychiatric help numerous times

15  throughout the interview.  (RT 3530:7-12.)  Dr. Lyon testified that petitioner never specifically

16  asked Dr. Lyon to help him.  (RT 3535:3-8.)  Dr. Lyon told petitioner several times throughout the

17  interview that he was not there to provide medical or psychiatric help to petitioner.  (RT 3535:19-

18  23.)  Petitioner stated that he understood.  (RT 3535:24-25.)

19        After Dr. Lyon testified, petitioner's counsel asked the judge to re-open the issue of

20  the voluntariness of petitioner's other confessions based on petitioner's statement to Dr. Lyon that

21  he had not been allowed to see a public defender.  (RT 3540:3-20.)  The court agreed to hear

22  additional testimony and argument about why that evidence should affect its prior rulings on

23  petitioner's motion to suppress.  (RT 3540:25 - 3541:5.)  Petitioner then testified.  (RT 3542.)

24  Petitioner said he asked to see an attorney several times after he arrived at the Placer County Jail.

25  (RT 3545:8-13.)  He first asked the person who brought him jail clothes to change into before he

26  met after dinner with Inspector Smith and Officer Jensen.  (RT 3545:8-18.)  This person did not

1 | answer him.  (RT 3547:5-7.)  He asked again when he was being booked and "they took

2 | information about me."  (RT 3547:10-14.)  This occurred after the evening interview by Smith

3 | and Jensen.  (RT 3544:18-24.)  Again, his request was not directly answered.  (RT 3547:12-14.)

4 | Instead, "they just told me I'd be arraigned in a couple of days or something like that."  (Id.)

5 | Petitioner understood he would not have a chance to see an attorney that day or the next, not until

6 | he went to court.  (RT 3547:20 - 3548:5.)  Petitioner recalled that during the juvenile proceedings

7 | in Idaho, he was told he would be sent to a place where he "would be helped" and he was.  (RT

8 | 3549:21 - 3550:1.)  He first remembers someone mentioning he could get help in the car ride from

9 | Carson City to Auburn.  (RT 3551:20-27.)  The second time was when "a man from Sacramento

10 | was talking to me about this guy that had killed ten people and now he was working in a

11 | psychiatric unit."  (RT 3552:19-24.)  Petitioner also testified that he felt that if he talked to police

12 | he would get help.  (RT 3557:4-6; 3559:18-25.)

13 |         On cross-examination, petitioner testified that he recalls being read his <u>Miranda</u>

14 | rights but that he was "confused" then and he just did what people told him to do.  (RT 3561:14 -

15 | 3562:4; 3566:22.)  He "was under the assumption" that he had to sign the <u>Miranda</u> waiver.  (RT

16 | 3562:2-4.)  Petitioner said he talked with officers because "I figured that's what you do when you

17 | are caught by the law.  Tell them what you know."  (RT 3565:11-15.)  None of the officers told

18 | him he had to talk with them, he "figured I had to.  That is what I am supposed to do."  (RT

19 | 3568:15-18.)  Petitioner agreed that he felt from the beginning that "you tell them what you

20 | know" and he felt that way all the way through the interviews.  (RT 3571:14-19.)  Petitioner

21 | testified that he talked to Dr. Lyons because he thought Dr. Lyons was there to help him.  (RT

22 | 3587:11-21.)

23 |         Upon reconsideration based on the new testimony, the court held that petitioner

24 | signed the <u>Miranda</u> waiver and agreed to talk with officers because of "his preexisting belief that

25 | that's what you did."  (RT 5795:25-27.)  The judge felt petitioner "had reached a decision, a

26 | voluntary decision, to speak with the officers, both in terms of giving up his right to remain silent

1   and in making statements completely separate and apart from any apparent inducements that they

2   might have given to him." (RT 5796:16-20.)  The judge held that there were inducements made

3   to petitioner to convince him to talk with officers. (RT 5796:21 - 5797:4.)  Those inducements

4   took the form of suggestions that "there would be some benefit to him making statements." (RT

5   5796:24-26.)  However, the judge held that those inducements did "not cross the line to specific

6   representations or inducements of specific leniency that he'd receive, but [were] within acceptable

7   limits to suggest that there is some generalized benefit to be gained by speaking." (RT 5797:5-9.)

8   The judge reiterated his prior conclusion that petitioner knowingly and voluntarily waived his

9   right to remain silent. (RT 5797:18-21.)  With respect to petitioner's statement to Sacramento

10  police officers to "'Just leave me alone,'" the judge concluded "that that language was not an

11  expression of Mr. Rundle's present unwillingness to speak with the police officers" nor was it an

12  invocation of his right to remain silent. (RT 5797:24 - 5798:6; 5798:20-23.)  The judge further

13  concluded that with regard to the testimony about petitioner's desire for an attorney, the judge

14  held:

15              It is clear from the context of those discussions that his
        inquiry was as to general representation in his criminal matter and
16      not an expression, once again, of a present unwillingness to speak to
        police, such as asking for an attorney in the context of the
17      statements or the right to exercise his – or his ability to exercise his
        right to remain silent by requesting an attorney.

18
              Accordingly, I find that there was no invocation of the right
19      to remain silent by any discussion concerning an attorney.

20  (RT 5798:10-19; 5798:26 - 5799:3.)  The trial judge denied petitioner's motion to suppress the

21  statements made to officers and to Dr. Lyon. (RT 5799:6-10.)

22          2.  Legal Standards

23          Petitioner's claim raises three related issues: whether the waiver of his

24  Miranda rights was valid, whether he invoked them and officials violated those rights by

25  continuing to question him, and whether his confessions were involuntarily given.

26  ////

1            a. <u>Miranda Waiver</u>

2            In <u>Miranda v. Arizona</u>, the United States Supreme Court held that "[t]he

3 prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial

4 interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to

5 secure the privilege against self-incrimination."  384 U.S. 436, 444 (1966).  To this end, custodial

6 interrogation must be preceded by advice to the potential defendant that he or she has the right to

7 consult with a lawyer, has the right to remain silent, and that anything stated can be used in

8 evidence against him or her.  <u>Id.</u> at 473-74.  These procedural requirements are designed "to

9 protect people against the coercive nature of custodial interrogations."  <u>DeWeaver v. Runnels</u>, 556

10 F.3d 995, 1000 (9th Cir. 2009).

11            A defendant may waive his <u>Miranda</u> rights, provided the waiver is "voluntary in

12 the sense that it was the product of a free and deliberate choice rather than intimidation, coercion,

13 or deception," and "made with a full awareness of both the nature of the right being abandoned

14 and the consequences of the decision to abandon it."  <u>Moran v. Burbine</u>, 475 U.S. 412, 421

15 (1986).  A valid waiver of <u>Miranda</u> rights depends upon the totality of the circumstances,

16 including the background, experience and conduct of the defendant.  <u>See</u> <u>United States v. Bernard</u>

17 <u>S.</u>, 795 F.2d 749, 751 (9th Cir. 1986).  The government must prove waiver by a preponderance of

18 the evidence.  <u>See</u> <u>Colorado v. Connelly</u>, 479 U.S. 157, 168–69 (1986); <u>Lego v. Twomey</u>, 404

19 U.S. 477, 488–89 (1972); <u>Terrovona v. Kincheloe</u>, 912 F.2d 1176, 1180 (9th Cir. 1990).  The

20 waiver need not be express as long as the totality of the circumstances indicates that the waiver

21 was knowing and voluntary.  <u>Berghuis v. Thompkins</u>, 560 U.S. 370, ___, 130 S. Ct. 2250, 2261

22 (2010); <u>North Carolina v. Butler</u>, 441 U.S. 369, 373 (1979); <u>United States v. Younger</u>, 398 F.3d

23 1179, 1185 (9th Cir. 2005).

24            To show a <u>Miranda</u> waiver was voluntary, it must be demonstrated that it was not

25 the result of governmental coercion.  <u>See</u> <u>Connelly</u>, 479 U.S. at 167, 170; <u>United States v. Leon</u>

26 <u>Guerrero</u>, 847 F.2d 1363, 1366 (9th Cir. 1988); <u>Derrick v. Peterson</u>, 924 F.2d 813, 820–24 (9th

1   Cir. 1990) (explaining waiver analysis in detail).  The question of whether petitioner's <u>Miranda</u>

2   waiver was "knowing and intelligent" is a separate inquiry.  <u>Cox v. Del Papa</u>, 542 F.3d 669, 675

3   (9th Cir. 2008).  This "cognitive" component of the <u>Miranda</u> waiver inquiry "depends upon [the

4   suspect's] mental capacity."  <u>Id.</u>  To show the waiver was knowing and intelligent, it is generally

5   sufficient to establish that the suspect knew his rights.  <u>See</u>, <u>e.g.</u>, <u>Sechrest v. Ignacio</u>, 549 F.3d

6   789, 805–06 (9th Cir. 2008) (finding petitioner's waiver knowing and voluntary where officer's

7   questions to petitioner after petitioner was read his <u>Miranda</u> rights were requests for clarification

8   of petitioner's unclear statements regarding his desire to speak to police); <u>Paulino v. Castro</u>, 371

9   F.3d 1083, 1086–87 (9th Cir. 2004) (statement that suspect understood his rights and wanted to

10  talk to officer sufficient to waive right to counsel); <u>United States v. Doe</u>, 60 F.3d 544, 546 (9th

11  Cir. 1995) (officer's unrebutted testimony established by preponderance of evidence that juvenile

12  knowingly and voluntarily waived his <u>Miranda</u> rights); <u>United States v. Rodriguez–Rodriguez</u>,

13  364 F.3d 1142, 1146 (9th Cir. 2004) (suspect suffering from mild or moderate heroin withdrawal

14  who was "coherent," "alert," and "oriented" voluntarily waived his <u>Miranda</u> rights after they were

15  read to him in English and Spanish), <u>abrogated</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>Young v. Holder</u>, 697 F.3d

16  976 (9th Cir. 2012).  The suspect must have understood "he could not be compelled to be a

17  witness against himself."  <u>Colorado v. Spring</u>, 479 U.S. 564, 574-75 (1987).  However, "[t]he

18  Constitution does not require that a criminal suspect know and understand every possible

19  consequence of a waiver of the Fifth Amendment privilege."  <u>Id.</u> (citing <u>Moran v. Burbine</u>, 475

20  U.S. 412, 422 (1986), and <u>Oregon v. Elstad</u>, 470 U.S. 298, 316–17 (1985)).

21              b.  <u>Invocation of Rights</u>

22          Once <u>Miranda</u> warnings have been given, if a suspect invokes his constitutional

23  rights, "all questioning must cease."  <u>Smith v. Illinois</u>  469 U.S. 91, 98 (1984); <u>see also</u> <u>Miranda</u>,

24  384 U.S. at 473-74; <u>Michigan v. Mosley</u>, 423 U.S. 96, 100 (1975); <u>DeWeaver</u>, 556 F.3d at 1001.

25  If a suspect waives his <u>Miranda</u> rights and proceeds with an unassisted interrogation, he must

26  thereafter "unambiguously request counsel" in order to restore his right to have an attorney

1  present during the interrogation.  Davis v. United States, 512 U.S. 452, 459, 461 (1994); United

2  States v. Rodriguez, 518 F.3d 1072, 1079 (9th Cir. 2008).  This means that the suspect "must

3  articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in

4  the circumstances would understand the statement to be a request for an attorney."  Davis, 512

5  U.S. at 459.  Where there has been only an equivocal or ambiguous assertion of the right to

6  counsel in that context, the attending officer *may* ask questions to clarify the defendant's wishes,

7  but is not required to do so and may simply "continue questioning until and unless the suspect

8  clearly requests an attorney."  Id. at 461.

9          Generally, the United States Supreme Court has held that a suspect need not rely

10  on any special combination of words to invoke the right to silence.  Quinn v. United States, 349

11  U.S. 155, 162 (1955); see also Miranda, 384 U.S. at 473-74 (a suspect's assertion of the right to

12  remain silent "in any manner" compels the police to cease questioning).  To determine whether a

13  suspect invoked his Fifth Amendment rights, "a court should examine the entire context in which

14  the claimant spoke."  Bradley v. Meachum, 918 F.2d 338, 342 (2d Cir. 1990) (quoting United

15  States v. Goodwin, 470 F.2d 893, 902 (5th Cir. 1972)).  The Court "has not yet directly addressed

16  ambiguous statements in the context of the right to remain silent" and has not applied the Davis

17  standard to require an unequivocal invocation in the right to remain silent context as it has

18  required for an invocation of the right to counsel.  DeWeaver, 556 F.3d at 1000-01; see also James

19  v. Marshall, 322 F.3d 103, 108 (1st Cir. 2003); Bui v. DePaolo, 170 F.3d 232, 239 (1st Cir. 1999).

20  Although other circuit courts have extended the Davis standard to the invocation in the right-to-

21  silence context, the Ninth Circuit has "declined to decide whether the Davis requirement of a clear

22  and unequivocal invocation applies to the right to remain silent."  DeWeaver, 556 F.3d at 1001.

23  However, because the United States Supreme Court has not squarely addressed the issue, a state

24  court decision that applies the "clear and unequivocal" standard articulated in Davis to a case

25  involving the alleged invocation of the right to remain silence is not contrary to nor an

26  unreasonable application of federal law under 28 U.S.C. § 2254(d)(1).  Id. at 1002.

c. <u>Voluntariness of Confessions</u>

1

2          The Fourteenth Amendment to the United States Constitution demands that

3  confessions be made voluntarily.  <u>See Lego</u>, 404 U.S. at 483-85.  A confession is voluntary only if

4  it is "'the product of a rational intellect and a free will.'"  <u>Medeiros v. Shimoda</u>, 889 F.2d 819,

5  823 (9th Cir. 1989) (quoting <u>Townsend v. Sain</u>, 372 U.S. 293, 307 (1963)); <u>see also Blackburn v.</u>

6  <u>Alabama</u>, 361 U.S. 199, 208 (1960).  A confession is involuntary "if coerced either by physical

7  intimidation or psychological pressure."  <u>Mickey v. Ayers</u>, 606 F.3d 1223, 1233 (9th Cir. 2010)

8  (citing <u>United States v. Shi</u>, 525 F.3d 709, 730 (9th Cir. 2008)).  "Coercive police activity is a

9  necessary predicate to finding that a confession is not 'voluntary' within the meaning of the Due

10  Process Clause of the Fourteenth Amendment."  <u>Connelly</u>, 479 U.S. at 167.

11          In determining whether a confession is voluntary, a court "examines whether a

12  defendant's will was overborne by the circumstances surrounding the giving of a confession."

13  <u>Dickerson v. United States</u>, 530 U.S. 428, 434 (2000).  "The line of distinction is that at which

14  governing self-direction is lost and compulsion, of whatever nature or however infused, propels or

15  helps to propel the confession."  <u>Collazo v. Estelle</u>, 940 F.2d 411, 416 (9th Cir. 1991) (en banc)

16  (quoting <u>Culombe v. Connecticut</u>, 367 U.S. 568, 602 (1961)).  Voluntariness is to be determined

17  in light of the totality of the circumstances.  <u>Miller v. Fenton</u>, 474 U.S. 104, 112 (1985); <u>Haynes v.</u>

18  <u>Washington</u>, 373 U.S. 503, 513 (1963).  This includes consideration of both the characteristics of

19  the petitioner and the details of the interrogation.  <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226

20  (1973).  Relevant circumstances that should be considered in determining whether a confession

21  was voluntarily made include the following factors: (1) the youth of the accused; (2) his/her

22  intelligence; (3) the lack of any advice to the accused of his/her constitutional rights; (4) the

23  length of the detention; (5) the prolonged nature of the questioning; and (6) the use of any

24  punishment such as the deprivation of food or sleep.  <u>Id.</u>; <u>United States v. Haswood</u>, 350 F.3d

25  1024, 1027 (9th Cir. 2003).  The primary focus of the voluntariness inquiry is, however, on the

26  conduct of the interrogating officials; petitioner must establish the "crucial element of police

1   overreaching." Connelly, 479 U.S. at 163.  A "defendant's mental condition, by itself and apart

2   from its relation to official coercion, should [not] dispose of the inquiry into constitutional

3   'voluntariness.'" Id. at 164.

4          Officials cannot extract a confession "by any sort of threats or violence, nor . . . by

5   any direct or implied promises, however slight, nor by the exertion of any improper influence."

6   Hutto v. Ross, 429 U.S. 28, 30 (1976) (quoting Bram v. United States, 168 U.S. 532, 542-43

7   (1897)).  Thus, in Lynumn v. Illinois, 372 U.S. 528, 534 (1963), the Court found a confession was

8   coerced by officers' false statements that state financial aid for defendant's infant children would

9   be cut off, and her children taken from her, if she did not cooperate.  In Rogers v. Richmond, 365

10  U.S. 534, 541-45 (1961), the Court found the defendant's confession was coerced when it was

11  obtained in response to a police threat to take defendant's wife, who suffered from arthritis, into

12  custody.  In Spano v. New York, 360 U.S. 315, 323 (1959), the Court found a confession was

13  coerced where police instructed a friend of the accused to falsely state that the accused's

14  telephone call had caused him trouble, that his job was in jeopardy, and that loss of his job would

15  be disastrous to his three children, his wife, and his unborn child.  See also Miranda, 384 U.S. at

16  476 ("any evidence that the accused was threatened, tricked, or cajoled into a waiver [of Fifth

17  Amendment right to remain silent] will, of course, show that the defendant did not voluntarily

18  waive his privilege").  Neither physical intimidation nor psychological pressure is permissible.

19  Haswood, 350 F.3d at 1027 ("A confession is involuntary if coerced either by physical

20  intimidation or psychological pressure."); United States v. Tingle, 658 F.2d 1332, 1335 (9th Cir.

21  1981) ("subtle psychological coercion suffices . . . at times more effectively 'to overbear a rational

22  intellect and a free will'").  On the other hand, "if interrogators obtained a confession after

23  Miranda warnings and a valid waiver, the confession was likely voluntary." DeWeaver, 556 F.3d

24  at 1003.

25  ////

26  ////

3. <u>State Court Decision</u>

The California Supreme Court denied petitioner's challenge to the trial court's

denial of his suppression motions.  First, the court set out the legal standards:

> When a defendant challenges the admission of his or her statements on the ground they were involuntarily made, the prosecution must prove by a preponderance of the evidence the statements were, in fact, voluntary. (<u>People v. Guerra</u> (2006) 37 Cal.4th 1067, 1093, 40 Cal.Rptr.3d 118, 129 P.3d 321 (<u>Guerra</u>).) A statement is involuntary if it is "not ' "the product of a rational intellect and a free will." ' " (<u>Mincey v. Arizona</u>(1978) 437 U.S. 385, 398, 98 S.Ct. 2408, 57 L.Ed.2d 290 (<u>Mincey</u>).) The court in making a voluntariness determination "examines 'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." (<u>Dickerson</u>, <u>supra</u>, 530 U.S. at p. 434, 120 S.Ct. 2326.) Coercive police tactics by themselves do not render a defendant's statements involuntary if the defendant's free will was not in fact overborne by the coercion and his decision to speak instead was based upon some other consideration. (<u>Colorado v. Connelly</u> (1986) 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (<u>Connelly</u>); <u>People v. Maury</u> (2003) 30 Cal.4th 342, 404–405, 133 Cal.Rptr.2d 561, 68 P.3d 1 (<u>Maury</u>).) The determination whether the authorities improperly coerced a defendant's statements involves an evaluation of the totality of the circumstances, including the nature of the interrogation and the circumstances relating to the particular defendant. (<u>Dickerson</u>, <u>supra</u>, 530 U.S. at p. 434, 120 S.Ct. 2326.)
>
> The same inquiry applies when a court evaluates the voluntariness of a <u>Miranda</u> waiver. (<u>Connelly</u>, <u>supra</u>, 479 U.S. at pp. 169–170, 107 S.Ct. 515.) Such a waiver must be knowingly and intelligently made, meaning that the defendant must have been capable of freely and rationally choosing to waive his or her rights and speak with the officers. (<u>People v. Frye</u> (1998) 18 Cal.4th 894, 988, 77 Cal.Rptr.2d 25, 959 P.2d 183 ("<u>Frye</u>").)
>
> Even if a defendant voluntarily has waived his or her <u>Miranda</u> rights to remain silent and to have counsel present, the defendant later may revoke the waiver. In such a case, "once a defendant has indicated an intent to assert his right to remain silent or to counsel, all further attempts at police interrogation should cease." (<u>People v. Jennings</u> (1988) 46 Cal.3d 963, 977, 251 Cal.Rptr. 278, 760 P.2d 475.) "In order to invoke the Fifth Amendment privilege after it has been waived, and in order to halt police questioning after it has begun, the suspect 'must *unambiguously*' assert his right to silence or counsel. (<u>Davis v. United States</u> (1994) 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (<u>Davis</u>), italics added.) It is not enough for a reasonable police officer to understand that the suspect might be invoking his

1    rights. (Ibid.) Faced with an ambiguous or equivocal statement, law
     enforcement officers are not required under Miranda, supra, 384
2    U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, either to ask clarifying
     questions or to cease questioning altogether. (Davis, supra, 512 U.S.
3    at pp. 459–462, 114 S.Ct. 2350.)" (People v. Stitely (2005) 35
     Cal.4th 514, 535, 26 Cal.Rptr.3d 1, 108 P.3d 182 (Stitely).) A
4    defendant has not invoked his or her right to silence when the
     defendant's statements were merely expressions of passing
5    frustration or animosity toward the officers, or amounted only to a
     refusal to discuss a particular subject covered by the questioning.
6    (Ibid.; Jennings, supra, 46 Cal.3d at p. 978, 251 Cal.Rptr. 278, 760
     P.2d 475; People v. Silva (1988) 45 Cal.3d 604, 629–630, 247
7    Cal.Rptr. 573, 754 P.2d 1070; see also Miranda, supra, 384 U.S. at
     pp. 473–474, 86 S.Ct. 1602.)

8
             On appeal, we review independently the trial court's legal
9    determinations of whether a defendant's statements were voluntary
     (Guerra, supra, 37 Cal.4th at p. 1093, 40 Cal.Rptr.3d 118, 129 P.3d
10   321), whether his Miranda waivers were knowingly, intelligently,
     and voluntarily made (People v. Mayfield (1993) 5 Cal.4th 142,
11   172, 19 Cal.Rptr.2d 836, 852 P.2d 331 (Mayfield)), and whether his
     later actions constituted an invocation of his right to silence (People
12   v. Gonzalez (2005) 34 Cal.4th 1111, 1125, 23 Cal.Rptr.3d 295, 104
     P.3d 98). We evaluate the trial court's factual findings regarding the
13   circumstances surrounding the defendant's statements and waivers,
     and " 'accept the trial court's resolution of disputed facts and
14   inferences, and its evaluations of credibility, if supported by
     substantial evidence.' " (Ibid.; Guerra, supra, 37 Cal.4th at pp.
15   1092–1093, 40 Cal.Rptr.3d 118, 129 P.3d 321.)

16   43 Cal. 4th at 114-15.

17           The California Supreme Court first examined petitioner's contention that he

18   invoked his right to remain silent at the conclusion of the first interview with Placer County

19   officers.  After determining that petitioner had waived the issue by failing to make this argument

20   during the suppression hearing, the court reviewed the merits in the alternative:

21           1. *Invocation of Right to Silence at First Interview*

22                   Defendant first contends he invoked his right to remain
             silent at the conclusion of the first interview with the Placer County
23           officers at the Carson City jail when he told them he wanted to stop
             the interview because he had a headache and wished to return to his
24           cell. Defendant never raised this claim in the trial court. . . .

25           . . .

26   ////

Even if this claim had not been forfeited, it is without merit. Defendant's request to stop the interview at the Carson City jail was not an assertion of his right not to incriminate himself. Defendant already had confessed to the Garcia murder and provided the officers with a map showing where the body was located. Defendant had not expressed any reluctance to speak further about the murder before asking to stop the interview because he had a headache. Immediately after defendant asked to end the interview, the officers, in fact, stopped the questioning, and asked him only whether they could pose more questions during the next few days, to which he answered, "Yes." Defendant never testified during the suppression hearing that when he asked to stop the interview because he had a headache, he at that time had decided not to speak further with the officers at any future occasion concerning the crimes. In fact, defendant's testimony was to the contrary: that he always intended to cooperate with the authorities because he thought "that's what you do." It is clear from this record that defendant did not invoke his right not to incriminate himself, but merely asked for a break from questioning. The statements made by defendant during the later session with the officers, including the questioning by the Sacramento officers, therefore were not the "fruits" of any constitutional violation resulting from the continued questioning of defendant after he asked for a temporary suspension of questioning for the night.

Id. at 115-17.

The California Supreme Court next considered whether officers took advantage of petitioner's pleas for help with his mental problems and improperly coerced his confession to the Lactawen murder.

### 2. *Asserted Inducements by Sacramento County Officers*

Defendant contends his confessions to the Lactawen murder, which were admitted at the penalty phase of the trial, should have been suppressed because they were the product of improper coercion by officers from the Sacramento County Sheriff's Department. We disagree.

After defendant confessed to the Garcia and Sorensen murders, the Placer County officers contacted homicide investigators in the Sacramento County Sheriff's Department who were investigating a series of other murders of young women in the Interstate Highway 5 corridor in Sacramento County (the I–5 murders). During the first interview with the Sacramento County officers, defendant denied any involvement in any murders other than the two to which he had confessed. In a second interview, defendant continued to deny involvement in the I–5 murders but

170

admitted having committed another murder, which turned out to be the Lactawen homicide. After defendant provided details of that incident, the officers realized the murder was under the jurisdiction of the City of Sacramento Police Department and contacted homicide officers in that agency. Those officers then conducted a third interview, during which defendant provided more details of the Lactawen murder.FN11 These interviews were tape-recorded, and a redacted recording of the second interview, with references to the I–5 murders excised, was played to the jury along with a recording of the third interview.

> FN11. The Sacramento County officers conducted another interview the following day and again questioned defendant concerning the I–5 murders. Defendant continued to deny any involvement. By the time of the suppression hearing, it had been determined that defendant was not a suspect in those murders.

Defendant argues these recorded statements were involuntary, and thus improperly admitted, because his will was overborne when the Sacramento County officers, during their second interview, threatened to withhold psychiatric treatment if defendant did not confess, promised him leniency and treatment if he did confess, and predicted defendant's mental difficulties would seriously worsen if he did not talk but would lessen if he did. The trial court found the officers did make "inducements" but their statements did not extend beyond suggestions defendant would realize some "generalized benefit" by speaking. More significantly, the court found the representations that were made were not the cause of defendant's decision to make the statements. Rather, the trial court concluded, defendant chose to confess "because of his preexisting belief that that's what you did" and his desire to "unburden himself."

On appeal, defendant argues primarily that the trial court erred by finding that the actions of the officers did not constitute improper coercion. We need not resolve that question. Even assuming—without deciding—the statements made to defendant might constitute improper promises or threats under some circumstances, we conclude the trial court did not err by finding that a preponderance of the evidence in this case established defendant's decision to confess to the Lactawen murder was voluntary and was "completely separate and apart from any apparent inducements that [the officers] might have given to him." (See Connelly, supra, 479 U.S. at p. 167, 107 S.Ct. 515; Maury, supra, 30 Cal.4th at pp. 404–405, 133 Cal.Rptr.2d 561, 68 P.3d 1.)

Defendant's challenge to the trial court's finding of a lack of causation centers on the circumstance that his confession to the Lactawen murder followed close in time to when the officers made their representations in attempting to convince him to talk. He

171

argues, relying upon the Court of Appeal's decision in People v. Cahill (1994) 22 Cal.App.4th 296, 316, 28 Cal.Rptr.2d 1, that there is a rebuttable presumption his confession resulted from the representations, because of their temporal proximity. Assuming, without deciding, defendant's reading of People v. Cahill, supra, 22 Cal.App.4th 296, 28 Cal.Rptr.2d 1, is a correct statement of the law, FN12 we nonetheless conclude the totality of the circumstances in this case establishes defendant's confession was not the product of the representations made by the officers.

> FN12. The Court of Appeal did not specifically use the term "rebuttable presumption"; the word "presumption" comes from our decision in People v. Jimenez (1978) 21 Cal.3d 595, 614, 147 Cal.Rptr. 172, 580 P.2d 672, overruled on another ground in People v. Cahill (1993) 5 Cal.4th 478, 509–510, footnote 17, 20 Cal.Rptr.2d 582, 853 P.2d 1037, which the Court of Appeal cited. In Jimenez, however, we addressed the question whether a second confession is tainted by improper police coercion that rendered a first confession involuntary. In such cases, "[t]he rule has been long and well settled in this state, that when an accused who has been subjected to improper influences makes a confession, and shortly thereafter again incriminates himself, '. . . there is a presumption that the influence of the prior improper treatment continues to operate on the mind of the defendant and that the subsequent confession is the result of the same influence which rendered the prior confession inadmissible, and the burden is upon the prosecution to clearly establish the contrary. [Citations.]' " (People v. Jimenez, supra, 21 Cal.3d at p. 614, 147 Cal.Rptr. 172, 580 P.2d 672.) That is a situation different from when, as in People v. Cahill, supra, 5 Cal.4th 478, 20 Cal.Rptr.2d 582, 853 P.2d 1037, and this case, a court is evaluating whether, in the first instance, there was an involuntary confession. Although the lapse of time between an officer's promise or threat and a defendant's decision to confess certainly may be a relevant factor when assessing the totality of the circumstances surrounding the voluntariness of the statement, it is not clear that closeness in time should give rise to a presumption that a confession was coerced.

First, the tape-recorded statements upon which defendant relies were made after defendant had admitted committing a third murder. As the officer testified at the suppression hearing, the first interview conducted by the Sacramento County officers concerning the I–5 murders was unproductive. The officers then returned a few minutes later with their supervisor, who "covered a lot of the ground [they] had already talked about . . . and got the same sort of denials that [they] had earlier encountered." Approximately 27 minutes into the second interview, defendant told the officers he had not committed any of the killings about which they were

172

questioning him, but had committed another murder. It was at this point that the tape recorder was turned on. Although this tape recording begins with the officers discussing possible benefits defendant might receive by telling the officers about the murder, defendant's initial admission obviously came before those particular statements. Indeed, defendant testified at the hearing that the first time the Sacramento County officers mentioned obtaining help for him was when an officer made a statement about another murderer who supposedly was placed in a prison psychiatric facility—a statement found more than one minute into the tape (that is, after defendant had admitted committing another murder). There was no testimony at the suppression hearing concerning any promise, threat, or other inducement having been made before the tape recorder was turned on. Thus, the record does not contain evidence suggesting the officers made any representations before defendant confessed to the Lactawen murder, although defendant, apparently, had not yet supplied them with the details.

Second, as the trial court observed, it appears from statements made by defendant during the interviews that he never believed he would receive the benefits discussed by the officers. Despite their statements that defendant could receive help if he talked, he repeatedly expressed his belief that even if he spoke to them he would be sent to prison, forgotten about, and receive no help. He continued to voice this belief even after providing the details of the murder. At no point during the interview did defendant explicitly state or even imply that he had been convinced otherwise. Although defendant testified at the suppression hearing that he believed, even before speaking to the authorities, he would receive help from them, this after-the-fact, self-serving testimony is directly contradicted by the prior contemporaneous expressions of his state of mind: that he would not receive any help, but instead would be sent to prison and forgotten.FN13 In fact, on cross-examination, defendant testified he told the officers during the interviews he would not be offered a beneficial deal because "the way the people were cussing at me and stuff out in the booking room, I figured it was over." FN14

FN13. Indeed, even when defendant was speaking during the interview about his experiences at the reform school in Idaho, he told the officers that "People didn't try to help you. They just played games with you and made you stand in corners and shit."

FN14. The trial court noted that some of defendant's testimony at the hearing arguably was self-serving, but stated it would "accept his testimony as a generally accurate portrayal of his state of mind at the time." As defendant's answer on cross-examination makes clear, however, his testimony was contradictory regarding whether he believed he would receive the benefits mentioned by the officers.

Third, defendant's own testimony at the suppression hearing established that his decision to confess to the three murders was based upon his own preexisting personal belief that a person should cooperate with the authorities and tell them what he knows about a crime, completely separate from any representations made by the officers. On direct examination, when asked about his <u>Miranda</u> waivers, defendant said, "I figured I had to cooperate. I always did before. When I got in trouble in Idaho, I did it then." On cross-examination and redirect examination, defendant reiterated many times his belief that confessing is "what you do when you are caught by the law." Indeed, the trial court examined defendant briefly, specifically asking him: "When you say you felt you had to cooperate with [the officers], that was something you felt from before this ever started and you believed that all the way through?" Defendant responded, "Yes, because you tell them what you know." FN15 In addition, the circumstance that defendant had confessed to the Placer County officers concerning two murders, although those officers had not given any "inducements," is further evidence of his state of mind concerning his willingness to admit his role in the Lactawen murder regardless of any representation made by the Sacramento County officers.

FN15. The trial court earlier had asked defendant, "I want you to tell me whether I'm understanding you correctly. [¶] It sounds to me that you're saying that you assumed from when this first started, from the first moment they picked you up, that what you had to do was tell them what happened." Defendant responded, "Correct."

In sum, there is ample evidence supporting the conclusion that defendant's decision to confess to the Lactawen murder was not the product of any coercive tactic by the officers, but rather was based upon defendant's free will and his preexisting belief that when questioned by the authorities, a person should tell what he knows. This evidence substantially outweighs any implication arising from defendant's decision to confess to the Lactawen murder a relatively short time after the officers made their representations about defendant's receiving help—the primary circumstance cited by defendant in support of his claim of error. Accordingly, the trial court properly denied the motion to suppress these statements.

<u>Id.</u> at 117-20.

4. <u>Discussion</u>

a. <u>Admissibility of November 21 Statements</u>

Petitioner first argues the statements made to the Placer County officers on November 21 violated his <u>Miranda</u> rights because he invoked his right to remain silent on

1  November 20.  After talking to Detective Jensen and Inspector Smith for 45 minutes at the Carson

2  City Jail, petitioner asked to stop because his "head was hurting."  (RT 240:2-4.)  After being

3  asked if "he wanted to take a break, if he needed aspirin or something to eat," petitioner said, "no,

4  he just wanted to get back to his cell and be by himself."  (RT 240:7-10.)  Officers stopped

5  questioning him at that point.  (RT 243:25-28.)  However, before they left, Inspector Smith asked

6  petitioner if they could return within the next few days to ask more questions and petitioner

7  responded, "yes."  (RT 240:7-21.)

8          Petitioner argues the California Supreme Court misapplied the law and

9  unreasonably determined the facts.  Neither argument has merit.  First, petitioner contends that his

10 request to be by himself constituted a clear invocation of his Fifth Amendment privilege.

11 Therefore, the argument continues, officers returning the following day were required, at a

12 minimum, to advise petitioner of his Miranda rights again before continuing questioning.  (Dkt.

13 No. 92 at 270-272.)  Petitioner's argument is essentially that any request to stop questioning can

14 only be considered an invocation of rights, not a simple request to take a break.[49]  Petitioner cites

15 no law to support this argument.  He cites only general statements recognizing that a suspect has a

16 right to "cut off questioning."  See Miranda, 384 U.S. at 474; Mosley, 423 U.S. at 327 (suspect's

17 statement that he did not want to discuss the robberies was an assertion of right to silence).

18          This case is similar to the situation that confronted the Court of Appeals in

19 DeWeaver.  After advising DeWeaver of his Miranda rights, officers started to discuss in detail

20 the shootings they were investigating.  556 F.3d at 999.  DeWeaver became "upset" and "asked to

21 be returned to the jail."  Id.  One of the officers asked DeWeaver to "hear him out."  Id.

22

23          [49] Petitioner makes a certain valid point.  The California Supreme Court's statement that
   the fact petitioner had already confessed to the Garcia murder supported a finding that petitioner
24 did not invoke his right to remain silent is problematic.  As petitioner points out, under the
   court's reasoning on this point, a suspect who had made incriminating statements could never
25 invoke his right to remain silent.  (Dkt. No. 92 at 272.)  However, this was only one of the court's
   reasons for finding petitioner had not invoked his Fifth Amendment rights.  As stated in the text,
26 the other reasons described by the state court are sufficient to support its holding.

1   DeWeaver then continued to talk with the officers.  Id.  The state court held that "asking to be

2   taken back to jail did not evidence a refusal to talk further."  Id. at 1002 (internal citation omitted).

3   To make this determination, the state court relied upon several factors: DeWeaver said nothing

4   about ending the interrogation or not wanting to talk with officers, the officers knew that

5   DeWeaver knew how to invoke his right to remain silent because he had done so earlier, and the

6   officers clearly did not consider DeWeaver to be invoking his right to silence.  Id.  The Court of

7   Appeals held that the state court decision was not an unreasonable application of federal law.  Id.

8         In the present case, petitioner's express reason for ending the interview was that he

9   had a headache.  His request to return to his cell was immediately followed by agreeing to later

10  continue to talk with the officers about the crimes they had been questioning him about.

11  Petitioner's request to take a break was just that, a request to end the interrogation for that

12  evening.  The continued interrogation the following morning did not require new Miranda

13  warnings or otherwise amount to a Miranda violation.[50]  Further, to the extent the California

14  Supreme Court relied upon Davis, cited in its recitation of the legal standards, in ruling on this

15  aspect of petitioner's claim, that reliance was not unreasonable.  DeWeaver, 556 F.3d at 1001-02

16  (state court application of Davis to an invocation of the right to remain silent not contrary to or an

17  unreasonable application of Supreme Court precedent).  Petitioner has not shown the California

18  Supreme Court unreasonably applied federal law in so holding or made an unreasonable

19  determination of the facts.

20                  b.  Admissibility of Evidence of Lactawen Homicide

21        Petitioner argues his confession to the killing of Elizabeth Lactawen was the result

22  of psychological coercion by officials.  He claims officers were aware he was "psychologically

23  vulnerable" and took advantage of it by threatening to deny him care if he did not talk, promising

24  _____

25     [50]  Petitioner argues only that new Miranda warnings were required on the morning of the
    21st because he invoked his right to silence on the evening of the 20th.  He does not argue that
26  the overnight break in the interrogation was so lengthy that the officers were required to re-advise
    petitioner of his Miranda rights and this court does not consider that question.

1  treatment and leniency if he did, and forecasting suicide if he did not relieve his conscience.

2  Petitioner argues that he made inculpatory statements immediately after Officers Bell, Reed, and

3  Biondi assured him he would get help if he confessed.  This timing shows, according to petitioner,

4  that his inculpatory statements were the result of the officers' behavior.

5       The California Supreme Court's holding that the confession was not the result of

6  any inducements rested on three factual findings: (1) petitioner confessed to a third murder before

7  the incidents of alleged coercion occurred; (2) petitioner's statements to officials showed that he

8  did not believe he would receive any benefits from confessing; and (3) petitioner's confession was

9  the result of a pre-existing belief that talking with the police is just "what you do."

10      The undersigned concludes that the state court's first basis for its holding is not

11 persuasive and rests, in part, on an incorrect factual statement.  The California Supreme Court

12 concluded its finding that petitioner was not induced to initially confess to a third murder by

13 stating: "Thus, the record does not contain evidence suggesting the officers made any

14 representations before defendant confessed to the Lactawen murder, although defendant,

15 apparently, had not yet supplied them with the details."  43 Cal. 4th at 119.  This conclusion is not

16 correct.  Petitioner's only statement was that he had committed a third murder.  At that point, the

17 victim had not been identified and petitioner had provided no details.  Had he stopped providing

18 officials with information at that time, it is highly possible he would never have been identified as

19 the perpetrator of the Lactawen homicide and it would not have been introduced at the penalty

20 phase.  Petitioner provided all the important identifying information after the alleged improper

21 inducements.  Therefore, the California Supreme Court's reliance upon the fact that petitioner had

22 already confessed to the murder before any improper inducements were made does not support its

23 conclusion that petitioner was not induced to confess.

24      That said, the state court provides two other, supported reasons for determining

25 petitioner was not induced by officers' statements.  First, petitioner repeatedly indicated he was

26 not convinced that he would receive leniency or mental health care if he talked with officers.

1    Second, in his testimony at the second suppression hearing, petitioner made clear that he felt

2    talking with officers was the right thing to do.  This court finds the timing of petitioner's

3    confession to the Lactawen murder, so close upon the heels of the officers' promises and threats, a

4    possible indication that it may have been induced by the officer's behavior.  However, this court's

5    role under 28 U.S.C. § 2254(d) is to determine only whether the state court's reasoning was so far

6    afield that "no fair-minded jurist" could have made the same determination.  Petitioner does little

7    to support such a determination and this court cannot find the state court's decision

8    unreasonable.[51]  The record shows that petitioner did not believe the promises of leniency and that

9    he felt a pre-existing obligation to tell officers the truth.  The California Supreme Court's decision

10   based on those findings is adequate to support its denial of petitioner's claim that the trial court

11   erred in allowing the penalty phase jury to hear evidence of the Lactawen murder.

12           Claim G.  Admission of Psychiatric Evidence

13                  Petitioner argues that the trial court erred in admitting his statements to Dr. Lyons

14   because they were not voluntary.   He further argues that Dr. Lyons' opinions should have been

15   excluded as well because they were, at least in part, the result of petitioner's involuntary

16   statements.  The background facts for this claim are set forth above in the discussion of Claim F.

17   The California Supreme Court first rejected this claim on the grounds that it was not raised before

18   the trial court.  43 Cal. 4th at 121.  In the alternative, the court considered the merits of that claim

19   as follows:

20           3. *Statements to Dr. Lyons*

21                  Defendant challenges the admission of Dr. Lyons's
             testimony regarding statements made by defendant during the

22           interview conducted in the Placer County jail soon after his arrest.
             Defendant contends these statements should have been excluded on

23

24           [51] Petitioner cites only Blackburn v. Alabama, 361 U.S. 199, 207-08 (1960), in support of
     his argument that authorities may not take advantage of a suspect's mental illness to obtain a

25   confession.  However, the issue upon which the California Supreme Court relied in the present
     case was causation.  The issue in Blackburn, a case decided well before the Court's focus on

26   police overreaching in Connelly, was the mental status of the accused.   361 U.S. at 206-08.

the ground the waiver of his Miranda right to remain silent was not knowing, intelligent, and voluntary, because his preoccupation with receiving psychological treatment rendered him unable to appreciate the circumstance that Dr. Lyons was acting on behalf of the prosecution. Defendant also claims his statements were involuntary because they were the product of the prosecution's "highly disturbing practice" of sending a psychiatrist to visit a mentally disturbed defendant.

. . . .

   Even if they were not forfeited, defendant's claims that he did not knowingly and intelligently waive his Miranda rights and that his waivers and statements to Dr. Lyons were involuntary would fail, because there is no evidence supporting them. To the contrary, Dr. Lyons testified in detail concerning his giving defendant the Miranda advisements, including informing defendant that Lyons had been appointed by the district attorney and might testify against defendant at trial, and that his purpose in meeting with defendant was not to provide him with medical or psychiatric treatment. Dr. Lyons testified defendant stated that he understood his rights and Dr. Lyons's role before agreeing to speak to Dr. Lyons. Defendant repeatedly and emphatically stated he wished to speak to Dr. Lyons despite Lyons's potentially adverse role in the case. Throughout the interview, defendant appeared to understand Dr. Lyons's questions and was able to communicate.FN18

   FN18. Dr. Lyons did, however, prescribe at the end of the interview a tranquilizer for defendant due to his high level of anxiety.

   Moreover, defendant testified he generally realized from the various Miranda advisements he received that what he said would be used in court, and although he testified he believed he would receive "help" from the authorities, he never stated his own thinking was so affected by his desire for help that he did not understand the implications of speaking with Dr. Lyons or felt unable to exercise his free will to refuse to do so. Although defendant's answers on cross-examination were somewhat evasive, defendant, when asked whether he realized his statements to Dr. Lyons might be used against him answered, "I didn't know what extent he would, no." When specifically asked whether he voluntarily spoke with Dr. Lyons about his crimes, defendant answered, "Yes. That's what his job was. He wanted to know my state of mind, how I felt about the crimes."

   It was not until defendant was asked somewhat leading questions on redirect examination that he testified his "principal motivation" for speaking to Dr. Lyons was his desire to receive help from him. Even if this claim is true, it does not establish that defendant's decision to speak with Dr. Lyons was the result of any

1    coercive activity by Dr. Lyons, as opposed to defendant's internal
     beliefs and desires.
2
          Defendant argues on appeal, however, that the very
3    circumstances of the interview were improperly coercive because,
     prior to meeting Dr. Lyons, the officers had told defendant they had
4    arranged for psychological help for him. This argument, however, is
     refuted by the evidence in the record. Dr. Lyons testified he
5    repeatedly told defendant he was not meeting with him to provide
     psychiatric help, and defendant, in fact, understood this and did not
6    expect help from Dr. Lyons, but rather expressed his desire for
     future psychological help in a general sense. Thus, any
7    misapprehension defendant initially may have had regarding Dr.
     Lyons's role and what defendant might gain from speaking with
8    him would have been dispelled during the interview. There is no
     evidence in the record supporting defendant's claim that he did not
9    knowingly, intelligently, and voluntarily waive his <u>Miranda</u> rights
     before speaking with Dr. Lyons, or that his statements were
10   otherwise involuntary because of improper coercion.

11   43 Cal. 4th at 120-22.

12         Petitioner argues that his statements were involuntary because Dr. Lyons

13   interviewed him shortly after Inspector Smith assured him he would get psychiatric help.  At the

14   beginning of the seventh interrogation, petitioner expressed his fear that he would not receive

15   mental health treatment in jail.  He was "scared and confused, 'cause these people aren't gonna

16   worry about helping any, they're just going to ship me off into a little square room and forget

17   about me."  (Supp. CT 4729.)  He continued, "I want to see people that can help me."  (<u>Id.</u>)  One

18   of the officers responded, "Okay, well, we're going to – we're to going [sic] to let you see people

19   that can help you.  I've got a call in for the deputy district attorney this morning that can make, uh,

20   those arrangements."  (<u>Id.</u>)  The interview then continued.  It lasted 54 minutes.  (RT 215:17-19.)

21   About three and a half hours after its conclusion, Dr. Lyons met with petitioner.  (RT 227:2-24;

22   3500:15-17.)

23         Petitioner argues that the combination of (1) the officer's promise that he would

24   call the deputy district attorney to get petitioner some help, (2) Dr. Lyons' testimony that

25   petitioner was in "bad mental shape" during the interview, and (3) the testimony of both Dr.

26   Lyons and petitioner that petitioner repeatedly expressed his concern about getting psychiatric

1  help, amount to a necessary finding that petitioner misunderstood Dr. Lyons' role and did not,

2  therefore, speak to him voluntarily.  Petitioner also points to his own suppression hearing

3  testimony that he talked with Dr. Lyons because he wanted help and it was Dr. Lyons' "job" to

4  help him.  (RT 3587:11-15.)  However, petitioner omits the fact that the question petitioner was

5  asked was whether "one of the reasons" he talked with Dr. Lyons was because he wanted help.

6  (Id. at 12-13.)  Petitioner also points to his answers to the following leading questions:

7          Q       Was your state of mind at that time that you wanted
                   somebody to at least look at whatever it was wrong with
8                   your head that might have caused you to do whatever it was
                   you did and give you some help for straightening that out?
9
           A       Yes.
10
           Q       Was that your principal motivation at that time?
11
           A       Yes.
12

13  (RT 3587:16-23.)

14          Petitioner makes no attempt to grapple with the evidence that Dr. Lyons read

15  petitioner his Miranda rights (just as officers had done before interrogating him), that petitioner

16  waived those rights, and that Dr. Lyons repeatedly told petitioner he was not there to treat him, he

17  was there at the behest of the district attorney, and he could end up testifying against petitioner.

18  Petitioner repeatedly indicated to Dr. Lyons that he understood Dr. Lyons' role.  Petitioner's few

19  self-serving answers to leading questions at the suppression hearing do not amount to much

20  evidence to the contrary.  Whether or not petitioner's desire for psychiatric help partly motivated

21  his decision to speak with Dr. Lyons is not the point.  The question is whether petitioner

22  voluntarily spoke with Dr. Lyons.  Petitioner has not shown that "coercive police activity" caused

23  him to speak with Dr. Lyons.  See Colorado v. Connelly, 479 U.S. 157, 167 (1986).  Similarly,

24  petitioner has not shown that his will was "overborne by the circumstances."  Dickerson v. United

25  States, 530 U.S. 428, 434 (2000).  Therefore, the California Supreme Court's determination that

26  petitioner's statements to Dr. Lyons were voluntary was not unreasonable under section 2254(d).

1          Claim H.  Exclusion of Evidence of Sexual Abuse

2          Petitioner argues that the trial court erred in excluding evidence that petitioner's

3   grandfather sexually abused petitioner's mother.  Petitioner claims that such evidence was

4   important to corroborate his testimony that his mother abused him.  Petitioner has failed to show

5   the California Supreme Court unreasonably denied this claim and this court recommends its

6   denial.

7          1.  Background

8          The trial court held a closed hearing regarding the admissibility of juvenile court

9   records of petitioner's mother, Charlotte Jane Russell, and criminal records of her father, Billy Joe

10  Russell.  Those records showed that Mrs. Rundle had been sexually abused by her father over a

11  period of several years starting when she was twelve years old.  (Ex. 68 at 210, 213;[52] Ex. 99 (Dkt.

12  Nos. 10-27 to 10-32) at 669, 694.)  In 1962, Billy Joe Russell was charged with one count of

13  felony incest.  (Ex. 99 (Dkt. Nos. 10-27 to 10-32) at 694).)  He plead guilty, was decreed a sexual

14  psychopath, and was committed to Atascadero State Hospital for diagnosis.  (Id. at 677-79, 689-

15  90.)  Doctors diagnosed Mr. Russell with "personality trait disturbance" and "passive aggressive

16  personality, passive dependent type."  (Id. at 684-85.)  They determined he was not a sexual

17  psychopath.  (Id.)

18         Petitioner's mother's juvenile records also showed that, at fourteen, she was

19  charged with "leading an immoral life" after she admitted having sexual intercourse with several

20  boys.  (Ex. 68 at 209-10.)

21         Petitioner's trial counsel argued there is a "definitive correlation between those

22  who have been molested as children and grow up and those who themselves molest children as

23  adults."  (RT 7979:16-18.)  He argued the evidence would support petitioner's testimony that his

24

25         [52]  The scanned version of this exhibit that was filed with the petition is incomplete.  (See
    Ex. 68 (Dkt. Nos. 9-19, 9-20).)  It is missing pages 206-25.  A complete version of Ex. 68 was
26  lodged herein with the state petition on April 12, 2010.  (See Dkt. No. 27.)

mother molested him.  (RT 7979:5-11.)  The trial judge held that petitioner had failed to establish

a causal connection between being sexually abused as a child and later being a sexual abuser.  (RT

7984:25 - 7985:20.)  He excluded the evidence of molestation, but reserved ruling on the evidence

in petitioner's mother's juvenile file showing that she had sexual relationships with other

juveniles. (RT 7987:4-10.)  The judge stated, "I am not prepared to make a ruling thus far, but I

am prepared to say this:  If at some point counsel feels that that is an appropriate avenue of

inquiry, I wish to have that heard outside the presence of the jury." (RT 7987: 9-13.)

2.  Legal Standards

Criminal defendants have a constitutional right, implicit in the Sixth Amendment,

to present a defense; this right is "a fundamental element of due process of law."  Washington v.

Texas, 388 U.S. 14, 19 (1967).  See also Crane v. Kentucky, 476 U.S. 683, 687, 690 (1986);

California v. Trombetta, 467 U.S. 479, 485 (1984); Webb v. Texas, 409 U.S. 95, 98 (1972);

Moses v. Payne, 555 F.3d 742, 757 (9th Cir. 2009).  "'The Supreme Court has made clear that the

erroneous exclusion of critical, corroborative defense evidence may violate both the Fifth

Amendment due process right to a fair trial and the Sixth Amendment right to present a defense.'"

Chia v. Cambra, 360 F.3d 997, 1003 (9th Cir. 2004) (quoting DePetris v. Kuykendall, 239 F.3d

1057, 1062 (9th Cir. 2001)).  However, the constitutional right to present a defense is not

absolute.  Alcala v. Woodford, 334 F.3d 862, 877 (9th Cir. 2003).  "Even relevant and reliable

evidence can be excluded when the state interest is strong."  Perry v. Rushen, 713 F.2d 1447,

1450 (9th Cir. 1983).

A state court's evidentiary ruling, even if erroneous, is grounds for federal habeas

relief only if it renders the state proceedings so fundamentally unfair as to violate due process.

Drayden v. White, 232 F.3d 704, 710 (9th Cir. 2000); Spivey v. Rocha, 194 F.3d 971, 977-78 (9th

Cir. 1999); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991).  A state law justification

for exclusion of evidence does not abridge a criminal defendant's right to present a defense unless

it is "arbitrary or disproportionate" and "infringe[s] upon a weighty interest of the accused."

1   United States v. Scheffer, 523 U.S. 303, 308 (1998).  See also Crane, 476 U.S. at 689-91

2   (discussion of the tension between the discretion of state courts to exclude evidence at trial and

3   the federal constitutional right to "present a complete defense"); Greene v. Lambert, 288 F.3d

4   1081, 1090 (9th Cir. 2002).  Further, a criminal defendant "does not have an unfettered right to

5   offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of

6   evidence." Montana v. Egelhoff, 518 U.S. 37, 42 (1996) (quoting Taylor v. Illinois, 484 U.S. 400,

7   410 (1988)).  "A habeas petitioner bears a heavy burden in showing a due process violation based

8   on an evidentiary decision."  Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir.), amended, 421 F.3d

9   1154 (9th Cir. 2005).  Finally, habeas relief is only appropriate for an error regarding the

10  exclusion of evidence if the evidence was material.  The question is whether the error had a

11  "'substantial and injurious effect or influence in determining the jury's verdict.'" Eslaminia v.

12  White, 136 F.3d 1234, 1237 (9th Cir. 1998) (quoting Brecht v. Abrahamson, 507 U.S. 619, 627

13  (1993)).

14          3.  State Court Decision

15          In denying petitioner's appellate claim of trial court error, the California Supreme

16  Court held:

17              Prior to defendant's mother being called as a witness in the
            defense case, defendant notified the trial court he planned to
18          introduce evidence establishing that his mother had been sexually
            abused by her father—defendant's grandfather—when she was a
19          young girl. Defendant argued this evidence would corroborate his
            testimony that his mother sexually abused him, because Dr. Yarvis
20          earlier had testified about a correlation between a person's being the
            victim of incest as a child and later, as a parent, becoming the
21          perpetrator of incest on his or her children. The trial court sustained
            the prosecution's objection on relevance grounds, finding Dr.
22          Yarvis's testimony insufficient to establish the correlation between
            being a victim of incest and becoming a perpetrator. Therefore, the
23          evidence of abuse inflicted by defendant's grandfather was
            irrelevant. Defendant contends on appeal the trial court erred and
24          claims, as he did in the trial court, that exclusion of this evidence
            violated his state and federal constitutional rights. We conclude the
25          trial court did not abuse its discretion in excluding this evidence,
            and defendant's constitutional rights were not violated.

26

As mentioned above, when a defendant has proffered evidence, the relevance (and therefore the admissibility) of which depends upon the existence of a preliminary fact, he or she bears the burden of producing sufficient evidence of the preliminary fact. (Lucas, supra, 12 Cal.4th at p. 466, 48 Cal.Rptr.2d 525, 907 P.2d 373; Evid. Code, § 403, subd. (a)(1).) Sufficient evidence in this context means evidence strong enough to " 'support a favorable determination by the jury.' " (Lucas, supra, 12 Cal.4th at p. 466, 48 Cal.Rptr.2d 525, 907 P.2d 373.) The determination of the existence, or nonexistence, of sufficient evidence of a preliminary fact is committed to the sound discretion of the trial court. (Ibid.)

Here, the preliminary fact at issue was whether there is an increased probability a child whose parent subjected her to incest will, as an adult, inflict similar abuse upon her own children. As the trial court pointed out, there is no inherent logical connection between being a victim of incest and later engaging in incest with one's own children. Rather, proof of such a correlation would require, as the trial court described it, some type of "scientific" support, for example, medical, psychological, or statistical studies.

In arguing for admission of this evidence, defendant relied exclusively upon the testimony of Dr. Yarvis to establish such a connection, but Yarvis's testimony was remarkably equivocal and limited. The entirety of the questions and answers touching upon this subject, cross-examination included, comprises less than one full page of the reporter's transcript. During direct examination, the following exchange occurred:

"Q [by defense counsel]: Just incidentally, is incestuous behavior by a parent frequently associated with similar victimization of that parent when the parent was a child?

"A [by Dr. Yarvis]: We're really just beginning to study this area, so it's still one where more is not known than is known. [¶] There certainly appears to be some evidence in the psychiatric literature that suggests that a parent who has been either physically or sexually abused has a greater likelihood to inflict similar abuse on their child than a parent who has not been so affected. But how much more likely is not clearly known.

"Q: Okay. [¶] Is it an accurate and general statement that incest tends to run in families?

"A: Well, on the basis of what I just said, I suppose you'd have to conclude that. I hesitated because I said it is much more clear about physical abuse than it is clear at this point about sexual abuse, although I think what you've just said is probably correct."

185

On cross-examination, the prosecutor asked Dr. Yarvis: "You would agree with me, would you not, that all children who have been the subject of sexual abuse do not become sexual abusers?" Dr. Yarvis replied: "Absolutely not." FN24

> FN24. In the following question, Dr. Yarvis was asked whether he agreed that "there is no cause and effect automatic relationship between a victim of child molestation and a person becoming a violent rapist," to which he answered, "You mean a one-to-one causal effect? Absolutely not." In light of the double negative contained in some of the questions, although Dr. Yarvis's negative answers, if read literally, would express disagreement with the proposition stated in the question, it seems clear that this was not the intent of the answer and that he, in fact, was in agreement.

We also note that although the trial court read into the record this second question and answer about violent rapists when discussing the issue of whether to admit the evidence of incest between defendant's mother and grandfather, this testimony is not relevant to the question whether incest victims are more likely than other persons to engage in incest with their own children. Both of the prosecutor's questions appear to have been intended to address the separate issue of the effects upon defendant of the sexual abuse allegedly inflicted by his mother, though the first question also was general enough to apply to abuse inflicted upon defendant's mother by her father.

The shortcomings of this testimony in establishing the preliminary fact at issue are obvious. According to Dr. Yarvis, at the time of defendant's trial, study of the possibility of this correlation was just beginning, though there was "some" evidence that "appear[ed]" to "suggest" a relationship existed. There was, however, more not known than known, especially with regard to sexual abuse as opposed to physical abuse. Moreover, even if a victim of incest were more likely than another person to later engage in incest with her children, the increased level of likelihood was "not clearly known."

Dr. Yarvis's answer to the more abstract question concerning whether incest "tends to run in families" was based upon the equivocal opinion discussed in his prior response, not his knowledge of any separate statistical analysis of the frequencies of incest within families. Thus, his response, "what you've just said is probably correct," was merely a restatement of the prior answer in a slightly different context and did not add independent weight to the testimony.

On appeal, defendant cites other evidence of the asserted correlation, but we evaluate the trial court's exclusion of the

proffered evidence based upon the evidence before the court when it made its decision. (People v. Fairbank (1997) 16 Cal.4th 1223, 1249, 69 Cal.Rptr.2d 784, 947 P.2d 1321 ["Of course, we cannot consider on appeal evidence that is not in the record"].) Defendant also cites, for the first time on appeal, the opinion of the Supreme Court of Minnesota in State v. Cermak (Minn.1985) 365 N.W.2d 238 (Cermak), in which the court rejected the appellant's challenges, including lack of foundation, to an expert's testimony regarding the "intergenerational" nature of incest. That case, however, is distinguishable and only serves to reinforce our conclusion here.

In Cermak, the expert testified concerning her own extensive research into (and treatment of) families affected by incest, which at that time had spanned several years and included her publication of a demographic study on the characteristics of offenders, victims, and spouses. She unequivocally expressed an opinion that incest was a learned behavior that was passed from one generation to the next unless there was outside intervention. (Cermak, supra, 365 N.W.2d at pp. 241–242.) This testimony stands in stark contrast to Dr. Yarvis's statements, which were exceedingly tentative in expressing the opinion that a correlation existed, and lacked citation to the sources of the information upon which his opinion—such as it was—was based, other than a general reference to the "psychiatric literature." FN25

> FN25. Our discussion of Cermak does not imply that evidence similar to the expert's opinion in that case would be sufficient to establish a correlation between victimization and later becoming a perpetrator. We address the evidence in that case only to highlight the equivocal nature of Dr. Yarvis's opinion in the present case.

Based upon the evidence presented by defendant at trial, we conclude, as the trial court found, that defendant failed to establish as a preliminary fact that a correlation exists between being a victim of incest as a child and later as a parent engaging in incest with her children. The trial court therefore did not abuse its discretion in excluding as irrelevant the proffered evidence of the incestuous relationship between defendant's mother and grandfather. Because we conclude the proffered evidence was irrelevant, and properly was excluded as such, it follows defendant's constitutional rights were not violated. (People v. DeSantis (1992) 2 Cal.4th 1198, 1249–1250, 9 Cal.Rptr.2d 628, 831 P.2d 1210 [exclusion of irrelevant evidence does not violate a defendant's due process, confrontation, or 8th Amend. rights] (DeSantis).)

43 Cal. 4th at 130-33.

////

1          4. Analysis

2          Petitioner makes a number of arguments based on evidence that was not part of the

3 record before the trial court. (Dkt. No. 92 at 292:8-23.) Because petitioner argues here that the

4 trial court erred, the California Supreme Court limited its consideration to the evidence that was

5 before the trial court. 43 Cal. 45 at 132 ("On appeal, defendant cites other evidence of the

6 asserted correlation, but we evaluate the trial court's exclusion of the proffered evidence based

7 upon the evidence before the court when it made its decision.") This court must do the same.

8          Petitioner simply argues that "Dr. Yarvis' testimony provided the logical link

9 between the incestuous relationship of Petitioner's grandfather and his mother and the incestuous

10 relationship of [h]is mother and him." (Dkt. No. 92 at 293:4-6.) Petitioner then jumps to the

11 next conclusion, that the evidence of his grandfather's abuse of his mother "corroborated" his

12 testimony that his mother sexually abused him. However, petitioner does not show how the trial

13 court and California Supreme Court misconstrued Dr. Yarvis's testimony, which, it must be

14 stressed, was the only evidence presented to the trial court regarding a link between petitioner's

15 mother's experience and his own. Dr. Yarvis did not establish sufficiently a link between being

16 the victim of incest and being a perpetrator of it.

17          Petitioner attempts to cast the legal standard as somehow requiring special

18 consideration of "corroborative" evidence. (Dkt. No. 92 at 294:12-25.) However, the cases cited

19 do not specifically consider whether or not the evidence "corroborated" the defense. Rather, the

20 standard is whether the evidence was "relevant and material" to the defense. Washington v.

21 Texas, 388 U.S. 14, 16 (1967). The issue in Washington was whether a defendant had the right to

22 compulsory process. Id. at 19. The issues in the other cases cited by petitioner similarly involved

23 denials of specific rights to present evidence or of the general right to present relevant and

24 material evidence. See Chambers v. Mississippi, 410 U.S. 284, 294 (1973) (defendant denied

25 right to confront and cross-examine); Franklin v. Henry, 122 F.3d 1270, 1273 (9th Cir. 1997)

26 (petitioner's rights violated when trial court excluded evidence relevant to victim's credibility and

1   material to petitioner's defense), overruled on other grounds by Payton v. Woodford, 299 F.3d

2   815 (9th Cir. 2002), vacated, Woodford v. Payton, 538 U.S. 975 (2003); Hart v. Gomez, 174 F.3d

3   1067, 1069 (9th Cir. 1999) (ineffective assistance of counsel for not investigating and presenting

4   material evidence to corroborate key defense witness); Eslaminia, 136 F.3d at 1237-39 (jury

5   exposed to facts not in evidence which were material to credibility of defendant).  Petitioner cites

6   no cases requiring a court to admit evidence it deems irrelevant to the defense case or creating

7   some different standard for relevance than that used by the state courts here.

8         The California Supreme Court made the factual determination that Dr. Yarvis's

9   testimony did not establish an intergenerational basis for incest.  This determination was not

10   unreasonable under 28 U.S.C. § 2254(d)(2) in light of the facts presented to the trial court.

11   Further, petitioner makes no showing that the California Supreme Court unreasonably applied

12   federal authority.

13       Claim I.  Evidentiary Rulings

14         Petitioner argues that evidentiary rulings by the trial judge violated his rights under

15   the Fifth, Sixth, Eighth, and Fourteenth Amendments.  For the reasons set out below, none of

16   petitioner's arguments satisfy 28 U.S.C. § 2254(d).  Accordingly, this court recommends denial of

17   Claim I.

18         1.  Impeachment with Miranda Hearing Testimony

19         Petitioner argues the trial court erred when it permitted the prosecutor to impeach

20   petitioner's trial testimony with testimony he gave at the suppression hearing.

21         a.  Background

22         As discussed above in the section on petitioner's Miranda claims, the second

23   suppression hearing, held on March 3, 1989, involved the admissibility of petitioner's statements

24   to Dr. Lyons.  (RT 3497.)  After Dr. Lyon testified, petitioner's counsel asked the judge to re-open

25   the issue of the voluntariness of petitioner's other confessions based on petitioner's statement to

26   Dr. Lyon that he had not been allowed to see a public defender.  (RT 3540:3-20.)  The judge

1 agreed to hear additional testimony and argument about why he should reconsider his prior rulings

2 on petitioner's motion to suppress.  (RT 3540:25 - 3541:5.)

3             The defense announced that it would call petitioner to testify.  (RT 3541:6-9.)  The

4 judge warned counsel and petitioner that statements petitioner made at the suppression hearing

5 could be "admissible for potential impeachment should he take the stand" at trial.  (RT 3541:10-

6 22.)  Defense counsel stated that they intended to bring out only the "circumstances surrounding"

7 petitioner's statements and not testimony regarding the statements themselves.  (RT 3541:27 -

8 3542:5.)

9             Petitioner then testified.  (RT 3542.)  At one point, defense counsel objected that

10 one of petitioner's answers was nonresponsive:

11           Q.    Did you talk to them that day at the Carson City Jail
                   and give them a full statement about the Caroline
12                 Garcia killing . . .?

13           A.    It wasn't a – yes.  It wasn't a full statement.  I just
                   drew a map and –.
14
                   MR. SMITH: Well, excuse me.  I move to strike that
15                 as nonresponsive, and to the extent that the question
                   calls for anything substantive, it is beyond the scope
16                 of the limited waiver of self-incrimination.

17                 THE COURT: I don't believe it was intended that
                   way.  I think the witness may have taken it that way.
18                 I will sustain the objection. It will be stricken from
                   the record, not to be taken as a response in that regard.
19

20 (RT 3562:12-25.)  The judge then turned to petitioner to make sure he understood.  He told

21 petitioner to simply respond "yes or no," rather than providing any information "about the actual

22 things that you said." (RT 3563:2-9.)   Shortly thereafter, the prosecutor asked,

23           Q     Did you decide to talk with them yourself?  Did you
                   make that decision that "I'll talk with them because I
24                 am going to tell the truth?"

25           A     Well, they come and asked me.  They said they had
                   all the evidence, so I – yes, I guess so.
26

1      Q    Okay.  You decided on your own to talk to them, is
              that right?

2

3      A    After they told me they had all the evidence, yes.

Q    Okay.  And did you want to tell the truth at that
4              interview at the jail yourself?

5      A    I did.

6      MR. SMITH: Well, the same objection.  That's a
           substantive question.

7

8      THE COURT: Well, it's mixed.  I think the question
           will be admitted not for the substantive notion of
9           wanting to tell the truth –

10      MR. BEDORE: It is for his state of mind, your Honor.

11      THE COURT: Yes.  Accepted solely for that
           purpose, limited to it.

12      MR. BEDORE:  Okay.  Let me make sure so we
           understand.
13

14      Q    Did you, yourself, on your own want to tell the deputies the
              truth in your statement at the jail?

15      A    I didn't walk in voluntarily.  I figured that that's what
              you do when you are caught by the law.  Tell them
16              what you know.

17 (RT 3564:17 - 3565:15.)

18      During cross-examination of petitioner at trial, the prosecutor asked whether, after

19 his arrest, petitioner told sheriff's deputies what he knew about the Garcia killing.  (RT 7621:9-

20 12.)  Petitioner answered, "Not accurately."  (RT 7621:13.)  The prosecutor then attempted to

21 impeach petitioner with his suppression hearing statements that he wanted to tell deputies the

22 truth.  (RT 7621:16 - 7622:1.)  Defense counsel objected that this line of impeachment was

23 "misleading" because "the purpose of any of those questions and answers didn't have to do with

24 the substantive truth of the statements."  (RT 7622:6-11.)  The prosecutor responded that there

25 were "lots of things in there about substance."  (RT 7622:12-20.)  The court's ruling was

26 ambiguous.  The judge stated: "Well, certainly the context in which those questions were asked

1   was to establish the voluntariness. [¶]Some of the substance, at least the jury could find – some of

2   the questions, at least, the jury could find went to substance, and I think those are arguably

3   sufficient within the substance to be permissible."  Thereafter the court and defense counsel went

4   back and forth about how to inform the jury that the context of petitioner's statements involved

5   their voluntariness, not their substance.  (RT 7622-24.)  Defense counsel appeared primarily to be

6   concerned that the jury not know that petitioner had sought to exclude those statements.  (RT

7   7624:1-4.)  At one point, the court asked, "What you are telling me is notwithstanding the prior

8   admissibility of these statements, they should be excluded under section 352?"  (RT 7624:5-7.)

9   Defense counsel responded, "Precisely."  (RT 7624:8.)  The court went on to state: "I believe the

10  probative value of those prior statements are of consequence.  They were under oath.  They were

11  in great measure directed towards the nature, content of them."  (RT 7624:9-12.)

12                              b. <u>State Court Decision</u>

13          The California Supreme Court found petitioner's claim to be "without merit:"

14           At the suppression hearing, defendant testified he wanted to tell the
         authorities the truth, which in the context of the motion to suppress
15       was relevant evidence on the issue whether his confessions were
         voluntary and his <u>Miranda</u> waivers were valid. (Evid.Code, § 210
16       [relevant evidence is that "having any tendency in reason to prove
         or disprove any disputed fact that is of consequence to the
17       determination of the action"].) At trial, defendant testified he did
         not want to tell the truth to the officers, and he was impeached with
18       his hearing testimony on that issue. In addition, defendant's own
         trial testimony put in issue not only whether he wanted to tell the
19       truth to the officers, but also the very truthfulness of his
         confessions.

20
             Defendant, however, never testified at the suppression
21       hearing that he actually told the truth to the officers, and therefore
         no such statement was admitted as evidence at trial. Indeed, whether
22       or not he actually told the truth to the officers was not germane at
         the suppression hearing, where the only issues were whether his
23       statements were voluntary and his <u>Miranda</u> waivers were valid.
         Nevertheless, once defendant at trial also put at issue the veracity of
24       his confessions, the same testimony regarding his state of mind
         admitted at the suppression hearing took on threefold significance:
25       it tended generally to impeach his credibility as a witness; it tended
         directly to prove he did want to tell the truth to the officers (see
26       <u>People v. Crew</u> (2003) 31 Cal.4th 822, 849, 3 Cal.Rptr.3d 733, 74

                                        192

P.3d 820); and it tended circumstantially to prove he did, in fact, tell the truth to the officers.

On appeal defendant takes issue with this third use, but, notably, this was not the concern he raised at trial. There he argued, in essence, that the jury would not recognize the thin line between his stating he wanted to tell the truth and his not saying he told the truth, without some explanation of the context in which his suppression-hearing statements were made. In other words, at trial defendant contended the jury improperly might view his hearing testimony as an admission that he told the truth to the officers when, in fact, the truthfulness of the confessions was not in issue at that time. Defendant did not argue at trial, however, that it would be improper to view his wishing to tell the truth as circumstantial evidence he told the truth, perhaps because, as we shall explain, this inference was proper.

In using the prior testimony in cross-examination at trial, the prosecution adduced the same evidence admitted at the suppression hearing—that defendant wanted to tell the truth to the officers. No "substantive" evidence of the confessions beyond what defendant previously gave pursuant to his "limited waiver of the right to self-incrimination" was admitted at trial. In fact, no such "substantive" evidence existed, because of the properly circumscribed nature of the suppression hearing testimony.FN20 Instead, at trial a new inference could be drawn from that same evidence: because defendant wished to tell the truth, he probably did tell the truth. FN21 (Cf. People v. Griffin (2004) 33 Cal.4th 536, 578, 15 Cal.Rptr.3d 743, 93 P.3d 344 [state-of-mind exception to the hearsay rule under Evid. Code, § 1250 permits admission of a hearsay statement as proof of "the declarant's future conduct in accordance with his or her expressed intent"].) Defendant's own trial testimony put the truthfulness of his testimony and his earlier confessions at issue. There was nothing improper, therefore, in admitting the suppression-hearing testimony to rebut his trial testimony or in allowing the jury to infer from this evidence that defendant acted in accordance with his state of mind, and that his confessions to the officers were truthful. Because there was no error in admitting the testimony given at the suppression hearing, no violation of defendant's constitutional rights occurred. (See Partida, supra, 37 Cal.4th at pp. 434–435, 35 Cal.Rptr.3d 644, 122 P.3d 765.)

FN20. Indeed, it was somewhat of a truism for the trial court to state at the suppression hearing that defendant's statement that he wished to tell the truth was admitted solely for the purpose of showing his state of mind. Defendant was questioned and gave answers about only his state of mind. This was unlike the situation in which, for instance, a hearsay statement about a fact is admitted for the limited purpose of showing the declarant's state of mind. There,

1
2
3
4
5
6

without such limitation, the hearsay statement would be evidence of two matters: the state of mind of the declarant and the truth of the underlying matter asserted in the hearsay statement. (Compare Evid.Code, § 1250, subd. (a) and People v. Noguera (1992) 4 Cal.4th 599, 620–621, 15 Cal.Rptr.2d 400, 842 P.2d 1160.) Here, defendant's state of mind—his desire to tell the truth—simply was the only matter at issue. That the jury could infer from defendant's statement of his state of mind that he acted in accordance with that mental state does not change the "limited" nature of the admitted evidence itself.

7
8
9

FN21. Although the trial court's brief statement of its reasons for allowing the use of the prior testimony is cryptic, this may be exactly what the court meant when it stated that "some of the questions, at least, the jury could find . . . went to substance. . .."

10    43 Cal. 4th at 126-27.

11                              c. Discussion

12          Petitioner contends the use of his prior testimony was improper because it was

13    limited specifically to his state of mind and should not have been used to impeach his testimony

14    about the truthfulness of his confessions.  Petitioner mischaracterizes the trial court's ruling as

15    flying in the face of its exclusion of evidence at the suppression hearing.  As described by the

16    California Supreme Court, that was not the case.  First, the only one of petitioner's statements that

17    was stricken from the record was his first one – that his statement regarding the Garcia crimes

18    "wasn't a full statement."  At the suppression hearing, the trial judge did not strike any other

19    responses.  The trial judge instead agreed to limit his consideration of the statements to

20    petitioner's state of mind.  Moreover, jurors did not, as petitioner argues, hear testimony that

21    petitioner told deputies the truth.  Rather, they heard him say he wanted to tell the truth.  Just

22    because the suppression hearing determination did not involve drawing an inference from that

23    statement that petitioner did in fact tell deputies the truth does not mean jurors at trial were not

24    permitted to draw that inference.  Accordingly, the trial court did not err in permitting petitioner to

25    be impeached with his suppression hearing testimony, and the California Supreme Court's

26    rejection of this claim was not unreasonable under section 2254(d).

2.  Exclusion of Names in Ms. Sorensen's Address Book

Ms. Sorensen's mother told officers that her daughter kept a list of boyfriends, including those with whom she had sexual intercourse.  (RT 6554:9-26.)  A copy of Ms. Sorensen's address book included a page with a list of sixteen boys.  (RT 6463:5-8.)  The defense sought to question Ms. Sorensen's mother about her daughter's sexual experience and the list. (RT 6412:26 - 6413:2.)  The prosecutor objected.  The court conducted a hearing on the issue. Defense counsel argued that evidence of Ms. Sorensen's sexual experience would have corroborated petitioner's testimony that Ms. Sorensen engaged in "spontaneous and consental [sic] sexual activity" with petitioner.  (RT 6456:17-26.)  The officer testified that she did not know where the list Ms. Sorensen's mother had referred to came from or whether it was part of Ms. Sorensen's address book.  (RT 6564:27 - 6565:3.)  Ms. Sorensen's mother testified that she did not recall telling the officer such a list existed and did not know whether or not the sixteen boys listed on one page of her daughter's address book were sexual partners.  (RT 6460:25 - 6462:8.)  The court sustained the prosecutor's objection to that line of questioning.  (RT 6414:28.)

The California Supreme Court denied the claim as follows:

> The trial court found that, even assuming the list was admissible under a hearsay exception and did not constitute prohibited character evidence, defendant had not established a sufficient foundation for its admission. The trial court therefore sustained the prosecutor's objection and excluded the proffered evidence of Sorensen's sexual activity. On appeal, defendant challenges the trial court's decision. We conclude the trial court did not err.FN22
>
> FN22. In his closing argument, the prosecutor asserted that defendant's testimony that Sorensen made an unannounced, unwelcome sexual advance was unbelievable, and the evidence of Sorensen's sexual activities with her boyfriend Matthew Sklansky did not support any inference that she would attempt to have oral sex with a stranger she had just met while hitchhiking. After the prosecutor completed his summation, defendant asked the court to reopen the defense case to present the previously excluded evidence of Sorensen's other sexual activities, that is, the list of 16 names. Defendant asserted the prosecutor exploited the exclusion of the list when arguing that Sorensen would not have sex with a stranger. The trial court denied the motion to

reopen, because the prosecutor's argument did not change the circumstance that defendant had failed to establish the foundation for admission of the list. For the same reasons, as we shall discuss, we conclude the trial court also did not err in this regard.

"Of course, only relevant evidence is admissible. (Evid.Code, § 350.) Sometimes the relevance of evidence depends on the existence of a preliminary fact. [Citations.] The court should exclude the proffered evidence only if the 'showing of preliminary facts is too weak to support a favorable determination by the jury.' [Citations.] The decision whether the foundational evidence is sufficiently substantial is a matter within the court's discretion." (People v. Lucas (1995) 12 Cal.4th 415, 466, 48 Cal.Rptr.2d 525, 907 P.2d 373 (Lucas); see also Evid.Code, § 403, subd. (a)(1) [when the relevance of proffered evidence depends upon the existence of a preliminary fact, the proponent of the evidence has the burden of producing sufficient evidence of that fact].)

Here, defendant failed to establish as preliminary facts that Bradish and Officer Miller were competent to testify concerning Sorensen's sexual history in general or, specifically, concerning the meaning of the list of names. At most, if one accepts Miller's testimony to the extent it conflicts with that of Bradish, Miller testified only that she believed Bradish had a list of Sorensen's boyfriends, some of whom had had sexual relations with Sorensen. There was no testimony from Miller that the list in Sorensen's address book was the presumed list of sexual partners, and Bradish likewise testified she did not know the significance of the list, having discovered it only after Sorensen was missing. In short, defendant failed to establish as a preliminary fact that the list was what he claimed it to be. Rather, defendant's belief that the list of names chronicled Sorensen's sexual partners was only speculation. The list therefore was irrelevant, and the trial court properly excluded it. (People v. Scheid (1997) 16 Cal.4th 1, 14, 65 Cal.Rptr.2d 348, 939 P.2d 748 [trial court lacks discretion to admit irrelevant evidence].) In addition, because Bradish testified she could only guess with whom Sorensen may have been sexually involved and Officer Miller also knew of no specifics, the two witnesses had no other relevant evidence to present in that regard. Accordingly, the trial court did not err in excluding the proffered evidence of Sorensen's sexual activities. FN23

FN23. We note this evidence was not only irrelevant for lack of foundation, it also properly was excluded because the inferences defendant wished to draw from the list were entirely speculative. (People v. Babbitt (1988) 45 Cal.3d 660, 684, 248 Cal.Rptr. 69, 755 P.2d 253 ["exclusion of evidence that produces only speculative inferences is not an abuse of discretion"].) First, even if the list of 16 names in the address book was the list Officer Miller had in mind, she

testified that only "some" of the names were of Sorensen's sexual partners. This indefinite quantification provided no support for the inference that Sorensen's sexual history was "extensive," which was the primary basis for defendant's claim that the list would corroborate his testimony about her actions. Second, because the list provides no details of the relationships Sorensen had with these individuals, it again would be speculation to infer from the fact Sorensen had some unspecified sexual experiences (with some unknown number of persons) that she would have behaved in the manner to which defendant testified at trial. We also observe that the jury was made aware of the circumstance that Sorensen was sexually active through Sklansky's testimony, the significance of which was discussed by counsel in the final arguments to the jury.

43 Cal. 4th at 128-30.

Petitioner spends a good deal of time arguing that relevant evidence must be admitted, but little time demonstrating that Ms. Sorensen's address book was relevant evidence. First, there was no evidence establishing that the list of boys in the address book was a list of sexual partners. Further, even if petitioner could have proved it was the list which Ms. Sorensen's mother had referenced, the officer testified that only some of the boys on the list were sexual partners. Second, petitioner has not shown Ms. Sorensen's sexual history would have corroborated his testimony. Petitioner has made no showing that the diary would show Ms. Sorensen had had a sexual relationship with anyone, like petitioner, whom she had just met. Therefore, the California Supreme Court's rejection of this claim was not unreasonable.

Claim J.   Insufficient Evidence of Attempted Rape of Ms. Sorensen

Petitioner argues the evidence at trial was insufficient to establish each of the elements of the crime of attempted rape of Ms. Sorensen. Because the California Supreme Court reasonably determined the evidence was sufficient, Claim J should be denied.

1. Background

Ms. Sorensen's body was found in a culvert area east of the shoulder of Interstate 80. (RT 6477:25-28; 6502:26 - 6503:3.) Her body was covered with clumps of grass. (RT 6485:2-5; 6503:4 - 6504:15.) She was completely nude, with her hands tied very tightly behind

197

1   her back with a pair of corduroy pants.  (RT 6509:16-18; 6595:15-19.)  The coroner who

2   performed the autopsy on Ms. Sorensen's body described it as markedly decomposed and partially

3   skeletonized.  (RT 6588:28 - 6589:5.)  The cause of death was classified as undetermined due to

4   decomposition changes.  (RT 6620:1-2.)  The coroner testified that he felt that Ms. Sorensen

5   probably died a violent death and that the cause of death was probably asphyxia secondary to

6   strangulation.  (RT 6608:27 - 6609:7; 6620:3-14.)

7          Petitioner points out that testimony showed that Ms. Sorensen's body had no signs

8   of fractures, defensive wounds, or trauma to her sexual organs.  However, the coroner testified

9   that the decomposition of the body made findings of any trauma unlikely.  (RT 6605:28 - 6606:3.)

10  The coroner could not determine whether any act of sexual intercourse had taken place before or

11  after her death.  (RT 6615:2-10; 6647:6-9.).  According to petitioner, the only evidence presented

12  by the prosecution of any sort of sexual contact was contained in petitioner's post-arrest

13  statements.  Detective Jensen testified that on November 21, 1986, shortly after his arrest,

14  petitioner admitted that he had killed Ms. Sorensen.  (RT 6835:25-27.)  Detective Jensen asked if

15  petitioner had sex with her, and he replied, "I think so."  (Id.)  When the officers questioned him

16  further, petitioner said he did not remember a lot of things, he just knew that it happened.  (RT

17  6837:7-8.)  Later that evening, Detective Jensen again asked petitioner whether he had sex with

18  Ms. Sorensen and petitioner replied, "'I know I did that.'"  (RT 6846:22.)  Detective Jensen asked

19  where, and petitioner answered, "'It had to be there.  I remember it happening.'"  (RT 6846:26-

20  27.)  Petitioner also told officers he was "terrified" after he had sex with Ms. Sorensen.  (RT

21  6847:22-24.)  Petitioner confessed that he "strangled her because I was scared."  (RT 6849:4-5.)

22          At trial, petitioner testified that he had had sex with prostitutes before he met up

23  with Ms. Sorensen and had no interest in having sex with her.  (RT 7524:9, 19-20; 7796:10 -

24  7810:3; 7535:16-27.)  Petitioner explained that he became enraged when Ms. Sorensen made a

25  sexual advance towards him and he strangled her.  (RT 7537:1-19; 7539:10-25; 7540:1-17.)

26  Petitioner further testified that after Ms. Sorensen was dead, he undressed the body and engaged

1  in sexual acts with it.  (RT 7545:10-20.)  While petitioner admits that his trial testimony

2  contradicted his earlier statements on several key points, petitioner argues here that his testimony

3  amounted to "an unequivocal denial of rape or attempted rape."

4           2.  <u>Legal Standards</u>

5          The Due Process Clause "protects the accused against conviction except upon

6  proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

7  charged."  <u>In re Winship</u>, 397 U.S. 358, 364 (1970).  There is sufficient evidence to support a

8  conviction if, "after viewing the evidence in the light most favorable to the prosecution, any

9  rational trier of fact could have found the essential elements of the crime beyond a reasonable

10  doubt."  <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979).  "[T]he dispositive question under

11  <u>Jackson</u> is 'whether the record evidence could reasonably support a finding of guilt beyond a

12  reasonable doubt.'"  <u>Chein v. Shumsky</u>, 373 F.3d 978, 982 (9th Cir. 2004) (quoting <u>Jackson</u>, 443

13  U.S. at 318).

14          In conducting federal habeas review of a claim of insufficient evidence, "all

15  evidence must be considered in the light most favorable to the prosecution."  <u>Ngo v. Giurbino</u>,

16  651 F.3d 1112, 1115 (9th Cir. 2011).  "A petitioner for a federal writ of habeas corpus faces a

17  heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction

18  on federal due process grounds."  <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274 (9th Cir. 2005).  In order

19  to grant relief, the federal habeas court must find that the decision of the state court rejecting an

20  insufficiency of the evidence claim reflected an objectively unreasonable application of <u>Jackson</u>

21  and <u>Winship</u> to the facts of the case.  <u>Coleman v. Johnson</u>, 132 S. Ct. 2060, 2062 (2012) (per

22  curiam); <u>Ngo</u>, 651 F.3d at 1115; <u>Juan H.</u>, 408 F.3d at 1275 & n.13.  Thus, when a federal habeas

23  court assesses a sufficiency of the evidence challenge to a state court conviction under AEDPA,

24  "there is a double dose of deference that can rarely be surmounted."  <u>Boyer v. Belleque</u>, 659 F.3d

25  957, 964 (9th Cir. 2011); <u>Coleman v. Johnson</u>, 132 S. Ct. at 2062 ("<u>Jackson</u> claims face a high bar

26  in federal habeas proceedings because they are subject to two layers of judicial deference.").  The

1   federal habeas court determines sufficiency of the evidence in reference to the substantive

2   elements of the criminal offense as defined by state law.  Jackson, 443 U.S. at 324 n.16; Chein,

3   373 F.3d at 983.  However, the court looks to federal law to determine "the minimum amount of

4   evidence that the Due Process Clause requires."  Coleman v. Johnson, 132 S. Ct. at 2064.

5                    3.  State Court Decision

6              The California Supreme Court considered this claim on appeal and denied it on the

7   merits:

8              Our role in reviewing such a challenge is limited. "In
               reviewing a challenge to the sufficiency of the evidence under the
9              due process clause of the Fourteenth Amendment to the United
               States Constitution and/or the due process clause of article I, section
10             15 of the California Constitution, we review the entire record in the
               light most favorable to the judgment to determine whether it
11             discloses substantial evidence—that is, evidence that is reasonable,
               credible, and of solid value—from which a reasonable trier of fact
12             could have found the defendant guilty beyond a reasonable doubt."
               (People v. Cole (2004) 33 Cal.4th 1158, 1212, 17 Cal.Rptr.3d 532,
13             95 P.3d 811.) "The appellate court presumes in support of the
               judgment the existence of every fact the trier could reasonably
14             deduce from the evidence." (People v. Kraft (2000) 23 Cal.4th 978,
               1053, 99 Cal.Rptr.2d 1, 5 P.3d 68 (Kraft).)

15
               Defendant's challenge to the sufficiency of the evidence of
16             the attempted rape of Sorensen consists primarily of viewing
               various items of evidence in isolation and arguing each could be
17             viewed as pointing to his innocence of the charge rather than his
               guilt. Even if defendant's premise is correct, this is not persuasive
18             on the issue we must address: whether no rational juror could have
               drawn the opposite inference from the evidence as a whole.
19             Defendant also cites several past opinions in which we and the
               Courts of Appeal have found evidence insufficient to support a
20             conviction for a crime involving sexual assault. Reviewing the
               sufficiency of evidence, however, necessarily calls for analysis of
21             the unique facts and inferences present in each case, and therefore
               comparisons between cases are of little value. (People v. Thomas
22             (1992) 2 Cal.4th 489, 516, 7 Cal.Rptr.2d 199, 828 P.2d 101.)
               Except as specifically mentioned below, the cases cited by
23             defendant are not particularly helpful in reviewing the facts of the
               present case.
24
               Conviction of the crime of attempted forcible rape requires
25             proof the defendant formed the specific intent to commit the crime
               of rape and performed a direct but ineffectual act, beyond mere
26             preparation, leading toward the commission of a rape. (§ 21a;

People v. Carpenter (1997) 15 Cal.4th 312, 387, 63 Cal.Rptr.2d 1, 935 P.2d 708 (Carpenter).) The elements of the crime of forcible rape FN27 are "an act of sexual intercourse accomplished with a person not the spouse of the perpetrator . . . [¶] . . . [¶] [w]here it is accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another." (§ 261, subd. (a)(2).) FN28 There is no dispute defendant and Sorensen were not spouses. The following evidence and the reasonable inferences that could be drawn from it are sufficient to prove the remaining elements of the crime and the special circumstance in question.FN29

> FN27. Rape of a spouse is separately punishable under section 262.

> FN28. Under section 663, a defendant can be convicted of an attempt to commit a crime even though the crime, in fact, was completed. Further, evidence tending to prove that the crime was completed, even though not absolute proof of the crime of attempt, gives rise to a reasonable inference that the perpetrator intended to commit that crime. (Cf. People v. Colantuono (1994) 7 Cal.4th 206, 218, fn. 9, 26 Cal.Rptr.2d 908, 865 P.2d 704 [evidence of a completed battery is relevant in determining whether the defendant committed an assault].)

> FN29. To avoid the possibility of confusion, we emphasize that defendant was charged with attempted forcible rape, which, unlike the crime of forcible rape, is a specific intent crime. (See People v. DePriest (2007) 42 Cal.4th 1, 48, 63 Cal.Rptr.3d 896, 163 P.3d 896.) Accordingly, in the following discussion, our references to the specific intent to commit rape are made in the context of discussing the sufficiency of the evidence of the charges in the present case, and do not implicate the basic distinction between the intent elements of attempted rape (specific intent) and rape (general intent).

The incident occurred at night near a secluded highway exit in a rural area, beyond sight of passing motorists, a place and time defendant might attempt a rape more readily than in a place where discovery or intervention was a stronger possibility. The victim was a small 15–year–old girl, whereas defendant was a 21–year–old man who described himself as quite strong for his size, giving rise to a reasonable inference he knew that by physical force or threats of harm he could compel Sorensen to acquiesce in any demand he might make. In addition to the circumstances that defendant and Sorensen had first met that day and that Sorensen had a boyfriend, earlier that very evening in her telephone call to her boyfriend, Sorensen said she would not have sexual intercourse with him because she was menstruating. These facts lead to a reasonable

inference that Sorensen would not have willingly agreed to have sexual relations with a relative stranger on a cold night, on the ground, near a highway exit.

The victim was found nude and with her arms bound very tightly behind her back. Although, as we have stated in cases such as those cited by defendant, the circumstance of the victim's being found partially or wholly unclothed is not by itself sufficient to prove a rape or an attempted rape has occurred, such a fact is not irrelevant and is one of the relevant circumstances. Moreover, the combination of the nude state of Sorensen's body and the presence of physical restraint in this case provides stronger evidence that a forcible rape or attempted rape occurred than where the body simply is unclothed. Additionally, the jury reasonably could infer that the absence of signs of a struggle—such as trauma to Sorensen's body or damage to her clothing—was the result of her surrender to defendant's demands in the hopes of surviving her ordeal, rather than proof she was a willing participant or was dead when she was undressed.

Also, unlike several of the cases cited by defendant, here there was no evidence tending to show a sexual assault did not occur. When a victim is discovered a relatively short time after the crime, it is more likely the crime scene and the victim's body will show evidence of sexual assault—such as trauma to the body or sexual organs, or the presence of the perpetrator's bodily fluids—if such an assault occurred. An absence of such evidence in that type of case may be strong evidence the perpetrator did not have or intend to have sexual contact with the victim, which may tend to outweigh other facts and inferences, rendering the evidence of sexual assault legally insufficient. (See, e.g., People v. Johnson (1993) 6 Cal.4th 1, 39, 23 Cal.Rptr.2d 593, 859 P.2d 673, overruled on another ground in Rogers, supra, 39 Cal.4th at p. 879, 48 Cal.Rptr.3d 1, 141 P.3d 135; People v. Anderson (1968) 70 Cal.2d 15, 22, 73 Cal.Rptr. 550, 447 P.2d 942; People v. Craig (1957) 49 Cal.2d 313, 317, 316 P.2d 947.) Here, by contrast, the evidence did not tend to eliminate a sexual assault; it simply was inconclusive due to the nature of the crime scene and the advanced state of decomposition of Sorensen's body.

Finally, and perhaps most importantly, defendant's own admissions support the conclusion there was sufficient evidence for a rational trier of fact to find he attempted to rape Sorensen.FN30 Defendant told the officers he "had sex" with Sorensen and he ultimately strangled her because he "was scared." The jury reasonably could infer defendant was frightened because he just had forcibly raped Sorensen and feared being reported to the authorities. In addition, defendant told the officers that, while in a remote location at night, he had forced Garcia to have sex with him despite her resistance, and Garcia similarly later was found dead, nude, and with her hands tied behind her back. This was a significant prior act

the jury could consider highly relevant in determining defendant also had the intent to rape Sorensen. (See Evid. Code, § 1101, subd. (b).)

> FN30. Of course, the jury is charged with evaluating the credibility of witness testimony and out-of-court statements such as party admissions, and on appeal we may not substitute our determination as to credibility. Indeed, we must view the evidence in the light most favorable to the verdict and presume the existence of each fact that a rational juror could have found proved by the evidence. (People v. Smith (2005) 37 Cal.4th 733, 739, 37 Cal.Rptr.3d 163, 124 P.3d 730.) We therefore need not reweigh the credibility of defendant's various versions of the Sorensen murder, and shall address only those statements that the jury could have found credible and reasonably indicative of defendant's guilt.

Defendant argues that even if the evidence adequately supports a finding he attempted to commit some sexual assault upon Sorensen, insufficient evidence existed for the jury to determine he specifically intended to have vaginal intercourse, which, as we stated in People v. Holt (1997) 15 Cal.4th 619, 676, 63 Cal.Rptr.2d 782, 937 P.2d 213 (Holt), is required for the commission of a rape. He relies upon our decision in People v. Raley (1992) 2 Cal.4th 870, 889–891, 8 Cal.Rptr.2d 678, 830 P.2d 712 (Raley), in which we concluded the evidence was insufficient to sustain a guilty verdict on a charge of attempted forcible oral copulation. As mentioned above, however, the facts of other cases, such as Raley, are not particularly helpful in evaluating the sufficiency of the evidence in this case. Here, the victim was found in a remote area, dead, nude, and bound; defendant admitted having had sex with her; evidence of the nature of the sexual assault was inconclusive due to the passage of time before her body was discovered; and defendant confessed to raping and killing another young woman in similar circumstances not long before this incident. (See, e.g., People v. Holloway (2004) 33 Cal.4th 96, 138–139, 14 Cal.Rptr.3d 212, 91 P.3d 164.) That defendant also may have had the intent to sodomize the victim, as one might surmise from his trial testimony, does not mean the jury rationally could not have inferred from the evidence as a whole that he had the specific intent to rape Sorensen and took a direct step beyond mere preparation toward effectuating his intent. Such a finding was not based upon suspicion and speculation, as defendant argues, but upon reasonable inferences from the evidence and, as such, was supported by legally sufficient evidence. Because sufficient evidence supported the jury's verdict of guilt of the attempted rape of Sorensen, we reject defendant's claim that the associated first degree murder conviction must be reversed and the attempted-rape special circumstance finding set aside.

1  43 Cal. 4th at 137-40.

2          4.  Discussion

3          The California Supreme Court sets out above the substantive legal standards for

4  proving attempted rape: (a) the defendant formed the specific intent to commit the crime of rape,

5  and (b) he performed a direct but ineffectual act, beyond mere preparation, leading toward the

6  commission of a rape.  A rape is defined as sexual intercourse accomplished "by means of force,

7  violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or

8  another."  As discussed above, this court must doubly defer to the California Supreme Court's

9  rejection of this claim.  First, all reasonable inferences from the evidence must be made in favor

10  of the prosecution.  Second, this court may only find the California Supreme Court's rejection of

11  the claim was a decision no reasonable jurist could make.

12          Petitioner attempts to pick away at various aspects of the California Supreme

13  Court's opinion.  However, the jury could reasonably have rejected petitioner's trial testimony and

14  inferred from his confession, the nude and bound state of the body, and his confession to a prior

15  rape and murder, that he intended to rape Ms. Sorensen.  Further, binding her hands could

16  reasonably be considered an act "leading toward the commission of a rape."  The jury's

17  conclusion that petitioner attempted to rape Ms. Sorensen is not "so insupportable as to fall below

18  the threshold of bare rationality."  Coleman v. Johnson, 132 S. Ct. at 2065.  Because the

19  California Supreme Court so held, its determination is entitled to deference under 28 U.S.C. §

20  2254(d).

21      Claim K.  Inappropriate Special Circumstance

22          Petitioner withdrew this claim.  (Dkt. No. 92 at 317.)

23      Claim L.  Effect of Guilt Phase Relief on Penalty

24          Petitioner argues that if this court determines that any of petitioner's convictions or

25  special circumstance findings were unconstitutional, it must consider the effect on the penalty

26  phase.  Because this court does not so find, it need not reach the issues raised by Claim L.

1   Claim M.  <u>Trial Court Failure to Hold Competency Hearing</u>

2          Petitioner argues that the trial court should have had a bona fide doubt about his

3   competence at the beginning of the penalty phase.  The California Supreme Court held that the

4   facts before the trial court were not sufficient to create such a doubt.  For the reasons set forth

5   below, petitioner has not shown the California Supreme Court's decision was unreasonable under

6   section 2254(d).  Therefore, Claim M should be denied.

7          1.  <u>Background</u>

8          On May 24, 1989, during the prosecutor's opening statement at the penalty phase,

9   petitioner informed court staff and his attorneys that he did not want to be in court for the

10  remainder of the proceedings.  The judge initiated a meeting with counsel because petitioner had

11  "taken the extraordinary step of speaking to my staff."  (RT 8485:2-24.)  After petitioner was

12  given an opportunity to talk with his attorneys, the court conducted a closed hearing.  (RT 8488.[53]

13  Attorney Smith started by explaining counsel's concerns:

14              It's both of our view, which is a judgment I think we both
            arrived at simultaneously before we had a chance to consult with
15              each other, that Mr. Rundle at this moment is totally irrational and
            is not making a rational judgment as to whether or not he should
16              absent himself from these proceedings and does not in my opinion, I
            think, Mr. Humphreys' opinion, as well, have a reasoned
17              understanding of the effects that decision may have on him.

18              Notwithstanding that, I don't think he is comprehending the
            advice that we are attempting to give him and that result.
19

20  (RT 8489:10-20.)  Mr. Smith concluded by telling the court that he and Mr. Humphreys both felt

21  they had "better declare a doubt."  (RT 8489:21-24.)  Mr. Smith suggested that they be given

22  some time and that they might attempt to have petitioner seen by a professional because petitioner

23  "is having an extreme anxiety attack right now."  (RT 8489:26-28; 8490:27 - 8491:3.)  The court

24  _____

25  [53]  The transcript of the closed proceeding is RT 8488-94.  Those transcript pages were
    unsealed by order of the California Supreme Court.  (Nov. 19, 2003 Order in <u>People v. Rundle</u>,
    No. S012943, lodged herein as item 10.g. of the state court record.)  The transcript pages can be
26  found attached to that order.

1  agreed that, "I think a doctor is essential." (RT 8492:22.) The court also told counsel they should

2  do whatever was necessary to determine whether petitioner was "irrational to the point of being

3  unable to cooperate or being irrational on this point and could be talked into a rational decision."

4  (RT 8490:24-26.) The judge suggested that petitioner might "benefit from a mild sedative and

5  still continue." (RT 8493:3-4.) Before recessing the trial for the remainder of the day, the judge

6  advised petitioner, outside the jury's presence, that he appreciated "your willingness to speak with

7  counsel" but wanted to reinforce that the "final decision is yours and your final decision will be

8  honored so long as I'm convinced that you've arrived at it carefully and rationally." (RT 8495:19-

9  25.) The court also warned petitioner that "it is not likely to be to your advantage in terms of the

10 results to not be here. I can't tell you that your being here will make things better. [¶] The

11 likelihood is your not being here could only make it worse, if any impact at all." (RT 8496:6-10.)

12 The next day, counsel reported that petitioner was not making a request to be absent and the

13 proceedings continued. (RT 8499:6-13.)

14        Petitioner describes visits by counsel and a Dr. Roske on May 24. While that

15 extra-record evidence is relevant to petitioner's claim of ineffective assistance of counsel,

16 discussed above in Claim D.4.d., it is not relevant to his claim of trial court error. As the legal

17 standards below indicate, this court is limited to considering the record before the trial judge to

18 determine whether or not he was in error.

19        Petitioner also points out that the trial judge mentioned several times petitioner's

20 high level of stress and emotional reactions to some testimony. (Dkt. No. 92 at 320 n.88.)

21 However, petitioner takes many of these statements out of context. For example, in January 1989,

22 during a discussion of any restraints on petitioner during trial, the judge did not simply state that

23 petitioner was "under extreme pressure." (Id.) Rather, the judge stated he "recognize[d] that Mr.

24 Rundle, as anybody in his circumstance would be, is under an extreme amount of pressure with

25 respect to these proceedings, and it gets worse as we get closer to trial." (Dkt. No. 346:25-28.)

26 Similarly, when he mentioned that petitioner had been "emotional" during certain parts of the

1    proceedings, the judge prefaced that comment by describing petitioner's courtroom behavior as

2    "appropriate" and like a "gentleman" and the judge noted petitioner had "posed absolutely no

3    problems for the Court or staff or anyone else."  (RT 5803:11-27.)  Moreover, the judge did not

4    indicate petitioner's emotional reactions were in any way unreasonable or any sort of indication of

5    petitioner's incompetence.  Petitioner also points to evidence showing petitioner's "fragile mental

6    state."  (Dkt. No. 92 at 320 n. 88.)  However, the facts that petitioner may have expressed some

7    suicidal thoughts and been under extreme stress is not necessarily indicative of his incompetence.

8    Further, there is no indication the trial judge was made aware of those incidents.

9            2. <u>Legal Standards</u>

10           The conviction of a legally incompetent defendant violates the Due Process Clause

11   of the Fourteenth Amendment.  <u>Cooper v. Oklahoma</u>, 517 U.S. 348, 354 (1996); <u>Cacoperdo v.</u>

12   <u>Demosthenes</u>, 37 F.3d 504, 510 (9th Cir. 1994).  In federal court, a defendant is incompetent to

13   stand trial if he lacks "'sufficient present ability to consult with his lawyer with a reasonable

14   degree of rational understanding'" or "'lacks a rational as well as factual understanding of the

15   proceedings against him.'"  <u>Indiana v. Edwards</u>, 554 U.S. 164, 170 (2008) (quoting <u>Dusky v.</u>

16   <u>United States</u>, 362 U.S. 402 (1960)); <u>see also</u> <u>Godinez v. Moran</u>, 509 U.S. 389, 396 (1993);

17   <u>McMurtrey v. Ryan</u>, 539 F.3d 1112, 1118 (9th Cir. 2008); <u>Douglas v. Woodford</u>, 316 F.3d 1079,

18   1094 (9th Cir. 2003).  In California, "[a] defendant is mentally incompetent . . . [if] the defendant

19   is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct

20   of a defense in a rational manner."  California Penal Code § 1367.

21           A trial court judge must conduct a competency hearing on his own motion

22   "[w]here the evidence raises a 'bona fide doubt' as to a defendant's competence to stand trial."

23   <u>Pate v. Robinson</u>, 383 U.S. 375, 385 (1966); <u>Stanley v. Cullen</u>, 633 F.3d 852, 860 (9th Cir. 2011).

24   The question is whether a reasonable judge, "'situated as was the trial court judge'" should have

25   experienced a "'good faith'" or "'substantial doubt'" regarding the defendant's competence.

26   <u>Stanley</u>, 633 F.3d at 860 (quoting <u>deKaplany v. Enomoto</u>, 540 F.2d 975, 983 (9th Cir. 1976));

1  Deere v. Woodford, 339 F.3d 1084, 1086 (9th Cir. 2003) (quoting Cuffle v. Goldsmith, 906 F.2d

2  385, 392 (9th Cir. 1990)).

3          Whether a defendant is capable of understanding the proceedings and assisting

4  counsel depends on "evidence of the defendant's irrational behavior, his demeanor in court, and

5  any prior medical opinions on competence to stand trial." Drope v. Missouri, 420 U.S. 162, 180

6  (1975). None of these factors is determinative, but any one of them may be sufficient to raise a

7  reasonable doubt regarding competence. Id.

8          3. State Court Decision

9          The California Supreme Court rejected this claim on appeal:

10          Defendant now contends that the trial court should have
    conducted a competency hearing based upon counsel's
11     representation that defendant was "totally irrational" in his initial
    desire to absent himself from the penalty phase proceedings, and
12     that the court's failure to do so violated defendant's various
    constitutional and statutory rights. This claim is without merit.
13
          It is true that an incompetent defendant—one who, because
14     of a mental disorder or developmental disability, lacks an
    understanding of the nature of the proceedings and is unable to
15     assist his attorneys rationally in conducting the defense—may not
    be subjected to trial, and that a trial court faced at any point in a trial
16     with a "bona fide doubt" based upon substantial evidence whether a
    defendant is competent must conduct an adequate investigation into
17     the defendant's ability to proceed. (§§ 1367, subd. (a), 1368, subd.
    (a); Pate v. Robinson (1966) 383 U.S. 375, 385, 86 S.Ct. 836, 15
18     L.Ed.2d 815; People v. Welch (1999) 20 Cal.4th 701, 738, 85
    Cal.Rptr.2d 203, 976 P.2d 754.) It also is clear from the record that
19     defendant's "irrational" behavior was an emotional reaction to the
    stress of the penalty phase of the trial, reflecting a difference of
20     opinion between defendant and his attorneys concerning the
    strategic decision whether defendant should absent himself from
21     further proceedings. There was no evidence, let alone substantial
    evidence, that defendant's behavior was caused by a mental disorder
22     that prevented him from understanding the proceedings or assisting
    his attorneys in a rational manner. Defendant had behaved rationally
23     throughout the pretrial and guilt phases of the trial and had testified,
    in a completely rational manner, in his own defense. Despite his
24     attorneys' gratuitous remark to the trial court that they thought they
    "had better declare a doubt," counsel's description of defendant's
25     state of mind was not that he was mentally incompetent, but that he
    was very emotional and "adamant" in his decision not to be present
26     despite counsel's best arguments to the contrary. Indeed, counsel

stated defendant was "having an extreme anxiety attack right now," and might benefit from some tranquilizing medication. Defense counsel never stated they did not believe the trial could proceed, nor did they directly ask the trial court to explore the issue of defendant's mental competency. The court appropriately adjourned the proceedings for the day in an attempt to permit defendant's emotional stress to dissipate, which it apparently did, as there were no further difficulties the next morning and defendant's counsel thereafter expressed no "doubt" regarding defendant's behavior. Accordingly, there was no statutory or constitutional error in the decision not to conduct a more searching inquiry on this matter. (Cf. Frye, supra, 18 Cal.4th at p. 1005, 77 Cal.Rptr.2d 25, 959 P.2d 183 ["An angry and emotional reaction to a verdict of guilt does not indicate an inability to understand the nature of the criminal proceedings, or to rationally assist counsel"].)

43 Cal. 4th at 180.

4. Discussion

Petitioner's argument relies primarily on two statements by his attorneys: that they felt petitioner was "totally irrational" and that they needed to "declare a doubt" as to his competence. Petitioner ignores the facts that these statements were made during the course of a discussion about petitioner's desire to absent himself from the penalty phase proceedings. Counsel felt petitioner was acting irrationally about that decision and were concerned that he was not understanding their reasons for wanting him present. In fact, the "totally irrational" comment was temporally qualified. Counsel felt petitioner was "at this moment" "totally irrational." Further, the fact that petitioner was anxious or stressed during his trial seems perfectly normal. He was being confronted with horrible things he had done and was facing life without parole or the death penalty. Naturally, he was stressed. Finally, nothing about petitioner's anxiety indicates he did not understand the proceedings or was unable to consult with his attorneys. To the extent the stress of the penalty phase caused him to want to leave it, the trial judge handled the issue appropriately. He met with counsel after being informed petitioner wished to leave the courtroom; he gave counsel time to meet with petitioner; he encouraged counsel to have petitioner seen by a doctor; he advised petitioner that absenting himself could hurt him before the jury.

////

1   After counsel informed the court that petitioner was prepared to remain in court,

2   there were no other indicators that petitioner could not consult with counsel or understand what

3   was going on.  Accordingly, the California Supreme Court's decision was not unreasonable under

4   28 U.S.C. § 2254(d).

5       Claim N.  Prosecutorial Misconduct

6   Petitioner argues that numerous instances of prosecutorial misconduct at both

7   phases of trial violated his rights under the Due Process Clause and under the Eighth

8   Amendment's guarantee of a reliable penalty phase determination.  For the reasons set forth

9   below, this court does not agree.  Petitioner has failed to meet the section 2254(d) threshold.

10   Therefore, Claim N should be denied.

11       1.  Legal Standards

12   A defendant's due process rights are violated when a prosecutor's misconduct

13   renders a trial fundamentally unfair.  Darden v. Wainwright, 477 U.S. 168, 181 (1986).

14   However, such misconduct does not, per se, violate a petitioner's constitutional rights.  Jeffries v.

15   Blodgett, 5 F.3d 1180, 1191 (9th Cir. 1993) (citing Darden, 477 U.S. at 181, and Campbell v.

16   Kincheloe, 829 F.2d 1453, 1457 (9th Cir. 1987)).  Rather, claims of prosecutorial misconduct are

17   reviewed "'on the merits, examining the entire proceedings to determine whether the prosecutor's

18   [actions] so infected the trial with unfairness as to make the resulting conviction a denial of due

19   process.'"  Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995).  See also Greer v. Miller, 483

20   U.S. 756, 765 (1987); Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974); Turner v Calderon,

21   281 F.3d 851, 868 (9th Cir. 2002).  Relief is limited to cases in which the petitioner can establish

22   that prosecutorial misconduct resulted in actual prejudice.  Johnson, 63 F.3d at 930 (citing Brecht

23   v. Abrahamson, 507 U.S. 619, 637-38 (1993)); see also Darden, 477 U.S. at 181-83; Turner, 281

24   F.3d at 868.  Put another way, prosecutorial misconduct violates due process when it has a

25   substantial and injurious effect or influence in determining the jury's verdict.  See Ortiz-Sandoval

26   v. Gomez, 81 F.3d 891, 899 (9th Cir. 1996).

1        In considering claims of prosecutorial misconduct involving allegations of

2   improper argument, the court must examine the likely effect of the statements in the context in

3   which they were made and determine whether the comments so infected the trial with unfairness

4   as to make the resulting conviction a denial of due process.  Turner, 281 F.3d at 868; Sandoval v.

5   Calderon, 241 F.3d 765, 778 (9th Cir. 2000); see also Donnelly, 416 U.S. at 643; Darden, 477

6   U.S. at 181-83.  In fashioning closing arguments, prosecutors are allowed "reasonably wide

7   latitude," United States v. Birges, 723 F.2d 666, 671-72 (9th Cir. 1984), and are free to argue

8   "reasonable inferences from the evidence."  United States v. Gray, 876 F.2d 1411, 1417 (9th Cir.

9   1989).  See also Ducket v. Godinez, 67 F.3d 734, 742 (9th Cir. 1995).  "[Prosecutors] may strike

10  'hard blows,' based upon the testimony and its inferences, although they may not, of course,

11  employ argument which could be fairly characterized as foul or unfair."  United States v.

12  Gorostiza, 468 F.2d 915, 916 (9th Cir. 1972).

13       Petitioner also argues the prosecutorial misconduct violated his Eighth Amendment

14  rights to a reliable verdict.  While he cites Darden for that proposition, the Court in that case did

15  not analyze the petitioner's claims under the Eighth Amendment, finding concerns of reliability in

16  sentencing were "not applicable to this case."  477 U.S. at 183 n.15.  In Caldwell v. Mississippi,

17  472 U.S. 320 (1985), the Court did hold that a prosecutor's argument at the sentencing phase

18  violated the Eighth Amendment.  In that case, the prosecutor argued that "the jury's decision as to

19  life or death was not final, that it would automatically be reviewed by the State Supreme court,

20  and that the jury should not be made to feel that the entire burden of the defendant's life was on

21  them."  Id. (citing Caldwell, 472 U.S. at 333.)  The Court in Caldwell held that "such comments

22  'presen[t] an intolerable danger that the jury will in fact choose to minimize the importance of its

23  role,' a view that would be fundamentally incompatible with the Eighth Amendment requirement

24  that the jury make an individualized decision that death is the appropriate punishment in a specific

25  case."  Id. (quoting Caldwell, 472 U.S. at 333.)  The Court in Darden noted that its application of

26  the Eighth Amendment to claims of prosecutorial misconduct is "relevant only to certain types of

1   comment - those that mislead the jury as to its role in the sentencing process in a way that allows

2   the jury to feel less responsible than it should for the sentencing decision."  Id.

3              2.  Guilt Phase Misconduct

4                   a.  Improper Impeachment of Petitioner

5          As discussed above in Claim I, petitioner argues the trial court erred when it

6   permitted the prosecutor to impeach petitioner's trial testimony with testimony he gave at the

7   suppression hearing.  Here, petitioner argues the prosecutor committed misconduct by

8   "exploiting" that ruling and misrepresenting petitioner's earlier testimony.

9                    i.  Background

10         The background for this claim is set out above in the discussion of Claim I.

11  Petitioner argues that because the prosecutor was reading from the transcript of the suppression

12  hearing, he knew the judge had excluded testimony regarding the substance of petitioner's

13  statements to police.  Petitioner argues the effect of this trial court error and prosecutorial

14  misconduct was exacerbated when, in closing, the prosecutor argued that the jury would have to

15  find petitioner perjured himself at the suppression hearing in order to find him not guilty of first

16  degree murder.  (RT 8234:21-24.)

17                   ii.  State Court Decision

18         As petitioner points out, the California Supreme Court rejected his prosecutorial

19  misconduct claim on procedural grounds.  43 Cal. 4th at 157.  However, petitioner fails to

20  mention that the court also ruled on the merits of that claim.[54]  The court held:

21         Defendant contends the prosecutor engaged in misconduct in
           cross-examining him by making reference to the transcripts of his
22         suppression hearing testimony, because that testimony was admitted
           for a limited purpose and its use at trial was misleading. This

23

24         [54]  This court need not consider the procedural default issues if the interests of judicial
      economy are best served by addressing the merits.  Lambrix v. Singletary, 520 U.S. 518, 525
25    (1997); Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002) ("Procedural bar issues are not
      infrequently more complex than the merits issues presented by the appeal, so it may well make
26    sense in some instances to proceed to the merits if the result will be the same.").

1    contention is without merit for the same reasons discussed ante, in
2    part II.C.1.a; that is, there was no error—or misconduct—in the use
     of the hearing testimony, because defendant placed his credibility
     and state of mind at issue by choosing to testify and contradicting
3    his confessions to the officers, and his hearing testimony was
     relevant and properly admitted to impeach him.
4

5    Id. at 157-58.  The referenced section by the California Supreme Court addressing alleged trial

6    court error is set out above in the discussion of Claim I.  There, the California Supreme Court

7    reasoned that petitioner's state of mind in choosing to confess was properly admitted at the

8    suppression hearing and was proper impeachment.  Id. at 123-27.  The suppression hearing

9    testimony that petitioner wanted to confess to tell the truth was not testimony on the substance of

10   his confession; petitioner did not testify that he told officers the truth.  Id. at 126.  Rather, his

11   testimony involved his reasons for confessing.  Id.  The jury was entitled to draw an inference

12   from that suppression hearing testimony that petitioner did, in fact, tell the truth in his

13   confessions.  Id. at 126-27.  Because petitioner placed the credibility of those confessions at issue

14   by testifying at trial that they were in part false, the fact that petitioner had testified he wanted to

15   tell officers the truth was relevant impeachment.  Id.  The "defendant's state of mind–his desire to

16   tell the truth–simply was the only matter at issue.  The fact that the jury could infer from

17   defendant's statement of his state of mind that he acted in accordance with that mental state does

18   not change the 'limited' nature of the admitted evidence itself."  Id. at 127 n.20.

19                                   iii.  Discussion

20          As discussed above regarding Claim I, petitioner has not shown the trial court

21   erred.  It follows, then, that the prosecutor did not commit misconduct by taking advantage of any

22   alleged trial court error.  Therefore, the California Supreme Court's rejection of this claim was not

23   unreasonable under section 2254(d).

24              b.  Prosecutorial Misconduct in Cross-examination of Dr. Yarvis

25          Petitioner next argues that the prosecutor's questions to Dr. Yarvis about the

26   psychology of rapists and sexual psychopaths exceeded the scope of the direct examination and

                                        213

1    insinuated that petitioner was a sexual psychopath.

2                                    i.  Background

3              Shortly after opening statements, defense counsel announced on the record that

4    they would not use expert psychiatric testimony to prove any substantive facts.  (RT 5909:14-16.)

5    Just prior to Dr. Yarvis' testimony, the prosecutor sought to discover Dr. Yarvis's file on

6    petitioner.  (RT 7207:22 - 7208:9.)  In response, defense counsel stated that such materials would

7    not be discoverable.  He reiterated that the defense did not intend to question Dr. Yarvis about the

8    facts or circumstances of the offenses.  (RT 7213:9-10.)  Defense counsel told the court he

9    intended to ask Dr. Yarvis "questions about his knowledge of Mr. Rundle's situation with his

10   mother and the effect that that situation would have had on his mental state, and to express some

11   other observations that he may have made having to do with his mental state."  (RT 7213:11-15.)

12             Petitioner claims that Dr. Yarvis testified on direct only about incest and sexual

13   abuse.  However, Dr. Yarvis's testimony was more specific than petitioner indicates.  As

14   described above, Dr. Yarvis testified that petitioner had told him about the physical and sexual

15   abuse he had suffered at home.  (RT 7235:1-13.)  While he testified that he did not find petitioner

16   to be psychotic, he did testify about the general effects of abuse and incest on children.  (RT 7236-

17   53.)

18             During cross-examination of Dr. Yarvis, the prosecutor asked, "What

19   is a sexual psychopath?"  (RT 7318:8.)  Defense counsel objected, arguing that the question was

20   irrelevant and called for a legal conclusion beyond the scope of direct examination.  (RT 7318:9-

21   10.)  The judge agreed.  (RT 7318:11.)  When the prosecutor next asked whether Dr. Yarvis had

22   studied the areas of rape and rapists and encountered in his practice convicted rapists, the court

23   intervened.  (RT 7318:12-19.)  The court did not "want the record messed up by opinions on the

24   defendant's . . ."  (RT 7318:22-24.)  The prosecutor interrupted to explain that he was going to ask

25   the doctor's professional opinions on some aspects of rape.  (RT 7318:25 - 7319:3.)  He claimed

26   that the defense asked Dr. Yarvis to compare rape and, he believed, incest.  (Id.)  The court

                                          214

1  clarified the scope of direct examination:

2        The question he was asked was to talk about the severity of
3  mental disorder with respect to rapists versus necrophilia. I don't
   believe that's opened the door to ask general questions about the
   psychology or diagnosis involved in someone who commits a rape.
4
        I will hold you to your word.  I will overrule the objection
5  because the door has been opened that much with the caveat it
   better not start sounding like that.
6

7  (RT 7319:11-19.)  The court cautioned the prosecutor that he could not ask questions relating to

8  the defendant or "anything more than exploring the question that the prosecution [sic]

9  [defense] asked which was comparative severity of mental illness with respect to rape

10  versus necrophilia.  That was the area that was opened and that's the area that can be

11  explored."  (RT 7319:22-28.)

12        The prosecutor then proceeded to ask Dr. Yarvis about his experience treating

13  rapists, whether sexual gratification is a motive for rape, whether rape is an act of power and

14  control over a female, and whether he was familiar with the terms "power rape," "anger rape" and

15  "sadistic rape."  (RT 7320:10-28.)  The prosecutor then specifically reiterated his question, what is

16  a "sexual psychopath?"  (RT 7321:3-4.)  Defense counsel did not object.

17                          ii.  State Court Decision

18  The California Supreme Court rejected this claim, holding:

19        Defendant contends misconduct occurred when the
   prosecutor asked questions during the cross-examination of defense
20  expert Dr. Yarvis concerning the terms "sexual psychopath" and
   "sadistic rape" and other aspects of the psychology of rapists. He
21  argues the questions exceeded the scope of the direct examination
   and were asked only to insinuate without any evidentiary support
22  that, for example, defendant was a sexual psychopath who engaged
   in sadistic rape. After the trial court sustained defendant's initial
23  objection to a question about the term "sexual psychopath," and
   thereafter clarified the acceptable scope of cross-examination on the
24  subject of the psychology of rapists, defendant did not object to the
   prosecutor's subsequent questions on this subject, nor claim the
25  prosecutor had engaged in misconduct or ask the court to give an
   admonition to the jury. Defendant therefore may not raise this claim
26  on appeal. In any event, his claim also is without merit, because

215

1      there was nothing deceptive, reprehensible, or improper about these
       questions, which were well within the scope of questioning
2      permitted by the court and, being general questions about the
       psychology of rape without reference to defendant or the
3      circumstances of this case, in no way improperly "impl[ied] or
       insinuate[d] the truth of the facts about which questions are posed."
4      (Visciotti, supra, 2 Cal.4th at p. 52, 5 Cal.Rptr.2d 495, 825 P.2d
       388.)

5

6   43 Cal. 4th at 158.

7                        iii.  Discussion

8           The California Supreme Court's decision is somewhat puzzling.  The trial judge

9   told the prosecutor he could not ask general questions about the psychology of a rapist, and that

10  this line of questioning was limited to the "comparative severity of mental illness with respect to

11  rape versus necrophilia."  The California Supreme Court's statement that the questions were

12  "within the scope of questioning permitted by the court" appears to be incorrect and is therefore

13  an unreasonable construction of the facts under 28 U.S.C. § 2254(d)(2).  Because this claim

14  survives section 2254(d), this court is not required to defer to the California Supreme Court's

15  ruling on this claim.

16          This court finds, however, that even considering petitioner's claim de novo, it

17  should be denied.  Assuming the prosecutor's actions amounted to misconduct, those actions did

18  not substantially affect the verdict.  First, to the extent the question about "sexual psychopaths"

19  insinuated that petitioner was one, Dr. Yarvis shot that insinuation down when he responded that

20  the term was no longer used and there were no analogous terms.  (RT 7321:3-18.)  The remaining

21  questions to which petitioner objects involved the psychology of rapists generally and the use of

22  the terms "power rape, anger rape, and sadistic rape."  The question about rape being an act of

23  power or control over a woman was not necessarily prejudicial and petitioner does not focus on it.

24  He appears to be primarily concerned about the injection of "highly inflammatory terms and

25  images" into the case.  Whether jurors believed petitioner raped the women or believed he

26  sexually assaulted them after their deaths, it is hard to imagine jurors would not have found both

                                          216

1   scenarios so disturbing that labeling petitioner's actions "sadistic" could hardly have had any

2   effect on their final decision. Furthermore, after mentioning the terms in one question, the

3   prosecutor dropped them and moved on.  (RT 7320:26 - 7321:4.)

4          Petitioner relies almost completely on state law to argue the prosecutor's questions

5   amounted to unconstitutional misconduct.  He cites one federal appellate court opinion, United

6   States v. Beeks, 224 F.3d 741 (8th Cir. 2000).  In Beeks, the court excluded the defendant's prior

7   criminal history because the defendant did not testify.  The prosecutor went through a fairly

8   elaborate routine in questioning the defendant's employer.  The prosecutor took the defendant's

9   employment file from the witness, looked at it, and after a number of other questions, asked the

10  defendant's employer how the defendant had responded to the application's question about prior

11  felony convictions.  224 F.3d at 744.  Defense counsel immediately objected.  Id.  Even though

12  the answer to the question was "no," the Court of Appeals for the Eighth Circuit held the

13  prosecutor's remarks were improper because they clearly sought to convey to the jury that the

14  defendant had some past criminal involvement and had lied about it to his employer.  Id. at 746.

15  Because the evidence against the defendant was not strong, the court held the prosecutor's

16  conduct was prejudicial.  Id. at 747-48.

17         The questions asked by the prosecutor in the present case were not the same.  They

18  did not imply a fact not in evidence.  While they may have been misconduct, it was obvious,

19  particularly from Dr. Yarvis's responses, that they did not have any psychiatric meaning.  Further,

20  unlike the situation in Beeks, the guilt phase evidence here was substantial.  The prosecutor's

21  questions to Dr. Yarvis did not render the guilt phase fundamentally unfair.  Therefore, this claim

22  should be denied.

23                    c.  Prosecutorial Misconduct for Attempting to Elicit Testimony re Third
                          Murder
24

25         Petitioner argues the prosecutor committed misconduct when he attempted to elicit

26  testimony from petitioner and Philip Bodily regarding the Lactawen murder.

1           i. <u>Background</u>

2           In December 1988, in his response to petitioner's motion to exclude evidence of

3 the Lactawen homicide, the prosecutor informed the court that he would not introduce, "in any

4 manner," evidence regarding the Lactawen homicide during the guilt phase. (CT 576:10-12.)

5 However, just days before petitioner testified at the guilt phase, the prosecutor moved to introduce

6 that evidence. (CT 684-723.)  The court denied the motion based on the defense's reliance on the

7 prosecutor's prior representation. (RT 7192-202.)   Petitioner claims that in the following series

8 of questions, the prosecutor attempted to get petitioner to mention the Lactawen murder.

9           Q     Well, how often do you get furiously mad that you
                        don't think?
10
11          A     It's happened before.

12          Q     Well, it happened with Ms. Garcia you described,
                        huh?
13          A     Correct.

14          Q     Okay. And it happened with Ms. Sorensen?

15          A     Correct.

16          Q     Is this an every day occurrence that you get furiously
                        mad enough to kill people?
17
18          A     No, but it's happened before.

19 (RT 7854:19 - 7855:1.)

20          At defense counsel's request, the court held a sidebar. (RT 7855:2-3.)  The court

21 told the prosecutor, "You know the problem."  The prosecutor responded, "I don't plan on

22 mentioning the Sacramento incident."  The court told him "the continual invitation to answers that

23 are going to be calling for a direct denial of other conduct needs to be avoided."   (RT 7855:6-18.)

24  Later, the prosecutor pursued a similar line of questioning:

25          Q     Do you like to tie women up like you were doing to
                        this lady at the time?
26

1    A    Yes.

2    Q    At that time?

3    A    In that set of feelings, yes.

4    Q    Did you like to tie them up while they're alive, also?

5         Mr. Smith: Objection.

6         The Court: Hold on. Objection sustained. No. 2 warning.

7  (RT 7868:27 - 7869:8.)

8         Petitioner also argues that the prosecutor directed questions to Philip Bodily that

9  were designed to elicit information about the Lactawen homicide.  The prosecutor asked Bodily if

10 he was aware of the crimes with which petitioner was charged.  (RT 7393:6-9.)  Bodily

11 responded, "Triple murder."  (RT 7393:10.)  After a couple more questions, Bodily was excused.

12 In a sidebar, the court mentioned the "obvious issue with respect to the witness' response."  (RT

13 7394:4-5.)  Addressing defense counsel, the judge stated, "I take it, you don't wish to emphasize it

14 any further."  Mr. Humphreys responded, "You've got that right."  (RT 7394:7-9.)

15                          ii.  State Court Decision

16        Petitioner states the California Supreme Court denied this claim on procedural

17 grounds.  Such an assertion is not accurate.  In fact, with respect to the prosecutor's questioning of

18 petitioner, the California Supreme Court assumed "defendant preserved prosecutorial misconduct

19 challenges to these exchanges," and addressed the merits.  43 Cal. 4th at 159.  The court found

20 that the prosecutor's questions did not constitute misconduct because they were not necessarily

21 intended to elicit a response involving the Lactawen killing.

22            [W]e are not persuaded by defendant's claims that through these
             questions the prosecutor was attempting to bait defendant into
23           making a response that would open the door to the introduction of
             the Lactawen evidence. After the first challenged question was
24           asked, the prosecutor told the trial court he did not intend to
             mention the Lactawen murder, and it appears the court accepted that
25           representation, although it advised him to avoid the apparently
             unintended problem of asking questions that might lead in that
26           direction. Moreover, this first question—whether it was an everyday

                                        219

occurrence for defendant to get "furiously mad" enough to kill someone—seems essentially to have been a rhetorical question designed to discredit defendant's claim that he had fits of rage that prevented him from thinking about what he was doing, and probably would lead to a negative answer, not a statement related to the Lactawen murder. Had the prosecutor been attempting to force defendant into making some such statement or a denial that arguably would allow for impeachment with the Lactawen evidence, he might have asked a question inviting a more factual response, such as "on what other occasions have you been furiously mad enough to kill someone?"

The second question—whether defendant liked to tie up women when they are alive—is, again, insufficient to suggest the prosecutor, despite his earlier assurance to the trial court to the contrary, intended to elicit an answer calling for the introduction of evidence of the Lactawen murder. The question, asked in response to defendant's statement that he liked to tie up women "[i]n that set of feelings" (meaning, possibly, when the woman was dead), appears to have been an attempt to clarify defendant's answer. It also simply called for a yes or no answer about what defendant "like[d]," which was not likely to elicit a statement related to what he had done in the past. Because the trial court sustained the objection to the question and the prosecutor proceeded to a different topic, it would be unduly speculative to conclude, based upon the question itself, that the prosecutor was attempting to force defendant into opening the door to the admission of evidence of the Lactawen murder. Accordingly, we discern no indication of prosecutorial misconduct in the cross-examination of defendant.

Id. at 159-60.

The state court held that petitioner's claim of misconduct regarding the questioning of Philip Bodily was procedurally barred. Id. at 160. However, the court went on to address the merits of that claim as well, finding that there was nothing wrong with the prosecutor's question. The problem was Mr. Bodily's erroneous response. Id.

Finally, the state court concluded that even had petitioner shown the prosecutor committed misconduct, there was no evidence that "the outcome or fairness of the trial would have been adversely affected." Id. at 161.

The jury simply never heard about the Lactawen murder during the guilt phase of the trial. It also had no reason to suspect the prosecutor's questions to defendant had anything to do with a third rape and murder, or that Bodily's triple-murder answer was anything other than a misunderstanding on his part. Even if the

1    prosecutor had been attempting to subvert the trial court's ruling, he
     was unsuccessful, and the outcome of the trial was not affected.
2

3    Id.

4                          iii.  Discussion

5              Petitioner argues that the prosecutor had no reason to ask the questions of him or

6    Bodily besides hoping to elicit a response regarding the Lactawen killing.  With respect to the

7    question to Bodily, this court agrees with the California Supreme Court that the prosecutor's

8    questions to Philip Bodily were not designed to elicit inappropriate testimony regarding the

9    Lactawen killing.  The questions asked of petitioner pose a more difficult issue.  The first question

10   asking petitioner how often he got so furiously mad that he did not think did not refer to killing

11   and therefore cannot be said to have been trying to elicit an inappropriate response.  The second

12   question, "Is this an every day occurrence that you get furiously mad enough to kill people?" was

13   considered by the California Supreme Court to be rhetorical.  This determination appears correct.

14   It is hard to imagine the prosecutor hoped petitioner would make the response he did.  The

15   expected response, as the California Supreme Court pointed out, would have simply been, "no."

16   Petitioner's response is like that given by Mr. Bodily, unexpected.

17             The third question to petitioner asked whether petitioner liked to tie up women

18   when they were alive.  While such a question may have been asked for a number of reasons,

19   including potentially attempting to elicit a response that might enable the prosecutor to introduce

20   the Lactawen killing, the questioning was cut off before anything like that occurred.  The simple

21   fact that the prosecutor asked the question would not have caused the jury to believe petitioner

22   had in fact tied up women besides the victims in this case when they were alive or, certainly, that

23   petitioner had committed another homicide.  Petitioner has failed to show the California Supreme

24   Court's rejection of this claim was unreasonable and it should be denied.

25   ////

26   ////

                                      221

d. <u>Prosecutorial Misconduct for Making Unsupported Arguments and
Encouraging Speculation</u>

Petitioner's next claim is that the prosecutor urged jurors to speculate about what petitioner had done to the women.

i. <u>Background</u>

In closing, the prosecutor argued:

[U]nfortunately, due to Mr. Rundle's clever hiding of each body, you were not able to[,] and I cannot show you and describe for you[,] just what these women looked like after he got done with them.

You cannot see the physical beating he gave each of these women.

You cannot see any physical evidence of rape, any black-and-blue bruising around their thighs, any beatings to their body, and strangulation marks on their neck, and damage to their vagina or their anus.

And I am sorry I can't produce that evidence for you. I wish I could, but I have to compliment Mr. Rundle for preventing us from seeing that.

. . .

[W]e cannot give you that physical evidence.

However, I think you can use your imaginations based on what you have heard here to recreate what those women would have looked like if we found the bodies the next day.

(RT 8071:10 - 8072:9.)

In rebuttal, the prosecutor again asked the jury to speculate, this time about why the women's clothing had not been ripped or torn:

[T]here's a very reasonable, rational, logical explanation for why these clothing – clothing of each of these women, if they are not torn, are not torn.

////

////

222

1          Mr. Rundle was a very strong person. I would suggest to you
2    that Lanciann Sorensen at five foot one half inch and one hundred
     ten pounds and fifteen years of age had virtually no chance against
3    him.

4          And I would suggest to you that Ms. Garcia, who was about
     five four or five five, one hundred twenty-five pounds, had very
5    little chance, because you have to put yourself in the position of a
     female like those two women who are all of a sudden thrust into a
6    violent conflict.

7          And I want you to think about what Mr. Rundle told each of
     these women when he wanted to have sex and they refused, and
8    how he blew up at them, and how he probably yelled and screamed
     at them, and how he described for you a right-hand punch as hard as
9    he could to Ms. Garcia's face.

10         And I would suggest to you that wasn't half of what he did
     to her, and that's not half of what he did to Ms. Sorensen to
11   neutralize them.

12         But think about after he attacks these women and tells them
     they are going to have sex, how he tells them, "Let me tie you up
13   and I won't hurt you. All I want is to do this. I'll let you go."

14         How many times do you think it would take a woman, any
     woman in their position, to get hit in the face, to get kicked, to get
15   hit in any manner, before they say, "Stop. I'll do it."

16         Think about it. And once they gave in, hoping that if they do
     to him what he wants them to do, he will dump them, carry Garcia
17   out of the car, and he'll let her go home.

18         That is exactly when he disrobed them.

19   (RT 8207:7 - 8208:11.)

20                         ii.   State Court Decision

21         The California Supreme Court denied the claim on procedural grounds, but reached

22   the merits in the alternative:

23         The prosecutor's comments properly asked the jurors to
     draw certain inferences from the evidence presented at trial. This is
24   not a case like those cited by defendant in which a prosecutor's
     statements implied the existence of facts outside the record of which
25   counsel, but not the jury, were aware. (See, e.g., People v. Benson
     (1990) 52 Cal.3d 754, 794–795, 276 Cal.Rptr. 827, 802 P.2d 330;
26   People v. Bolton (1979) 23 Cal.3d 208, 212–213, 152 Cal.Rptr.

                                   223

1   141, 589 P.2d 396.) Here, the whole point of the prosecutor's
    statements was that there was no available credible evidence
2   regarding the state of Garcia's and Sorensen's bodies immediately
    after the murders were committed or what actually happened to the
3   victims during the killings. It was therefore necessary for the jury to
    draw inferences based upon the evidence presented at trial.
4   Counsel's suggestions concerning those inferences were not
    improper invitations to the jury to engage in speculation or
5   references to facts outside the record. The prosecutor properly left it
    to the jury to determine the reasonableness of his suggestions.
6   (People v. Navarette (2003) 30 Cal.4th 458, 520, 133 Cal.Rptr.2d
    89, 66 P.3d 1182; People v. Dennis (1998) 17 Cal.4th 468, 522, 71
7   Cal.Rptr.2d 680, 950 P.2d 1035.) In any event, the prosecutor's
    description of the possible scenario of the victims submitting to
8   defendant's demands and his suggestion of what might have been
    said was not prejudicial misconduct, especially in light of the
9   evidence of the brutal killings already presented to the jury.

10  48 Cal. 4th at 161-62.

11                          iii. Discussion

12          Petitioner relies primarily on state cases to argue that the prosecutor here argued

13  the existence of facts that could not be "found in, or reasonably inferred from, the record." (Dkt.

14  No. 92 at 337-39.)  Petitioner cites three federal cases for this argument.  In Berger v. United

15  States, 295 U.S. 78, 84-85 (1935), the Court held that a prosecutor committed misconduct in his

16  cross-examination and argument when he misstated the facts, told the jury witnesses had said

17  things they had not, suggested by his questions that statements had been made to him personally

18  out of court, and bullied and argued with witnesses.  In Viereck v. United States, 318 U.S. 236,

19  247-48 (1943), the Court held that the prosecutor's comparison of the jury's role to fighting in the

20  war, an argument which "could only have been to arouse passion and prejudice," amounted to

21  misconduct.  Finally, petitioner cites United States v. Kojayan, 8 F.3d 1315, 1317-19 (9th Cir.

22  1993), only for the general proposition that statements from prosecutors "matter a great deal."

23  The issue in that case involved the prosecutor's outright misrepresentation of facts.

24          In the present case, petitioner has pointed out no facts that the prosecutor

25  misstated, as in Berger and Kojayan, nor has he shown the prosecutor engaged in argument

26  unrelated to the facts of the case, as in Viereck.  As the California Supreme Court pointed out, the

1   prosecutor did not intimate that he knew facts outside the record.  It is true that the prosecutor

2   asked the jury to imagine what happened during the murders, and it is true that the prosecutor

3   colored his description with possible statements made by petitioner and by the victims.  However,

4   the prosecutor was quite clear that he did not know what occurred and that he was making up a

5   scenario. He did not misstate facts in the record and give the jury the impression that he knew

6   something they did not.  Petitioner has not shown that the California Supreme Court's

7   conclusions, that the prosecutor's argument appropriately drew inferences from the facts presented

8   at trial and that the argument did not, in the context of a damning guilt-phase case, prejudice

9   petitioner, were unreasonable under section 2254(d).  Accordingly, this assertion of prosecutorial

10  misconduct should be denied.

11                   e.  Prosecutorial Misconduct for Exploiting Jurors' Fear of Crime

12                   Petitioner argues that the prosecutor's argument, which followed a discussion of

13  rape, was inappropriately inflammatory and prejudicial:

14                   We live here in a free country, a democracy, in which we
                     buy deadbolt locks, we get guard dogs, we arm ourselves to the hilt
15                   with weapons, we buy burglar alarms to protect us just from those
                     kind of people.
16
                     When we were children we played outside the house and we
17                   walked to the store and we walked to school and we rode our bikes
                     to school, and you don't see it much anymore.
18
                     And you don't see that kind of activity because of the exact
19                   reason that Mr. Rundle killed these girls.

20  (RT 8074:16-25.)

21                   After rejecting this claim for the failure to object at trial, the California Supreme

22  Court examined the merits.  43 Cal. 4th at 162.  The court held that the remarks were isolated and

23  brief, and they would not have "inflamed the jury's passions to the point where the outcome of the

24  trial was affected or the trial became fundamentally unfair."  Id.

25                   There is no question that it is misconduct for a prosecutor to use arguments

26  "calculated to inflame the passions or prejudices of the jury" or that "would divert the jury from

1   its duty to decide the case on the evidence by injecting issues broader than the guilt or innocence

2   of the accused under controlling law." <u>United States v. Young</u>, 470 U.S. 1, 10 (1985) (quoting

3   ABA Std. for Crim. Justice 4-7.8).   However, prosecutorial argument only rises to a constitutional

4   violation if is "so infected the trial with unfairness as to make the resulting conviction a denial of

5   due process." <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986).   Further, for petitioner to

6   succeed, the error must not be harmless.   <u>United States v. Hastings</u>, 461 U.S. 499, 510-12 (1983).

7   On habeas, the test of harmlessness is whether the misconduct had a  "substantial and injurious

8   effect or influence in determining the jury's verdict." <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 627

9   (1993).

10          The prosecutor's argument spans almost 100 pages of the transcript.  (RT 8061-

11   8157.)   The argument appealing to the jurors' fear of crime appears on just ten lines of one

12   transcript page.  (RT 8074:16-25.)  Petitioner does not argue that this appeal to jurors' fears was a

13   theme of the prosecutor's argument or was even made anywhere else in the argument.  Petitioner

14   has not a shown a likelihood that the argument had any influence on the jury's verdict.  Similarly,

15   petitioner has not shown that the California Supreme Court's conclusion that the prosecutor's

16   statements were harmless was unreasonable under section 2254(d).

17                    f.  <u>Prosecutorial Misconduct for Exploiting Exclusion of Evidence</u>

18          As described above in the discussion of Claim I, the trial court barred questioning

19   about Ms. Sorensen's address book.  In this claim, petitioner asserts that the prosecutor exploited

20   the exclusion of this evidence during his closing argument.  The prosecutor argued that

21   petitioner's story regarding Ms. Sorensen was not believable in part because it was extremely

22   unlikely Ms. Sorensen, who had told her boyfriend she "couldn't engage in sexual relations

23   because she was on her menstrual cycle," would engage in sexual behavior with a "total stranger."

24   (RT 8110:15 - 8112:17.)

25          The California Supreme Court denied the claim on procedural grounds and on the

26   merits.  43 Cal. 4th at 162.  The court held: "defendant failed to establish the list was relevant

1   evidence on the issue of Sorensen's sexual proclivities, especially with regard to strangers, and

2   thus there is no basis for a claim that the prosecutor took unfair advantage of its exclusion or

3   misled the jury in this regard."  This court agrees with the California Supreme Court's conclusion.

4   Petitioner has not shown Ms. Sorensen's sexual history would have contradicted the prosecutor's

5   claim.  Petitioner's statement that Ms. Sorensen's diary "strongly suggest[ed] otherwise," is not

6   well taken.  (Dkt. No. 92 at 347:13.)  Petitioner has made no showing that the diary would show

7   Ms. Sorensen had had a sexual relationship with anyone, like petitioner, whom she had just met.

8   The California Supreme Court's merits determination was not unreasonable under 28 U.S.C. §

9   2254(d).

10                              g.  Prosecutorial Misconduct for Personally Denigrating Petitioner

11                   The prosecutor referred to petitioner's conduct with Ms. Sorensen as again acting

12   like a "caveman."  (RT 8213:7-10.)  The California Supreme Court found the prosecutor's

13   comments to be a "fair use of colorful language to explain the prosecutor's view of the evidence:

14   that defendant did what he wanted to his victims in spite of the most basic societal constraints and

15   any protestations on their part."  43 Cal. 4th at 163.  Petitioner cites a number of cases in support

16   of this claim in which prosecutors made denigrating references to defendants.  Darden, 477 U.S. at

17   179 (defendant referred to as an "animal"); Kellog v. Skon, 176 F.3d 447, 451-52 (8th Cir. 1999)

18   ("monster" and "sexual deviant"); Ippolito v. United States, 108 F.2d 668, 670-71 (6th Cir. 1940)

19   ("rattlesnakes and skunks").  What petitioner fails to mention, however, is that in two of these

20   three cases, the courts considered any misconduct harmless.  Darden, 477 U.S. at 180-82 (While

21   the prosecutor's argument deserves "condemnation," it did not deprive the petitioner of a fair

22   trial.); Kellog, 176 F.3d at 452.  Further, in Ippolito, a more than 70-year-old case from another

23   circuit, the court determined the error was not harmless because there was "no overwhelming

24   evidence of guilt."  108 F.2d at 671.  As has been discussed above, the evidence of petitioner's

25   guilt in the present case was substantial.  Therefore, the California Supreme Court's denial of this

26   claim was not unreasonable under section 2254(d).

1              h. Prosecutorial Misconduct for Attacking Integrity of Defense Counsel

2              In petitioner's final complaint of prosecutorial misconduct at the guilt phase, he

3    argues the prosecutor insinuated that defense counsel had a role in helping petitioner make up a

4    story to avoid a first degree murder conviction.

5                              i. Background

6              In his rebuttal argument, the prosecutor described petitioner's various stories to

7    various people. (RT 8234:25 - 8247:24.) He read petitioner's testimony describing a meeting

8    with Dr. Yarvis and attorney Smith. (RT 8244:7 - 8245:16.) He recounted that when asked

9    whether the purpose of that meeting was to "clear up your inconsistencies that you had had earlier

10   with Doctor Yarvis, correct?", petitioner responded "Correct." (RT 8244:27 - 8245:2.) The

11   prosecutor then argued:

12                      Now, the only one that's there during these incidents with
                  these women that we know of is Mr. Rundle and the girls, and how
13                a psychiatrist and an attorney are going to now clear up and get the
                  true version of what happened that night you ladies and gentlemen
14                will have to decide.

15   (RT 8245:7-12.) The prosecutor then read and argued the following:

16                      "Q. Did they all vary and go in different directions, also, as you
                  were talking to Doctor Yarvis ten to twelve times at the jail?
17
                      "A. Pretty much, until the last interview.
18
                      "Q. When Mr. Smith helped you put it all together, is that right?
19
                      "A. He didn't actually help. I mean, he didn't coax me, but they
20                wanted to know why."

21                      I think, ladies and gentlemen, it is not a mystery why at this
                  trial Mr. Rundle has given you this scenario of sexual conduct
22                occurring after these women died, et cetera, et cetera, et cetera.

23                      It is designed to avoid criminal responsibility for attempted
                  rape, first degree felony murder, commission of a rape, and the
24                special circumstances involving rape, and for no other reason.

25   (RT 8245:28 - 8246:15.)

26   ////

                                            228

1                          ii.  State Court Decision

2                 The California Supreme Court held that "[n]o misconduct occurred." 43 Cal. 4th

3    at 163.

4                 The central issue at the trial was defendant's credibility. Defendant
                  admitted he had learned before trial it would be beneficial to his
5                 defense if it was established he did not form the intent to have
                  sexual intercourse with the victims until after they were dead. The
6                 prosecutor's statements constituted fair comment upon the evidence
                  regarding the supposed need for defendant, who was the only living
7                 person who witnessed the killings, to meet with others to determine
                  the truth of what happened, and a reasonable suggestion of a
8                 possible motive for defendant to lie about the murders. The
                  prosecutor did not directly accuse defense counsel of encouraging
9                 defendant to lie, but even to the extent the statements swept counsel
                  up in defendant's asserted lies, this was not an improper comment
10                in the context of this case, in which defendant's story changed
                  drastically during trial preparations.

11

12   Id.

13                         iii.  Discussion

14                 Insinuating that defense counsel helped petitioner fabricate a defense would

15   amount to misconduct.  See United States v. Sanchez, 176 F.3d 1214, 1225 (9th Cir. 1999)

16   (prosecutor committed misconduct by "denigrating the defense as a sham").  However, again, the

17   federal cases petitioner cites do not support him.  In several of the cases, no constitutional

18   violation was found.  In Sassounian v. Roe, 230 F.3d 1097, 1106 (9th Cir. 2000), the petitioner

19   claimed the prosecutor's reference to a "trick" photograph implied that his counsel had set up the

20   photo.  The court did not, as petitioner claims, hold that this statement was misconduct.[55]  Rather,

21   the court simply held that it did not rise to the level of a due process violation.  Id.  Similarly, in

22   Johnson v. United States, 162 F.2d 562, 563-64 (9th Cir. 1947),  rev'd on other grounds, 333 U.S.

23   10 (1948), the Court of Appeals held the prosecutor's assertions that defense counsel had

24   _____

25        [55]  The court stated that the trial judge had "correctly sustained several objections to the
     alleged misconduct."  230 F.3d at 1106.  This is hardly a holding that the prosecutor committed
26   misconduct and, in any event, the court found no constitutional violation.

                                           229

1   "concocted" and "made up" the "story" did not amount to a constitutional violation.  The evidence

2   of guilt was sufficiently strong that the prosecutor's conduct did not influence the verdict.  See

3   also United States v. Jones, 839 F.2d 1041, 1050 (5th Cir. 1988) (prejudicial effect of prosecutor's

4   comment outweighed by evidence of guilt); United States v. Matthews, 240 F.3d 806, 818-19 (9th

5   Cir. 2000) (insinuation defense counsel was hiding the truth not plain error), adopted in relevant

6   part, 278 F.3d 880 (9th Cir. 2002) (en banc).

7          Where courts did find constitutional violations, the misconduct was far more

8   extensive than the alleged misconduct here. Moreover, in many cases cited, the standard used was

9   the appellate standard that it was "more probable than not" the errors affected the verdict, rather

10  than the stricter standard used on habeas – that the errors substantially and injuriously affected the

11  verdict.  See Jones, 839 F.2d at 1050 ("our power to reverse a conviction for prosecutorial

12  misconduct no doubt is greater on direct review . . . than it would be on habeas review").  In Davis

13  v. Zant, 36 F.3d 1538, 1547-48 (11th Cir. 1994), the court found a number of comments by the

14  prosecutor that the defense was a "last minute fabrication" amounted to misconduct.  Those

15  comments directly stated that "they," which in context could only refer to defense counsel,

16  thought up the defense at the last minute.  The court found the comments so pervasive that they

17  were labeled a "major theme" of the prosecutor's argument. 36 F.3d at 1549.  Further, the court

18  labeled those comments "either patently false or misleading." Id.  Because "the evidence against

19  [the petitioner] was not strong enough to overbalance the prosecutorial misconduct in this case,"

20  the court granted habeas relief. Id. at 1550-51.  See also Sanchez, 176 F.3d at 1225 (it was "more

21  probable than not" cumulative effect of numerous instances of prosecutorial misconduct affected

22  the verdict); United States v. Rodrigues, 159 F.3d 439, 451 (9th Cir. 1998) (prosecutor's

23  significant misstatements of the law and accusation that defense counsel lied reversible error

24  under direct review standard), amended, 170 F.3d 881 (9th Cir. 1999).

25          In the present case, the prosecutor did not directly accuse defense counsel of

26  helping petitioner create a story to avoid a first degree murder conviction.  The prosecutor restated

1    the evidence presented at trial.  That evidence showed that petitioner's full description of what he

2    testified happened was not revealed until his final meeting with Dr. Yarvis and attorney Smith.

3    The fact that petitioner's story changed numerous times, including the story he told his own

4    defense team, was important to the government's argument about petitioner's lack of credibility.

5    This court finds that the California Supreme Court's determination that the prosecutor did not

6    commit misconduct was not unreasonable.  Even if it was misconduct, the comment was limited

7    and isolated in the prosecutor's extensive arguments to the jury.  Given the substantial evidence of

8    petitioner's guilt, this court finds the comments did not substantially affect petitioner's right to a

9    fair trial.

10                    i.  <u>Cumulative Effect of Guilt Phase Prosecutorial Misconduct</u>

11                    As described above, many of petitioner's claims simply did not constitute

12   misconduct on the part of the prosecutor.  For the claims where misconduct may have or did

13   occur, the combined prejudice from those claims is insufficient to amount to a "substantial"

14   impact on the verdict.  This conclusion is particularly true because the misconduct was directed at

15   different things. While petitioner argues the errors all dealt with petitioner's credibility, that is not

16   the case.  The questions to Dr. Yarvis which petitioner argues injected prejudicial terms into the

17   case did not involve petitioner's credibility, any attempt to elicit responses from petitioner about

18   the Lactawen murder did not involve credibility, any exploitation of jurors' fear of crime did not

19   involve credibility, and referring to petitioner as a "caveman" did not involve credibility.  All

20   these instances of misconduct or arguable misconduct were isolated and varied.  They would not

21   have combined in the jurors' minds to amount to prejudice substantially affecting the jurors'

22   consideration of the guilt phase evidence.  The one possible error related to credibility, denigrating

23   defense counsel's integrity, was minimal in the context of the government's strong case for guilt.

24   Accordingly, petitioner's claims of prosecutorial misconduct at the guilt phase should fail.

25   ////

26   ////

1              3. <u>Penalty Phase Prosecutorial Misconduct</u>

2                  a. <u>Reading Transcript of Petitioner's Interrogations</u>

3         Petitioner first argues the prosecutor committed misconduct when, in his opening

4 statement, he quoted at length from transcripts of the interrogations of petitioner regarding the

5 Lactawen case.  Petitioner cites only a couple state court cases about the purpose of opening

6 statements.  The only case cited for the proposition that the prosecutor's actions were improper is

7 a decision of the Kentucky Supreme Court.  <u>See</u> <u>Fields v. Commonwealth</u>, 12 S.W. 3d 275 (Ky.

8 2000).  Petitioner makes no showing that, under federal law, the prosecutor's actions were

9 inappropriate.  Petitioner has not established that the California Supreme Court's conclusion, that

10 this claim "lacks merit because the reading of the transcripts was not deceptive, reprehensible, or

11 otherwise improper," is unreasonable under section 2254(d).  Therefore, this claim should be

12 denied.

13                b. <u>Arguing that the Evidence Required a Death Verdict</u>

14         Petitioner complains about the following two statements made by the prosecutor

15 near the beginning of his closing argument.  First, the prosecutor began his closing argument by

16 stating, "based solely on this evidence and the law in this case and everything you have heard

17 concerning this case over the last, oh, approximately two to three months, . . . that I believe this

18 evidence, this evidence alone, requires the maximum punishment allowed by California law."

19 (RT 9382:19-24.)  Shortly after that statement, he again argued that "the evidence clearly

20 demands" that petitioner's punishment be death.  (RT 9384:7-12.)  Petitioner argues that these

21 statements were a misstatement of the law because a death verdict is never required or

22 "preordained by the state of the evidence."  (Dkt. No. 92 at 351:12-13.)  He also argues those

23 statements absolved the jurors of responsibility by indicating that a death verdict was "required."

24         The California Supreme Court denied the claim on procedural grounds and also

25 reached the merits:

26 ////

> [T]here was no misconduct, because the comment, viewed in
> context, was simply proper argument by the prosecutor concerning
> his view of the state of the evidence. (People v. Mayfield, supra, 14
> Cal.4th at p. 804, 60 Cal.Rptr.2d 1, 928 P.2d 485 ["it is not
> misconduct for a prosecutor in the penalty phase of a capital case to
> express in argument a personal opinion that death is the appropriate
> punishment, provided the opinion is grounded in the facts in
> evidence"].)

43 Cal. 4th at 191.  Petitioner cites federal cases only for the general propositions that the Eighth Amendment precludes automatic imposition of the death penalty, Woodson v. North Carolina, 428 U.S. 280, 301 (1976), and precludes minimizing the jury's sense of responsibility in sentencing, Caldwell v. Mississippi, 472 U.S. 320, 328-33 (1985).  Petitioner does not explain how the prosecutor's argument violated either of those rules.  The issue in Woodson was the constitutionality of imposing a mandatory death sentence for every first degree murder.  The prosecutor's suggestion in the present case that the evidence in this case "requires" a death sentence recognizes the individual nature of the sentencing determination, unlike the law at issue in Woodson.  A petitioner can only establish a violation of the rule in Caldwell if he shows the prosecutor's argument "affirmatively misled the jury regarding its role in the sentencing process so as to diminish its sense of responsibility." Romano v. Oklahoma, 512 U.S. 1, 10 (1994).  The prosecutor's argument in the present case did not reduce the jury's responsibility for making a final decision.  Therefore, the California Supreme Court's decision was not unreasonable under section 2254(d).

### c. Arguing that Jury Should Not be Afraid to Return a Death Verdict

Petitioner asserts that the following argument also minimized the jury's responsibility for determining the verdict:

> I want to make sure that none of you feel guilty about making this
> kind of decision, that none of you are afraid to make the kind of
> hard decision you have to make, and that you understand that you
> are making a legal decision which in this State hundreds of juries
> have made before and which as members of this community you
> have been called upon to decide the evidence, and should it reach
> this stage decide the appropriate punishment.

233

1   (RT 9383:10-18.)

2          The California Supreme Court denied the claim on procedural grounds and also

3   denied the claim on the merits because "the statements, taken in context, simply admonished the

4   jury to follow the law in its deliberations and in no way minimized the 'hard decision' faced by

5   the jury." 43 Cal. 4th at 191-92.  Again, petitioner has not shown how the prosecutor's statements

6   would have made jurors feel less responsible for their ultimate decision.  This is not a situation

7   like the one the Court confronted in Caldwell where the prosecutor told jurors that their decision

8   would be automatically reviewed by the state supreme court so their decision "is not the final

9   decision." 472 U.S. at 325.  Nothing the prosecutor told jurors relieved them of the full

10  responsibility to make a decision, based on the evidence, in the present case.  Accordingly, the

11  California Supreme Court's decision was not unreasonable under section 2254(d).

12                         d.  Commenting on Petitioner's Absence

13         During his closing, the prosecutor argued that petitioner had attempted to

14  "manipulate" the jury during his guilt phase testimony by making up a "ridiculous" description of

15  the crimes.  (RT 9389:27 - 9390:6.)  He then made the following comments on petitioner's

16  absence from the courtroom during his mother's testimony:

17                 Here is a person who blames, essentially, his mother and
                   says the most ridiculous assertions of what his mother did to him as
18                 he grew up, and I would suggest to you lied extensively about what
                   his mother may have done to him, and then didn't have the guts in
19                 this courtroom to sit here while his lawyers questioned her about
                   having sexual intercourse with him because he couldn't look her in
20                 the eye with those ridiculous lies.

21  (RT 9390:7-14.)  Petitioner argues that this comment violated petitioner's right to waive his

22  presence at trial.  He relies upon cases holding that the prosecutor may not comment on or draw

23  an adverse inference from: (1) a defendant's failure to testify, Griffin v. California, 380 U.S. 609,

24  613-15 (1965); (2) a defendant's invocation of his Miranda rights, Doyle v. Ohio, 426 U.S. 610,

25  617-18 (1976); or (3) a defendant's refusal to consent to a warrantless search, United States v.

26  Prescott, 581 F.2d 1343, 1352 (9th Cir. 1978).  He further argues that the prosecutor's remark

1    suggested that petitioner's absence should be considered in aggravation, creating an invalid

2    aggravating factor in violation of the Eighth and Fourteenth Amendments.  Finally, petitioner

3    argues that the argument was misconduct for the additional reason that it exploited the court's

4    erroneous exclusion of the evidence of an incestuous relationship between petitioner's mother and

5    her father.

6            The California Supreme Court considered the merits of petitioner's claim,

7    concluding that the prosecutor's remark was not misconduct:

8            Defendant contends, again for the first time on appeal, that
     the prosecutor's comment upon defendant's decision to absent
9    himself during his mother's testimony, as proof that defendant's
     own guilt phase testimony was false, constituted (1) an improper
10   comment upon defendant's exercise of his constitutional rights, (2)
     an improper suggestion that the jury should consider this
11   circumstance as an aggravating factor in the penalty determination,
     and (3) unfair exploitation of the trial court's decision to exclude
12   evidence concerning the molestation of defendant's mother by her
     father. No misconduct occurred. Concerning the second and third
13   claims, the prosecutor's comment constituted proper rebuttal to the
     character evidence presented by the defense in mitigation, and not a
14   suggestion that this was an aggravating factor (People v. Mayfield,
     supra, 14 Cal.4th at p. 804, fn. 15, 60 Cal.Rptr.2d 1, 928 P.2d 485),
15   and, as discussed ante, in part II.C.1.c, because the evidence of
     molestation allegedly committed by defendant's grandfather
16   properly was excluded, the prosecutor's comment did not take
     unfair advantage of the court's ruling.

17
             The prosecutor's remark also did not improperly penalize
18   any assertion by defendant of his constitutional rights. No error
     based upon Griffin v. California (1965) 380 U.S. 609, 85 S.Ct.
19   1229, 14 L.Ed.2d 106 (Griffin) occurred, because the prosecutor's
     comment was directed to defendant's waiver of his constitutional
20   right to be present, not the assertion of some constitutional right,
     such as the right to remain silent at issue in Griffin. (Compare
21   Griffin, supra, 380 U.S. at p. 614, 85 S.Ct. 1229 [The practice of
     allowing comment upon the defendant's failure to testify "is a
22   penalty imposed by courts for exercising a constitutional privilege.
     It cuts down on the privilege by making its assertion costly."].)
23   Simply, there is no constitutional right to be voluntarily absent
     during trial. (Frye, supra, 18 Cal.4th at p. 1011, 77 Cal.Rptr.2d 25,
24   959 P.2d 183["[T]hese qualifications to the right to be present
     [namely, waiver and removal for disruption] do not confer an
25   affirmative right to be absent from trial. Nor are we aware of any
     decision recognizing a concomitant right of the defendant not to be
26   present or to otherwise avoid being confronted with the witnesses

                                      235

1        against him."].)

2                Moreover, this is not a situation such as was present in
         <u>Doyle v. Ohio</u> (1976) 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91,
3        where the defendant was misled concerning the possible effect of
         his choice to be absent. In the present case, defendant was, in fact,
4        advised several times that voluntarily absenting himself likely
         would be detrimental to his defense, and he acknowledged he
5        realized this before he was allowed to waive his presence. Nor was
         defendant faced with the Hobson's choice of having to relinquish
6        one constitutional right in order to preserve another. (<u>See Simmons
         v. United States</u> (1968) 390 U.S. 377, 394, 88 S.Ct. 967, 19 L.Ed.2d
7        1247.)

8                The circumstance that, as we observed above, it was
         statutory error for the trial court to allow defendant to voluntarily
9        absent himself during his mother's testimony does not render the
         prosecutor's comment upon his absence misconduct. (Cf. <u>Visciotti</u>,
10       <u>supra</u>, 2 Cal.4th at p. 82, 5 Cal.Rptr.2d 495, 825 P.2d 388
         ["Regardless of whether an appellate court may later conclude that a
11       piece of evidence was erroneously admitted, argument directed to
         the evidence does not become misconduct by hindsight."].)

12

13   43 Cal. 4th at 192-93 (footnote omitted).

14           Petitioner does not explain why the California Supreme Court was incorrect in

15   construing the prosecutor's remarks as a response to mitigating evidence, as opposed to a new

16   factor in aggravation, or how a comment on the credibility of petitioner's testimony somehow

17   amounted to "exploitation" of the exclusion of evidence regarding petitioner's mother and her

18   father.  The California Supreme Court's denial of these two arguments was not unreasonable

19   under section 2254(d).

20           With respect to petitioner's contention that the prosecutor's argument violated his

21   right to absent himself from trial, petitioner has cited no "clearly established Federal law, as

22   determined by the Supreme Court" in support of this contention.  Rather, petitioner asks this court

23   to extend Supreme Court case law regarding a prosecutor's comment on a defendant's invocation

24   of a constitutional right.  As the California Supreme Court points out, petitioner did not have a

25   constitutional right to absent himself from trial.  Moreover, petitioner was warned that jurors

26   might consider his absence in an adverse light.  (RT 7989-90.)  This court cannot find that the

                                              236

1   California Supreme Court's decision "'was so lacking in justification that there was an error well

2   understood and comprehended in existing law beyond all possibility for fairminded

3   disagreement.'" Parker v. Matthews, 132 S. Ct. 2148 (2012) (quoting Harrington v. Richter, 131

4   S. Ct. 770, 786-87 (2011)).[56]

5                              e. Exploiting Exclusion of Evidence of Address Book

6                    During the penalty phase argument, the prosecutor referred to Ms. Sorensen as an

7   "innocent young girl." (RT 9394:1.) The defense objected to the use of that term. The court

8   overruled the objection. The California Supreme Court denied the claim on the procedural ground

9   that there had been no objection at trial, which was incorrect. In any event, the state court also

10  denied the claim "because this evidence was properly excluded" and therefore, "the prosecutor

11  took no unfair advantage." 43 Cal. 4th at 193. Because this court agrees that Ms. Sorensen's

12  address book was properly excluded, the California Supreme Court's reasoning here is sound.

13  Further, to the extent petitioner also argues that the reference to Ms. Sorensen as "innocent" was

14  misleading, the jury already knew Ms. Sorensen was engaging in more adult activities such as

15  taking drugs, having a sexual relationship with her boyfriend, and hitchhiking. One use of the

16  term "innocent," would hardly have lead the jury to view Ms. Sorensen in a different light or

17  petitioner in a worse one.

18                              f. Encouraging Speculation re Victims' Experience

19                    Petitioner next objects to the prosecutor's argument encouraging the jury to

20  speculate about what the victims would have experienced.

21                              i. Background

22                    During closing argument, the prosecutor provided the following description of the

23  crimes:

24  _____

25        [56] It is worth pointing out that petitioner has done little to help this court's analysis. As
      he does with respect to many of his arguments of prosecutorial misconduct, petitioner simply
      states that the claim was denied on procedural grounds and ignores the California Supreme
26    Court's alternative ruling on the merits.

1   [W]hen you are looking at the total picture in that jury deliberating
    room, that out of all these factors that can be considered, the one
2   that is the most significant and the most important in deciding
    punishment is just how this man committed these crimes against
3   those two ladies.

4           Therefore, I would ask you again to project yourself back to
    the scenes of each of these two murders and sexual assaults, and
5   look at and assess what this man had in his mind and what he did to
    each of these victims.

6
            And I want you to imagine, if you can, when you are
7   assessing the weight to give to the way Mr. Rundle killed and
    sexually tortured these women, to try and consider the humiliation,
8   terror and pain each of these women underwent at the hands of that
    man before he violently strangled them.

9

10  (RT 9395:4-19.)

11          The prosecutor then invited the jurors to look at the photographs of Ms.

12  Lactawen's dead body to visualize what happened to Ms. Garcia and Ms. Sorensen.

13          And I think that for you to really consider what Ms. Garcia
    and Ms. Sorensen went through at the hands of Mr. Rundle, that it
14  will assist you – and I'm not asking you to do it, but if you think
    you need to – look again at Ms. Lactawen's pictures. She was found
15  the same day.

16          As I told you in my final argument a month or so ago,
    because the Defendant was very clever in concealing these bodies,
17  those photographs could not graphically show you what he did to
    Ms. Garcia and Ms. Sorensen, but if you want to get an inkling of
18  the violence he performed on each of those women, take a look at
    Ms. Lactawen's photographs one more time if you think it is
19  necessary.

20  (RT 9395:26 - 9396:9.)  Petitioner also objects to the prosecutor's subsequent argument:

21          If I could first discuss with you the crime involving
    Elizabeth Lactawen on May 10, 1986.
22
            The photographs, as distasteful as they are, were necessary,
23  and I think those photographs combined with Doctor Neilsen's
    explanation and testimony concerning his autopsy of that young
24  lady, very graphically tell the full story of what this man is capable
    of.
25

26  (RT 9401:24 - 9402:2.)  In his quotation of this portion of the prosecutor's argument, petitioner

238

leaves out the final part of the last sentence.  The prosecutor's complete argument was:

> The photographs, as distasteful as they are, were necessary, and I think those photographs combined with Doctor Neilsen's explanation and testimony concerning his autopsy of that young lady, very graphically tell the full story of what this man is capable of and, in fact, what he did to this unfortunate woman, who was four feet five inches tall and seventy-six pounds and twenty-four years old.

(RT 9401:26 - 9402:5.)

ii.  <u>State Court Decision</u>

The California Supreme Court denied this claim on procedural grounds and the merits as follows:

> Echoing another guilt phase misconduct claim, defendant contends the prosecutor engaged in misconduct at the penalty phase by suggesting to the jury it should consider evidence of the physical trauma to Lactawen in filling in the gaps in the evidence regarding the Garcia and Sorensen murders and the condition of their bodies immediately after defendant murdered them. Defendant claims this argument improperly invited the jury to  speculate, misstated the evidence, "violated the propensity rule" by arguing that all three murders were committed in the same manner, and improperly sought to inflame the passions of the jury. Defendant did not object or request an admonition, and therefore has forfeited this claim. In any event, no misconduct occurred. For the same reasons we stated ante, in part II.C.6.d, the argument challenged here fairly suggested inferences the jury properly could draw from the evidence presented at trial, especially in light of the striking similarities among the murders, and left for the jury the decision whether to accept or reject those suggestions. (<u>See also</u> People v. Slaughter (2002) 27 Cal.4th 1187, 1212, 120 Cal.Rptr.2d 477, 47 P.3d 262 [at the penalty phase, the prosecutor is permitted "to invite the jurors to put themselves in the place of the victims and imagine their suffering"]; <u>People v. Lewis</u> (2001) 25 Cal.4th 610, 672, 106 Cal.Rptr.2d 629, 22 P.3d 392 ["At the penalty phase of a capital trial, a prosecutor is permitted to argue any reasonable inferences from properly admitted evidence of a defendant's prior violent crime, even if such inferences relate to the defendant's character as revealed in the prior violent crime itself or in its surrounding circumstances"]; <u>Ray</u>, <u>supra</u>, 13 Cal.4th at pp. 349–350, 52 Cal.Rptr.2d 296, 914 P.2d 846 [§ 190.3, factor (b) permits the jury's consideration of "evidence of violent criminality committed at any time in the defendant's life, and whether or not adjudicated, to show his propensity for violence"]; <u>People v. Kelly</u> (1990) 51 Cal.3d 931, 964, 275 Cal.Rptr. 160, 800 P.2d 516 [photographs of victims properly were admitted at penalty phase when they supported the prosecution's

239

1       theory of the crimes and were not "unduly gruesome"].)

2 43 Cal. 4th at 193-94 (footnote omitted).

3            iii.  <u>Discussion</u>

4       Petitioner raises a number of issues regarding these arguments.  First, he contends

5 the prosecutor's argument invited the jury to speculate, as he had in the guilt phase argument,

6 about the circumstances of the offenses.  Second, he contends the arguments misstated the

7 evidence by describing the "torture," and "humiliation, terror and pain" the women must have

8 suffered.  Third, he contends the prosecutor improperly used the Lactawen autopsy photographs to

9 argue petitioner assaulted Ms. Garcia and Ms. Sorensen in the same manner.  Petitioner claims

10 this argument violated the "propensity rule," which prohibits attempts to show a criminal

11 defendant's character lead him to commit the crime.  <u>See</u> <u>Washington v. Hofbauer</u>, 228 F.3d 689,

12 699 (6th Cir. 2000).  Finally, petitioner argues that use of the Lactawen photographs to invite the

13 jury to imagine what happened to Ms. Garcia and Ms. Sorensen was calculated to inflame the

14 juror's passions, rather than focusing them on the evidence.

15       This claim suffers the same problems as petitioner's similar guilt phase claim.

16 First, in support of his argument that the prosecutor encouraged improper speculation, he relies

17 primarily on state law.  He cites just one federal case for a general rule.  However, that case

18 involved facts which are distinguishable from those here.  In <u>Tankleff v. Senkowski</u>, 135 F.3d

19 235, 253 (2nd Cir. 1998), the Court of Appeals held that it was improper for the prosecutor to

20 imply that the reason the defendant's sister did not testify was because she would have

21 contradicted the defendant's story.  The prosecutor knew that implication was false because the

22 sister's testimony at a suppression hearing corroborated the defendant's story.  In the present case,

23 petitioner is not alleging that the prosecutor directly contradicted known evidence; rather he

24 contends the prosecutor invited inappropriate speculation.  The prosecutor's comments about

25 what Ms. Garcia and Ms. Sorensen may have felt were obviously argument and admittedly based

26 on a lack of evidence.  The prosecutor was not attempting to mislead the jury regarding the

1   evidence, as the prosecutor did in <u>Tankleff</u>.  Further, even if the prosecutor's action in the present

2   case were comparable, <u>Tankleff</u> does not support his claim for relief.  The court in that case held

3   that the petitioner had not shown he was substantially prejudiced by the prosecutor's remarks.

4          In support of his argument about violation of a "propensity rule," petitioner relies

5   on only one federal case which is, again, inapplicable.  Petitioner cites <u>Hofbauer</u> for its statement

6   of the rule that the use of "bad character" evidence to show a defendant had the propensity to

7   commit a crime can amount to misconduct.  228 F.3d at 699-700.  In <u>Hofbauer</u>, the court

8   considered a prosecutor's "extensive" argument regarding the defendant's character by

9   emphasizing that the defendant "did not work, beat [his girlfriend] regularly, consumed alcohol

10   excessively, and did not make payments on [his girlfriend's] home."  <u>Id.</u> at 695.  The prosecutor

11   asked the defendant about each issue on cross-examination, largely ignoring the issue at trial.  <u>Id.</u>

12   at 695-96.  During his closing argument, the prosecutor "again focused on [the defendant's]

13   character," referring to the defendant as, among other things, a "self-serving, illogical selfish non-

14   compassionate, no emotional interest in a family type of person."  <u>Id.</u> at 696.  He argued

15   repeatedly that the crime "fit" the defendant's character.  <u>Id.</u> at 696-97.  The Court of Appeals

16   found the prosecutor's argument was "perhaps the paradigm of the improper 'bad character'

17   argument," and concluded that the misconduct was "severe."  The prosecutor's actions in the

18   present case were quite different.  Here, the prosecutor's comparison of the Lactawen murder to

19   the Garcia and Sorensen crimes was not an attempt to comment upon petitioner's character.

20   Rather, it was a comparison of what appeared to be three very similar crimes.  Petitioner fails to

21   show that comparison falls within the ambit of the propensity rule.

22          Finally, petitioner's argument regarding use of the Lactawen photographs is weak

23   on several levels.  First, the prosecutor did not directly compare the cases.  Rather, in one

24   comment he suggested that jurors might get  "an inkling of the violence he performed on each of

25   those women."  Second, the prosecutor's second reference to the Lactawen photographs was not,

26   as petitioner attempts to show by an incomplete citation to the record, an attempt to compare the

1  Lactawen murder with the Garcia and Sorensen murders.  Rather, those comments were directed

2  at the Lactawen murder alone.  Petitioner's federal court citations to general rules do not help him.

3  See United States v. Young, 470 U.S. 1 (1985) ("prosecutor should not use arguments calculated

4  to inflame the passions or prejudices of the jury"); Viereck v. United States, 318 U.S. 236, 247-48

5  (1943) (Prosecutor's remarks improper because they amounted to "an appeal wholly irrelevant to

6  any facts or issues in the case, the purpose and effect of which could only have been to arouse

7  passion and prejudice.").  Petitioner has not shown that the California Supreme Court's denial of

8  this claim was contrary to or an unreasonable application of federal law.

9                                  g.  Remarking on Failure to Present a Defense to Lactawen Homicide

10            Petitioner argues the prosecutor improperly referred to the lack of a defense to

11  testimony about Ms. Lactawen's murder.  (RT 9400:28 - 9401:1.)  Petitioner claims the comment

12  implicated petitioner's right not to testify because he was the only one who could have rebutted

13  the government's case about the Lactawen murder.  In addition, petitioner argues that the

14  prosecutor impermissibly capitalized on the denial of petitioner's motion in limine to exclude the

15  Lactawen evidence.[57]

16            When discussing the evidence of unadjudicated criminal conduct, the prosecutor

17  noted that, "you didn't see any defense to any of the crimes.  We didn't see anything presented to

18  rebut testimony about Ms. Lactawen's murder."  (RT 9400:27 - 9401:1.)  The defense

19  immediately objected.  The court then  instructed the jurors:

20            The jurors should keep in mind the Defendant has no burden
           of proof with respect to crimes in aggravation.

21
            Just as in the guilt phase, the prosecutor bears the sole
22            burden of proving each of those crimes beyond a reasonable doubt.

23            Disregard any inference in the argument to the contrary.

24  (RT 9401:4-11.)

25  _____

26      [57]  Petitioner's challenge to the denial of his motion in limine is discussed below in claim
    O.

The California Supreme Court denied this claim on the merits:

During his penalty phase argument, the prosecutor stated, with regard to the section 190.3, factor (b) evidence, "And we all know, you didn't see any defense to any of these crimes. We didn't see anything presented to rebut testimony about Ms. Lactawen's murder." When defendant objected to this statement as "Griffin error" see Griffin, supra, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106) the trial court reminded the jury that the burden to prove the factor (b) evidence rested upon the prosecution and that defendant bore no burden. Defendant contends on appeal that the prosecutor's comment violated defendant's constitutional right to choose not to testify, and that the trial court's admonition was insufficient to cure the alleged error. He is mistaken.

The People assert the prosecutor's comments properly emphasized the absence of evidence controverting the prosecution's evidence. (See People v. Mitcham (1992) 1 Cal.4th 1027, 1051, 5 Cal.Rptr.2d 230, 824 P.2d 1277.) Even if we were to assume otherwise, as urged by defendant—that the prosecutor's comment violated defendant's constitutional right to refrain from testifying, under Griffin, supra, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (see People v. Johnson (1992) 3 Cal.4th 1183, 1229, 14 Cal.Rptr.2d 702, 842 P.2d 1 (Johnson)), because only his own testimony could have rebutted the evidence against him—we would conclude that any misconduct was harmless beyond a reasonable doubt. The prosecutor's statement was, at most, "an indirect, brief and mild reference to defendant's failure to testify as a witness." (People v. Mincey, supra, 2 Cal.4th at p. 446, 6 Cal.Rptr.2d 822, 827 P.2d 388.) The prosecutor did not suggest that the jury should draw any additional inference of guilt from defendant's failure to testify beyond the inference of guilt established by the evidence that had been presented. "Such references have uniformly been held to be harmless error." (Id. at p. 447, 6 Cal.Rptr.2d 822, 827 P.2d 388; People v. Hovey (1988) 44 Cal.3d 543, 572, 244 Cal.Rptr. 121, 749 P.2d 776.) Moreover, the overwhelming proof that defendant committed the Lactawen murder, and the trial court's timely admonition to the jury regarding the burden of proof and its instruction that the jury could not draw any adverse inference from defendant's decision not to testify at the penalty phase, further ameliorated any possibility of harm. (People v. Carter (2005) 36 Cal.4th 1215, 1267, 32 Cal.Rptr.3d 838, 117 P.3d 544.) Accordingly, any misconduct would have been harmless beyond a reasonable doubt.

Defendant also contends the prosecutor's statement took unfair advantage of the denial of defendant's in limine motion to exclude the Lactawen murder evidence, because the prosecutor "place[d] appellant in an untenable position and subsequently argue[d] that the choice appellant was forced to make supported sentencing him to death." Even if defendant had not forfeited this

1    claim by failing to raise it below, we would conclude that it fails
     because, as discussed above, any possible misconduct would have
2    been harmless beyond a reasonable doubt.

3    43 Cal. 4th at 194-95.

4          Petitioner argues that the prosecutor's comment was error, but does nothing to

5    show prejudice.  He makes no argument and cites no case law in support of his one-sentence

6    statement that "[t]his admonishment did not cure the harm caused by the prosecutorial

7    misconduct." (Dkt. No. 92 at 358:14-15.)  This court finds no basis for determining that the

8    California Supreme Court's rejection of this claim was unreasonable. The evidence that petitioner

9    murdered Elizabeth Lactawen, including his confession to doing so, was overwhelming.  The

10   prosecutor's limited comment would not have "substantially and injuriously" affected the verdict.

11                      h.  Denigrating Mitigating Factors

12         In his closing, the prosecutor argued; 'It appears to me from this evidence that

13   the entire defense in this case is to blame others. . . ." (RT 9436:8-9.)  Later, as he was concluding

14   his closing argument, the prosecutor urged the jury not to "descend into this type of penalty phase

15   madness which is tantamount to the same madness Mr. Rundle tried to convince you of in the

16   guilt phase." (RT 9477:7-10.)  In addition, petitioner takes issue with the  prosecutor's comments

17   labeling petitioner a "snitch." When he discussed petitioner's evidence that he had alerted jail

18   guards to the location of a prison weapon created by an inmate planning an escape from the Placer

19   County Jail while awaiting trial for capital murder charges, the prosecutor stated:

20         [Petitioner] helped Sergeant Roloff, gave him a little bit of
           information which would have been discovered anyway, but he did.
21
           He snitched off somebody in the jail; and granted, law
22         enforcement definitely needs snitches. Without them we would have
           had a harder time finding the crooks, but he did. He was a snitch for
23         Sergeant Roloff.

24   (RT 9398:2-8.)  Petitioner argues these statements amounted to an improper denigration of the

25   mitigating evidence.

26   ////

                                    244

1    The California Supreme Court denied this claim for the failure to object at trial and

2  also on the merits.  It held: "There was nothing deceptive or reprehensible about these comments,

3  and they did not, individually or cumulatively, improperly denigrate defendant's evidence in

4  mitigation."

5    Petitioner relies solely on a few state court cases to support his argument that these

6  comments amounted to misconduct.  (Dkt. No. 92 at 361:22-28.)  Those cases hardly amount to a

7  showing that the California Supreme Court's decision was contrary to, or an unreasonable

8  application of, federal law as decided by the United States Supreme Court.  Accordingly,

9  petitioner's claim should be denied.

10               i.  Suggesting that Lack of Mitigating Evidence was Aggravating

11   At the end of his penalty phase argument, the prosecutor went through each

12  statutory sentencing factor that could be considered mitigating and argued that petitioner had not

13  presented evidence to establish any of them.  (RT 9443:16 - 9451:8.)  Despite the fact the

14  prosecutor referred to every one of these factors as not present or "neutral," petitioner claims the

15  prosecutor's argument would have lead the jury to consider the absence of the mitigating factors

16  as points against petitioner rather than as truly neutral.  Petitioner also argues here that the

17  prosecutor improperly told the jurors a personality disorder was not a mitigating factor.

18   The California Supreme Court denied the claim on procedural grounds and made

19  the following merits rulings:

20          [T]he prosecutor never stated that the absence of a statutory
             mitigating factor amounted to an aggravating factor; to the contrary,
21          he described such a circumstance as "neutral." There is nothing
             improper in arguing that mitigating factors are not present and that,
22          by contrast, the facts of the crimes are aggravating factors under
             section 190.3, factor (a)—which is the argument made by the
23          prosecutor in this case.

24  43 Cal. 4th at 196 (citation omitted).  With respect to the argument that a personality disorder

25  could not be considered under the mitigating factor for a "mental disease or defect," the California

26  Supreme Court held:

1  The challenged argument generally constituted permissible
   comment upon the state of the evidence and did not misstate the
2  law, especially in light of the proper instructions given to the jury. It
   is true the prosecutor twice inaccurately described the experts'
3  opinions concerning whether defendant suffered from a mental
   illness or defect.FN58 The prosecutor's comments were brief,
4  however, and the jury was instructed on various occasions during
   the trial that statements by the attorneys were not evidence.
5  Moreover, the prosecutor did not argue simply that because there
   was no diagnosis of psychosis, these factors in mitigation were
6  inapplicable. Rather he discussed at length defendant's "personality
   disorder" and ultimately argued the evidence was not mitigating.
7  Finally, defense counsel did not argue that defendant suffered from
   a mental disease or defect, and, in fact, seemed to agree with the
8  prosecutor's assessment of the experts' testimony.

9       FN58. The prosecutor twice stated that all three experts
        agreed that defendant did not suffer from a disease or mental
10       defect, whereas only one so testified, another described
        defendant's character disorder as a mental defect, and the
11       third was not asked to give an opinion on this subject.

12  43 Cal. 4th at 196-97.

13       Petitioner relies solely on state law for his argument that a discussion of an absence

14  of mitigating evidence could be construed as aggravating evidence. (Dkt. No. 92 at 366-69.) He

15  cites just a few federal cases. He cites two cases for the proposition that mental health problems

16  may be considered mitigating. See Eddings v. Oklahoma, 455 U.S. 104, 114-15 (1982 ) (trial

17  court erred in instructing jury it could not, as a matter of law, consider evidence of defendant's

18  emotional disturbance); Smith v. Stewart, 140 F.3d 1263, 1270 (9th Cir. 1998) (defense attorney

19  erred in failing to introduce evidence of antisocial personality disorder at penalty phase). He cites

20  a third federal case for the proposition that a jury must be allowed to consider evidence presented

21  in mitigation. McDowell v. Calderon, 130 F.3d 833, 837 (9th Cir. 1997), overruled in part on

22  other grounds in Weeks v. Angelone, 528 U.S. 225 (2000). None of these federal cases establish

23  any sort of rule that a prosecutor may not argue the inapplicability of statutory mitigating factors.

24  Moreover, the prosecutor here appeared to be careful not to argue that the lack of a mitigating

25  factor amounted to an aggravating factor by referring to the absence of each as "neutral."

26  Accordingly, petitioner has failed to show the California Supreme Court's rejection of this claim

1 was unreasonable under 28 U.S.C. § 2254(d).

2                    j. _Misleading Jury re Weighing Process_

3              Petitioner next argues that the prosecutor mislead the jurors about the deliberative

4 process by telling them four times that they could consider evidence in mitigation only if it

5 "lessens" the defendant's "criminal culpability" or "responsibility."  (RT 9391:15-19; 9431:2-4;

6 9450:9-11; 9467:18-20.)  It is well established that a sentencing jury "may not be precluded from

7 considering, as a mitigating factor, any aspect of the defendant's character or record and any of the

8 circumstances of the offense that the defendant proffers as a basis for a sentence less than death."

9 Lockett v. Ohio, 438 U.S. 586, 604 (1978).  The California Supreme Court held:

10               [W]e discern no misconduct. The prosecutor's isolated remarks
                 regarding responsibility and culpability, even if erroneous, were not
11               so significant as to overshadow the prosecutor's other correct
                 statements of the definition of mitigation. The prosecutor in no way
12               argued that the jury could not consider defendant's evidence in
                 mitigation, and in fact he discussed essentially the entire defense
13               case and often pointed out that it was for the jury to determine
                 whether and to what degree particular evidence amounted to a
14               mitigating factor. Any possible misconduct would be of minimal
                 significance, and was rendered even less potentially harmful by
15               defendant's penalty phase argument, which stressed the jury's
                 ability to consider mercy and sympathy, and the trial court's proper
16               instructions on the scope of the mitigating factors.

17 43 Cal. 4th at 197.

18              Whether or not the prosecutor's statements were error, they did not substantially

19 and injuriously affect the verdict.  As the California Supreme Court points out, the prosecutor

20 made an equal number of appropriate comments about the way mitigation must be considered.

21 (See, e.g., RT 9443:9-13 (A mitigating factor is anything "which lessens the degree of moral

22 culpability of the defendant or provides a moral or sympathetic basis to impose the lesser as

23 opposed to the greater penalty."); RT 9438:24 - 9439:1 ("obviously you can find that the

24 defendant's upbringing and what he was subjected to as a youngster is so important that it

25 overshadows some of these other things and that it should be given great consideration and his life

26 should be spared because he was subjected to such abuse . . ."); RT 9451:9-17 ("This is the

1    mitigating factor [factor (k)] that you can find, if you can, from any of the evidence you've heard

2    that you think lessens Mr. Rundle's responsibility, and you give it some sympathetic value or you

3    give is some moral value.").)  In addition, the defense made very clear that the jury should

4    consider good qualities and mercy.  (See, e.g., RT 9518:18-21 (death penalty should be reserved

5    "only for those persons whose crimes and background show beyond a shadow of any doubt that

6    they can't be redeemed or rehabilitated and have no human qualities whatsoever"); RT 9533-34

7    (discussion of petitioner's "gainful employment"); RT 9541-44 (discussion of petitioner's

8    successful adaptation to prison life and his skills that could be used to work in prison); RT 9544-

9    52 (summary of petitioner's life as one marked by abuse and rejection, despite which petitioner

10   "has many admirable human qualities").  Finally, jurors were told that argument was only that and

11   were instructed by the court on the appropriate consideration of mitigating evidence.  (RT 9566:7-

12   16; 9567:6-12; 9569:17 - 9570:23.)  Petitioner has not established that no fair-minded jurist could

13   have rejected this claim.

14                     k.  Cumulative Effect of Prosecutorial Misconduct

15              Petitioner argues that these instances of misconduct at the penalty phase, combined

16   with the guilt phase misconduct, amounted to prejudice at the penalty phase.  The California

17   Supreme Court concluded that "there was no pervasive prosecutorial misconduct . . . that denied

18   defendant his constitutional right to a reliable and fair penalty proceeding."  As described above,

19   petitioner has established very few acts of arguable misconduct by the prosecutor at either phase.

20   The significant evidence of petitioner's guilt for two shocking crimes, and his admission of guilt

21   to a third, placed heavy weight on the aggravating side of the scale.  The penalty phase defense

22   was hardly "powerful," as petitioner describes it.  It cannot be said that the California Supreme

23   Court's rejection of this claim was so unreasonable that "no fair-minded jurist" could have come

24   to the same conclusion.

25   ////

26   ////

1    Claim O.  Denial of Motion to Exclude Evidence of Lactawen Homicide or Change
2            Venue

3        Petitioner filed a pre-trial motion in limine to exclude evidence of the Lactawen

4    homicide or, alternatively, to change venue to Sacramento County where a consolidated

5    trial of the Garcia, Sorensen and Lactawen homicides could be held.  (CT 539-51.)  Petitioner

6    argued that introduction of the Lactawen homicide evidence at the penalty phase of the Placer

7    County trial while a capital case charging the Lactawen homicide was pending in Sacramento

8    County violated Petitioner's due process rights.  Petitioner argued he would be forced to choose

9    between defending the Lactawen charges in the Placer County trial and thereby prejudicing his

10   defense at the upcoming Sacramento County trial, and not opposing the evidence of the Lactawen

11   homicide at the Placer County trial, thereby prejudicing his penalty phase defense.  The trial court

12   denied the motion, stating "I make no comment on the wisdom of what takes me there, but I think

13   I am compelled to make that finding."  (RT 334:24-25.)

14       As discussed above, petitioner chose not to defend against the allegations arising

15   from the Lactawen homicide at the penalty phase in this case.  Petitioner complains that the

16   prosecutor's penalty phase arguments capitalized on the predicament by pointing out that

17   petitioner presented no defense to the Lactawen killing at the penalty phase.  (RT 9400:28 -

18   9401:1 ("We didn't see anything presented to rebut testimony about Ms. Lactawen's murder.").)

19   As discussed above, the trial court told the jury to ignore any implication in that remark that the

20   defense bore some burden with respect to aggravating evidence.  (RT 9401:4-11.)  Petitioner

21   argues here that the court should have further instructed the jury that it could give no aggravating

22   weight to the absence of a defense to the Lactawen homicide and that the failure to present a

23   defense was a strategic decision by his counsel designed to protect petitioner's right to defend

24   himself against the pending Lactawen charges.

25       Relying on its decision in People v. Avena, 13 Cal. 4th 394 (1996), the California

26   Supreme Court held it was not unconstitutional to compel a defendant to make a choice between:

249

1    (i) testifying at the penalty phase, and thereby losing his "privilege against compelled

2    self-incrimination for a future trial in the Lactawen matter, or (ii) remaining silent, thereby leaving

3    the evidence of his guilt unrebutted." 43 Cal. 4th at 186.  In Avena and in its prior decision

4    People v. Caro, 46 Cal. 3d 1035 (1988), the California Supreme Court relied upon the United

5    States Supreme Court's decision in McGautha v. California, 402 U.S. 183 (1971):

> In McGautha the United States Supreme Court held that
> Ohio's practice of determining guilt and penalty issues in a single
> "unitary" trial in capital cases violated neither the Fifth Amendment
> privilege against self-incrimination nor any federal constitutional
> right of the defendant to be heard on the issue of punishment, even
> though it meant that the defendant would be forced to waive his
> privilege against self-incrimination on the issue of guilt if he chose
> to testify on the issue of punishment. (402 U.S. at pp. 213–220, 91
> S.Ct. at pp. 1470–74.)  Curtailing the reach of earlier broad
> language in Simmons v. United States (1968) 390 U.S. 377, 394, 88
> S.Ct. 967, 976, 19 L.Ed.2d 1247, which had declared it "intolerable
> that one constitutional right should have to be surrendered in order
> to assert another[,]" the McGautha court observed: "The criminal
> process . . . is replete with situations requiring the 'making of
> difficult judgments' as to which course to follow. [Citation.]
> Although a defendant may have a right, even of constitutional
> dimensions, to follow whichever course he chooses, the
> Constitution does not by that token always forbid requiring him to
> choose." (402 U.S. at p. 213, 91 S.Ct. at p. 1470.)

16   Caro, 46 Cal.3d at 1056 (some internal citations omitted).

17           Petitioner does not mention McGautha in his argument on this claim.  A review of

18   that case shows that it contradicts petitioner's argument.  However, McGautha was vacated by the

19   Supreme Court in light of  Furman v. Georgia, 408 U.S. 238 (1972).  Crampton v. Ohio, 408 U.S.

20   941 (1972).   Nonetheless, that Court and the Court of Appeals for the Ninth Circuit have cited

21   with approval the McGautha language relied upon by the California Supreme Court in the present

22   case.  See Newton v. Rumery, 480 U.S. 386, 393-94 (1987); Corbitt v. New Jersey, 439 U.S. 212,

23   218-19 n.8 (1978); Bonin v. Calderon, 59 F.3d 815, 840 (9th Cir. 1995); United States v.

24   Yarbrough, 852 F.2d 1522, 1529 (9th Cir. 1988).  In fact, the Court of Appeals in Bonin

25   addressed an argument identical to that made here.  Petitioner Bonin argued that it was

26   unconstitutional to force him to choose to defend against unadjudicated murders presented at the

penalty phase, when that choice could result in evidence being used against him in the subsequent

prosecution of those murders.  59 F.3d at 839-40.  Relying on the McGautha language, the Court

of Appeals rejected the petitioner's claim.  Id. at 840.  Clearly established federal law supports the

California Supreme Court's decision.  Petitioner has not shown otherwise.  Therefore, this claim

should be denied.

Claim P. Admission of Evidence of Prior Unadjudicated Criminal Conduct

The prosecution introduced evidence of four unadjudicated acts of force or

violence: (1) petitioner's alleged physical assaults and forcible acts of oral copulation and sodomy

on his former wife, Randi Rundle, during their marriage between April 1984 and May

1985; (2) petitioner's sexual assault of six-year-old Rebecca Young in 1979, when he was

fourteen; (3) petitioner's sexual assaults of twelve-year-old Brian Minner and eleven-year-old

Cori Howe in 1979, when petitioner was fourteen; and (4) the murder of Elizabeth Lactawen on

May 10, 1986.  (CT 397-99, 505-06.)  Petitioner contends that the introduction of this evidence

violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.  He further

contends that the admission of this evidence was unconstitutionally prejudicial because: (1) the

jurors were not required to find unanimously that each act had been proven beyond a reasonable

doubt; and (2) the court failed to define the presumption of innocence and "reasonable doubt."  As

discussed below, none of these arguments have merit.  Accordingly, this court recommends denial

of Claim P.

1.  Testimony of Randi Rundle

Petitioner argues the admission of Randi Rundle's testimony that petitioner forced

her to have anal sex and orally copulate him violated his due process rights because he did not

have a fair opportunity to defend against them.  He claims the evidence was unreliable in violation

of the Eighth Amendment because there was no corroboration; because Ms. Rundle never

reported the incidents; because the accusations were amorphous, lacking identifying dates, times

or places; and because the judge found Randi Rundle's testimony lacked credibility.  Finally,

1   petitioner argues that admission of the evidence after expiration of the statute of limitations for

2   those crimes violated his due process and Eighth Amendment rights.

3                    a. Background

4              Just before Randi Rundle was called to testify at the penalty phase, defense counsel

5   requested an opportunity to examine Ms. Rundle outside the jury's presence to ask her whether

6   she was "compelled to participate in some acts" and whether she reported any of the incidents to

7   authorities.  (RT 8861:17 - 28.)  The trial judge eventually agreed that a hearing was necessary to

8   give petitioner notice of "what specific acts, dates and times are being offered."  (RT 8868:13-17.)

9   Randi Rundle then testified outside the jury's presence.  (RT 8875-25.)  She testified that during

10  the fifteen or sixteen months of their marriage petitioner once threw her down a hallway and

11  pounded her head into the floor (RT 8878:9-25), three or four times a week he would restrain her

12  and force her to have anal sex (RT 8880:9 - 8884:16; 8885:2-14), and eight or ten times he forced

13  her to orally copulate him by pushing her head against him until she vomited (RT 8886:11 -

14  8889:5).  On cross-examination, she testified that petitioner forced her to have anal sex ten to fifty

15  times (RT 8898:8-27) and that petitioner never verbally threatened her (RT 8902:1-5).  She had

16  told the district attorney previously that petitioner had forced her to have anal sex about once a

17  week.  (RT 8915:1-4.)  Randi Rundle also testified that she continued to have a "normal" sexual

18  relationship with petitioner during that time.  (RT 8918:10-21.)   After hearing the defense

19  argument that the prosecution had not sufficiently established that petitioner's conduct amounted

20  to a felony, the trial judge permitted Randi Rundle's testimony:

21                    I think that the problem is that there is a fine line, I suppose,
                 both in terms of the definition of a crime and certainly with respect
22               to evidentiary problems between acceptable sexual conduct in a
                 marriage, however different, and a criminal offense in the context of
23               a marriage, and it may well be necessary that the jury be specifically
                 instructed as to the findings they'd have to make in order to negate
24               potential consental [sic] aspects of this, both in terms of the issue
                 of reasonable belief on the part of the defendant and in terms of
25               whether or not the continuing participati[on] might be evidence of
                 consent. . . .

26

1  (RT 8928:14-25.)  The judge continued that if the jury believed the witness's testimony that she

2  resisted, then "the elements of those offenses have been made out, [and] the People are entitled to

3  have the jury make that decision."  (RT 8928:26 - 8929:13.)  The judge also told the defense it

4  would be "entitled to specific instructions on what jury findings would be necessary."  (RT

5  8929:14-20.)

6         Randi Rundle then testified before the jury about the incident when petitioner

7  threw her down and pounded her head into the ground.  (RT 9025:14 - 9026:28.)  She testified

8  that petitioner forced her to have oral sex three or four times to the point that she vomited.  (RT

9  9027:27 - 9029:22; 9031:20 - 25.)  After being reminded that she had previously stated that it had

10  been eight or ten times, she corrected herself.  (RT 9031:27 - 9032:2.)  She testified that petitioner

11  forced her to have anal sex about three or four times a week.  (RT 9032:9 - 9034:27.)  Randi

12  Rundle also testified that petitioner beat her many times and described several incidents, including

13  one during an argument over her pregnancy.  (RT 9038:25-28; 9039:2 - 9046:6; 9052:28 -

14  9053:13.)

15         When he considered petitioner's automatic motion for reconsideration of the

16  sentence, the trial judge stated:

17         In connection with my duty to independently review the
       evidence in this case, to determine whether the judgment of the jury
18     is contrary to the law or the evidence, I specifically find, as follows:

19         First, the evidence presented during the penalty phase of this
       trial establishes beyond a reasonable doubt that David Rundle
20     committed the following other crimes involving violence or the
       threat of violence:
21
           The rape and murder of Elizabeth Lactawen;
22
           The attempted forcible rape, forcible oral copulation, and
23     lewd act by force against Rebecca Young;

24         The crime of forcible oral copulation and lewd acts by force
       against two young men in connection with the testimony of Brian
25     Minner;

26  ////

1                    Acts of assault and battery against Rand[i] Rundle.
               However, the Court has reasonable doubt whether all or any of the
2                    alleged acts of forcible sex took place in the manner described by
               Rand[i] Rundle, and finds such acts are not properly considered in
3                    aggravation of the penalty in this matter.

4     (RT 9744:9-28.)

5                        b.  <u>Legal Standards</u>

6           A state court's evidentiary ruling, even if erroneous, is grounds for federal habeas

7     relief only if it renders the state proceedings so fundamentally unfair as to violate due process.

8     <u>Drayden v. White</u>, 232 F.3d 704, 710 (9th Cir. 2000); <u>Spivey v. Rocha</u>, 194 F.3d 971, 977-78 (9th

9     Cir. 1999); <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 919 (9th Cir. 1991).  "A writ of habeas corpus

10    will be granted for an erroneous admission of evidence only where the 'testimony is almost

11    entirely unreliable and . . . the factfinder and the adversary system will not be competent to

12    uncover, recognize, and take due account of its shortcomings.'" <u>Mancuso v. Olivarez</u>, 292 F.3d

13    939, 956 (9th Cir. 2002) (quoting <u>Barefoot v. Estelle</u>, 463 U.S. 880, 899 (1983)).  Admission of

14    evidence violates due process only if "there are no permissible inferences the jury may draw from

15    the evidence." <u>Jammal</u>, 926 F.2d at 920.  "Even then, the evidence must 'be of such quality as

16    necessarily prevents a fair trial.'" <u>Id.</u> (quoting <u>Kealohapauole v. Shimoda</u>, 800 F.2d 1463 (9th

17    Cir. 1986)).

18                   Moreover, as the Ninth Circuit has observed:

19                   The Supreme Court has made very few rulings regarding the
               admission of evidence as a violation of due process.  Although the
20                   Court has been clear that a writ should be issued when
               constitutional errors have rendered the trial fundamentally unfair, it
21                   has not yet made a clear ruling that admission of irrelevant or
               overtly prejudicial evidence constitutes a due process violation
22                   sufficient to warrant issuance of the writ.  Absent such "clearly
               established Federal law," we cannot conclude that the state court's
23                   ruling was an "unreasonable application."

24    <u>Holley v. Yarborough</u>, 568 F.3d 1091, 1101 (9th Cir. 2009) (citing <u>Williams v. Taylor</u>, 529 U.S.

25    362, 375 (2000), and <u>Carey v. Musladin</u>, 549 U.S. 70, 76-77 (2006)).

26    ////

1                          c. <u>State Court Decision</u>

2              The California Supreme Court denied petitioner's claim on procedural grounds.  43

3   Cal. 4th at 181.  The court also considered the merits.  In addressing the issues raised here, the

4   court first rejected petitioner's statute of limitations argument based on its prior holdings that the

5   remoteness of the offense offered in aggravation affects its weight, not its admissibility.  <u>Id.</u>

6   (citing <u>People v. Huggins</u>, 38 Cal. 4th 175, 246 (2006)).  The court next held that "the asserted

7   untrustworthiness of this testimony goes to its credibility, an issue that was for the jury to

8   determine.  The claimed lack of reliability did not deny defendant his constitutional right to a

9   reliable penalty determination."  <u>Id.</u> at 181-82 (citation omitted).  The court added that the fact

10  that the trial judge did not find Ms. Rundle's testimony about the sexual assault credible "is not a

11  finding that no rational juror could have found the testimony credible."  <u>Id.</u> at 181 n.51.

12             With respect to petitioner's argument that the nonspecific nature of Randi Rundle's

13  testimony deprived petitioner of the opportunity to defend against it, the court held:

14             We . . . shall apply to defendant's claim the general
               principles we previously have enunciated concerning similar due
15             process challenges to the admission of factor (b) evidence. "In
               <u>People v. Rodrigues</u> (1994) 8 Cal.4th 1060, 36 Cal.Rptr.2d 235, 885
16             P.2d 1, we concluded that the admission of violent criminal conduct
               occurring many years before the penalty trial is not necessarily
17             inconsistent with a defendant's rights to due process, a speedy trial
               and a reliable penalty determination. We reasoned that 'the state has
18             a legitimate interest in allowing a jury to weigh and consider a
               defendant's prior criminal conduct in determining the appropriate
19             penalty, so long as reasonable steps are taken to assure a fair and
               impartial penalty trial.' [Citation.] We identified those 'reasonable
20             steps' as including notice of the evidence to be introduced, the
               opportunity to confront the available witnesses, and the requirement
21             of proof beyond a reasonable doubt. When these steps have been
               taken, we concluded, the remoteness of the offense affects its
22             weight, not its admissibility. [Citation.]" (<u>People v. Yeoman</u> (2003)
               31 Cal.4th 93, 136–137, 2 Cal.Rptr.3d 186, 72 P.3d 1166; <u>see also</u>
23             <u>Anderson</u>, <u>supra</u>, 25 Cal.4th at pp. 585–586, 106 Cal.Rptr.2d 575,
               22 P.3d 347; <u>Kraft</u>, <u>supra</u>, 23 Cal.4th at pp. 1070–1071, 99
24             Cal.Rptr.2d 1, 5 P.3d 68.)

25             We further emphasize that, unlike a criminal charging
               document, which must allege with sufficient specificity particular
26             offenses (§ 952), the notice required under factor (b) is notification

                                        255

of the evidence to be introduced (§ 190.3). Notice of factor (b) evidence "is sufficient if the defendant has a reasonable opportunity to respond." ( People v. Lewis and Oliver (2006) 39 Cal.4th 970, 1051, 47 Cal.Rptr.3d 467, 140 P.3d 775 (Lewis and Oliver).) Furthermore, we observe that, unlike what must be established with regard to substantive criminal charges, there is no requirement that a capital sentencing jury unanimously find the existence of a violent criminal offense to be proved beyond a reasonable doubt before an individual juror may consider such evidence in aggravation under factor (b). (Griffin, supra, 33 Cal.4th 536, 585, 15 Cal.Rptr.3d 743, 93 P.3d 344.)

For these reasons, our review of whether factor (b) evidence properly was admitted and considered by the jury is quite different from our review of the sufficiency of the evidence presented to support a criminal conviction.FN52  It long has been the rule under both the federal and state Constitutions that in resolving a due process challenge such as that made by defendant, we must balance the competing interests at issue—on the one hand, the defendant's interest in having a fair opportunity to respond to the accusations and ensuring the reliability of the evidence offered against him, with, on the other hand, the state's interest in presenting the sentencing jury with a complete picture of the defendant's character. (Mathews v. Eldridge (1976) 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18; People v. Ramirez (1979) 25 Cal.3d 260, 269, 158 Cal.Rptr. 316, 599 P.2d 622.) We believe that adherence to the "reasonable steps" mentioned above with regard to the admission of "generic" factor (b) testimony—keeping in mind the goal of achieving a fair, reliable, and complete penalty proceeding—ensures a defendant due process. If those reasonable steps have been undertaken, the nonspecific nature of the testimony will affect its weight rather than its admissibility or the constitutionality of defendant's trial.

> FN52. Similarly, we observe that, unlike cases involving a conviction based upon insufficient evidence resulting in a "legally inadequate theory," in which automatic reversal of the conviction generally is required ( People v. Guiton (1993) 4 Cal.4th 1116, 1128, 17 Cal.Rptr.2d 365, 847 P.2d 45), any error regarding the admission of factor (b) evidence is subject to harmless-error review in light of other properly admitted aggravating evidence. (See e.g., People v. Medina (1995) 11 Cal.4th 694, 768, 47 Cal.Rptr.2d 165, 906 P.2d 2.)

In this case defendant received notice of the evidence to be introduced, through the prosecution's filing of a written notice of intent to offer evidence of defendant's sexual and physical assaults upon his ex-wife, as well as the sworn statement she made to the prosecution (which was provided to the defense before trial) and her testimony at the hearing held to determine the admissibility of the

statement. Defendant had the opportunity to confront the available witness (his ex-wife) at trial, and the jury was instructed that before it could consider such evidence in aggravation, it must find beyond a reasonable doubt that defendant committed any violent offense against his ex-wife. Other than unsupported allegations, defendant makes no showing how the "generic" nature of this testimony denied him the opportunity to respond. (Cf. Jones, supra, 51 Cal.3d at pp. 319–320, 270 Cal.Rptr. 611, 792 P.2d 643 [observing it is unlikely a defendant who had continuous access to a victim over a significant period of time would offer an alibi or misidentification defense, and a defendant can respond to the generic testimony of a victim by choosing to testify or by attacking the victim's credibility in other ways].)

Indeed, the response made by defendant to his ex-wife's testimony apparently was sufficiently effective to cause at least the trial court to entertain doubts about her veracity. Regardless of the trial court's view of the evidence, and keeping in mind the objective of presenting the jury with a view of defendant's character as complete as possible, we cannot conclude, as a matter of law, that the testimony was insufficient to enable any rational juror to find beyond a reasonable doubt that defendant committed a violent offense against his ex-wife. The absence of testimony associating particular acts with specific dates may have affected the weight of the evidence, but did not render the testimony so unreliable that as a matter of constitutional due process the jury should not have been permitted to consider it as potential evidence in aggravation.

43 Cal. 4th at 183-85.

d. Discussion

Petitioner argues that he did not have a fair opportunity to rebut "Ms. Rundle's generic testimony about numerous undifferentiated sexual acts, occurring over a thirteen-month period five years before Petitioner's trial." (Dkt. No. 92 at 380:13-15.) However, petitioner does little to explain why that is so. He simply states that it was "impossible" for him "to provide any explanation why he would not have opportunity or access to commit the alleged offenses." (Dkt. No. 92 at 381:10-11.) Further, petitioner cites no authority for the proposition that such specificity is necessary for aggravating evidence.

Petitioner next argues that this error was compounded by the trial court's instructions, which did not require the jurors to unanimously decide each of the various sexual acts testified to by Randi Rundle. Petitioner again cites no authority supporting this supposed

257

1  requirement.

2          Petitioner argues the evidence also ran afoul of the Eighth Amendment

3  requirement of a "heightened need for reliability in the determination that death is the appropriate

4  punishment." (Id. at 380:20-21.)   He claims a number of problems with Randi Rundle's

5  testimony contributed to its unreliability: her "doubtful credibility," the lack of contemporaneous

6  police reports, the lack of any other corroboration, and the lack of physical evidence.  He further

7  argues, without citation to authority, that testimony about forced sexual activity within a marriage

8  is "sufficiently problematic" that it should automatically require corroboration.  Finally, petitioner

9  argues that the fact the statute of limitations had run on any assault and battery charges Randi

10  Rundle might bring is further indication that the admission of this "stale" evidence violated his

11  rights.

12          Petitioner cites several cases in support of his Eighth Amendment arguments.

13  While most of the cited cases mention the requirement of reliability in capital sentencing, none are

14  on point.  In Gardner v. Florida, 430 U.S. 349 (1977), the Court granted relief because the

15  petitioner's sentence was based in part on confidential information that had not been disclosed to

16  the defense.  In the present case, however, petitioner had notice of Randi Rundle's testimony and

17  an opportunity to cross-examine her and present contrary evidence.  Similarly, Richardson v.

18  Johnson, 864 F.2d 1536, 1541 (11th Cir. 1989), does nothing to support petitioner's argument.  In

19  that case, the Court of Appeals held that even if the sentencing judge should not have relied upon

20  unconstitutionally obtained prior convictions, the petitioner was not prejudiced because the judge

21  could have nonetheless relied upon the evidence underlying those convictions, so long as that

22  evidence was reliable.  In United States v. Marion, 404 U.S. 307 (1971), the Court considered the

23  policy bases for statutes of limitations.  Petitioner has not shown that the United States Supreme

24  Court, or any other court for that matter, has applied those rationales to the introduction of

25  aggravating evidence in a sentencing proceeding.  The remaining cases cited by petitioner involve

26  facts which bear no resemblance to the situation presented here.  See Caldwell v. Mississippi, 472

1  U.S. 320 (1985) (regarding misleading prosecutorial argument); Johnson v. Mississippi, 486 U.S.

2  578 (1988) (death sentence overturned because it was based in part on a prior conviction that was

3  overturned); United States v. Ibarra, 737 F.2d 825 (9th Cir. 1984) (challenge to unsupported

4  statements in a presentence report).   Petitioner cites nothing to show the California Supreme

5  Court's rejection of this claim was contrary to or an unreasonable application of Federal law, as

6  determined by the Supreme Court.

7                    2.  Admission of Evidence of Juvenile Crimes

8              Petitioner argues that evidence of crimes committed when he was fourteen years

9  old was not sufficiently relevant or reliable to be considered at the penalty phase.  The California

10  Supreme Court held that the jury's consideration of the juvenile evidence was not constitutional

11  error.  43 Cal. 4th at 185.  The court noted that petitioner's arguments explaining the reasons

12  jurors should have discounted this evidence would have been appropriate argument at trial that

13  jurors should give the evidence little weight.  Id.

14              Petitioner relies upon the reasoning in a Supreme Court case about the execution of

15  juveniles.  See Roper v. Simmons, 543 U.S. 551 (2005).  He cites no cases applying this reasoning

16  to the use of juvenile offenses as aggravating factors.  Petitioner was not a juvenile at the time of

17  the Garcia and Sorensen crimes.  Therefore, this claim should fail.

18                    3.  Admission of Evidence of Lactawen Homicide

19              Petitioner simply reiterates arguments he made above in Claim O.  As discussed

20  above, they should fail.

21                    4.  Failure to Instruct that Jurors Must Find Aggravating Factors
                         Unanimously
22

23              Petitioner argues that the trial court's failure to require the jury to find each

24  aggravating factor unanimously was unconstitutional under the Supreme Court decisions in Ring

25  v. Arizona, 536 U.S. 584 (2002), and Apprendi v. New Jersey, 530 U.S. 466 (2000).  The

26  California Supreme Court rejected this claim as follows:

1

2

3

4

5

> The decisions in <u>Ring v. Arizona</u> [ ] and <u>Apprendi v. New Jersey</u> [ ]
> do not affect California's death penalty law. (<u>Smith</u>, supra, 30
> Cal.4th at p. 642, 134 Cal.Rptr.2d 1, 68 P.3d 302.)  Moreover,
> "'[b]ecause the determination of penalty is essentially moral and
> normative [citation], and therefore different in kind from the
> determination of guilt,' the federal Constitution does not require the
> prosecution to bear the burden of proof or burden of persuasion at
> the penalty phase. [Citations.]" (<u>Sapp</u>, supra, 31 Cal.4th at p. 317, 2
> Cal.Rptr.3d 554, 73 P.3d 433.)

6   43 Cal. 4th at 198-99 (some citations omitted).

7       In <u>Apprendi</u>, the Supreme Court held that any fact that increases a criminal penalty

8   beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a

9   reasonable doubt.  530 U.S. at 490.  In <u>Ring</u>, the Court held that a jury, rather than a judge, must

10  find the existence of an aggravating factor where that aggravating factor is necessary to imposition

11  of the death penalty.  536 U.S. at 609.  Petitioner simply cites these cases without arguing their

12  applicability.  Neither case compels a holding that, in California, a jury must find each

13  aggravating factor unanimously.  Petitioner has not shown the California Supreme Court's

14  rejection of this claim was contrary to, or an unreasonable application of, clearly established

15  federal law.

16              5.  <u>Failure to Instruct on Presumption of Innocence and to Define
                    Reasonable Doubt</u>

17

18      Petitioner contends the trial judge should have instructed the jury that the

19  presumption of innocence applied to unadjudicated criminal activity presented in aggravation.  He

20  further contends the judge should have defined "reasonable doubt" in the penalty phase

21  instructions.  The California Supreme Court denied the claim on procedural grounds and further

22  held:

23

24

25

26

> It also is meritless, because the court informed the jury that the
> guilt phase instructions applied during the penalty phase except when the
> court's penalty phase instructions differed, and the jury was
> provided with a copy of the written guilt phase instructions, which
> discussed the presumption of innocence and the meaning of
> reasonable doubt. The trial court also specifically instructed the jury
> concerning defendant's right not to testify during the penalty phase

1  and instead to rely upon the failure of the prosecution to carry its
   burden of proof, further informing it that the factor (b) evidence was
2  to be considered by the jury only if it found the crimes had been
   proved beyond a reasonable doubt. Additional instructions could
3  have emphasized this, but were not required.

4   43 Cal. 4th at 189.  Petitioner relies upon the Supreme Court's statement that an instruction on the

5   presumption of innocence would be constitutionally required "only if the circumstances created a

6   genuine risk that the jury would conclude, from factors other than the State's evidence, that the

7   defendant committed other crimes."  Delo v. Lashley, 507 U.S. 272, 279 (1993).  Petitioner argues

8   that the fact the jurors had already found petitioner guilty of the underlying crimes caused them to

9   be "biased" fact-finders and the Eighth and Fourteenth Amendments thus required instructions at

10  the penalty phase on the presumption of innocence and on the definition of reasonable doubt.

11  Under petitioner's theory, these instructions would be required at the penalty phase any time the

12  same jury considered both guilt and penalty.  Delo does not so hold.  Further, as the California

13  Supreme Court points out, the jurors were instructed to follow the guilt phase instructions at the

14  penalty phase and were provided with copies of those guilt phase instructions.  Petitioner does not

15  explain why this procedure was inadequate to protect his rights.  Petitioner has failed to show the

16  California Supreme Court's decision was contrary to, or an unreasonable application of, federal

17  law.

18      Claim Q.  Penalty Phase Instructions Failed to Define Life Without Parole

19      Petitioner argues the trial judge was required to instruct sua sponte that a sentence

20  of life without the possibility of parole meant that petitioner would never be considered for parole.

21  The California Supreme Court held:

22      Defendant contends the trial court erred by failing to instruct
        the jury on its own motion concerning the meaning of a sentence of
23      life imprisonment without the possibility of parole, and thereby
        caused "an unfair, capricious and unreliable penalty determination
24      and prevented the jury from giving effect to the mitigating evidence
        presented at the penalty phase in violation of the Sixth, Eighth and
25      Fourteenth Amendments." Defendant's reliance upon Simmons v.
        South Carolina (1994) 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d
26      133 and other United States Supreme Court cases arising from the

1    State of South Carolina is misplaced. As we previously have
     explained, juries in California specifically are instructed in capital
2    cases that the choice of penalty is between a sentence of death and
     one of life imprisonment without the possibility of parole, and not
3    merely life imprisonment—as the juries were instructed in <u>Simmons</u>
     and similar cases. (<u>People v. Smith</u> (2003) 30 Cal.4th 581, 635–636,
4    134 Cal.Rptr.2d 1, 68 P.3d 302 (<u>Smith</u>).)  There was no error.

5    43 Cal. 4th at 187.

6         As the California Supreme Court points out, the South Carolina cases upon which

7    petitioner relies are inapposite.  They address the South Carolina instruction that gave juries a

8    choice between a "life sentence" and death.  <u>Simmons v. South Carolina</u>, 512 U.S. 154 (1994)

9    (where future dangerousness at issue, jury in penalty phase of capital case must be instructed that

10   a sentence of "life imprisonment" included parole ineligibility).  In the present case, the

11   instruction given appears to meet the standard set out in <u>Simmons</u> because the jury was informed

12   that a sentence of life imprisonment was "without the possibility of parole."  (RT 9564:22-23.)  In

13   fact, the Court in <u>Simmons</u> noted that California was among the many states whose capital

14   sentencing schemes appropriately required penalty phase juries be informed that their choice was

15   death or life without parole.  512 U.S. at 167 n.7.

16        Petitioner argues, however, that studies show there is "widespread confusion"

17   about the term "life without the possibility of parole."  Therefore, according to petitioner, as in

18   <u>Simmons</u>, the trial court had an obligation to clarify the term.  It would be one thing if petitioner

19   had provided the trial judge with information from the cited studies about jury confusion about the

20   term "life without possibility of parole," had requested a clarifying instruction, and had been

21   denied.  However, that is not petitioner's argument.  Petitioner argues that, without any request

22   from counsel or any other apparent indication of jury confusion, and without any law from any

23   court requiring it, the trial judge erred in failing to explain the term.  As is obvious, petitioner has

24   failed to show the California Supreme Court's rejection of this claim is contrary to, or an

25   unreasonable application of, clearly established federal law as determined by the United States

26   Supreme Court.

1       Claim R.  <u>Exclusion of Evidence regarding Life Without Parole</u>

2              Petitioner argues the trial judge erred when he excluded penalty phase evidence

3    regarding the conditions of a sentence of life without parole.  As discussed below, petitioner has

4    failed to show the California Supreme Court's rejection of this claim was unreasonable.

5    Therefore, Claim R should be denied.

6           1.  <u>Background</u>

7              In his opening statement at the penalty phase, defense attorney Humphreys told the

8    jury he would present the testimony of a prison employee about the living conditions in prison so

9    jurors would be aware that petitioner would be "severely punished" by a sentence of life without

10   parole.  (RT 8549:19 - 8550:8.)  After the conclusion of opening statements, the prosecutor

11   requested a hearing "to consider the relevance of that testimony prior to calling that witness."  (RT

12   8552:18-22.)  The judge agreed to hear argument.  (RT 8552:23-26.)  The defense informed the

13   court that the prison employee would testify:

14              [G]enerally as to the general conditions of confinement in state
                prisons, the size of the cells, the population insofar as it effects
15              celling, celling techniques or numbers; . . . what sort of confinement
                is, is practiced in the state prisons insofar as tracking people's
16              movements; types of things that a prisoner is subjected to on a daily
                basis, particularly insofar as it involves being on a schedule along
17              with everybody else:  No real privacy, no real time to do things
                when you want to do them.
18
                   I would also ask her of any observations she's made of
19              conditions in prison insofar as sexual offenders are treated any
                differently by other inmates.
20
                   I would also want to know what programs are available to
21              Mr. Rundle or would be available to Mr. Rundle were he to be
                sentenced to prison on a life without parole sentence.
22

23   (RT 8931:24 - 8932:12.)

24              The trial judge granted the prosecutor's motion to exclude the evidence.  (RT

25   8940:20-21.)  The judge relied upon the California Supreme Court's holding in <u>People v.</u>

26   <u>Thompson</u>, 45 Cal. 3d 86, 138-39 (1988), that the evidence was inadmissible.  The judge also

1  reviewed United States Supreme Court authority and found that <u>Thompson</u> was "consistent with

2  the Federal Constitutional parameters."  (RT 8937:18-26; 8938:25 - 8941:11.)

3            2.  <u>Legal Standards</u>

4            As discussed above, this court's review of a state court's evidentiary

5  determinations is limited.  An additional consideration here is petitioner's right to present

6  evidence in mitigation.  In <u>Lockett v. Ohio</u>, 438 U.S. 586, 604 (1978), the Supreme Court held

7  that sentencing courts must consider any mitigating evidence relevant to "any aspect of a

8  defendant's character or record and any of the circumstances of the offense that the defendant

9  proffers as a basis for a sentence less than death."  This rule has been reiterated numerous times

10 by the Supreme Court and the Court of Appeals.  <u>See</u>, <u>e.g.</u>, <u>Zant v. Stephens</u>, 462 U.S. 862, 879

11 (1983); <u>Smith v. Mahoney</u>, 611 F.3d 978, 996 (9th Cir. 2010).  In <u>Smith</u>, the Court of Appeals

12 explained that the rules of <u>Lockett</u> and <u>Zant</u> "suggest that non-character, non-circumstance

13 evidence need not factor into the constitutionality of a death sentence."  611 F.3d at 996.

14           3.  <u>State Court Decision</u>

15           The California Supreme Court agreed with the trial court.  It held:

16           "Evidence concerning the rigors of confinement has no bearing on
            the character or background of the individual offender or the
17           circumstances of the capital offense. It is therefore irrelevant and
            inadmissible under section 190.3, factor (k)." (<u>People v. Ray</u> (1996)
18           13 Cal.4th 313, 352–353, 52 Cal.Rptr.2d 296, 914 P.2d 846 (<u>Ray</u>);
            <u>see also</u> <u>Thompson</u>, <u>supra</u>, 45 Cal.3d at p. 139, 246 Cal.Rptr. 245,
19           753 P.2d 37 ["Describing future conditions of confinement for a
            person serving life without possibility of parole involves
20           speculation as to what future officials in another branch of
            government will or will not do"].) "Moreover, even under the
21           Eighth Amendment to the federal Constitution, the trial court retains
            the authority to exclude irrelevant evidence in the first instance.
22           (See <u>Lockett v. Ohio</u> (1978) 438 U.S. 586, 604, fn. 12, 98 S.Ct.
            2954, 57 L.Ed.2d 973.)" (<u>Frye</u>, <u>supra</u>, 18 Cal.4th at p. 947, fn. 1, 77
23           Cal.Rptr.2d 25, 959 P.2d 183; <u>see also</u> <u>DeSantis</u>, <u>supra</u>, 2 Cal.4th at
            pp. 1249–1250, 9 Cal.Rptr.2d 628, 831 P.2d 1210.) There was no
24           statutory error or violation of defendant's constitutional rights in the
            exclusion of the proffered evidence.

25

26 43 Cal. 4th at 186-87.

1        4. <u>Discussion</u>

2            Petitioner makes a series of arguments in support of his claim.  First, he argues that

3   he "was entitled to a sentencing body that fully understood the nature of the sentencing options it

4   was statutorily and constitutionally empowered to make" and that he was entitled to rebut the

5   prosecutor's arguments about future dangerousness.  (Dkt. No. 92 at 396:14-16.)  The <u>Lockett</u> line

6   of cases describes constitutionally required mitigating evidence as "any aspect of a defendant's

7   character or record and any of the circumstances of the offense."  Under these cases, petitioner

8   was not entitled to introduce evidence of prison conditions because it did not involve his character

9   or the circumstances of the offense.

10           Petitioner also argues he was entitled to present evidence of prison conditions to

11  rebut both the "average jury member's" impression of prison conditions and the prosecutor's

12  argument of future dangerousness.  Petitioner cites nothing in support of his first argument.  There

13  is no indication the jury considered prison conditions in rendering their penalty decision – the

14  prosecutor presented no evidence of prison conditions and the jury was not instructed to consider

15  them in any way.  Accordingly, there was no evidence for petitioner to "rebut" and his first

16  argument should fail.

17           Petitioner's second contention rests on alleged references in the prosecutor's

18  argument to petitioner's future dangerousness.  Petitioner does not identify which parts of the

19  prosecutor's argument "raised the specter of Petitioner's future dangerousness." (Dkt. No. 92 at

20  397:22-23.)  He simply cites to pages 9386, 9389, 9342, and 9470-72 of the record of transcript.

21  (<u>Id.</u> at 397:23.)  The court has examined each page cited and is not able to locate any specific

22  references by the prosecutor to petitioner's future dangerousness.  The prosecutor does label

23  petitioner's character as "evil" and "dangerous."  However, in the cited pages, the prosecutor does

24  not argue that if petitioner remains in prison, he is a risk to others.  If petitioner intended the court

25  to somehow construe parts of the prosecutor's argument as referring to future dangerousness, he

26  should have more specifically pointed them out and explained.  In any event, petitioner has

1  certainly not shown that evidence of prison conditions would have rebutted the prosecutor's

2  argument about petitioner's character.  This case is nothing like <u>Simmons</u>, in which the court

3  refused to inform the jury that a life sentence was without the possibility of parole, and the Court

4  noted the jury's perception that the petitioner may be freed would have been exacerbated by the

5  prosecutor's "repeated suggestion that Petitioner would pose a future danger to society if he were

6  not executed."  512 U.S. at 161-62.

7  Petitioner's citation to <u>Skipper v. South Carolina</u>, 476 U.S. 1 (1986), is based on a

8  quotation taken out of context.[58]  The issue in <u>Skipper</u> was whether a defendant has the right to

9  present evidence of his good behavior during the time he was in jail awaiting trial.  476 U.S. at 4.

10  The Court held the evidence was relevant to the defendant's character and his probable future

11  conduct if sentenced to life in prison.  <u>Id.</u>  The Court in <u>Skipper</u> repeated the rule that a defendant

12  may not be precluded from introducing mitigating evidence regarding his character.  <u>Id.</u> (citing

13  <u>Eddings v. Oklahoma</u>, 455 U.S. 104, 110 (1982)).  Evidence regarding the defendant's conduct in

14  jail was relevant to his character, including how he would behave should he be sentenced to life.

15  <u>Id.</u> at 5.  The evidence petitioner sought to proffer in the present case was irrelevant to his

16  character.  <u>Skipper</u> is inapposite.

17  Petitioner's next argument is that the Eighth Amendment requirement of reliability

18  in sentencing required admission of the evidence.  Citing <u>McCleskey v. Kemp</u>, 481 U.S. 279

19  (1987), he argues the evidence of prison conditions was relevant because it could "serve as a basis

20  for a sentence less than death."  Again, petitioner takes a quotation out of context.  The Court in

21  <u>McCleskey</u> did not hold that a defendant must be permitted to introduce any evidence that might

22  reduce his sentence.  Rather, in reviewing the development of the law, the Court made the quoted

23

24  [58]  Petitioner's brief quotes the following: "evidence that the defendant would not pose a
25  danger if spared (but incarcerated) must be considered potentially mitigating. Under <u>Eddings</u>,
    such evidence may not be excluded from the sentencer's consideration."  (Dkt. No. 92 at 397-98
26  (quoting <u>Skipper</u>, 476 U.S. at 5).)

1   statement.  The Court stressed that the mitigating evidence must be relevant and defined the scope

2   of relevant evidence as it had in <u>Lockett</u> - evidence regarding "any aspect of a defendant's

3   character or record and any of the circumstances of the offense."  481 U.S. at 304.  Similarly,

4   <u>California v. Ramos</u>, 463 U.S. 992, 1001-02 (1983), does not help petitioner.  The Court in that

5   case held that California juries could be told of the Governor's power to commute a sentence.

6   The Court did not, however, hold that the information was constitutionally required, only that it

7   was constitutionally permissible.  It cannot be said that the California Supreme Court's decision

8   contravened or unreasonably applied the holding in <u>Ramos</u>.

9          Petitioner's final arguments that the trial court's exclusion of the evidence violated

10  his due process right to a sentencer who knew the sentencing alternatives and that it violated some

11  sort of liberty interest created by Penal Code section 190.3's statement that "evidence may be

12  presented . . . as to any matter relevant to aggravation, mitigation, and sentence . . . ."  are both

13  unsupported by any case law on point.  Accordingly, Claim R should be denied.

14      Claim S.  <u>Failure to Instruct Jury at Penalty Phase re Guilt Phase Instructions</u>

15          At the guilt phase, the court instructed jurors that they "must not be influenced by

16  pity for the defendant," or "by mere sentiment, conjecture, sympathy, passion, prejudice, public

17  opinion or public feelings."  (RT 8259:2, 12-14.)  The court further instructed that the jury should

18  "reach a just verdict regardless of the consequences."  (RT 8259:17-18.)  At the penalty phase,

19  jurors were told they could consider all guilt phase instructions except as noted during the penalty

20  phase instructions.  (RT 9567:1-5.)  Shortly thereafter, the judge instructed the jury that one

21  exception involved the consideration of pity and sympathy:

22          In the first part of this trial you were instructed not to
            consider sympathy or pity for Mr. Rundle in reaching your verdicts.
23

            In the penalty phase, however, you can and must consider
24          sympathetic and moral values and factors concerning the Defendant
            in weighing the aggravating and mitigating factors and in finally
25          deciding which penalty is appropriate.

26  (RT 9570:12-19.)  The judge informed the jury that he was sending it back to the jury room with

1  "the original packet of instructions that you had with one change on the first two pages having to

2  do with not considering sympathy."  (RT 9582:15-18.)

3          The California Supreme Court found the trial court erred in failing to delete the

4  portion of the guilt phase instructions telling the jury to reach a verdict "regardless of the

5  consequences." 43 Cal. 4th at 188.  The court concluded, however, that the error "was harmless

6  under any standard" because

7          as other instructions and counsel's arguments made clear, the jury's
        role at the penalty phase was so obviously contrary to this part of

8          the instruction that no reasonable juror possibly could have been
        confused by the inclusion of the written instruction not to consider

9          the consequences of the verdict, an instruction that was not given
        orally to the jury at the penalty phase. (People v. Hayes (1990) 52

10         Cal.3d 577, 644, 276 Cal.Rptr. 874, 802 P.2d 376; People v.
        Howard (1988) 44 Cal.3d 375, 443, 243 Cal.Rptr. 842, 749 P.2d

11         279.)

12  Id. at 189.

13          This court agrees.  The jury's role at the penalty phase was to consider which

14  consequence petitioner would receive.  This is not a situation like the one considered by the

15  Supreme Court in Caldwell v. Mississippi, 472 U.S. 320, 329 (1985), where the prosecutor

16  inappropriately sought to minimize the jury's sense of responsibility for the penalty verdict.

17  Because, as the California Supreme Court points out, the "regardless of the consequences" phrase

18  directly contradicted the jury's role at sentencing, it is not possible to construe it as having

19  "minimized" jurors sense of responsibility or in any way lightened the prosecutor's burden.

20  Petitioner simply concludes jurors could have relied upon the "regardless of the consequences"

21  phrase without explaining how and without confronting the California Supreme Court's decision.

22  The California Supreme Court's rejection of this claim was not unreasonable under 28 U.S.C. §

23  2254(d).

24          Claim T.  Arbitrary and Capricious Imposition of the Death Penalty in California

25          Petitioner argues the death penalty is arbitrarily and capriciously imposed in

26  California because whether a death sentence is sought, and whether a death sentence is imposed,

1    depends upon the county in which the case is prosecuted.  He presents statistical evidence

2    showing the rate of death sentences varies significantly by county.  Petitioner raised this claim in

3    his state habeas petition, which was denied summarily by the California Supreme Court.

4              Petitioner relies upon the United States Supreme Court's decision in Bush v. Gore,

5    531 U.S. 98 (2000) (per curiam), to argue the state must assure uniformity in implementing a

6    fundamental right.  According to petitioner, because charging decisions are left to the sole

7    discretion of county district attorneys, the state capital charging system violates the Equal

8    Protection Clause.  In Bush v. Gore, the Court considered specific problems stemming from the

9    2000 presidential election.  The Court explicitly limited its holding to those election process

10   issues.  531 U.S. at 109 ("Our consideration is limited to the present circumstances, for the

11   problem of equal protection in election processes generally presents many complexities."); see

12   also Coleman v. Quarterman, 456 F.3d 537, 542-43 (5th Cir. 2006) ("Bush v. Gore's utter lack of

13   implication in the criminal procedure context" is "beyond debate."); Baca v. Scribner, 2008 WL

14   850309, *9 (E.D. Cal. March 28, 2008), adopted, 2008 WL 3992725 (E.D. Cal. August 25, 2008);

15   Nguyen v. Runnels, 2007 WL 879008 (N.D. Cal. Mar. 21, 2007).

16             Petitioner has shown no clearly established federal law applying the holding of

17   Bush v. Gore to anything like the claim he brings here.  Further, petitioner's one-sentence

18   argument that the disparity in death sentencing throughout California violates some, unidentified

19   state-created liberty interest is unsupported.  Claim T should be denied.

20        Claim U.  Penalty Phase Instructions are Vague

21             Petitioner argues the penalty phase instructions were vague.  He claims that the

22   sentencing factors listed in California Penal Code §§ 190.3(a) through (k), of which the jury was

23   instructed, were vague, incomprehensible, and failed to properly guide the jury's discretion.  (Dkt.

24   No. 92 at 407.)  He presents studies showing that penalty phase jurors often misunderstood

25   penalty phase instructions and failed to appropriately consider mitigating evidence.  The

26   California Supreme Court denied this claim summarily.

1    The standard created by the Supreme Court for determining whether a capital

2  sentencing factor is vague is whether "it has some 'common-sense core of meaning . . . that

3  criminal juries should be capable of understanding.'"  Tuilaepa v. California, 512 U.S. 967, 973

4  (1994) (quoting Jurek v. Texas, 428 U.S. 262, 279 (1976)).  The Court explained that its

5  vagueness review is "quite deferential" because "'the proper degree of definition' of eligibility

6  and selection factors often 'is not susceptible of mathematical precision.'"  Id. (quoting Walton v.

7  Arizona, 497 U.S. 639, 654 (1990), overruled on other grounds by Ring v. Arizona, 536 U.S. 584

8  (2002)).  The Court noted that it had found "only a few factors vague."  Id. at 974.  The Court in

9  Tuilaepa then concluded that factors (a), (b), and (i) of the California capital sentencing scheme

10  are not vague.  Id. at 975-77.

11    Petitioner cites no case law on point.  He attempts to distinguish Tuilaepa by

12  arguing that it examined the California sentencing factors in "the abstract sense" while he is

13  arguing the factors are vague because "they fail to identify any circumstance or types of

14  circumstances that the jury may consider in order to distinguish the offense from other offenses

15  not subject to the death penalty or to make clear that there may be mitigating aspects of the

16  circumstances of the crime."  (Dkt. No. 92 at 410:2-5.)  However, petitioner does not have any

17  support for this distinction.  Further, he has not shown the United States Supreme Court has been

18  willing to consider the language of jury instructions unconstitutionally vague based on studies

19  showing some jurors have misunderstood it nor has he shown the instructions otherwise violate

20  "clearly established Federal law, as determined by the Supreme Court of the United States."

21  Therefore, Claim U should be denied.

22    Claim V.  Petitioner's Death Sentence is Disproportionate

23    Petitioner argues that because his trial attorneys rendered ineffective assistance of

24  counsel at both phases of trial, his death sentence was unreliable and disproportionate.

25  Petitioner's ineffective assistance of counsel claims are examined and rejected above.  Petitioner

26  makes no new showing in this claim that the California Supreme Court's rejection of it was

1    contrary to or an unreasonable application of federal law.  Accordingly, Claim V should be

2    denied.

3              Claim W.   California's Death Penalty Scheme Fails to Narrow the Class of Persons
                          Eligible For the Death Penalty

4

5              Petitioner was tried and sentenced in 1989 for crimes committed in 1986.  In

6    California, a defendant was eligible for the death penalty or for a sentence of life in prison without

7    the possibility of parole, if a jury convicted him of first degree murder and found at least one

8    special circumstance.[59]  Cal. Penal Code §§ 190.1, 190.2, 190.4.  If a prosecutor decided to seek

9    the death penalty, a second trial was held to determine whether a death-eligible defendant should

10   be sentenced to death or life without the possibility of parole.  Id. § 190.4(a).  At the time of

11   petitioner's trial, California had 26 special circumstances.  Id. § 190.2.[60]  Petitioner argues that the

12   special circumstances are so numerous and so broad that at least one can be found in almost any

13   first degree murder case.  Therefore, his argument continues, California's special circumstances

14   fail to narrow the class of murderers eligible for the death penalty as required by the Eighth

15   Amendment.[61]  The California Supreme Court rejected this claim summarily on state habeas.  For

16   _____

17   [59]  Petitioner's jury found three special circumstances: (1) that petitioner committed the
     murder of Ms. Garcia while engaged in the attempted commission of the crime of rape, (2) that
18   petitioner committed the murder of Ms. Sorensen while engaged in the attempted commission of
     the crime of rape, and (3) that petitioner committed multiple murders.  (RT 8321-22.)

19   [60]  In 1986, Cal. Penal Code § 190.2(a) listed 19 special circumstances, one of which
20   (felony-murder) had 9 enumerated sub-parts.  The "heinous, atrocious, or cruel" special
     circumstance, subsection (a)(14), was struck down by the California Supreme Court in People v.
21   Superior Court (Engert), 31 Cal. 3d 797 (1982), and was not included in the discussion of the
     special circumstances by petitioner or his expert.  (See Decl. of Steven F. Shatz, Ex. 98 (Dkt. No.
22   10-26) at 3 n.3.)

23   [61]  Respondent indicates that petitioner has somehow exceeded the scope of his state court
     briefing on this issue.  (Dkt. No. 95 at 216:12-14.)  However, respondent fails to inform the court
24   how the presentation in this court differs from the presentation in state court.  Petitioner is not
     required to present his claim in a manner identical to the way he presented it in state court.  See
25   Picard v. Connor, 404 U.S. 270, 277-78 (1997) (To be exhausted, the state claim need not be
     identical to the federal claim.  Exhaustion requires only that the substance of the federal claim be
26   fairly presented.).  Respondent's counsel's failure to fully elaborate his argument and failure to
     address this claim fully does a disservice to the court.

1 the reasons set out below, this court finds petitioner has failed to show the California Supreme

2 Court was unreasonable.  Accordingly, Claim W should be denied.

3        1.  Legal Standards

4        The Eighth Amendment's narrowing requirement is the product of a series of

5 Supreme Court cases starting with Furman v. Georgia, 408 U.S. 238 (1972).  Furman was a per

6 curiam opinion in which the Court held that the Georgia and Texas capital sentencing statutes

7 violated the Eighth and Fourteenth Amendments.  However, there was little clear agreement on

8 the underlying reasons for that decision.  Five justices wrote concurring opinions.  The opinions of

9 Justices Stewart are White are considered some basis for a "majority" holding.  See 408 U.S. at

10 401 (Burger, J., dissenting) (While it is "not entirely clear" what the holding is, the Stewart and

11 White opinions are the "two pivotal concurring opinions.")  They focused on the fact that the

12 states' capital sentencing statutes made every murderer eligible for the death penalty, but provided

13 no guidance to help juries decide when to impose it.  As a result, "the death penalty is exacted

14 with great infrequency even for the most atrocious crimes and . . . there is no meaningful basis for

15 distinguishing the few cases in which it is imposed from the many cases in which it is not."  408

16 U.S. at 313 (White, J., concurring).  Justice Stewart similarly focused on the apparent arbitrariness

17 of imposition of the death penalty:

18         These death sentences are cruel and unusual in the same way that
        being struck by lightning is cruel and unusual. For, of all the people
19         convicted of rapes and murders in 1967 and 1968, many just as
        reprehensible as these, the petitioners are among a capriciously
20         selected random handful upon whom the sentence of death has in
        fact been imposed.  My concurring Brothers have demonstrated that,
21         if any basis can be discerned for the selection of these few to be
        sentenced to die, it is the constitutionally impermissible basis of
22         race.  But racial discrimination has not been proved, and I put it to
        one side. I simply conclude that the Eighth and Fourteenth
23         Amendments cannot tolerate the infliction of a sentence of death
        under legal systems that permit this unique penalty to be so
24         wantonly and so freakishly imposed.

25 408 U.S. at 309-10 (footnotes and citations omitted).

26 ////

1          In Gregg v. Georgia, 428 U.S. 153, 188 (1976), the Court further explained that in

2   Furman it held that the death penalty "could not be imposed under sentencing procedures that

3   created a substantial risk that it would be inflicted in an arbitrary and capricious manner."  Rather,

4   "where discretion is afforded a sentencing body on a matter so grave as the determination of

5   whether a human life should be taken or spared, that discretion must be suitably directed and

6   limited so as to minimize the risk of wholly arbitrary and capricious action."  428 U.S. at 189

7   (opinion of Stewart, Powell, and Stevens, JJ.).  In his concurring opinion Justice White described

8   how a death penalty statute should work:

9               As the types of murders for which the death penalty may be
                imposed become more narrowly defined and are limited to those
10              which are particularly serious or for which the death penalty is
                peculiarly appropriate as they are in Georgia by reason of the
11              aggravating-circumstance requirement, it becomes reasonable to
                expect that juries even given discretion not to impose the death
12              penalty will impose the death penalty in a substantial portion of the
                cases so defined. If they do, it can no longer be said that the penalty
13              is being imposed wantonly and freakishly or so infrequently that it
                loses its usefulness as a sentencing device.

14

15   Id. at 222-23.  The Court in Gregg upheld Georgia's revised death penalty statute which, at a

16   separate penalty phase, required a jury to find at least one of ten statutory aggravating factors to be

17   true before it imposed a death sentence.  Id. at 198-205.

18          In Zant v. Stephens, 462 U.S. 862, 877 (1983), the Court examined Georgia's

19   aggravating circumstances and held that each must "genuinely narrow the class of persons eligible

20   for the death penalty and must reasonably justify the imposition of a more severe sentence on the

21   defendant compared to others found guilty of murder."  Each aggravating circumstance must

22   "provide a principled basis for distinguishing" the petitioner's case "from the many other murder

23   cases in which the death penalty was not imposed under the statute."  Id. at 878 n.16.  The Court

24   applied the narrowing principles of Zant to sentencing statutes in Lowenfield v. Phelps,

25              To pass constitutional muster, a capital sentencing scheme must
                "genuinely narrow the class of persons eligible for the death penalty
26              and must reasonably justify the imposition of a more severe

1    sentence on the defendant compared to others found guilty of
     murder."  Under the capital sentencing laws of most States, the jury
2    is required during the sentencing phase to find at least one
     aggravating circumstance before it may impose death.  By doing so,
3    the jury narrows the class of persons eligible for the death penalty
     according to an objective legislative definition.

4

5    484 U.S. 231, 244 (1988) (internal citations omitted).

6            To summarize, the goal of the Eighth Amendment narrowing requirement is

7    limiting the possibility of arbitrary and capricious imposition of the death penalty.  States may

8    accomplish this by enacting objective legislative standards to limit the pool of those eligible for

9    the death penalty in a way that reasonably justifies imposition of a more severe sentence on them.

10   The sentencer may then exercise discretion to determine who will be selected to receive that

11   sentence.[62]  If the death eligible pool is so overly large that it includes persons with vastly

12   different levels of culpability, then the discretionary decisionmaking at the selection stage may not

13   be sufficiently limited.  Without sufficient, objective limits, the system risks arbitrary and

14   capricious application of the death penalty upon those who are not necessarily the most deserving

15   of the greatest punishment.

16           2.  Discussion

17           Petitioner argues that because a very low percentage of those who are eligible for

18   the death penalty are sentenced to death, California's death penalty scheme fails to "genuinely

19   narrow the class of persons eligible for the death penalty."  Primarily, he focuses on the number

20   and breadth of California's special circumstances, which create the class of those eligible for the

21   death penalty.  The California Supreme Court has explained that the special circumstances were

22   enacted to perform the "constitutionally required 'narrowing' function."  People v. Bacigalupo, 6

23

24          [62]  The final selection process necessarily involves greater discretion because it requires
     "particularized consideration of relevant aspects of the character and record of each convicted
25   defendant" and consideration of "any aspect of a defendant's character or record and any of the
     circumstances of the offense that the defendant proffers as a basis for a sentence less than death."
26    Woodson v. North Carolina, 428 U.S. 280, 303 (1976); Lockett v. Ohio, 438 U.S. 586, 604
     (1978).

1   Cal. 4th 457, 467-68 (1993).

2          Petitioner makes a series of arguments in support of his contention that the special

3   circumstances fail to narrow the class of persons eligible for the death penalty.  Several are not

4   particularly helpful.  First, petitioner argues that the history behind passage of the initiative which

5   expanded the special circumstances in 1978 demonstrates that its intent was to apply the death

6   penalty to "every murderer."  Typically, legislative history, including the history of passage of an

7   initiative, is considered only to interpret unclear language.  See Mohamad v. Palestinian

8   Authority, 132 S. Ct. 1702, 1709 (2012) ("'[R]eliance on legislative history is unnecessary in light

9   of the statute's unambiguous language.'"); California Redevelopment Assn. v. Matosantos, 53

10  Cal. 4th 231, 279 (2011) ("[U]nless the text [of an initiative] is ambiguous and supports multiple

11  interpretations," courts must rely on the language of the text and have no need to look to its

12  history.)  Petitioner does not allege the language of the special circumstances is vague or

13  otherwise explain how the intent behind the proponents of the initiative has any relevance to his

14  narrowing argument.

15         Petitioner next argues the California courts have broadly interpreted and applied

16  the special circumstances.  He goes on to cite two examples.  First, in 1987 the California

17  Supreme Court expanded felony-murder liability in People v. Anderson, 43 Cal. 3d 1104, 1147

18  (1987).  Second, petitioner makes a fairly lengthy argument about the expansion of the "lying in

19  wait" special circumstance.  The initial problem with both examples is that they are inapplicable

20  to petitioner's case.  Petitioner was charged with the felony-murder special circumstance in effect

21  in 1986, before Anderson was decided.[63]  Petitioner was not charged with, or convicted of, the

22  lying in wait special circumstance.

23

24         [63]  The law in effect in 1986 is referred to as the "Carlos window."  It is the time period
     between 1983, when the California Supreme Court in Carlos v. Superior Court, 35 Cal. 3d 131
25   (1983), held that the robbery felony-murder special circumstance required proof of intent to kill,
     and 1987, when the court overruled Carlos in Anderson, 43 Cal. 3d 1104, for application of the
26   special circumstance to the actual killer.

1          Moreover, to the extent petitioner is attempting to show the overbreadth of the

2   lying in wait special circumstance is "illustrative" of the overbreadth of the statute generally, his

3   argument is not well taken.  Petitioner fails to mention that the Court of Appeals for the Ninth

4   Circuit has rejected the very arguments he makes.[64]  In Morales v. Woodford, 388 F.3d 1159,

5   1174-78 (9th Cir. 2004), the court considered the language of the lying in wait special

6   circumstance and the way in which it had been interpreted, and applied, by California courts.  The

7   court concluded the lying in wait special circumstance met the Eighth Amendment narrowing

8   requirements.

9          Petitioner's primary support for his argument about the expansiveness of the

10  special circumstances is the declaration of law professor Steven Shatz.  (Ex. 98 (Dkt. No. 10-26).)

11  Professor Shatz describes a study he conducted in 1997 to determine:

12              (1) the degree to which the special circumstances listed in
                California Penal Code § 190.2 limit death-eligibility for persons
13              convicted of first degree murder and (2) to determine what
                percentage of persons convicted of first degree murder who are
14              statutorily death-eligible are sentenced to death, i.e., California's
                death sentence ratio.
15

16  (Dkt. No. 10-26 at 1-2.)[65]  Professor Shatz examined published opinions from the California

17  Supreme Court and California Courts of Appeal and unpublished opinions from the California

18  Court of Appeal for the First Appellate District in first degree murder cases from 1988-1992.  (Id.

19  at 9-12.)  He examined a total of 404 opinions.[66]  After removing some for various reasons, he had

20

21          [64]  In fact, petitioner cites the Morales dissent twice, without mentioning the majority
22  holding.  (Dkt. No. 92 at 429 & n.115.)  Petitioner fails to mention, much less grapple with, the
    holding in Morales.

23          [65]  The results of Professor Shatz's study are reported in an article he co-authored with
24  attorney Nina Rivkind, "The California Death Penalty: Requiem for Furman?" 72 N.Y.U. L. Rev.
    1283 (1997).  Professor Shatz notes that the statistics reported in the published study vary slightly
25  from those reported in his declaration in the present case due to the narrower statutory scheme
    applicable to the present case.  (Dkt. No. 10-26 at 2 n.1.)

26          [66]  253 published and 151 unpublished opinions.  (Dkt. No. 10-26 at 8-12.)

1  a pool of 392.  (Id. at 9 n.13 & at 12 n.17.)  In 239 of the cases, the state factfinder had found at

2  least one special circumstance true.  (Id. at 10, 13.[67])  Two of these cases were reversed on appeal

3  so they were considered to have no special circumstance findings.  (Id.)  In the remaining 153

4  cases, there were no special circumstance verdicts.  (Id.[68])  Based on a review of the courts'

5  opinions, Professor Shatz determined that special circumstances were present in 121 of those 153

6  cases.  (Id.)  The legal standard he applied was "whether, under the facts as stated by the appellate

7  court, a reasonable juror could have found a special circumstance beyond a reasonable doubt."

8  (Id. at 7 & n.12.)  He refers to these cases, along with those in which a state factfinder found a

9  special circumstance, as "factual special circumstance cases."  (Id. at 13.)

10        Based on these findings, Professor Shatz determined that about 84% of all first

11  degree murder cases were factually special circumstance cases.  (Id.)  In addition, during the time

12  period studied, state-wide there were 1,729 persons convicted of first degree murder and 166 of

13  them were sentenced to death.  (Id. at 4-5.)  Based on these figures, Professor Shatz determined

14  that 9.6% of all first degree murderers were sentenced to death.  (Id.)  Comparing the two figures,

15  Professor Shatz determined that California's "death sentence rate," the percentage of potentially

16  death-eligible murderers receiving the death penalty, was 11.4%.  (Id. at 18.)

17        The linchpin of petitioner's argument is that a death penalty scheme under which a

18  small percentage of death-eligible defendants actually receive the death penalty is

19  _____

20  [67] Professor Shatz sets out his findings in Tables 1 and 2 of his declaration.  (Dkt. No. 10-26 at 10, 13.)  In Table 1 there are three categories of published opinions: those with a death judgment, those with a first degree murder verdict and a special circumstance finding, and those

21  with only a first degree murder verdict.  (Id. at 10.)  Table 2 has two categories of unpublished first degree murder convictions from the First Appellate District.  (Id. at 13.)  Death judgments

22  were issued in 158 cases (Table 1).  In the non-death judgment cases, state court factfinders found special circumstances in 40 published cases (Table 1) and 41 unpublished cases (Table 2).

23  Therefore, the total number of cases in the study in which state court factfinders found special circumstances was 239.

24

25  [68] Table 1 shows 52 cases with published opinions that did not include a special circumstance verdict.  Table 2 shows no special circumstance verdict in 101 cases with

26  unpublished opinions.  Thus, the total number of cases reviewed in which no state factfinder had found a special circumstance is 153.

1   unconstitutional.  Petitioner appears to compare Professor Shatz's ratios with those he claims the

2   Court relied on in Furman.  (Dkt. No. 92 at 416 n.102.)  According to petitioner, the majority in

3   Furman relied upon evidence showing that 15-20% of those convicted of murder were sentenced

4   to death.  However, none of the justices in the Furman majority mentioned the 15-20% figure.

5   The 15-20% figure is mentioned only in the dissents of Justices Burger and Powell.  In fact,

6   Justice Burger cited the 15-20% ratio to counter the petitioners' "unwarranted hyperbole" that the

7   rate of imposition of the death penalty was "freakishly rare."  408 U.S. at 386 n.11.  Thus, the

8   court will not consider the 15-20% figure as some sort of benchmark below which the rate of

9   imposition of the death penalty could be said to be so infrequent that it violates the Eighth

10  Amendment narrowing requirement.  Furman and its progeny do not clearly establish the rule

11  petitioner seeks.  See Hawkins v. Wong, 2013 WL 3422701, *3 (E.D. Cal. Jul. 8, 2013) (Because

12  the Supreme Court has not examined the issue in the way petitioner proposes, petitioner has failed

13  to show the California Supreme Court's rejection of his claim was contrary to, or an unreasonable

14  application of, federal law under 28 U.S.C. § 2254(d)).

15          Petitioner has failed to show he can succeed on the merits of this claim, much less

16  that the California Supreme Court's rejection of the claim was contrary to or an unreasonable

17  application of clearly established federal law under section 2254(d).

18          Claim X.  Prolonged Confinement on Death Row

19          Petitioner next argues his prolonged confinement on death row, made worse by the

20  delay in appointing counsel for his appeal, amounts to cruel and unusual punishment under the

21  Eighth Amendment.  The California Supreme Court denied this habeas claim summarily.

22  Petitioner ignores authority from the Ninth Circuit Court of Appeals rejecting similar claims.  See

23  Allen v. Ornoski, 435 F.3d 946, 958-59 (9th Cir. 2006); McKenzie v. Day, 57 F.3d 1461, 1466-67

24  (9th Cir. 1995).  Petitioner's reliance on international law has also been dismissed by the Court of

25  Appeals.  See McKenzie, 57 F.3d at 1466.  Finally, the Court of Appeals has stated quite clearly:

26  "The Supreme Court has never held that execution after a long tenure on death row is cruel and

1    unusual punishment." Allen, 435 F.3d at 958.  Petitioner has not shown the California Supreme

2    Court's rejection of this claim was in any way contrary to, or an unreasonable application of,

3    federal law.

4            Claim Y.  Death Sentence Violates International Law

5            Petitioner contends his death sentence violates international law.  Petitioner has

6    failed to show clearly established Federal law, as determined by the Supreme Court, requires

7    adherence to international law regarding the death penalty or any of petitioner's various other

8    claims.

9            Claim Z.  Method of Execution Violates the State, Federal, and International Law

10           Petitioner states that he is withdrawing this claim because it is not ripe for

11   adjudication.  The California Supreme Court denied this claim as premature without prejudice to

12   its renewal after an execution date is set.  This court recommends the federal court do the same.

13                              CONCLUSION

14           The standard for federal court review of a state court decision under 28 U.S.C. §

15   2254(d) is a highly deferential one.  After considering application of this standard to petitioner's

16   claims, this court concludes that petitioner has failed to satisfy section 2254(d) for almost every

17   claim in his petition.  Because he has not overcome the section 2254(d) hurdle, factual

18   development of those claims in this court should be precluded.  Thus, petitioner's motion for an

19   evidentiary hearing should be denied.  With respect to the claim of prosecutorial misconduct in

20   the cross-examination of Dr. Yarvis at the guilt phase, this court found the California Supreme

21   Court's decision unreasonable under section 2254(d)(2).  Upon de novo review, however, this

22   court concludes that claim too should fail.

23           Accordingly, this court HEREBY RECOMMENDS that petitioner's Claims A

24   through Y be denied and that petitioner's Claim Z be dismissed without prejudice.

25           These findings and recommendations are submitted to the United States District

26   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within sixty days

1   after being served with these findings and recommendations, any party may file written objections

2   with the court and serve a copy on all parties.  Such a document should be captioned "Objections

3   to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file

4   objections within the specified time may waive the right to appeal the District Court's order.

5   <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

6   DATED:  November 21, 2013

7

8   _____

9   KENDALL J. NEWMAN
    UNITED STATES MAGISTRATE JUDGE

10  rundle 2254d.fr2

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26